**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Corbel Distressed and Special Opportunities Fund, L.P. and Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P., <br><br> Plaintiffs <br><br> v. <br><br> Fernando Benveniste Londoño, Bioapi S.A.S., and Skalar Pharma Holding LLC., <br><br> Defendants. | **Civil No. 23-1041(GMM)** |

<u>**OPINION AND ORDER**</u>

Before the Court are Skalar Pharma Holding, LLC's ("Holding") and Fernando Benveniste Londoño's ("Londoño") (collectively "Defendants") *Motion to Dismiss* and *Motion to Dismiss Under Fed. R. Civ.P.12(B)(6) as to Codefendant Fernando Benveniste Londoño* (collectively "Motions to Dismiss"). (Docket Nos. 23 and 33). The Court **GRANTS** Defendants' Motions to Dismiss. Plaintiffs' claims under Puerto Rico and the common law are dismissed without prejudice.

## I. BACKGROUND[1]

Corbel Distressed and Special Opportunities Fund, L.P. ("Corbel") and Corbel Distressed and Special Opportunities Fund

---

[1] The factual background described by the Court is derived, principally, from the Complaint given that none of the Defendants have yet filed answers to the Complaint.

Civil No. 23-1041 (GMM)
Page – 2 –

(SPV Skalar), L.P. ("SPV Skalar") (collectively "Plaintiffs") are limited partnerships established under Delaware law. (Docket No. 1 ¶¶ 6-7). Holding is a Puerto Rican limited liability company majority owned and controlled by Londoño via Bioapi S.A.S. ("Bioapi"). (Docket No. 1 ¶ 10). Londoño is a resident of Colombia who via Holding and his company Bioapi founded and formerly served as the CEO of Skalar Pharma LLC ("Skalar Pharma"). (Docket No. 1 ¶¶ 8-9).

In or around October 2016, Londoño acquired a pharmaceutical plant in Guayama, Puerto Rico ("Plant") through his Colombian non-party company Biogen S.A.S. (Docket No. 1 ¶¶ 17-18). Londoño subsequently transferred Biogen S.A.S.'s Puerto Rico holdings to his new company, Bioapi. (Docket No. 1 ¶ 18). Londoño, through Bioapi, created Skalar Pharma on June 25, 2018 to operate the Plant. (Docket No. 1 ¶ 21). Skalar Pharma's July 18, 2018 *Operating Agreement* indicated that Londoño exercised control over the new company. (Id.).

In July 2021, Plaintiffs and Londoño entered a non-binding indication of interest regarding a $30 million senior secured notes investment in Skalar Pharma pending Plaintiffs' due diligence review. (Docket No. 1 ¶ 26). Between August and November 2021, Plaintiffs issued information requests to Defendants regarding Londoño's, Bioapi's, and Skalar Pharma's business and finances.

Civil No. 23-1041 (GMM)
Page — 3 —

(Docket No. 1 ¶ 29). Plaintiffs contend that Londoño directed all Skalar directors, officers, consultants, and employees to only communicate with them at his direction and with his approval. (Docket No. 1 ¶ 31).

During this period of negotiation and due diligence review, Londoño allegedly told Plaintiffs that the Plant had to cease operations due to a lack of capital and that Plaintiffs' contemplated investment would be used to restart the Plant's activities. (Docket No. 1 ¶ 37). Plaintiffs aver that Londoño continued to tout Skalar Pharma's sophistication, capabilities, and state-of-the-art equipment and facilities to Plaintiffs, stating that once financing was received, Skalar would be manufacturing product within three months, a timeline that Londoño supposedly later admitted was unrealistic. (Docket No. 1 ¶¶ 39-40).

In October of 2021, Plaintiffs state that they learned that Skalar Pharma was not registered with the FDA and that Defendants had never produced anything of commercial quality or grade subject to FDA review. (Docket No. 1 ¶ 51). On October 20, Defendants sent Plaintiffs a "heavily redacted" report on an Ibuprofen synthesis experimentation trial as an indication of their commercialization efforts. (Docket No. 1 ¶ 52). Plaintiffs also state that Londoño ordered Skalar Pharma's consultant to forward an image of a pill

Civil No. 23-1041 (GMM)
Page – 4 –

bottle labeled "Ibuprofen Bottle #1 09-03-19" with the message "Here is the picture of Ibuprofen" to Plaintiffs. (Docket No. 1 ¶ 59). Londoño allegedly provided the consultant with this image and Plaintiffs contend it was meant to be a picture of Ibuprofen produced by Skalar Pharma. (Id.). Plaintiffs further maintain that Londoño made other statements regarding Skalar Pharma's ibuprofen production capabilities including: (1) "the [Skalar Pharma] Plant [would] be producing Active Pharmaceutical Ingredient ("API") for which it [was] more than capable of doing so" and (2) that Ibuprofen was "simple" to manufacture relative to the APIs formerly produced at the Plant by the Plant's former operators and thus, it would be easy to expeditiously produce Ibuprofen on schedule in accord with the proposed *Note Purchase Agreement* ("NPA").( Docket No. 1 ¶¶ 55, 57).

On November 16, 2021, the transaction between Plaintiffs and Defendants was finalized via the NPA. (Docket No. 1 ¶¶ 61-62). Terms in the NPA included: (1) a representation that Skalar Pharma "successfully produced a kilo batch of Ibuprofen in compliance with all Applicable Laws and of premium quality so as to be marketable to pharmaceutical companies, as previously disclosed to the Agent" within three years prior to the NPA's closing date; (2) "[a]ll tangible property owned by the Issuers and their Subsidiaries necessary to the business of the Issuers and their

Civil No. 23-1041 (GMM)
Page – 5 –


Subsidiaries is in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, and, to the knowledge of the Issuers and their Subsidiaries, all repairs to such property material to its functioning are set forth on Schedule 4.21(b);" and (3) "[s]ince the acquisition of the Facility by Bioapi," in 2016, "there has been no event, change, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect[2]." (Docket No. 1-3 §§ 4.1(c), 4.21(b), 4.27).

Also on November 16, 2021, Defendants along with Skalar Pharma executed the *Skalar Pharma Holding LLC Limited Liability Company Agreement* ("Holding Operating Agreement") which Londoño signed on behalf of both Bioapi and Holding. (Docket No. 1 ¶¶ 61-62). Under the Holding Operating Agreement, Bioapi owned 60% of Holding through Class A membership interests and Plaintiffs owned 40% of Holding through Class B membership interests. (Docket No. 1-1, Schedule A). As the majority holder for Class A membership interests, Bioapi controlled the appointment of the five directors on Holding's board. (Id. § 4.1(a)(i)). Holding via Londoño also executed the A*mended and Restated Operating Agreement of Skalar*

---

[2] "(i) the business, Assets, financial condition or results of operations of the Note Parties and their Subsidiaries, taken as a whole; (ii) the ability of any Note Party to perform its material obligations under the Note Documents to which it is a party . . . ." Docket No. 1-3 at 68.

Civil No. 23-1041 (GMM)
Page – 6 –

*Pharma* ("Pharma Operating Agreement") to reflect that Holding fully owned the interests of Skalar Pharma. (Docket No. 1-2). On that same day, Holding and Skalar Pharma (collectively, "Issuers") signed the NPA with Plaintiffs which memorialized the agreement that Plaintiffs would purchase certain 9% secured notes in the amount of $30 million and laid out the contracting parties' ongoing obligations. (Docket No. 1-3 §§ 1.1(a), 1.4(a)(i)). The Issuers distributed notes in the original principal amount of $15 million to Corbel and notes in the original principal amount of $15 million to SPV Skalar. (Id., Schedule 1.1).

Following the closing of these agreements, Plaintiffs contend that Defendants routinely, knowingly, and flagrantly failed to meet the NPA's milestone deadlines and failed to communicate basic information and updates. (Docket No. 1 ¶¶ 72,73,77). For example, Plaintiffs state that Skalar Pharma did not to meet the NPA deadline of connecting the Plant to the power grid. (Docket No. 1 ¶ 74). Plaintiffs also allege that the Plant's equipment was significantly damaged, and Skalar Pharma lacked essential software, licenses, computer hardware, glassware, and emissions and lab quality permits. (Docket No. 1 ¶ 103). Plaintiffs contend that Londoño nevertheless continued to make misrepresentations about the Plant's permit status and production capabilities. (Id. at 103-105).

Civil No. 23-1041 (GMM)
Page – 7 –

Considering these failures, on June 14, 2022, SPV Skalar issued a *Notice of Events of Default and reservation of Rights* letter ("Notice") to Issuers stressing that Skalar had violated the NPA by failing to meet certain deadlines in the agreement including the acquisition of insurance coverage. (Docket No. 1 ¶¶ 79-80). On August 15, 2022, Plaintiff issued a second Notice to the Issuers. (Docket No 1 ¶ 86). Therein, Plaintiffs reidentified the defaults contained in the first Notice and added the additional default of Skalar Pharma's alleged failure to "demonstrate 'ongoing capacity to produce greater than zero (0) metric tons per month of commercial salable active pharmaceutical ingredients with sufficient quality standards' prior to June 16, 2022, the deadline for compliance with such covenant." (Id.). On August 29, 2022, Londoño allegedly wrote to Plaintiffs stating that neither Issuers nor Londoño himself had made any efforts to cure the reported defaults. (Docket No. 1 ¶ 88). He made no indication that they intended to do so in the future. (Id.). Therefore, the next day, Plaintiff sent Issuers their *Notice of Instruction and Notice of Exercise of Remedies* which had the effect of making Plaintiffs the managers of Skalar Pharma. (Docket No. 1 ¶¶ 89-90).

Allegedly in response to Plaintiffs' assumption of control over Skalar Pharma, Londoño and Holding filed a suit purportedly on behalf of Holding and Skalar Pharma against Plaintiffs. (Docket

Civil No. 23-1041 (GMM)
Page – 8 –

No. 1 ¶ 120). Plaintiffs argue that Londoño, Holding, and Skalar Pharma's claim lacks merit and moved for dismissal. (Id.).

This case was initiated through Plaintiff's Complaint on January 26, 2023. (Docket No. 1). In their Complaint, Plaintiffs raise claims under Sections 10(b) and 20(a) of the federal Securities Exchange Act of 1983, 15 U.S.C. § 78j(b), 15 U.S.C. § 78t-1, as well as fraud, *dolus* (bad faith), and unjust enrichment claims under Puerto Rico and the common law. (Id.). On March 23, 2023, Holding filed its motion to dismiss. (Docket No. 23). Approximately one month later, on April 21, Londoño filed his Motion to Dismiss. (Docket No. 33). In their Motions to Dismiss, Defendants contended, among other arguments, that Plaintiffs failed to substantiate their claims under the heightened pleadings standard for fraud and that the Court should dismiss the action for failure to join Skalar Pharma as a necessary party.

## II. LEGAL STANDARD

A.   <u>12(b)(6) Motion and the Higher Pleading Standard for Securities Fraud</u>

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion, a complaint must plead sufficient factual evidence "to state a claim to relief that is plausible on its face" and "raise[s] a right to relief above the speculative

Civil No. 23-1041 (GMM)
Page - 9 -

level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [a court] to draw on [its] judicial experience and common sense." Zenón v. Guzmán, 924 F.3d 611, 616 (1st Cir. 2019) (internal quotation marks omitted).

In considering whether a complaint is facially plausible, the Court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012). While the Complaint does not need to offer detailed factual allegations, "[t]headbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court then, taking the Complaint's well-pled facts as true, is "obligated to view the facts of the Complaint in the light most favorable to the plaintiffs, and to resolve any ambiguities in their favor." Ironshore Indem. Inc. v. Villa Marina Yacht Harbor Inc., No. CV 23-1370 (FAB), 2023 WL 6815125, at *2 (D.P.R. Oct. 17, 2023) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011)). The Plaintiff bears the burden of alleging a plausible cause of action. Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016).

Civil No. 23-1041 (GMM)
Page – 10 –

A civil complaint generally need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see* Iqbal, 556 U.S. at 677-78; Twombly, 550 U.S. at 567-68. However, Rule 9 of the Federal Rules of Civil Procedure requires that complaints of fraud or mistake be pled "with particularity." Fed. R. Civ. P. 9(b). *See* Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 49 (1st Cir. 2020). Rule 9 applied to securities fraud claims until 1995 when the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Public Law 104-67 (codified at 15 U.S.C. § 78u-4 (1995)), amended the Securities Exchange Act of 1934 and further heightened the pleading standard in securities fraud cases, making it even more rigorous than standards set under Rule 9.

As relevant here, § 21D(b) of the PSLRA "impose[s] heightened pleading requirements in [§ 10(b) and Rule 10b-5] actions." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S.,71, 81 (2006). Under the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1), Pub.L. No. 104-67 § 21D(b)(1). Thus, to

Civil No. 23-1041 (GMM)
Page – 11 –

withstand Defendants' motions to dismiss, Plaintiffs' fraud claims must have been pled with sufficient specificity.

B.    12(b)(7) Motion and Rule 19 for Joinder of a Necessary Party

Pursuant to Rule 12(b)(7) and 19 of the Federal Rules of Civil Procedure, a party may move to dismiss a claim for failure to join an indispensable party. *See* Fed. R. Civ. P. 12(b)(7), 19. "Necessary parties are those 'who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it.'" Z & B Enterprises, Inc. v. Tastee-Freez Intern., Inc., 162 F.App'x 16, 19 (1st Cir. 2006)(*quoting* Shields v. Barrow, 58 U.S. 130, 139 (1854)).

In determining whether a party is indispensable to pending litigation, a court undertakes a two-step process. United States v. San Juan Bay Marina, 239 F.3d 400, 405 (1st Cir. 2001). First under Rule 19(a), a court considers whether the individual or entity is a necessary party. Id. There are three tests for indispensability, any one of which can support a finding that a party is necessary. Maldonado-Viñas v. National Western Life Ins., Co., 303 F.R.D. 177, 180 (D.P.R. 2014). Under these tests, a person may be considered indispensable if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

Civil No. 23-1041 (GMM)
Page – 12 –

    (B) that person claims an interest relating to the subject
    of the action and is so situated that disposing of the
    action in the person's absence may:

        (i) as a practical matter impair or impede the
    person's ability to protect the interest; or

        (ii) leave an existing party subject to a
    substantial risk of incurring double, multiple, or
    otherwise inconsistent obligations because of the
    interest.

Fed. R. Civ. P. 19(a)(1).

    If a court finds that the party is necessary, the court then must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In performing a Rule 19 analysis, "courts [are called] to make pragmatic, practical judgments that are heavily influenced by the facts of each case." Bacardi Intern. Ltd. v. V. Suárez & Co., Inc., 719 F.3d 1, 9 (1st Cir. 2013). Courts "should keep in mind the policies that underlie Rule 19, 'including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them.'" Picciotto v. Cont'l. Cas. Co., 512 F.3d 9, 15–16 (1st Cir. 2008) (citing Acton Co. v. Bachman Foods, Inc., 668 F.2d 76, 78 (1st Cir. 1982)). "[I]t is the moving party's burden to show the district court the nature of

Civil No. 23-1041 (GMM)
Page – 13 –

the absentee's unprotected interests or the prejudice to be suffered by the movant due to the non-joined party's absence." Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp., 92 F. Supp. 2d 8, 15 (D.P.R. 2000).

**III. ANALYSIS**

A.   Dismissal for Failure to Join a Necessary Party

The Court first addresses Defendants' Rule 12(b)(7) and Rule 19 motions. Defendants allege that Plaintiffs failed to join Skalar Pharma as an indispensable party in its Complaint. (Docket No. 23 at 10 and 33 at 12).

Holding indicated that Skalar Pharma was one of the Issuers of the notes that Plaintiffs allege were deceptively and manipulatively issued via the NPA and its associated security agreement. (Docket No. 23 at 10 and 33 at 12). Holding further argues that Plaintiffs selectively excluded Skalar Pharma from their Complaint because Plaintiffs assumed and maintain control over Skalar Pharma. (Docket No. 23 at 10; 33 at 13). Specifically, on April 7, 2023, Plaintiffs' related company (Corbel DSOF-Skalar Agent, LLC) bought Holding's membership interests in Skalar Pharma. *See* Skalar Pharma Holding LLC, Skalar Pharma LLC v. Corbel Distressed abs Special Opportunities Fund, L.P., et al., Case No. GM2022CV00616. Defendants claim that Plaintiffs' acquisition of Skalar Pharma is inconsequential to Skalar Pharma's status as a

Civil No. 23-1041 (GMM)
Page – 14 –

necessary party since Skalar Pharma's interests are inextricably linked to the instant dispute and its rights would be fundamentally impacted by this case's outcome. (Docket No. 23 at 10; 33 at 13).

Conversely, Plaintiffs argue that Skalar Pharma is not an indispensable party under Federal Rule of Civil Procedure Rule 19 because: (1) the Court can provide complete relief without the joinder of Skalar Pharma under a theory of joint-and-several liability; (2) Skalar Pharma's ability to protect its interests will not be impeded by its non-joinder given that Plaintiffs assumed control over it making them virtually identical entities abrogating necessary joinder; and (3) Defendants made no substantive argument that they would be subject to multiple inconsistent legal obligations if the present case was resolved without Skalar Pharma's involvement. (Docket No. 43 at 9-11; 44 at 15). Moreover, Plaintiffs note that Section 10.1 of the NPA expressly provides that Plaintiffs "may bring a separate action or actions on each, any, or all of the Obligations against any Issuer, whether action is brought against the other Issuers or whether the other Issuers are joined in such action." (Docket No. 1-3 § 10.1). Thus, Plaintiffs conclude that their claim should not be dismissed on Rule 12(b)(7) grounds.

At its core, the present dispute is founded on various fraud and bad faith tort claims under federal securities and Puerto Rico

Civil No. 23-1041 (GMM)
Page – 15 –

law. It is not a contract action, where all parties to a contract are generally necessary. The First Circuit and this District have emphasized that this distinction is critical to the Court's necessary joinder determination. *See* Pujol v. Shearson/American Express, 877 F.2d 132 (1st Cir. 1989); In re Rio Piedras Explosion Litig., 179 F.R.D. 59, 63 (D.P.R. 1998). ""It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." … "Joinder of these tortfeasors continues to be regulated by Rule 20 . . .."" White v. Sunnova Energy Corp., 2019 U.S. Dist. LEXIS 42984, *4-5 (D.P.R. 2019) (citing Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) and Fed. R. Civ. P. 19 advisory committee notes). *See also* Pujol, 877 F.2d at 137 ("[A] person potentially liable as a joint tortfeasor is *not* a necessary or indispensable party, but merely a permissive party subject to joinder under Rule 20"); Inter Am. Builders Agencies Co. v. Sta-Rite Indus., 602 F. Supp. 2d 306, 309 (D.P.R. 2009) (emphasis supplied)("Where as here, defendants here alleged to be joint tortfeasors, they are jointly and severally liable and are thus dispensable parties.") Thus, given the character of Plaintiffs' claims and well settled precedent on the status of joint-tortfeasors as dispensable parties, the Court declines to dismiss the Complaint on the grounds provided by Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure.

Civil No. 23-1041 (GMM)
Page – 16 –

B.   <u>Security and Exchange Act Claims</u>

Section 10(b) of the Securities and Exchange Act makes it:

> unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any
> national securities exchange—
>
> […]
>
> (b) To use or employ, in connection with the purchase or
> sale of any security registered on a national securities
> exchange or any security not so registered, or any
> securities-based swap agreement any manipulative or
> deceptive device or contrivance in contravention of such
> rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

15 U.S.C. 78j(b)
Also, Rule 10b-5(b), which provides in relevant part that:

> [i]t shall be unlawful for any person, directly or
> indirectly, ... [t]o make any untrue statement of a
> material fact or to omit to state a material fact
> necessary in order to make the statements made, in the
> light of the circumstances under which they were made,
> not misleading […] in connection with the purchase or
> sale of any security.

17 C.F.R. 240.10b-5. "[P]laintiffs asserting a section 10(b) claim

"must adequately plead '(1) a material misrepresentation or

omission; (2) scienter; (3) a connection with the purchase or sale

of a security; (4) reliance; (5) economic loss; and (6) loss

causation.'" <u>Shash v. Biogen, Inc.</u>, 2023 U.S. App. LEXIS 26984,

*13 (1st Cir. 2023) (*quoting* <u>Thant v. Karyopharm Therapeutics Inc.</u>,

43 F.4th 214, 222 (1st Cir. 2022) and <u>In re Biogen Inc. Sec.</u>

Civil No. 23-1041 (GMM)
Page – 17 –


Litig., 857 F.3d 34, 41 (1st Cir. 2017)). Failure to plead any one

of these elements is fatal to a plaintiff's claim.

Section 20 (a) is the joint and several liability term of the

Security and Exchange Act and states that,

> Every person who, directly or indirectly, controls any
> person liable under any provision of this title [15 USCS
> §§ 78a et seq.] or of any rule or regulation thereunder
> shall also be liable jointly and severally with and to
> the same extent as such controlled person to any person
> to whom such controlled person is liable (including to
> the Commission in any action brought under paragraph (1)
> or (3) of section 21(d) [15 USCS § 78u(d)]), unless the
> controlling person acted in good faith and did not
> directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. sect 78t.  Section 20(a) thus functions to "create

liability derivative of an [independent] underlying securities

violation." *See* ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46,

67 (1st Cir. 2008). Accordingly, in the present matter, any Section

20(a) claim piggybacks upon the existence of a Section 10(b)

violation.

"To state a claim under Section 20(a), a plaintiff must allege

a primary violation of the Securities Exchange Act, and that the

"defendant exercised actual power or control over the primary

violator."" Tax-Free Fixed Income Fund for P.R. Residents, Inc. v.

Ocean Capital LLC, 2023 U.S. Dist. LEXIS 161741, *48 (*quoting*

Winters v. Stemberg, 529 F. Supp. 2d 237, 253 (D.Mass. 2008). If

such control is demonstrated, Section 20(a) mandates a finding of

Civil No. 23-1041 (GMM)
Page – 18 –

liability <u>unless</u> the controlling person 1) "acted in good faith" and 2) did not "induce" the violation. <u>In re Atlantic Financial Management, Inc.</u>, 784 F.2d 29, 30 (1st Cir. 1986) (emphasis supplied).

    1.  <u>Holding's liability for Londoño's alleged deception</u>

As an initial matter, the Court rejects Holding's argument that the Section 10(b) claim against it should be dismissed solely because the facts in the bulk of the Complaint named Londoño and Bioapi, and not Holding, as the actors engaging in fraud or deceit. As the First Circuit held in <u>In re Atlantic Financial Management, Inc.</u>, a "corporation's liability for an agent's misrepresentations may rest upon a theory of "apparent authority."" 784 F.2d 29, 31-32 (1986) (*quoting* Restatement (Second) of Agency § 8). *See also* <u>Alvarado v. Morgan Stanley Dean Witter</u>, Inc., 448 F. Supp. 2d 333 (D.P.R. 2006). Moreover, pursuant to the PSLRA and the Securities and Exchange Act, "scienter alleged against [a] company's agents is enough to plead scienter for a company" for the purpose of substantiating a 10(b) claim. <u>Bielski v. Cabletron Sys.</u>, 311 F.3d 11, 40 (1st Cir. 2002).

The First Circuit stated that the existence of Section 20(a) does not preclude the imposition of vicarious liability under an apparent authority theory. *See* <u>In re Atlantic Financial Management, Inc.</u>, 784 F.2d. at 32-33. Unlike actual authority which

Civil No. 23-1041 (GMM)
Page – 19 –

generally must be expressly conveyed in a document, "apparent authority arises when the principal … says or does something that, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." CNE Direct, Inc. v. Blackberry Corp., 821 F.3d 146, 151(1st Cir. 2016) (internal quotations omitted).

The Court finds that for the purposes of surviving a motion to dismiss it has been sufficiently alleged that Londoño acted on behalf of Holding as an agent with apparent authority. Holding is majority owned and controlled by Londoño through Bioapi. (Docket No. 1 ¶ 10). Moreover, Londoño signed on Holding's behalf, the Holding Operating Agreement executed between Plaintiffs, Bioapi, and Holding. (Docket No. 1 ¶ 62). Londoño also allegedly acted on Holding's behalf in the execution of the Pharma Operating Agreement. (Id. ¶ 64). Additionally, throughout the entire reported saga, it is alleged that Londoño was directly, or through others at his instruction, communicating with Plaintiffs on behalf of the Issuers of the NPA (Holding and Skalar Pharma) regarding the progress being made at the Puerto Rico Plant. See e.g., Id. ¶¶ 31, 32, 77, 88. The Court concludes that if it is determined that Plaintiffs' claims against Londoño are sufficiently robust to withstand a motion to dismiss, there can be sufficient grounds to

Civil No. 23-1041 (GMM)
Page – 20 –

similarly uphold claims against Holding pursuant to the doctrine
of apparent authority vicarious liability.

    2.  <u>Plaintiffs' 10(b) claims</u>

    Plaintiffs allege that they were fraudulently induced to
invest $30 million in Defendant's floundering Puerto Rico
pharmaceutical venture in violation of Section 10(b) of the
Securities Exchange Act.

    a.  <u>Material Misrepresentations and Material Omissions</u>

    "To survive a motion to dismiss under the securities law, a
complaint must adequately plead statements [or omissions] that
were 'misleading as to a <u>material</u> fact.'" <u>Thant</u>, 43 F.4th at 222
(*quoting* <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 38
(2011)) (emphasis supplied). While opinions differ from statements
of fact, "[a] reasonable investor may, depending on the
circumstances, understand an opinion statement to convey facts
about how the speaker has formed the opinion — or, otherwise put,
about the speaker's basis for holding that view." <u>Omnicare, Inc.
v. Laborers Dist. Council Constr. Induc. Pension Fund</u>, 575 U.S.
175, 188 (2015); *see* <u>Constr. Indus. & Laborers Joint Pension Trust
v. Carbonite, Inc.</u>, 22 F.4th 1, 7 (1st Cir. 2021)("[A] statement
in the form of an opinion . . . may convey three facts: that the
speaker has such a belief; that the belief fairly aligns with the
facts known to the speaker; and . . . that the speaker has made

Civil No. 23-1041 (GMM)
Page – 21 –

the type of inquiry that a reasonable investor would expect given the circumstances.").

In reviewing the Complaint, the Court finds that many of Londoño's pre-sale statements regarding milestones, timelines, and infrastructural and corporate capabilities of Skalar Pharma and the Plant toe the line between material misrepresentations, as understood in cases like Omnicare and Carbonite, Inc., and commercial "puffing" through overly optimistic statements.

Critically, under Section 10(b) of the Securities and Exchange Act, "[u]pbeat statements of optimism and puffing about [a] company's prospects" are not actionable. Yan v. Rewalk Robotics Ltd., 973 F.3d 22, 31 (1st Cir. 2020) (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999)). Moreover, in accord with a PLSRA pleading standard, to show that stated timelines were fraudulent a plaintiff must specify and provide supporting evidence of why the challenged statements were misleading. See 15 U.S.C. § 78u-4(b)(1); Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 456 (1st Cir. 2017)(Finding that a plaintiff failed to demonstrate defendant's proposed timeline, which it alleged was impossible to meet, constituted a misleading statement since it failed to provide evidence that the timeline could not be met). Moreover, the pleading standards for securities fraud claims cannot be satisfied

Civil No. 23-1041 (GMM)
Page – 22 –

through "fraud by hindsight." *See* <u>ACA Fin. Guar. Corp</u>. 512 F.3d at

62 (*quoting* <u>Shaw v. Connecticut General Life Insurance Company,</u> 82

F.3d 1276, 1223 (11th Cir. 2003)) ("A plaintiff may not plead

'fraud by hindsight'; i.e., a complaint 'may not simply contrast

a defendant's past optimism with less favorable actual results' in

support of a claim of securities fraud.").

The Court's reading of the Complaint suggests that Londoño

indicated to Plaintiffs that the Plant had been forced to cease

operations due to a lack of capital. But following Plaintiff's

investment, the Plant would be able to initiate and then scale up

the manufacture and production of pharmaceutical products within

a few months. Upon receiving finances from Plaintiffs, Londoño

indicated that the Plant would undertake infrastructural repairs

and hire necessary staff to meet its production timelines. The

Complaint contends that the lack of permits, resources, and working

infrastructure would have functionally made the NPA's milestones

impossible to meet. However, it is not clear to the Court that

such timelines were de facto impossible at the time of the NPA's

execution and not merely being construed as impossible considering

subsequent events. Thus, the Court cannot assuredly conclude that

the bulk of Londoño's alleged fraudulent statements, specifically

those pertaining to timelines and milestones, constitute material

misrepresentations.

Civil No. 23-1041 (GMM)
Page – 23 –


      Nevertheless,   even   concluding   that   most   of   Londoño's

statements were not fraudulent communications but rather common

commercial puffery, the Court identifies that the Complaint

presented a few alleged representations made by Londoño prior to

the sale of securities that are sufficient to qualify, if true, as

misleading   misrepresentations   under   Section   10(b).   These

allegations include that:

> Londoño represented that "Skalar Pharma had successfully
> manufactured scalable ibuprofen and that its facilities
> were ready to go". (Docket No. 1 ¶ 53).
>
> On October 24, 2021, Londoño through his consultant sent
> Plaintiffs a message stating, "Here is the picture of
> Ibuprofen," along with an image of a pill bottle labeled
> "Ibuprofen Bottle #1 09-03-19." Plaintiffs allege that
> the photo was meant to represent Ibuprofen produced by
> Skalar Pharma and claimed that the bottle contained no
> such product. (Docket No.  1 ¶ 59).
>
> Londoño claimed that Skalar Pharma possessed permits
> that it had inherited from Eli Lilly (the Plaint's former
> owner) to manufacture and sell Ibuprofen when it did
> not. (Docket No.  1 ¶ 80).[3]
> The NPA's term that "Within three (3) years prior to the
> Closing Date [November 16, 2021] the Company [Skalar
> Pharma] successfully produced a kilo batch of Ibuprofen
> in compliance with all Applicable Laws and of premium
> quality so as to be marketable to pharmaceutical
> companies, as previously disclosed to the Agent."
> (Docket No. 1 ¶ 92).

---

[3] At Docket No. 1 ¶ 23, Plaintiffs made a contradictory statement on this point.
There, Plaintiffs stated that Londoño did not claim to already possess such
permits, but rather indicated that he would transfer the permits in the future.
Plaintiffs subsequently noted Londoño had not made the transfer at the time of
the Complaint. Nevertheless, under a 12(b)(6) review standard, the Court is
called upon to view the evidence in the Complaint in a light most favorable to
the Plaintiff and thus the Court takes Plaintiffs' contention that Londoño told
them that he already possessed such permits as true.

Civil No. 23-1041 (GMM)
Page – 24 –

The NPA's statement that "[a]ll tangible property owned
by the Issuers and their Subsidiaries necessary to the
business of the Issuers and their Subsidiaries [was] in
good working order and condition, ordinary wear and
tear, casualty and condemnation excepted, and, to the
knowledge of the Issuers and their Subsidiaries, all
repairs to such property material to its functioning
[were] set forth on Schedule 4.21(b)." Plaintiffs claim
this statement was plainly false given that a report of
the Plant made one month following the NPA's execution
found significant equipment damage. (Docket No. 1 ¶¶ 95-
97).

The NPA's representation that "[s]ince the acquisition
of the Facility by Bioapi (in 2016) … there has been no
event, change, circumstance, or occurrence that,
individually or in the aggregate, has had or would
reasonably be expected to have a Material Adverse
Effect." Plaintiffs allege that a range of occurrences
with material adverse effects have occurred including
the inability to hire necessary personnel and the
deterioration of the Plant's equipment. (Docket No. 1.
¶¶ 43-47, 49-51, 58, 83-85, 93-94, 96-99, 103-108, 111-
112).

The Court finds that these statements were pled with sufficient

specificity that, if taken as true and viewed a in light most

favorable to Plaintiffs, qualify as material misrepresentations

for the purpose of withstanding a 12(b)(6) motion under the

heightened securities fraud pleading standard.

        b.   Scienter

    To be actionable under the PSLRA, a statement must be more

than merely material and misleading; it also must have been made

with the requisite scienter. ACA Fin. Guar. Corp. v. Advest, Inc.,

512 F.3d 46 (1st Cir. 2008). "Congress has heightened the pleading

standard for scienter allegations in private enforcement actions."

Civil No. 23-1041 (GMM)
Page – 25 –


S.E.C. v. Sharp, 2022 WL 4085676 (D. Mass. 2022) (*citing* Merrill
Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81
(2006)).

    Scienter is "a mental state embracing intent to deceive,
manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights,
Ltd., 551 U.S. 308, 319 (2007). To survive a motion to dismiss, a
plaintiff must sufficiently allege by "stat[ing] with
particularity facts giving rise to a strong inference that the
defendant acted with the requisite state of mind." 15 U.S.C. §
78u-4(b)(2), Pub.L. No. 104-67 § 21D(b)(2). In doing so, "plaintiff
must "show either that the defendants consciously intended to
defraud, or that they acted with a high degree of recklessness.""
Carbonite, Inc., 22 F.4th at 8(*quoting* Kader v. Sarepta
Therapeutics, Inc., 887 F.3d 48, 57 (1st Cir. 2018), and Aldridge
v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). Recklessness
requires "an extreme departure from the standards of ordinary care,
and which presents a danger of misleading buyers and sellers that
is either known to the defendant or is so obvious that the actor
must have been aware of it." Mehta v. Ocular Therapeutix, Inc.,
955 F.3d 194, 206 (1st Cir. 2020) (*quoting* Brennan v. Zafgen, Inc.,
853 F.3d 606, 613(2017)).

    Moreover, in determining whether an inference of scienter is
strong enough to withstand a motion to dismiss, a court is called

Civil No. 23-1041 (GMM)
Page – 26 –

on to conduct a comparative evaluation that weighs the "inferences urged by the plaintiff" against "competing inferences rationally drawn from the facts alleged." Tellabs, Inc., 551 U.S. at 314. *See also* In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 30 (1st Cir. 2012). In conducting this analysis, the court must view a plaintiff's claims in their entirety rather than examining the individual claims in isolation and conclude whether a reasonable person would deem an inference of scienter as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc., 551 U.S. at 309, 322-23, 314.

Based on the totality of the circumstances, Plaintiffs' allegations that Defendants were deceptive in their communications regarding permit status, past manufacture of the Ibuprofen product, and Plant condition, knowing that such statements were integral to Plaintiffs' funding decision, support an inference of scienter sufficient to withstand a 12(b)(6) motion. In the months preceding the execution of the NPA, Londoño allegedly made multiple statements to Plaintiffs to secure their financing of the Plant. Plaintiffs allege that Londoño misrepresented that Defendants possessed necessary permits, that Skalar Pharma's had experience manufacturing and producing commercial grade Ibuprofen, and that the plant had successfully produced product indicating its preparedness for the rapid initiation of manufacturing operations.

Civil No. 23-1041 (GMM)
Page – 27 –

Plaintiffs also aver that the NPA itself contained misleading statements including provisions regarding the condition of the Plant and Skalar Pharma's successful manufacture of a batch of premium quality Ibuprofen. Additionally, Plaintiffs stress that they made it clear to Defendants that the "historical manufacturing of the company's core pharmaceutical – Ibuprofen – and the state and condition of Skalar Pharma's manufacturing facilities" were of the utmost importance. (Docket No. 1 ¶ 30).

Based on these allegations, the Court finds that the Complaint sufficiently pled that Defendants were, at least, reckless in making communications on key issues that were likely to mislead Plaintiffs in their decision to enter the securities purchase agreement. The "competing inference rationally drawn from the facts alleged" —that would support a finding that Defendants did not act with the requisite scienter — would be that Londoño was merely engaging in run of the mill commercial puffing to close the sale deal with Plaintiffs. However, even if this was the case, a few of the alleged misleading statements made on issues of critical importance to Plaintiffs, support the Court's finding that the "competing inference" does not sufficiently outweigh an inference of scienter under the 12(b)(6) standard. Defendants' alleged false statements were not ambiguous. Among other representations, Defendants either had or had not successfully manufactured

Civil No. 23-1041 (GMM)
Page – 28 –

Ibuprofen in the past; the Plant either had or had not sustained material adverse damages since its acquisition; and Londoño did or did not have Eli Lilly's manufacturing permits. If, as was pled Defendants, made the alleged misrepresentations during securities sale negotiations, knowing that these particular matters were of marked importance to Plaintiffs in the execution of the NPA, the Court concludes that Defendants' scienter was adequately pled to survive a motion to dismiss.

        c.   <u>The alleged misrepresentation was related to a securities transaction</u>

The Court finds that the third element of a Section 10(b) claim is adequately pled as there is no dispute that the alleged fraud arose from the execution of the NPA, which was a securities sale transaction.

        d.   <u>Reliance</u>

 ""Reliance," … "is an essential element of the §10(b) private cause of action" because "proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." <u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 568 U.S. 455, 461 (2013) (*quoting* <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 810 (2011)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction--*e.g.*, purchasing common stock--based on that

Civil No. 23-1041 (GMM)
Page – 29 –

specific misrepresentation." <u>Erica P. John Fund, Inc.</u>, 563 U.S. at 810.

The Court concludes that to survive a motion to dismiss, Plaintiffs sufficiently pled the 10(b)-reliance element. Plaintiffs claimed that: (1) they were aware of Defendants' misleading statements such as those regarding the Plant's infrastructure conditions and Skalar Pharma's historical manufacture of commercial grade Ibuprofen; and (2) they relied on those statements in entering the NPA and choosing to invest $30 million in the pharmaceutical venture.

e.   <u>Loss and Causation</u>

Finally, "[t]o survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." <u>Shash</u>, 2023 U.S. App. LEXIS 26984, *34 (citing <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005)). A plaintiff may satisfy these elements by

(1)   identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud);

(2)   showing that the stock price dropped soon after the corrective disclosure; and

(3)   eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure -- as opposed to other possible depressive factors --

Civil No. 23-1041 (GMM)
Page – 30 –


that caused at least a "substantial" amount of the price
drop.

Mass. Ret. Sys. V. CVS Caremark Corp., 716 F.3d 229, 237-38 (1st
Cir. 2013) (*quoting* FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d
1282, 1311-12 (11th Cir. 2011)). While there are other ways to
prove loss causation, the Supreme Court stressed that "Congress'
intent to permit private securities fraud actions for recovery
[are allowed] where, but only where, plaintiffs adequately allege
and prove the traditional elements of causation and loss." Dura
Pharms., 544 U.S. at 346.

Plaintiffs did not establish the causation and loss elements.
As such, the Court finds that Plaintiffs failed to sufficiently
plead their 10(b) cause of action. Only two of the Complaint's 160
paragraphs mention the loss incurred by Plaintiffs. These
paragraphs state:

    134. As a direct and proximate result of the wrongful
         conduct of Defendants, Corbel suffered damages and
         economic loss.

    135. The economic terms of and the amounts paid by Corbel
         for the Notes under the NPA, and the Skalar Holding
         Class B membership interests were inflated to
         Corbel's financial detriment by virtue of the
         fraudulent scheme and actionable
         misrepresentations described herein.

Nothing in these statements pleads with the requisite specificity
that Plaintiffs incurred (1) a loss and (2) a loss that was the
result of Defendant's alleged misrepresentations. Critically, the

Civil No. 23-1041 (GMM)
Page – 31 –

Supreme Court rejected a theory of "recovery where a misrepresentation leads to an inflated purchase price but nonetheless does not proximately cause any economic loss." Dura Pharms., 544 U.S. at 346. Given that Plaintiffs' theory of loss causation rests on the alleged inflation of their interests, the Court cannot conclude that they sufficiently pled this element and thus, it is proper to dismiss this claim.

As noted, Plaintiffs' Section 20(a) claim relies on the existence of Plaintiffs' 10(b) violation. Since the Court determined that Plaintiffs failed to adequately plead their Section 10(b) cause of action so as to survive a 12(b)(6) motion, the Court must also find that Plaintiffs' 20(a) motion fails.

C.   Plaintiffs' remaining claims under Puerto Rico and Common Law

Having dismissed all federal claims, only state-law claims remain. "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Rivera v. Murphy, 979 F.2d 259, 264-265 (1st Cir. 1992). *See also* Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 191 (1st Cir. 2011) ("When a plaintiff's anchor claim is a federal cause of action and the court unfavorably disposes of the plaintiff's federal claim at

Civil No. 23-1041 (GMM)
Page – 32 –

the early stages of a suit, well before trial, the court generally dismisses any supplemental state-law claims without prejudice.") As such, the Court declines to exercise supplemental jurisdiction over state-law claims and concludes that in granting Defendants' motions to dismiss their federal law claims, it must dismiss without prejudice Plaintiffs' state-law claims.

## IV. CONCLUSION

For the reasons stated herein the Court **GRANTS** Defendants' Motions to Dismiss at Docket Nos. 23 and 33. Plaintiffs' federal law claims are dismissed with prejudice and state-law claims are dismissed without prejudice.

IT IS SO ORDERED.

In San Juan, Puerto Rico, November 8, 2023.

<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE