# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P. AND CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND (SPV SKALAR), L.P., | Civil Case No. 23-cv-1041 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FERNANDO BENVENISTE LONDOÑO, BIOAPI S.A.S. AND SKALAR PHARMA HOLDING LLC | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiffs Corbel Distressed and Special Opportunities Fund, L.P. and Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. (together, "Corbel"), by and through their undersigned counsel, for their Complaint against Defendants Fernando Benveniste Londoño ("Londoño"), Bioapi S.A.S. ("Bioapi") and Skalar Pharma Holding LLC ("Skalar Holding") (together, "Defendants") allege based on knowledge as to their own actions, based on Corbel's investigation, which has included review of documents and communications with current and former directors, consultants, executives and employees of Skalar Pharma LLC ("Skalar Pharma," together with Skalar Holding, "Skalar") and Skalar Holding, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This action arises out of a scheme designed and directed by Londoño to defraud Corbel. Londoño deployed two entities he controls, Bioapi and Skalar Holding, to implement his scheme. Londoño, Bioapi and Skalar Holding are the Defendants in this action. These entities, at

the hand and direction of Londoño, and Londoño personally made a series of material misrepresentations and omitted material facts to induce Corbel to enter into a Note Purchase Agreement, dated November 16, 2021 (the "NPA"), and related agreements which were all part of an integrated transaction (the "Transaction"). By the NPA, Corbel agreed to purchase $30,000,000 aggregate original principal amount of Senior Secured Notes due November 16, 2026, to be issued by Skalar Holding and its wholly owned subsidiary Skalar Pharma, a Puerto Rico putative Active Pharmaceutical Ingredient ("API") manufacturing company.[1] Londoño, Bioapi and Skalar Holding were to use the proceeds of this debt offering to fund Skalar Pharma.

2.     In procuring Corbel's investment, Londoño touted Puerto Rico's long history as a pharmaceutical industry hub, along with local governmental and regulatory efforts to make Puerto Rico increasingly attractive to manufacturers and investors. At the time Londoño went to market, Covid-19 and related supply chain issues heightened interest in and focus on pharmaceutical manufacturing domestically, including in Puerto Rico, having seen significant shifts in production to Asia in the preceding years. In particular, Puerto Rico offered tax breaks, incentive programs and economic development to support pharmaceutical companies. Londoño sought to leverage these opportunities and emphasized in his marketing to Corbel, Skalar Pharma's presence in a free trade zone and a tax stability agreement.

3.     Unfortunately, Puerto Rico's theoretically favorable operating environment was irrelevant because contrary to Londoño's repeated representations, including those contained in the NPA, Skalar Pharma did not have the infrastructure or working laboratory equipment in place to initiate production after close of the Transaction. Moreover, Skalar Pharma had not previously

---

[1]The U.S. Food and Drug Administration regulations define Active Pharmaceutical Ingredient as "any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body."

manufactured its featured pharmaceutical product – Ibuprofen – in the period preceding the Transaction as Londoño and Skalar had claimed and represented in the NPA.  In fact, Skalar Pharma had never produced Ibuprofen at its plant, nor could Skalar Pharma have done so with the equipment that was in place.  Defendants knew that their fraudulent statements and omissions would cause direct loss to Corbel, including but not limited to loss in investment value and costs associated with bringing the plant into working condition.

4.      Skalar Pharma's predicament was exacerbated by Londoño's controlling, self-serving style, and his alienation of much of the potential qualified workforce through his recidivist derelictions of basic obligations, such as paying peoples' salaries.

5.      The allegations set forth herein state causes of action against Defendants for violations of the federal securities laws, the laws of Puerto Rico and the common law.  As a result of these violations, Defendants are liable to Corbel for compensatory and punitive damages and for equitable relief including, but not limited to, disgorgement of and reimbursement to Corbel of the proceeds of their fraudulent scheme, all amounts wrongfully received, and the resulting harm to Corbel.  Defendants' conduct was wanton and willful such that an award of punitive damages is warranted.

## PARTIES AND RELEVANT ENTITIES

6.      Plaintiff Corbel Distressed and Special Opportunities Fund, L.P. is a limited partnership established under the laws of the State of Delaware with its principal place of business located at 11777 San Vincente Blvd., Suite 777, Los Angeles, CA 90049.  Corbel DSOF GP LLC is its general partner, and Corbel DSOF Capital Management, LLC, is its Managing Member.

7.      Plaintiff Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. is a limited partnership established under the laws of the State of Delaware with its principal place of

business located at 11777 San Vincente Blvd., Suite 777, Los Angeles, CA 90049.  Corbel DSOF GP (SPV Skalar) LLC is its general partner and Corbel DSOF Capital Management, LLC, is its sole member.

8.      Defendant Fernando Benveniste Londoño is the founder, and former CEO and President of non-party Skalar Pharma.  Londoño is the majority shareholder of Skalar Pharma through Skalar Holding and Londoño's company, Bioapi, which previously held all of the Class A Units of Skalar Holding.  Upon information and belief, Londoño resides in Colombia.

9.      Defendant Bioapi S.A.S. is a corporation organized under the laws of Colombia and duly authorized to do business in Puerto Rico since September 20, 2016.  Londoño established Bioapi in and around the time he acquired the plant and facilities that would become the operational headquarters of Skalar Pharma.  Upon information and belief, Londoño is the sole shareholder and ultimate beneficiary of Bioapi.  Up until on or about November 16, 2021, Bioapi owned all of the membership interest of Skalar Pharma.

10.     Defendant Skalar Pharma Holding LLC is a Puerto Rico Limited Liability Company.  Skalar Holding issued the notes purchased by Corbel under the NPA. Skalar Holding is majority owned and controlled by Londoño through his company Bioapi.  Bioapi and, in turn, Londoño have the right to and did designate the five members of Skalar Holding's Board of Directors.

11.     Non-party Skalar Pharma LLC is a wholly owned subsidiary of Skalar Holding LLC, headquartered in Guayama, Puerto Rico.  Skalar Pharma is intended to be a manufacturer of active pharmaceutical ingredients or APIs.

12.     Non-party Corbel DSOF – Skalar Agent, LLC ("Skalar Agent") is a Puerto Rico Limited Liability Company. Plaintiff Corbel Distressed and Special Opportunities Fund, L.P. is

Skalar Agent's sole member.  Skalar Agent is the current manager of Skalar Pharma.

## JURISDICTION AND VENUE

13.     Corbel's claims for relief arise under: (i) Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act") and Rule 10(b)-5 promulgated thereunder, (ii) the law of Puerto Rico, and (iii) the common law.

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the 1934 Act.  The Court also has supplemental jurisdiction over Corbel's non-federal claims for relief pursuant to 28 U.S.C. § 1367(a).

15.     The Court has personal jurisdiction over Defendants under the law of Puerto Rico and the U.S. Constitution. Defendants are subject to the general jurisdiction of this Court because they have each engaged in continuous and systematic activity in Puerto Rico. Defendants are also subject to the specific jurisdiction of this Court. Each Defendant has minimum contacts related to Corbel's claims. Defendants have purposely availed themselves of the benefits, privileges and protections afforded by the laws of the forum.  Corbel's claims arise from and relate to Defendants' contacts with the forum.  It is foreseeable that Defendants would be subject to suit in this forum. The exercise of personal jurisdiction over the Defendants in this action comports with fair play and substantial justice and is reasonable and fundamentally fair as a matter of due process.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the 1934 Act because a substantial part of the events or omissions giving rise to the actions relevant to this Complaint occurred in this District.   Additionally, Defendants reside and/or transact business in this District.

17.     In connection with the acts, conducts and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentality of interstate commerce and

the United States, including the mails and telephonic communications.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. Londoño's Foray into Puerto Rico

18.     Fernando Londoño claims to have approximately 30 years of pharmaceutical industry experience.  For over 20 years, Londoño has acted as chief executive of non-party Biogen S.A.S. ("Biogen"), a pharmaceutical company based in his native Colombia.

19.     In or about October 2016, Londoño acquired a pharmaceutical plant in Guayama, Puerto Rico from Eli Lilly through Biogen.  Upon information and belief, Londoño subsequently transferred Biogen's Puerto Rico holdings to newly created Bioapi.

20.     Londoño touted his acquisition with the announcement of an investment of $92 million to update the manufacturing facility and the hiring of 350 employees within the next five years.  Londoño's company was awarded $2 million in incentives from the Puerto Rico government in connection with its proposal according to news reports.

21.     Eli Lilly had previously announced plans to close the facility altogether, so Londoño's putative plans and promises were well-received in the local community.  But as would prove to be the case over the five plus years to follow, Londoño's plan and promises were hollow.

### B. Londoño Establishes Skalar Pharma

22.     On or about June 25, 2018, Londoño created Skalar Pharma to function as the operating company for his Puerto Rico pharmaceutical manufacturing business.  Skalar Pharma's sole member was Bioapi, with Londoño in control in accordance with the operating agreement executed on or about July 18, 2018.  This structure remained unchanged until the NPA, the attendant amendments to Skalar Pharma's operating agreement, and Bioapi's transfer of its ownership interests to newly formed Skalar Holding in November 2021.

23.     While Londoño promised investment, rehabilitation and growth for what had become the Skalar Pharma pharmaceutical plant, he did not deliver.  Upon information and belief, Londoño and Bioapi made no progress towards getting the plant up and running despite Londoño making a significant number of hires, which did nothing but convey a false sense of activity at Skalar Pharma.

24.     Upon information and belief, most of these employees brought in by Londoño and Bioapi performed administrative functions, if anything. There was attention paid to developing quality control protocols but none of the investment or activity that would be a prerequisite to manufacturing product.  To be sure, Skalar Pharma did not have the necessary permits and certifications to manufacture and commercialize.  While Londoño baldly and falsely claimed that Skalar Pharma could utilize Eli Lilly's permits, which it supposedly acquired when Londoño purchased the plant, no meaningful steps were taken towards any transfer of authorizations to deploy those permits.

### C. Londoño Looks to Tap the Markets

25.     During this period, Londoño's mantra was that the manufacturing plant was in good working condition.  He also claimed that Skalar Pharma had developed a synthesis (the equivalent of a chemical recipe) for Ibuprofen, and that he had successfully manufactured the drug at the plant to commercial production standards.  This would prove false.  He never manufactured Ibuprofen at the plant and did not possess the requisite laboratory equipment, synthesis, or personnel to do so.

26.     Armed with decades of pharmaceutical experience and a willingness to deploy his expertise to meld fact and fiction with impunity, Londoño directed the production of informational documents for distribution to potential investors and lenders.

27.     Corbel was introduced to Londoño in mid-2021 through mutual contacts.  After preliminary discussions and diligence, in or about July 2021, Corbel made a non-binding indication of interest with respect to an investment in Skalar Pharma in the form of senior secured notes. Corbel reviewed the information provided by Londoño concerning Skalar Pharma and its supposed historical performance and future financial requirements.  Corbel's indication of interest contemplated a $30 million investment in the form of convertible senior secured notes.  The indication of interest made clear that any transaction was dependent on Corbel satisfactorily completing its due diligence process.

28.     On July 15, 2021, Skalar Pharma, by Londoño, formally accepted Corbel's non-binding indication of interest.

29.     As described below, over several months, the non-binding indication of interest would develop into the Transaction whereby Corbel would purchase debt and acquire membership interests in newly created Skalar Holding among other rights and privileges as set forth in the Transaction documents.

**D.  Corbel's Due Diligence Efforts**

30.     As typical and contemplated, Corbel issued information requests to Londoño, Bioapi and Skalar Pharma as part of its due diligence process. These requests were made between August and November 2021.  These requests sought documents and information covering a wide range of issues pertinent to Skalar Pharma's business and finances, as well as regarding Bioapi and Londoño himself.

31.     Of extreme importance to Corbel was Skalar Pharma's historical manufacturing of the company's core pharmaceutical – Ibuprofen – and the state and condition of Skalar Pharma's manufacturing facilities.  These two issues would have a direct and material impact on Skalar

Pharma's ability to become operational and to produce Ibuprofen following the close of any financing transaction. They would also dictate Skalar Pharma's financial requirements and the terms on which potential investors such as Corbel would be willing to invest in the debt and equity of Skalar Pharma or any related entity. This was repeatedly conveyed to and known by Bioapi, Londoño and those working on their behalf. Questions concerning these issues were at the forefront throughout the due diligence process and were material considerations for Corbel in its underwriting process.

32.     Upon information and belief, Londoño directed all Skalar directors, officers, consultants and employees to communicate and provide information to Corbel only at his direction and with his approval. In other words, Londoño controlled what information was made available to Corbel and what information was not made available. Londoño himself was in regular contact with the Bioapi and Skalar Pharma attorneys working on the potential transaction and consulted and maintained authority over all aspects of the due diligence and the Transaction. This was at least in part based on the fact that Londoño was the only person with knowledge and information concerning many of the matters about which Corbel was inquiring.

33.     Corbel was in regular contact with Londoño himself and others working at his direction over the ensuing weeks and months. And Londoño was aware of the key points of focus for Corbel.

**E.  Misrepresentations and Omissions Regarding Facilities, Manufacturing Capabilities and Historical Production**

34.     Beginning in and around October 2021, Corbel developed concerns regarding Skalar Pharma's manufacturing history and current capabilities. And with questions mounting about how quickly Skalar Pharma could begin manufacturing product following any financing, the

terms and associated risks of the contemplated transaction – which was approaching the finish line – were no longer acceptable to Corbel.

35.     In response, Londoño doubled down on his fraudulent scheme to both secure financing from Corbel, and to obtain that financing at favorable terms.

36.     Using his pharmaceutical industry knowledge and experience, Londoño crafted what appeared to set forth reasonable and rational responses to Corbel's concerns as they arose.

37.     As noted, Corbel was appropriately focused on the manufacturing facility and Skalar Pharma's past and current manufacturing capabilities. That included the state of the facility, the timeline and financial requirements for bringing the facility back online, and, once back online, Skalar Pharma's wherewithal to manufacture Ibuprofen, the product touted by Londoño as the touchstone of Skalar Pharma.

38.     Londoño represented that Skalar Pharma had been forced to cease operations and manufacturing at the facility due to a lack of financial resources. Thus, the proceeds of the contemplated debt issuance were to be used to fund the restart of Skalar Pharma's manufacturing facility.

39.     A pharmaceutical company such as Skalar Pharma generates revenues through sales. To generate sales, Skalar Pharma required product – in this case, active pharmaceutical ingredients – that met the rigorous regulatory, legal and quality standards of the FDA and pharmaceutical industry. To possess and potentially sell any such product, Skalar Pharma needed to manufacture.

40.     Throughout, Londoño, and those acting at his direction, highlighted the sophistication and capabilities of Skalar Pharma's facilities and equipment, which they characterized as cutting-edge and state-of-the-art. Londoño represented that Skalar Pharma was

ready and able to deploy this equipment to manufacture product and was simply in need of the requisite working capital. In fact, Londoño repeatedly represented to Corbel that Skalar Pharma would be manufacturing product within three months of the receipt of the financing under discussion. Upon information and belief, after Skalar employees implored Londoño to withdraw this rigorous timeline, Londoño conceded the three-month timeline was unrealistic. But instead of being honest in his assessment, Londoño represented that within seven months Skalar Pharma would be producing pharmaceutical products. This was a lie.

41. To perpetuate his scheme, Londoño provided Corbel with a false impression regarding the state of the manufacturing facilities. Specifically, as conveyed by his counsel at Adsuar Muñiz Goyco Seda & Perez-Ochoa, P.S.C. ("AMG") on November 9, 2021, Londoño characterized the dormant plant as in a "coma," indicating that it could be awoken and operational when everyone was ready to move forward. According to Londoño, he made significant efforts over 2018 and 2019 to recommission the plant but stopped due to a lack of resources. The financing was designed to consummate those efforts. Londoño claimed that the plant had never closed down, but rather had remained "operative" and that the financing would take the plant across the finish line. In that regard, Londoño highlighted the significance of the name "Skalar," which means "to scale." Londoño emphasized that the Skalar name signified how the company would be ready and able to quickly scale up its manufacturing and sales after receipt of the financing. This was not the case and Londoño knew it.

42. Londoño's representations and related omissions regarding the manufacturing facilities conveyed a deliberately false impression of the state of the facilities, of what was required to render those facilities operational (if that were even possible) and the timeline for doing so.

43.     Defendants could foresee that, once the truth was known, Corbel would suffer losses in its investment and incur damages to bring the facilities into an operational state.

44.     The scope of Londoño's scheme to induce Corbel to proceed with the financing slowly emerged in the months that followed its closing. A February 2022 report to the Skalar Holding board revealed to Corbel extensive problems that Londoño and his team were far from resolving. Londoño either knew of these problems when he made representations to Corbel concerning the manufacturing facilities or was willfully blind to and consciously disregarded their existence.

45.     As a threshold issue, Londoño had not hired a plant manager (although, upon information and belief, it had been over two years since the last one resigned for non-payment of his salary). Nor did it seem that Londoño took action in the face of a recognized need for "operators and engineers to check Skalar manufacturing equipment and startup the plant," and "experienced manufacturing operators – [with] previous chemical/pharma plant experience." Evidently, a lawsuit against Londoño and Bioapi by several former employees for failure to pay their earned compensation was causing issues with hiring qualified individuals, including because these former employees were the only people in Puerto Rico who could perform the services required. This all meant that, contrary to Londoño's representations, the company was in no way positioned to satisfy the performance obligations to which it would commit under the NPA to induce Corbel to enter into the Transaction.

46.     More troubling was the state of the infrastructure that was a prerequisite to bringing electricity to the plant. Fixing this infrastructure was critical to what were increasingly prominent rehabilitative deficits, let alone any manufacturing efforts. Contractors had been forced to remove electricity cables. The support brackets undergirding electrical cables were

heavily corroded and required extensive welding, along with sanding and painting of the entire channel where cables were laid for "about 1,000 feet." The "sanding and painting" was to require "year long work due to extensive corrosion all across the site on outside surfaces."

47.     Basic equipment, internet, sanitation, and fire safety mechanisms like a sprinkler system were lacking. Air conditioning and chilling equipment did not work properly and there were pest control issues.

48.     The "Key action items" identified in Skalar Holding board materials for February and March 2022, months after the Transaction, demonstrated the situation's direness. These items included:

> Manufacturing process, Identification of manufacturing equipment to be utilized, Revision of manufacturing equipment, Hiring of team for revision of equipment and plant operation, [securing] Full electricity in place, Hiring of key management (Quality, Manufacturing, Supply Chain, Facilities), Setup of internet services, Computer equipment choosing/servers.

49.     It was as if Londoño was starting from scratch. And as a practical matter, Londoño *was* starting from scratch, notwithstanding his repeated representations otherwise to Corbel during the due diligence process. Corbel reasonably relied on these material misrepresentations and but for them would not have entered into the Transaction.

50.     And these myriad issues unsurprisingly triggered cash flow problems that had quickly and foreseeably developed given Londoño's financial projections being unmoored from reality.

51.     Perhaps the disconnect between Londoño's representations and reality was nowhere more pronounced than when it came to the actual manufacture of Ibuprofen.

52.     In early October 2021, Corbel requested "DMF Documentation assembled/completed [to] date." Per the U.S. Food and Drug Administration website, DMF or

Drug master files "are submissions to FDA used to provide confidential, detailed information about facilities, processes, or articles used in the manufacturing, processing, packaging, and storing of human drug products." The response directed by Londoño was that providing this was "[n]ot possible because most of it is in Master Control." Over a year later, Corbel still has not seen any DMF Documentation confirming Londoño's representations regarding historical manufacturing.

53. On October 15, 2021, Corbel discovered that Skalar Pharma was not registered with the FDA. This triggered the question of how Skalar Pharma could meet the production milestones set forth in the NPA. Londoño directed the response given to Corbel, which was that, based on historical production at the plant, FDA registration would be readily attainable. This was false because, contrary to Londoño's representations, Skalar Pharma under Londoño and Bioapi had never produced anything of commercial grade or quality that was subject to FDA review at the plant (or anywhere) let alone that had received FDA approval.

54. When asked for additional detail regarding historical manufacturing, Londoño had a report sent to Corbel describing the quality system development protocols at the plant and the third-party retained to oversee this effort. In so doing, Londoño was attempting to and did convey the false narrative that substantial production had occurred at the plant. In the same way, on October 20, Londoño directed that Corbel be sent a report on an Ibuprofen synthesis experimentation trial. This report was heavily redacted and was again designed to and did convey the false impression of manufacturing and progress towards commercialization at the plant.

55. In response to further questions from Corbel, Londoño continued to adhere to the false narrative he had been perpetuating, namely that Skalar Pharma had successfully manufactured scalable Ibuprofen and that its facilities were ready to go.

56.     For example, Londoño apprised Corbel by email that "the [Skalar Pharma] plant will be producing an API for which it is more than capable of doing so." The factual predicates underlying this statement were false and misleading and designed to deceive Corbel. Londoño knew Corbel would rely on his representations in light of his touted experience in the pharmaceutical industry, and special, unique and complete knowledge of Skalar Pharma's historical laboratory and manufacturing performance, work and capabilities, and the state of the manufacturing plant.

57.     Among the other putative claims advanced by Londoño in support of Skalar Pharma's ability to produce Ibuprofen were of the production of "more complex" APIs at the plant by Eli Lilly and that Skalar Pharma would have no issue scaling up its production of Ibuprofen, which is "considered 'simple' to manufacture." Londoño continued that they were starting with Ibuprofen because it is "i) a 'simple' product to produce in our facilities; ii) have the largest consumer of Ibuprofen API adjacent to our facilities; iii) Ibuprofen can be considered as a commodity product."

58.     Londoño also represented that "[t]he times in the technology transfer processes depend on the complexity of the API and the technology available in the facilities. For example, in the case of Duloxetine, it was estimated by Lilly that the transfer could take up to 12 months, however, and given the plant's capabilities, it was carried out in 3 months."

59.     The obvious implication of these representations is that by virtue of its experience in Ibuprofen production, the ease of Ibuprofen manufacturing, and the quality of its manufacturing facilities to expeditiously produce commercial grade product, Skalar Pharma was well-positioned to produce Ibuprofen and would certainly be able to do so within the schedule Skalar stipulated to in the NPA. These misleading statements and attendant material omissions were designed to

impress on Corbel that Skalar Pharma had manufactured Ibuprofen and was ready and able to quickly re-start that manufacturing process. All false.

60. Londoño also emphasized that "Puerto Rico is a pharmaceutical hub and can access quality workforce and trained for the needs of the industry." But Londoño had no interest in readily accessing the workforce and instead intended to, and did, delay the hiring of essential management staff to oversee and operate the development and manufacturing processes. Moreover, to the extent he wanted to, Londoño knew he would not be able to access the individuals needed because they were suing him for not paying their salaries when previously employed by Skalar Pharma.

61. Ultimately, to fully alleviate Corbel's concerns about manufacturing and to avoid the collapse of the Transaction, Londoño sent a picture of a pill bottle labeled "Ibuprofen Bottle #1 09-03-19" to one of Skalar Pharma's consultants and directed that consultant to call him. On this call, Londoño said the picture was of Ibuprofen that Skalar Pharma had produced and that Londoño had with him in Colombia. Londoño directed the consultant to share the picture with Corbel and tell them it was Ibuprofen produced by Skalar Pharma. In response to Londoño's directive, on October 24, 2021, this consultant sent by e-mail a picture to Corbel with the message "Here is the picture of Ibuprofen." In the picture attached to the e-mail was a pill bottle labeled "Ibuprofen Bottle #1 09-03-19." Upon information and belief, this bottle did not contain Ibuprofen manufactured by Skalar Pharma at its plant.

62. Corbel continued moving forward towards the Transaction based on the preceding representations by Londoño and Bioapi.

**F. Closing the Transaction**

63. The Transaction closed on or about November 16, 2021, with the execution of a series of interrelated agreements.

64. Skalar Pharma Holding LLC was established on or about November 9, 2016, under the Puerto Rico General Corporations Act of 2009. Effective November 16, 2021, Corbel, Bioapi and Skalar Holding executed the Skalar Pharma Holding LLC Limited Liability Company Agreement ("Holding Operating Agreement"). Londoño executed the agreement on behalf of Bioapi and Skalar Holding.

65. This agreement was premised upon and reflected Bioapi's contribution of its interests in Skalar Pharma to Skalar Holding. Under the agreement, Bioapi owned 60% of Skalar Holding in the form of the Class A membership interests. Ex. 1, Holding Operating Agreement, Schedule A. Corbel owned 40% of Skalar Holding in the form of the Class B membership interests. *Id.* As Class A holder, Bioapi, and in turn Londoño, had the exclusive right to appoint each of the five directors of the Skalar Holding board of directors. *Id.* § 4.1(a)(i).

66. Londoño, on behalf of Skalar Holding, executed the Amended and Restated Operating Agreement of Skalar Pharma ("Pharma Operating Agreement") to reflect Skalar Holding's ownership of 100% of the interests in Skalar Pharma. *See* Ex. 2, Pharma Operating Agreement.

67. Skalar Holding and Skalar Pharma LLC (collectively, the "Issuers"), entered into the NPA with Corbel on November 16, 2021. The NPA governed the Issuers' sale and Corbel's purchase of certain 9% secured notes in the original principal amount of $30,000,000 issued by the Issuers (the "Notes") and the ongoing obligations of the parties to the NPA. Ex. 3, NPA §§ 1.1(a); 1.4(a)(i).

68. The Issuers issued Notes in the original principal amount of $15,000,000 to Corbel Distressed and Special Opportunities Fund, L.P. and Notes in the original principal amount of

$15,000,000 to Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. *Id.*, Schedule 1.1.

69.     The Issuers were not required to repay the full principal balance of the Notes until the Maturity Date, November 16, 2026, subject to extension up to November 16, 2028 upon mutual agreement by the parties.  Ex. 3, NPA § 1.4(a)(i); Annex 1-12.

70.     Prior to the Maturity Date, the Notes accrued cash interest at a rate of 9% per annum.  Ex. 3, NPA § 1.4(a)(i). Interest payments were to be made monthly.  *Id.* Annex 1-14. Corbel retained an amount equal to eighteen (18) months of interest to be applied against such interest payments (the "Interest Holdback").  *Id.* § 1.4(d).

71.     Simultaneous with the NPA, the parties entered into a Security Agreement dated November 16, 2021.  Therein, Skalar Holding pledged its 60% membership interests (the "Pledged Interests") in Skalar Pharma as collateral in the event of a default of the NPA by Issuers.  Ex. 4, Security Agreement §§ 3.1; 8(a).

72.     The parties executed various other agreements in connection with the Transaction.

### G.  **Londoño Continues to Dominate Skalar Pharma Post-Closing**

73.     During the negotiation and due diligence process, Corbel observed that Londoño functionally controlled all aspects of Skalar Pharma's business and decision-making.  This made sense as a general matter given Skalar Pharma's sole member governance structure and that its sole member was Bioapi, which is wholly owned and controlled by Londoño.

74.     Following the Transaction, Londoño's "my way or the highway" approach to running the company became all the clearer and increasingly concerning.  Troublingly, individuals held out as key members of the Skalar team and with whom Corbel had developed positive working relationships were abruptly terminated or departed without real or with otherwise false

explanations. Corbel was further troubled by the fact that while Londoño was the ultimate authority on business and operational matters, he was regularly absent from Puerto Rico and became a black hole for key decisions.

75.    Londoño elected to entirely disregard corporate formalities implemented in connection with the Transaction. Londoño ignored the board that had been instituted as the governing body for Skalar Holding and Skalar Pharma and instead continued to operate Skalar Pharma as his exclusive domain. Londoño dismissed any challenge to his absolute authority and continued to lead the company down the path that he, and only he, chose.

76.    Londoño's megalomania handcuffed the strategy that Corbel's financing was intended and designed to implement, which further exacerbated a reality on the ground that differed materially from what was represented during the due diligence process.

**H.   Londoño's Authoritarian Mismanagement and Skalar's Covenant Breaches**

77.    There were unambiguous legal risks and ramifications to Londoño's approach to managing Skalar Pharma. These ramifications emerged from the NPA wherein Skalar Holding and Skalar Pharma covenanted to certain milestones. For example, Skalar Pharma was required to produce an API within seven months. Ex. 3, NPA § 5.4(b). When asked by concerned Skalar consultants and employees as to looming issues with satisfying milestones and covenants under the NPA such as this one, Londoño's response was, upon information and belief, that he did not concern himself with what the NPA (or any other agreement) required and that he would simply deal with any violations or breaches when they arose. This attitude and approach mirrored how Londoño generally handled many of Skalar's financial obligations, including employee salaries and vendor fees, large and small. For example, upon information and belief, Londoño simply refused to pay vendors that provided key services to the Guayama facility, imperiling the vendors'

livelihood for no reason. Making promises he could not and would not keep and defaulting on obligations is simply how Londoño conducts business.

78. Mindful of Skalar Pharma's milestones under the NPA, Corbel undertook to maintain regular contact with Skalar and its counsel. Silence from Skalar – resulting at least in part from Londoño's deliberate non-responsiveness – required Corbel to frequently chase Skalar for basic information and updates.

79. On March 15, 2022, counsel for Skalar advised that Skalar Pharma could not comply with "some of the post-closing items listed on Schedule of 5.14 of the NPA by the March 31, 2022, deadline." In particular, Skalar's counsel asserted that Skalar Pharma would not "be connected to the power grid" by the contractual deadline. Corbel, at Skalar's request, indicated they could potentially consider extending this deadline and not declaring a default, though Corbel was under no obligation to do so at this time.

80. The failure to meet the milestone in the NPA that Skalar Pharma be connected to the power grid was catastrophic. While revelations of facility and equipment issues indicated Skalar Pharma would not be meeting operation capacity within the timeframe covenanted in Section 5.4(b) of the NPA, this left no doubt. Nonetheless, Corbel generously agreed to continue to work with Londoño and Skalar and not immediately exercise rights under the NPA in response to defaults.

81. To be sure, the electricity failure was readily foreseeable. Historically, Puerto Rico's electricity grid and infrastructure was challenged, most notably by large companies that required significant electrical power to operate. As a result, the power authority approached companies, such as Skalar Pharma, with heightened awareness and diligence. And due to its mismanagement, and Londoño's utter failure to maintain its facility and take other remedial

measures, such as securing power generators like other commercial businesses, Skalar Pharma was not positioned to timely comply with the production milestones and related covenants in the NPA. Londoño's representations that securing electricity and then implementing API production would not be an issue once there was financing were false.

82.     Londoño sought to leverage the foreseeable and avoidable failure to timely secure electricity to avoid several other of the covenant breaches that he likely knew would result when he covenanted to them in the NPA.  And the responses from Londoño, Bioapi and Skalar as to their timetable for resolving these breaches were, at Londoño's direction, vague and incomplete, requiring Corbel to continuously chase for answers.  Corbel's patience and reasonableness was abused by Londoño.  Follow-ups over several months regarding covenant defaults went unheeded. Londoño simply ignored deadlines, as, upon information and belief, Londoño privately said he would.

### I.   Corbel Takes Action

83.     Over time, the magnitude and scope of Skalar's breaches under the NPA resulting from the failure to meet negotiated and agreed-upon (and extended) milestones left Corbel with no choice but to affirmatively exercise its rights and to protect its interests.

84.     On June 14, 2022, Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P., as Agent, issued a Notice of Events of Default and Reservation of Rights letter to the Issuers (the "Notice").  This Notice identified Skalar's violations of Section 5.14 of the NPA "for failure to deliver the post-closing deliverables required pursuant to (a) items 4 and 6 of Schedule 5.14 of the [NPA] prior to the extended deadline for delivery of such items of March 31, 2022, and (b) items 12 of Schedule 5.14 of the [NPA] prior to the deadline for delivery of such item of May 16, 2022."  The Notice also identified a violation of Section 5.8(a)(x) of the NPA "for failing to deliver

notice promptly to [Corbel] of each Event of Default noted" above. The Notice made clear that the identified defaults were "not intended to be exclusive or exhaustive" and in no way limited Corbel's rights as to any other defaults. Corbel expressly reserved its rights in the Notice as set forth therein.

85.     The unsatisfied deliverables identified in the Notice were "evidence . . . that all permits necessary for the operations of [Skalar Pharma] had been received" and "evidence . . . of insurance coverage" required under the NPA. Ex. 3, NPA, Schedule 5.14(4)-(6). Londoño had slow-walked and interfered securing the required insurance. Londoño had claimed that Skalar Pharma had permits to manufacture and sell Ibuprofen because it inherited such authorization from Eli Lilly when Bioapi bought the plant. But this was not the case, and there were no such permits in place. When pressed, Londoño shifted, obfuscated and did not deliver.

86.     Still, in a showing of tremendous restraint, Corbel did not exercise remedies under the NPA in connection with the Notice. Instead, Corbel undertook to provide Londoño and his team at Skalar with the opportunity to address their defaults and demonstrate their good-faith commitment to the terms of the NPA and operating the Skalar business consistent with promises and representations made to Corbel and fiduciary and contractual duties owed to Corbel.

87.     That was not to be the case. Nor could it have been the case, because Londoño's representations concerning Skalar's business made to induce Corbel's financial commitment to Skalar were materially false in several key respects. Putative historical facts conveyed orally, in writing and in the NPA were simply untrue.

88.     Over the summer of 2022, Corbel learned increasingly distressing information concerning Skalar's business and the bona fides of representations made to Corbel to induce its

entry into the NPA and to forestall its exercise of remedies in response to any of Skalar's several defaults under the NPA.

89.     The degree of what could only be deliberate malfeasance and game-playing is evident in an e-mail from a senior Skalar Pharma employee to Londoño and the Skalar Holding board in **August 2022** – nine months after the NPA was executed – regarding a series of open issues and questions:

> We need to speed up the process (for obtaining quotes) due to supply chain issues. The fastest turn-around for key equipment is 7 weeks for delivery. This would place the reception of the material at the same time of the synthesis first steps. As a result, we do not want to continue delaying the lab setup and ultimately the manufacturing process. Time in this case is money. … the cost differences on the quotes are marginal, thus I am confident any potential savings will much more costly if we continue delaying the lab set up.
>
> Enclosed find budget that you put together in 2019 to get the lab operational. I am surprised you did not remember that most of the lab instrumentation equipment was not usable. For your info most suppliers that have provided quotes for the equipment are somewhat skeptical since they went thru the same exercise in 2019 with Skalar to no avail. I wonder what equipment was utilized to do lab work in 2019?
>
> [They] estimated a cost of $100k-$200k to fix the lab based on a visual inspection. Once we were authorized to actually test the equipment (six weeks later) it was found out that the equipment did not have software license, hardware parts were missing thus rendering most equipment unusable or obsolete. For the ones that could be repaired, the cost is like new equipment (license/software and hardware needs to be purchased), as well as [a certain] maintenance contract.[2]

90.     The senior employee highlighted facts demonstrating the falsity of Londoño's representations in connection with the financing. He confirmed the absence of synthesis protocols, and the decrepit state of the facilities and equipment, along with the significant attendant costs of

---

[2] Translation from the original Spanish language.

addressing these issues. The senior employee emphasized the delays in receiving authorization to take action and move the process along. He also expressed appropriate incredulity that Londoño did not know and take into account the state of the equipment.

91.     With evidence of Londoño's fraudulent scheme magnified, to further protect its rights, Corbel issued a second Notice of Events of Default and Reservation of Rights letter to the Issuers, dated on August 15, 2022 (the "Second Notice"). Therein, Corbel reiterated the defaults noticed on June 14, and identified an additional default resulting from Skalar's "violation of Section 5.4(b) of the" NPA. This violation was "for failure to demonstrate 'ongoing capacity to produce greater than zero (0) metric tons per month of commercial salable active pharmaceutical ingredients with sufficient quality standards' prior to June 16, 2022, the deadline for compliance with such covenant (the foregoing, the 'Additional Default')." Corbel explained that "[w]hile compliance with all provisions of the NPA is both expected and contractually required of the Skalar Parties at all times, the Additional Default is of particular concern . . . as it speaks directly to the Skalar Parties' viability as a business."

92.     As before, the Second Notice made clear that the identified defaults were "not intended to be exclusive or exhaustive" and in no way limited Corbel's rights as to any other defaults. Corbel expressly reserved its rights in the Notice as set forth therein.

93.     Londoño wrote back to Corbel on August 29, 2022. In his response, he confirmed that neither the Issuers nor Londoño had taken any action to cure those Events of Default that were subject to curing and offered no indication they intended to attempt to do so or could do so.

94.     Accordingly, on August 30, 2022, Corbel sent to the Issuers their "Notice of Instruction and Notice of Exercise of Remedies."

95.    Therein, Corbel notified Issuers that Corbel was immediately assuming control of Skalar Holding's Pledged Interest under the Security Agreement, meaning Corbel obtained 100% of the membership interests in Skalar Pharma.

96.    Corbel further notified Issuers that it appointed Corbel DSOF – Skalar Agent, LLC ("Skalar Agent") as its Sub-Agent to exercise its rights and remedies in connection with assuming the Pledged Interest.

97.    In so doing, Corbel, through Skalar Agent, became the manager of Skalar Pharma. With access to Skalar's plant and the operating team, the state of affairs caused by Londoño's fraud and mismanagement only became clearer.

**J.    Fraudulent Misrepresentations in the NPA**

98.    As detailed above, Corbel has uncovered and confirmed the glaring falsity of several of Defendants' covenants and representations in the NPA.    These covenants and representations were material and relied on by Corbel in connection with Corbel's decision to purchase Notes under the NPA and acquire membership interests in Skalar Holding.

99.    First, Section 4.1(c) of the NPA contains the representation by Skalar that "Within three (3) years prior to the Closing Date [November 16, 2021] the Company [Skalar Pharma] successfully produced a kilo batch of Ibuprofen in compliance with all Applicable Laws and of premium quality so as to be marketable to pharmaceutical companies, as previously disclosed to the Agent."

100.    This statement, like numerous other statements regarding manufacturing detailed above, was materially false and misleading.    Corbel has uncovered, and Londoño, upon request, has offered, no evidence of any production of Ibuprofen over the preceding three years (or ever at the Skalar plant following its acquisition by Londoño in 2016).    To be sure, manufacturing of this

nature in Skalar's plant would have been impossible, as Corbel came to learn after its exercise of remedies and assumption of the management of Skalar Pharma in accordance with the terms of the parties' agreements.

101.    The significance of the production of a kilo batch of Ibuprofen consistent with the specifications set forth in Section 4.1(c) of the NPA cannot be overstated.  The first step of Ibuprofen development is the creation of a synthesis in the laboratory followed by production of a small volume of product.  With the synthesis in hand and production capability demonstrated, the next step is to scale-up to producing kilo batches in the laboratory.  Once the kilo batch production phase is completed, the process scales up to the contemplated manufacturing facility or pilot building.  The final pre-market step follows, which is large-scale production in a pilot building.  These results are provided to the FDA for approval.  The fact that there was no manufacturing of a kilo batch meeting the specifications set forth in the NPA meant Skalar was materially more removed from the manufacture of commercial FDA-approved Ibuprofen than had been represented.  That Skalar Pharma did not even possess an Ibuprofen synthesis protocol made this NPA representation all the further from the truth.

102.    Second, Corbel uncovered that the NPA materially mispresented the condition of Skalar Pharma's operating assets.  Section 4.21(b) of the NPA states "All tangible property owned by the Issuers and their Subsidiaries necessary to the business of the Issuers and their Subsidiaries is in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, and, to the knowledge of the Issuers and their Subsidiaries, all repairs to such property material to its functioning are set forth on Schedule 4.21(b)."  This is a false representation.

103.    After its exercise of remedies in August 2022, Corbel received a report dated December 12, 2019 (the "December 2019 Report"), about which, based on information and belief,

Londoño was aware, that revealed the truth. In particular, it discusses significant equipment damage, and out of service equipment. Corbel has no evidence or reason to believe any such equipment was repaired between December 2019 and November 2021, for purposes of this representation and nothing in that regard was set forth in Schedule 4.21(b) as contemplated by the NPA.

104. Notably, per the December 2019 Report:

- "One of the most worrying factors that we found at the time of the suspension of the electric service, was not having the necessary permits for the operation of the emergency generators."

- "The facilities of Skalar Pharma, LLC, were affected by Hurricane Maria. To this day, these remnants still persist in several areas of the facility."

- "From April 22, 2019, to the present, with supplier interruptions, resource limitations, and economic limitations, the development and understanding of the facilities of Skalar Pharma, LLC has begun. During this time there has been a significant deterioration in the facility and equipment, either due to lack of preventive and corrective maintenance due to financial limitation. That is why given the experience in the facility, the recommendation is to pursue the repair of the areas of facilities in plant and utilities as a priority in the near future."

105. These recommended repairs did not happen prior to the financing. Londoño had knowledge of the devastating issues at the manufacturing plant and knew that the misrepresentations would result in foreseeable losses to Corbel. The lack of maintenance for years made these issues and their magnitude unavoidable. Still, upon information and belief, Londoño shut down meaningful rehabilitative efforts.

106. Third, Section 4.27 of the NPA represents that "Since the acquisition of the Facility by Bioapi," in 2016, "there has been no event, change, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect." The NPA defines Material Adverse Effect as, *inter alia*, a material adverse effect on "(i) the business, Assets, financial condition or results of operations of the Note Parties and

their Subsidiaries, taken as a whole; (ii) the ability of any Note Party to perform its material obligations under the Note Documents to which it is a party . . . ."[3] This representation was completely false. As set forth herein, there were myriad "event(s), change(s), circumstance(s) [and] occurrences" that "had or would reasonably be expected to have a Material Adverse Effect" since 2016.

### K. Additional and Summary of Scienter Allegations

107. Londoño's scienter, and, in turn, the scienter of Bioapi and Skalar Holding, may be cogently and compellingly inferred from the scope and magnitude of the material misrepresentations and omissions described herein. Based thereon, it is evident that Londoño acted with conscious intent to defraud Corbel and with a high degree of recklessness in his dealings with Corbel. The evidence Corbel has been able to develop to date confirms Londoño's fraudulent intent with respect to the material, false and misleading representations contained in the NPA and made to Corbel over the course of the due diligence process. Londoño's fraudulent intent is further reflected in the evidence of misconduct Corbel has uncovered post-Transaction.

108. Indeed, Londoño has engaged in significant misconduct in connection with his management and operation of Skalar Pharma. This misconduct pre-dates the Corbel financing and has long actively disrupted Skalar Pharma's business and inhibited its growth. It has impacted management's ability to perform essential functions and the Board of Directors of Skalar Holding's fulfillment of its duties to manage Pharma. It has also contributed to, if not directly caused, Skalar Holding's inability to satisfy their obligations under the NPA.

---

[3] The "Note Parties" included the Skalar entities.

109. In that regard, Londoño knowingly and deliberately misled Corbel in connection with the negotiation of the NPA and the sale of the Notes thereunder as demonstrated herein and below.

110. Since Skalar Pharma's purchase of its plant in 2016, the plant has operated without any maintenance program or protocol. Equipment has sustained significant, costly damage as a result. The damages have been compounded by deficiencies in repair efforts and other unreasonable putative cost-cutting measures. On the laboratory side, Skalar Pharma has been operating, or attempting to operate, with damaged, obsolete equipment. It lacks software, required licenses, and essential computer hardware. There is no glassware for bench work, begging the question of how bench work was ever performed. No emission or quantity lab permits were obtained. Londoño lied about permit status, avoided making permits available and instead had their procurement included as a post-closing milestone.

111. Upon information and belief, Londoño blocked or vetoed remedial efforts. All of this negative information was deliberately and fraudulently concealed from Corbel by Londoño. This information renders representations in the NPA, and oral and written representations made to Corbel by Londoño or at his direction false.

112. Equally troubling is the absence of evidence that Skalar Pharma ever actually synthesized Ibuprofen, let alone produced a kilo batch of commercial grade Ibuprofen, as had been represented in connection with negotiation of the NPA and as reflected in the NPA's representations. The evidence in fact shows that Londoño lied about Skalar Pharma's past performance, future capabilities and ultimately the purpose for the funds sought and secured in the Transaction.

113.    After the financing closed, it became apparent that Londoño did not even have a method for Ibuprofen synthesis.  This meant, as was discussed by the Skalar Holding board, that they could not "determine [a] manufacturing process and . . . identify [the] equipment to be utilized." Londoño had made representations about what he had in hand, what he had done in the past and what he could readily do.  He had committed to firm production deadlines to induce Corbel to enter into the Transaction.  But, as Londoño knew, his representations were false and meeting such deadlines were impossible from the outset.

114.    No one with whom Corbel has spoken, including senior Skalar Pharma personnel, is aware of any lab report discussing 99.9% Ibuprofen synthesis as Londoño personally communicated to Corbel.  All that has been located in the Skalar plant is grey matter that is not Ibuprofen.

115.    Most notably, Skalar Pharma's laboratory glassware used to mix API syntheses (located undisturbed at the plant from its acquisition until the Transaction) is only equipped to handle a maximum pressure of 80 pounds-per-square-inch ("PSI") while Ibuprofen synthesis requires equipment able to handle a minimum of 1400 PSI for production. So, it would have been impossible for Pharma to synthesize Ibuprofen at the plant as represented.

116.    In February 2022, Londoño was still trolling for Ibuprofen synthesis and was in no way positioned to meet the related NPA milestone.  Around that time, the CEO of a third-party pharmaceutical company speculated in an email to Londoño and a Skalar board member that "[g]etting Ibuprofen Crystal" with specifications needed to sell to Skalar's primary target customer, "can be achieved with some work in lab scale fairly quickly (about 3 month) but scaling up to commercial level will take some time.  Could be achieved in existing facility provided all equipment[] can be cleaned, and validated with some or no modification."  Six months later,

having missed the NPA milestone deadline in June 2022 and having effectively given up on Ibuprofen, Skalar was still seeking quotes from "potential developers" for "the API synthesis project."

117.    Corporate formalities, obligations and fiduciary duties proved to mean nothing to Londoño.  He continued to assert his will on operations after the financing with Corbel closed.

118.    On top of affirmatively causing harm to Skalar, Londoño hamstrung any possibility of Skalar satisfying its covenants, meeting milestones, and ultimately becoming a productive API manufacturing facility.  For example, Londoño dominated and obstructed hiring efforts, including with respect to appointing a plant manager.  The plant manager position was critical to operations and no progress could be or would be made towards becoming truly operational without one in place. Upon information and belief, Skalar Pharma's prior plant manager had resigned in late 2019 and subsequently sued Londoño, Bioapi and others for non-payment of compensation due and owing.  Londoño refused to place a timeline on hiring a plant manager. Nor did he allow others to help advance the hiring process.  Londoño's approach reflected a total disregard for the promises and covenants made in the NPA.

119.    Londoño did not pay bills and created a culture where people did not want to work for or deal with the company. The delinquency deteriorated such that, upon information and belief, Skalar Pharma's security company was not being paid and large pieces of equipment started to disappear through the plant's front door.  Londoño would not allow payments to be made to vendors or would attempt to negotiate down agreed-upon invoices after performance already occurred.   Small vendors and self-employed service providers were no exception. Londoño willingly invited lawsuits.

120.    In terms of Londoño's financial misconduct, he is believed to have attempted to misappropriate funds from the company.  Upon information and belief, on or about March 17, 2022, Londoño issued a letter authorizing the release and transfer of funds in the amount of approximately $636,000 USD held by Pharma in escrow at Popular Insurance to an unknown account in the United States he had designated. Based on Londoño's authorization and instruction, on March 25, 2022, Popular Insurance released the escrowed funds to this account.  Fortunately, the United States recipient bank returned the funds out of concern regarding the propriety of the transfer, subject to a confirmatory explanation. Londoño responded that he could provide the requested information to legitimize the transfer, but never did so. This failure strongly suggests that this attempted transfer was wrongful.

121.    Upon information and belief, on another occasion, Londoño requested the transfer of $100,000 USD from a Skalar operating account to an account at InterAudi bank to which only Londoño (and no one else at Skalar) had access.

122.    In addition, upon information and belief, Londoño apparently instructed members of Skalar Pharma's management and accounting to pay his personal credit card bills for alleged business travel. But Londoño never submitted receipts or other documentation to substantiate any reimbursable business travel or otherwise obtain authorization.

123.    Londoño also had Skalar Pharma employ and pay consultants for purposes of which management at Skalar Pharma is unaware.

124.    Over time, directors on Londoño's hand-picked Skalar Holding board began to question his management and operation of Skalar Pharma, as well as sought to take initiative in key areas where the company was lagging or struggling due to Londoño's beleaguered approach. The first director that Londoño came to perceive as a threat to his autonomy was quickly terminated

from the board and replaced by someone Londoño correctly anticipated would stay in line and remain loyal.

125.     With Events of Default under the NPA continuing to manifest and Londoño's mismanagement and fraudulent conduct increasingly apparent, two directors resigned from the board in and around the time of Corbel's exercise of remedies leaving Londoño and his two subservient directors at the helm of Skalar Holding.

**L.  Londoño's Desperate Measures**

126.     Having caused several defaults under the NPA and faced with Corbel's exercise of remedies and control over Skalar Pharma consistent with the Transaction's agreements, Londoño, and his captive Skalar Holding board filed suit purportedly on behalf of Skalar Holding and Skalar Pharma in the Court of First Instance (the "Local Action").

127.     Londoño's lawsuit is without merit under Puerto Rico law and under New York law governing the NPA and related agreements.  Corbel is moving to dismiss to the complaint in the Local Action in its entirety.

128.     Troublingly, AMG served as counsel for Skalar Pharma and Skalar Holding in the Transaction and in connection with discussion and negotiation of post-Transaction defaults and Corbel's forbearances.  After Corbel filed the original complaint and raised its concerns about AMG's conflicts of interest, AMG withdrew as counsel from both the instant case and the Local Action.

**M. Corbel Takes Over Management of Skalar Pharma**

129.     In connection with Corbel's August 30, 2022 assumption of Skalar Holding's membership interests in in Skalar Pharma, Corbel, through Skalar Agent, took over management of Skalar Pharma.

130.  Since, Corbel has made attempts to mitigate the total loss of its $30 million investment resulting from Defendants' misrepresentations.

131.  As memorialized in the NPA, the plant was expected to manufacture commercially salable API by no later than June 26, 2022, but the plant was not even connected to the power grid until July 6, 2022.  By the time Corbel took over management of the plant, the plant had still not manufactured any commercially salable API and Skalar Pharma had generated zero revenue.

132.  As further memorialized in the NPA, the planned costs associated with the "Skalar Pharma Plant Start Up" were represented by Defendants to be under $3.7 million, including administrative costs and a "general contingency" of 15%.  Ex. 3, NPA, Schedule 1A at 144.

133.  Corbel intended the remainder of its $30 million investment to be used to fund the continued operation of the Plant and further upgrades to the plant's capabilities to increase profitability. However, Corbel has made and continues to make significant expenditures well in excess of $3.7 million to correct the issues concealed by Defendants' misrepresentations.

134.  These additional expenditures include, but are not limited to, costs associated with (1) hiring the requisite employees; (2) obtaining the necessary permits; (3) hiring third party experts to evaluate the plant and its capabilities; (4) purchasing the necessary equipment; (5) repairing damaged equipment; and (6) repairing the plant's infrastructure.  Corbel would not have been required to incur these additional expenditures, which run into the millions of dollars to date, but for Defendants' misrepresentations.

135.  Corbel quickly learned that, contrary to Defendants' misrepresentations, the Plant was nowhere near being capable of producing Ibuprofen and Skalar Pharma was unlikely to secure the necessary permits and authorizations to do so.  Accordingly, at significant additional cost, Corbel was forced to change course and outfit the plant to produce a different API.

136.     This necessary change has further delayed the plant's manufacturing timeline, and, as a result, Skalar Pharma has still not produced any commercially salable API or generated any revenue.

137.     On April 7, 2023, Corbel sold the membership interests in Skalar Pharma to Skalar Agent through a credit bid in a public sale conducted under Section 9-610 of the New York Uniform Commercial Code.  In consideration thereof, Skalar Agent agreed to cancel indebtedness in the amount of $15 million owed by Holding and Skalar Pharma to Corbel pursuant to the Notes. An addition $15 million, with interest, remains outstanding.

**COUNT I**
**(Violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and/or Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5)**

138.     Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 121 of their Complaint, as if fully set forth herein.

139.     Through the conduct described above, Defendants knowingly and willfully violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, all of which prohibit fraudulent conduct in connection with the purchase or sale of securities.

140.     Defendants engaged in a plan, scheme, and course of conduct, as to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Corbel; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

141.     Such scheme was intended to and did: (a) deceive Corbel; and (b) cause Corbel to

purchase the Notes. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, each one of them, took the actions set forth herein.

142.    In accordance with the above plan, scheme, conspiracy, and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the Defendants made actionable misstatements.

143.    Each of the Defendants also engaged in underlying deceptive devices or frauds in as part of the plan, scheme, conspiracy and course of conduct.

144.    As described above, Defendants acted with scienter throughout, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

145.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Skalar.

146.    Corbel relied on Defendants' false and misleading statements in purchasing the Notes. The Issuers made the false representations for the purpose of and knowing that they would induce Corbel to purchase the Notes and that they would result in damages arising directly from the concealment. Had Corbel known the truth, they would not have purchased or otherwise acquired the Notes or would not have purchased or otherwise acquired them at the prices and the terms that were paid and agreed upon.

147.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

148. Defendants knew or disregarded with deliberate recklessness that the statements they issued and disseminated were materially false and misleading and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.

149. Indeed, Defendants, by virtue of their receipt and knowledge of information reflecting the true fact, their control over, and/or receipt and/or modification of Skalar's materially incomplete, false and misleading misstatements and/or their access to confidential information concerning Skalar, knowingly or recklessly participated in the fraudulent course of conduct alleged herein. Indeed, the fraudulent scheme described in this Complaint could not have been perpetuated without the knowledge and complicity, or at a minimum reckless disregard, of Defendants.

150. As a direct and proximate result of the wrongful conduct of Defendants, Corbel suffered damages and economic loss that was foreseeable to Defendants as a direct result of their misstatements and omissions.

151. The economic terms of and the amounts paid by Corbel for the Notes under the NPA, and the Skalar Holding Class B membership interests were inflated to Corbel's financial detriment by virtue of the fraudulent scheme and actionable misrepresentations described herein.

152. In addition, Corbel has suffered economic loss of at least $20 million as a proximate result of Defendants' intentional fraud, including, but not limited to:

    i. Loss of anticipated interest payments from Defendants that would have accrued under the Notes but for Defendants' default, and estimated to be in the millions of dollars to date;

    ii. Expenditures to restart Skalar Pharma's operations in excess of the $3.7 million that Defendants' misrepresented as required in the NPA;

    iii. Expenditures in connection with changing the plant to produce APIs other than Ibuprofen;

    iv. Costs, including legal fees, associated with Corbel's takeover of management of Skalar Pharma necessitated by Defendants' fraud and wanton mismanagement.

## COUNT II
### (Violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t)

153.    Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 135 of its Complaint, as if fully set forth herein.

154.    Londoño and Bioapi controlled Skalar, and Londoño controlled Bioapi at all relevant times.

155.    By this control, Londoño and Bioapi caused Skalar, and Londoño caused Bioapi to engage in acts that violated Section 10(b) and Rule 10b-5 of the Exchange Act as set forth herein.

156.    Londoño and Bioapi are liable to Corbel for damages resulting from these violations.

## COUNT III
### (Dolus, Bad Faith or Negligence in the Performance of Contractual Obligations under the Civil Code of Puerto Rico)

157.    Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 139 of its Complaint, as if fully set forth herein.

158.    Defendants had a duty requiring that they take reasonable steps to ensure that his statements to Corbel were accurate in all material respects, and that they did not omit any facts or statements necessary to make other statements or facts therein under the circumstances under which they were made not misleading.

159.    Defendants breached this duty.

160.    Corbel relied on the false and misleading statements made by Defendants in breach of their duty to Corbel in entering into the NPA and performing thereunder.

161.    In addition, Defendants in bad faith and negligently caused Skalar to breach the NPA, as set forth herein.

162.    Defendants' bad faith and negligence caused Skalar to fail to comply with

covenants and milestones contained in the NPA.

163. Defendants' bad faith and negligence has also prevented Skalar Pharma from performing as required under the NPA.

164. Defendants' breaches, bad faith and negligent conduct have caused real and actual damage to Corbel.

## COUNT IV
### (Fraud or Dolus)

165. Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 147 of its Complaint, as if fully set forth herein.

166. Defendants repeatedly made false representations of material fact to Corbel as described above.

167. Defendants knew that their representations were false when made and had access to facts that contradicted and demonstrated the falsity of those representations.

168. Defendants knowingly made these material, false representations for the purpose of deceiving Corbel for the reasons described above.

169. Corbel reasonably and justifiably relied upon Defendants' material, false representations.

170. Defendants' deceit was deliberate, wanton and willful. They engaged in this fraud to protect their position and compensation.

171. Corbel has suffered substantial monetary injury as a direct and proximate result of Defendant's fraud.

172. Corbel is entitled to compensatory damages in an amount to be determined at trial as well as punitive damages.

## COUNT V
## (Unjust Enrichment)

173.     Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 155 of its Complaint, as if fully set forth herein.

174.     Defendants were enriched through payments from Corbel.

175.     Defendants were so enriched at Corbel's expense.

176.     For the reasons set forth herein, equity and good conscience demand that Defendants not be permitted to retain any money received from Skalar Pharma or Skalar Holding during the period in which they were engaged in the scheme to defraud Corbel up to the amount by which Corbel has been damaged.

177.     Accordingly, Defendants should be ordered to return such payments in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants in favor of Plaintiffs as follows:

a.     Awarding Plaintiffs damages in an amount to be determined at trial.

b.     Awarding Plaintiffs punitive damages in an amount to be determined at trial.

c.     Ordering a constructive trust for the benefit of Plaintiffs over the funds wrongfully received by Defendants and the proceeds thereof in an amount to be determined at trial.

d.     Ordering disgorgement from Defendants and restitution to Plaintiffs of the funds wrongfully received by Defendants and their proceeds in an amount to be determined at trial.

e.     Awarding Plaintiffs pre-judgment and post-judgment interest.

f.     Awarding Plaintiffs reasonable attorneys' fees and costs.

g.     Awarding Plaintiffs such other and further legal and equitable relief as the Court

may deem just and proper.

RESPECTFULLY SUBMITTED,

In San Juan, Puerto Rico, on January 30, 2024.

By:   /s/ *Neal Kronley*
      Ricardo F. Casellas Sánchez
      (USDC-PR No. 203114)
      Natalia Morales Echeverría
      (USDC-PR No. 226513)
      **CASELLAS ALCOVER & BURGOS, PSC**
      P.O. Box 364924
      San Juan, Puerto Rico 00936-4924
      Tel: (787) 756-1400
      Fax: (787) 756-1401
      rcasellas@cabprlaw.com
      nmorales@cabprlaw.com

      Neal Kronley (admitted *pro hac vice*)
      Marc Silverman (admitted pro hac vice)
      **DLA PIPER LLP (US)**
      1251 Avenue of the Americas, 24th Floor
      New York, NY 10020-1104
      Tel: (212) 335-4500
      neal.kronley@us.dlapiper.com
      marc.silverman@us.dlapiper.com

      *Attorneys for Plaintiffs Corbel Distressed and*
      *Special Opportunities Fund, L.P. and Corbel*
      *Distressed and Special Opportunities Fund (SPV*
      *Skalar), L.P.*