# Exhibit 1

**SKALAR PHARMA HOLDING LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**November 16, 2021**

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE FEDERAL OR STATE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFER SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

ARTICLE 1   DEFINITIONS ................................................................................... 1

    Section 1.1   Definitions ............................................................................. 1
    Section 1.2   Construction ........................................................................ 12
    Section 1.3   Discretion ............................................................................ 12

ARTICLE 2   ORGANIZATION ........................................................................... 13

    Section 2.1   Formation ............................................................................. 13
    Section 2.2   Company Name .................................................................... 13
    Section 2.3   Filings .................................................................................. 13
    Section 2.4   Term of the Company .......................................................... 13
    Section 2.5   Registered Office; Registered Agent; Principal Office; Other
                Offices .................................................................................. 13
    Section 2.6   Purposes and Powers ........................................................... 14
    Section 2.7   Foreign Qualification ........................................................... 14

ARTICLE 3   MEMBERS AND UNITS ................................................................. 14

    Section 3.1   Members ............................................................................... 14
    Section 3.2   Units .................................................................................... 15
    Section 3.3   No Liability of Members ...................................................... 17
    Section 3.4   Limitation on Authority of Members .................................... 17
    Section 3.5   Meetings of the Members ..................................................... 17
    Section 3.6   Resignation and Withdrawal ................................................ 18
    Section 3.7   Issuance of Additional Units; Additional Members ............. 18
    Section 3.8   Preemptive Rights ............................................................... 19
    Section 3.9   Certification of Units .......................................................... 21
    Section 3.10  Representations and Warranties by Company ...................... 21

ARTICLE 4   MANAGEMENT POWER, RIGHTS AND DUTIES ....................... 23

    Section 4.1   Management by the Board .................................................... 23
    Section 4.2   Officers ................................................................................ 28

ARTICLE 5   OBLIGATIONS, EXCULPATION AND INDEMNIFICATION .................... 28

    Section 5.1   Performance of Duties; No Liability of Officers ................. 28
    Section 5.2   Opportunities; Competing Activities, Solicitation, Disparagement ........ 29
    Section 5.3   Confidential Information ...................................................... 30
    Section 5.4   Transactions Between the Company and the Members .......... 30
    Section 5.5   Right to Indemnification ...................................................... 31
    Section 5.6   Advance Payment ................................................................ 31
    Section 5.7   Indemnification of Employees and Agents .......................... 32
    Section 5.8   Appearance as a Witness ..................................................... 32
    Section 5.9   Non-Exclusivity of Rights ................................................... 32
    Section 5.10  Insurance .............................................................................. 33
    Section 5.11  Savings Clause .................................................................... 33

EAST\186296037.4

ARTICLE 6    CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS ......................... 33

    Section 6.1    Establishment and Determination of Capital Accounts ........................... 33
    Section 6.2    Negative Capital Accounts ...................................................................... 33
    Section 6.3    Company Capital ...................................................................................... 33
    Section 6.4    Compliance With Section 1.704-1(b)(2)(iv) .......................................... 33
    Section 6.5    Transfer of Capital Accounts .................................................................. 34

ARTICLE 7    DISTRIBUTIONS ................................................................................................ 34

    Section 7.1    Generally ................................................................................................. 34
    Section 7.2    Distributions ............................................................................................ 34
    Section 7.3    Tax Distributions for Non-Distributed Income or Gain .......................... 35
    Section 7.4    Withholding of Certain Amounts ............................................................ 36

ARTICLE 8    ALLOCATIONS OF PROFITS AND LOSSES ................................................. 36

    Section 8.1    Allocation of Profits and Losses ............................................................ 36
    Section 8.2    Regulatory and Special Allocations ....................................................... 37
    Section 8.3    Tax Allocations ....................................................................................... 39

ARTICLE 9    TAX AND ACCOUNTING MATTERS; INFORMATION RIGHTS .............. 39

    Section 9.1    Tax Returns ............................................................................................. 39
    Section 9.2    Partnership Representative ...................................................................... 39
    Section 9.3    Reserves .................................................................................................. 40
    Section 9.4    Partnership Status.................................................................................... 40
    Section 9.5    Withholding Tax Payments and Obligations .......................................... 41
    Section 9.6    Bank Accounts ........................................................................................ 42
    Section 9.7    Maintenance of Books ............................................................................ 43
    Section 9.8    Accounting Year ..................................................................................... 43
    Section 9.9    Information Rights ................................................................................... 43

ARTICLE 10   TRANSFERS AND OTHER EVENTS................................................................ 45

    Section 10.1    Transfers and Restrictions on Transfer ................................................. 45
    Section 10.2    Assignments Generally; Substituted Member ....................................... 46
    Section 10.3    Required Amendments; Continuation .................................................... 49
    Section 10.4    Tag-Along Rights for Transfers ............................................................ 49
    Section 10.5    Sale of the Company .............................................................................. 51
    Section 10.6    Change in Business Form ...................................................................... 53
    Section 10.7    Change in Structure ............................................................................... 53
    Section 10.8    No Appraisal Rights............................................................................... 53
    Section 10.9    Void Assignment ................................................................................... 54
    Section 10.10   Put Right ................................................................................................ 54

ARTICLE 11   LIQUIDATION AND TERMINATION ............................................................. 56

    Section 11.1    Dissolution ............................................................................................. 56
    Section 11.2    Liquidation and Termination ................................................................. 56

EAST\186296037.4

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| Section 11.3 | Deemed Distribution and Recontribution | 57 |
| Section 11.4 | Deficit Capital Accounts | 57 |
| Section 11.5 | Cancellation of Certificate | 57 |
| Section 11.6 | Hart-Scott-Rodino | 57 |
| ARTICLE 12 | MISCELLANEOUS PROVISIONS | 58 |
| Section 12.1 | Creditors | 58 |
| Section 12.2 | Offset | 58 |
| Section 12.3 | Notices | 58 |
| Section 12.4 | Public Announcements | 59 |
| Section 12.5 | Entire Agreement | 59 |
| Section 12.6 | Effect of Waiver or Consent | 59 |
| Section 12.7 | Amendment or Modification | 59 |
| Section 12.8 | Severability | 60 |
| Section 12.9 | Successors and Assigns | 60 |
| Section 12.10 | Further Assurances | 60 |
| Section 12.11 | Notice to Members of Provisions | 60 |
| Section 12.12 | Third Parties | 60 |
| Section 12.13 | Governing Law | 61 |
| Section 12.14 | Waiver of Jury Trial | 61 |
| Section 12.15 | Consent to Jurisdiction | 61 |
| Section 12.16 | Waiver of Certain Rights | 61 |
| Section 12.17 | Counterparts; Delivery by Email | 61 |
| Section 12.18 | Specific Performance | 62 |
| Section 12.19 | Descriptive Headings | 62 |
| Section 12.20 | Severability with the Act | 62 |
| Section 12.21 | Computation of Time | 62 |
| Section 12.22 | No Strict Construction | 62 |
| Section 12.23 | DLA Piper | 62 |
| Section 12.24 | Title to Company Assets | 63 |

Term ...........................................................................................................Section Reference

"Act"...........................................................................................................Preamble
"Action" .....................................................................................................Section 1.1
"Additional Units"................................................................................. Section 3.8(a)
"Adjusted Capital Account"...................................................................Section 1.1
"Affiliate"...................................................................................................Section 1.1
"Agreement".............................................................................................Section 1.1
"Applicable Documents".......................................................................Section 1.1
"Approving Party"....................................................................................Section 1.1
"Approved Sale" ................................................................................. Section 10.6(a)
"Board"...............................................................................................Section 4.1(a)(i)
"Board Observer"..............................................................................Section 4.1(a)(ii)
"Book Value" ............................................................................................Section 1.1
"Business".................................................................................................Section 1.1
"Business Day" .........................................................................................Section 1.1
"Capital Account" ...................................................................................Section 6.1
"Capital Contribution" .........................................................................Section 1.1
"Cause".......................................................................................................Section 1.1
"Certificate" .............................................................................................Section 1.1
"Change of Control".................................................................................Section 1.1
"Class A Capital Amount" ................................................................ Section 7.2(a)
"Class A Holder"......................................................................................Section 1.1
"Class A Unit".............................................................................................Section 1.1
"Class B Director" ...........................................................................Section 4.1(a)(i)
"Class B Holder".......................................................................................Section 1.1
"Class B Unit"............................................................................................Section 1.1
"Closing"....................................................................................................Section 1.1
"Code".........................................................................................................Section 1.1
"Company".................................................................................................Section 1.1
"Company Loss" .............................................................................. Section 10.6(d)
"Company Minimum Gain"...................................................................Section 1.1
"Company Sale Process".................................................................Section 10.15(c)(i)
"Competing Enterprise" ...................................................................Section 10.1(b)
"Confidential Information" ...................................................................Section 1.1
"Convertible Units".................................................................................Section 1.1
"Consolidated" .........................................................................................Section 1.1
"Corbel" .....................................................................................................Section 1.1
"Damages" ......................................................................................... Section 5.5(a)
"Debt Then Outstanding"......................................................................Section 1.1
"Depreciation"..........................................................................................Section 1.1
"Directors".........................................................................................Section 4.1(a)(i)
"Distribution" ..........................................................................................Section 1.1
"Distribution Target"..............................................................................Section 1.1
"Economic Interest" ...............................................................................Section 1.1
"Effective Date" .......................................................................................Preamble

EAST\186296037.4

"Eligible Member" ............................................................................. Section 3.8(a)
"Enforceability Exceptions" .............................................................. Section 3.1(c)
"Equity Securities" ................................................................................... Section 1.1
"Estimated Tax Amount" ................................................................... Section 7.3(c)
"Excess Losses" .................................................................................. Section 8.1(b)
"Exempted Units" .............................................................................. Section 3.8(d)
"Expenses" ....................................................................................... Section 10.6(d)
"Fair Market Value" ................................................................................ Section 1.1
"Fee Letter" ............................................................................................. Section 1.1
"Financial Statement(s) ......................................................................... Section 1.1
"Firm" ...................................................................................................... Section 1.1
"Fiscal Month" ........................................................................................ Section 1.1
"Fiscal Quarter" ...................................................................................... Section 1.1
"Fiscal Year" ........................................................................................... Section 1.1
"
"Formation Date" ................................................................................... Preamble
"Fund Indemnitors" ................................................................................ Section 5.9
"GAAP" ................................................................................................... Section 1.1
"Holder" .................................................................................................. Section 1.1
"Holder Minimum Gain" ......................................................................... Section 1.1
"Holder Nonrecourse Deductions" .......................................................... Section 1.1
"HSR Act" ............................................................................................. Section 11.6
"Implied Equity Value" ..................................................................... Section 10.15(b)
"Indebtedness" ........................................................................................ Section 1.1
"Independent Third Party" ....................................................................... Section 1.1
"Initial Capital Contributions" ................................................................ Section 1.1
"Initial Public Offering" .......................................................................... Section 1.1
"Institutional Indemnities" .................................................................... Section 5.9
"Issuance Notice" ................................................................................ Section 3.8(a)
"Issuance Closing" ............................................................................. Section 3.8(b)
"Loan Termination Date" ........................................................................ Section 1.1
"Losses" .................................................................................................. Section 1.1
"Majority" ................................................................... Section 1.1, Definition of Profits
"Member" ................................................................................................ Section 1.1
"Membership Interest" ............................................................................ Section 1.1
"Monitoring Agreement" ......................................................................... Section 1.1
"Non-Competition Period" ................................................................... Section 5.2(b)
"Nonrecourse Deductions" ...................................................................... Section 1.1
"Note Purchase Agreement" .................................................................... Section 1.1
"Officer" .................................................................................................. Section 1.1
"Other Business" ................................................................................. Section 5.2(a)
"Partnership Representative" ................................................................... Section 9.2
"Permitted Person" .................................................................................. Section 1.1
"Permitted Transferee" ............................................................................ Section 1.1
"Permitted Withdrawal" .......................................................................... Section 3.6

EAST\186296037.4

"Person" ........................................................................................... Section 1.1
"Pro Rata Portion" .......................................................................... Section 1.1
"Pro Rata Share" .............................................................................. Section 1.1
"Proceeding" ..................................................................................... Section 5.5
"Profits" ............................................................................................. Section 1.1
"Property Company" ................................................................Section 10.15(b)
"Public Offering" .............................................................................. Section 1.1
"Put Notice" ...............................................................................Section 10.15(a)
"Put Units" ..................................................................................Section 10.15(a)
"Put Price" ..................................................................................Section 10.15(a)
"Regulatory Allocations" ...............................................................Section 8.2(g)
"Real Property" ...........................................................................Section 10.15(b)
"Registrable Securities" ................................................................... Section 1.1
"Repurchase Right" .....................................................................Section 3.8(e)(iii)
"Sale Notice" .................................................................................. Section 10.5
"Sale of the Company" .................................................................... Section 1.1
"Sale Proceeds Amount" ...............................................................Section 10.6(b)
"SEC" ................................................................................................ Section 1.1
"Section 6226 Adjustments" ........................................................... Section 9.2
"Section 6226 Election" .................................................................. Section 9.2
"Section 83(b) Election" ...............................................................Section 3.2(c)
"Securities Act" ............................................................................... Section 1.1
"Single Purpose Holder" ................................................................. Section 10.2
"Sponsor" .......................................................................................... Section 1.1
"Subsidiary" ...................................................................................... Section 1.1
"Successor in Interest" ..................................................................... Section 1.1
"Tag-Along Notice" .......................................................................... Section 10.5
"Tax Account" ................................................................................... Section 1.1
"Tax Amount" .................................................................................Section 7.3(b)
"Taxable Year" .................................................................................. Section 1.1
"Total Equity Value" ........................................................................ Section 1.1
"Transactions" .................................................................................. Section 12.23
"Transfer" .......................................................................................... Section 1.1
"Transferor" ....................................................................................... Section 10.5
"Treasury Regulations" .................................................................... Section 1.1
"Unit" ................................................................................................. Section 1.1
"Unit Ledger" ...............................................................................Section 3.2(c)(iii)
"Underlying Holder" ........................................................................ Section 10.2

EAST\186296037.4

# SKALAR PHARMA HOLDING LLC

## LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement of Skalar Pharma Holding LLC, a Puerto Rico limited liability company, dated and effective as of November 16, 2021 (the "Effective Date"), is adopted, executed and entered into by and among the Company and each of the other Persons listed as Members on the signature pages hereto and each other Person who becomes a Member in accordance with the terms of this Agreement.

**WHEREAS**, as of November 9, 2021 (the "Formation Date"), the Company was formed pursuant to the Puerto Rico General Corporations Act of 2009 (as from time to time amended and including any successor statute of similar import, the "Act") and the Certificate was filed with the Secretary of State of the Commonwealth of Puerto Rico;

**WHEREAS**, on the date hereof, Bioapi S.A.S has contributed all of its membership interest in Skalar Pharma LLC to the Company (which membership interests in Skalar Pharma LLC represents 100% of the membership interests therein); and

**WHEREAS**, the Members desire to enter into this Limited Liability Company Agreement in order to set forth, among other things, terms applicable to the Persons that were admitted as Members in connection therewith, the Units issued to such Members and the manner by which the business and affairs of the Company was to be managed and certain rights and obligations in respect of Units issued on or after the date thereof.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements herein made and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1    Definitions. As used in this Agreement, the following terms have the following meanings:

"Action" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any governmental authority or arbitral body.

"Adjusted Capital Account" means, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments: (a) credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement, or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The above definition of Adjusted Capital Account is

intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" of any particular Person (a) that is not a natural person, means (i) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise and/or is more than twenty percent (20%) equity holder of such specified Person, (ii) if such Person is a partnership or limited liability company, any limited or general partner or member thereof and (iii) if such person is a trust, the trustees and beneficiaries of such trust, and (b) that is a natural person, means (i) the natural person, (ii) the natural person's spouse (and former spouse(s)), (iii) any other natural person who is related to the natural person or the natural person's spouse within the second degree and (iv) any other natural person who resides with such natural person.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"Applicable Documents" means this Agreement, the Note Purchase Agreement and all documents entered into by the Company or any of its Subsidiaries under or in connection with the Note Purchase Agreement and, for purposes of this Agreement, including Section 7.2(a), Section 10.5, Section 10.6 and Section 10.15, includes amounts in the form of principal and interest under the Note Purchase Agreement.

"Approving Party" means Corbel.

"Bankruptcy" means, with respect to any Person, the occurrence of any of the following events: (i) the filing of an application by such Person for, or a consent to, the appointment of a trustee or custodian of such Person's assets; (ii) the filing by such Person of a voluntary petition in Bankruptcy or the seeking of relief under Title 11 of the United States Code, as now constituted or hereafter amended, or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they become due; (iii) the failure of such Person to pay its debts as such debts become due; (iv) the making by such Person of a general assignment for the benefit of creditors; (v) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering, a bankruptcy petition filed against such Person in any bankruptcy proceeding or petition seeking relief under Title 11 of the United States Code, as now constituted or as hereafter amended; or (vi) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or insolvent, or for relief in respect of such Person or appointing a trustee or custodian of such Person's assets and the continuance of such order, judgment or decree unstayed and in effect for a period of sixty (60) consecutive calendar days.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Book Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset, as reasonably determined by the Board;

(b)     The Book Values of all Company assets shall be adjusted to equal their respective gross Fair Market Values (taking Code Section 7701(g) into account), as determined by the Board as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the acquisition of an additional interest in the Company by any new or existing Member in exchange for services to the Company; (iii) the issuance of a non-compensatory option to acquire equity in the Company; (iv) the distribution by the Company to a Member of more than a de minimis amount of the Company's assets as consideration for an interest in the Company; and (v) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), *provided that* an adjustment described in this paragraph shall be made only if the Board reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(c)     The Book Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross Fair Market Value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Board; and,

(d)     The Book Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (f) of the definition of "Profits" and "Losses" of this Agreement; *provided, however*, that Book Values shall not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Book Value of an asset has been determined or adjusted pursuant to subparagraph (b) or (d), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses;

"Business" means the ownership and operation of an active pharmaceutical ingredient ("API") manufacturing facility.

"Business Day" means any day other than Saturday, Sunday or any day on which banks are required or authorized by law to be closed in New York, New York or Puerto Rico.

"Capital Contribution" means, with respect to any Holder, the amount of cash contributions and the initial Book Value of non-cash contributions made (or deemed made) by or on behalf of such Holder to the Company pursuant to ARTICLE III (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code

3

Section 752) as of the date in question, as shown opposite such Holder's name on Schedule A, as the same may be amended from time to time, and in respect of any Unit or other Equity Securities, the total consideration contributed (or deemed contributed) by the applicable Holder pursuant to ARTICLE III in respect of such Unit or other Equity Securities; in each case net of any liabilities assumed by the Company from such Holder in connection with such contribution and net of any liabilities to which assets contributed by such Holder in respect thereof are subject.

"Certificate" means the Certificate of Formation of the Company as filed with the Secretary of State of the Commonwealth of Puerto Rico, as such Certificate may be amended from time to time in accordance with the Act.

"Change of Control" means the time at which (i) Sponsor, directly or indirectly, fails to collectively hold at least a Majority of the Units, (ii) Fernando Londono shall no longer have day to day operational control of the Company and its Business, unless a replacement acceptable to Corbel has been appointed, (iii) there shall be consummated any consolidation or merger of any Member pursuant to which such Member's Units would be converted into cash, securities or other property, other than a merger or consolidation of such Member in which the holders of such Units immediately prior to the merger have the same proportionate ownership, directly or indirectly, of Units of the surviving Person immediately after the merger as they had immediately prior to such merger, (iv) all or substantially all of the Company's assets shall be sold, leased, conveyed or otherwise disposed of as an entirety or substantially as an entirety to any Person (including any Affiliate or associate of the Company) in one or a series of transactions.

"Class A Holder" means a Holder holding one or more Class A Units.

"Class A Unit" means a Unit representing a fractional part of the ownership of the Company and having the rights, preferences and obligations specified with respect to Class A Units in this Agreement.

"Class B Holder" means a Holder holding one or more Class B Units.

"Class B Unit" means a Unit representing a fractional part of the ownership of the Company and having the rights, preferences and obligations specified with respect to Class B Units in this Agreement.

"Closing" has the meaning ascribed to such term in the Note Purchase Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Skalar Pharma Holding LLC, a Puerto Rico limited liability company formed pursuant to the Certificate and this Agreement, as such limited liability company may be constituted from time to time, and including its successors.

"Company Minimum Gain" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

4

"Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the products, services or research or development of the Company, any of its Subsidiaries or their respective suppliers, distributors, customers, independent contractors or other business relations. Confidential Information includes the following: (a) internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about suppliers, distributors, customers, independent contractors or other business relations and their confidential information; (c) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable); and (d) all of the following U.S. and foreign: (i) patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice) and any reissue, continuation, continuation-in-part, division, extension or reexamination thereof; (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights and copyrightable works; (iv) registrations, applications and renewals for any of the foregoing; (v) trade secrets and confidential and proprietary information, including ideas, formulas, compositions, know-how, related processes and techniques, models, research and development information, drawings, specifications, designs, plans, proposals and technical data and manuals (in each case relating to products currently in production as well as products under development); (vi) computer software (including source code, executable code, data, databases and documentation); and (vii) all other intangible properties (including incorporeal properties); together with all books, records, drawings or other indicia, however evidenced.

"Convertible Units" means all Equity Securities or convertible debt of the Company that represent rights, warrants, options, convertible securities, exchangeable securities, or other similar rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, other Equity Securities of the Company, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Consolidated" means the consolidation in accordance with GAAP of the accounts or other items as to which such term applies. "Consolidating" has a correlative meaning.

"Corbel" means Corbel Distressed and Special Opportunities Fund, L.P., Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P., and any of their respective Affiliates.

"Debt Then Outstanding" means the amount of indebtedness for borrowed money then outstanding.

"Depreciation" means, for each Taxable Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Taxable Year, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Taxable Year, Depreciation shall be an amount

5

which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Taxable Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Taxable Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board.

"Distribution" means a distribution made by the Company to a Holder, whether in cash, property or securities, and whether by liquidating distribution or otherwise; provided, that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company of, or any forfeiture hereunder of, any, (b) any recapitalization or exchange of securities of the Company (including pursuant to Section 10.7 or Section 10.8 below), (c) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units or (d) any fees or other remuneration paid to any Holder in such Holder's capacity as an employee, officer, consultant or other provider of services to the Company.

"Economic Interest" means a Holder's share of the Company's net profits, net losses and Distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in, any decision of the Members, or any right to receive information concerning the business and affairs of the Company, in each case to the extent provided for herein or otherwise required by the Act.

"Equity Securities" means, as applicable, (i) any capital stock, membership interests or other share capital, (ii) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership interests or other share capital or containing any profit participation features, (iii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership interests, other share capital or securities containing any profit participation features or to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable for any capital stock, membership interests, other share capital or securities containing any profit participation features, (iv) any share appreciation rights, phantom share rights or other similar rights, or (v) any securities of the kind described in clauses (i) through (iv) above that are issued or issuable with respect to the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. Unless the context otherwise requires, the term "Equity Securities" refers to Equity Securities of the Company or any successor corporation of the Company.

"Fair Market Value" means the fair market value of the asset or service in question, as determined (i) in the case of Section 10.15, by the Class A Holder and the Class B Holder and (ii) in all other cases, by the Board, in each case, acting in good faith using all factors, information and data they deem to be pertinent and with due regard to the value implied by any transaction giving rise to the need to determine Fair Market Value, in each case, without discount for illiquidity or minority interest. In the case of Units or other Equity Securities of the Company, Fair Market Value shall mean the amount that would be distributable in respect of such Unit if the assets of the Company (or the asset of its Subsidiaries on a consolidated basis) as a going concern were sold in an orderly transaction designed to maximize the proceeds therefrom, and such proceeds were distributed in accordance with Section 7.2, after payment of

6

all liabilities. If the parties are unable to agree within fifteen (15) days, the equity value of the Company calculated by a Firm selected by the Class A Holder and Class B Holder, or, if the parties cannot agree as to a Firm within five (5) days, pursuant to a selection process providing that the Approving Party would propose three Firms and the Class A Holder shall select one of the three Firms proposed by the Approving Party within five (5) days. The selected Firm shall determine Fair Market Value in accordance with this definition within twenty (20) Business Days, with such determination being final and binding on all parties.

"Fee Letter" means the Fee Letter, dated as of Closing, between the Company and Corbel.

"Financial Statement(s)" means, with respect to any accounting period of any Person, statements of income and statements of cash flows of such Person for such period, and balance sheets of such Person as of the end of such period, setting forth in each case in comparative form figures for the corresponding period in the preceding Fiscal Year or, if such period is a full Fiscal Year, corresponding figures from the preceding Fiscal Year's annual Financial Statements, all prepared in reasonable detail and in accordance with GAAP, subject to year-end adjustments and the absence of footnotes in the case of monthly and quarterly Financial Statements. Financial Statement(s) shall include the schedules thereto and annual Financial Statements shall also include the footnotes thereto.

"Firm" means a nationally recognized independent valuation firm experienced in valuing businesses selected by the Board.

"Fiscal Month" means any of the monthly accounting periods of the Company.

"Fiscal Quarter" means any calendar quarter ending on March 31, June 30, September 30 or December 31.

"Fiscal Year" means the fiscal year of the Company and shall be the same as its Taxable Year. Each Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year. Unless otherwise agreed to by the Board, the Fiscal Year of the Company shall end on December 31 of each calendar year.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied, which are in effect as of the date of this Agreement.

"Holder" means any Person who holds any Units, whether as a Member, as an unadmitted assignee of a Member, or otherwise. No Holder who is not a Member shall be deemed a "member" (as that term is used in the Act) of the Company and no Holder who is not also a Member shall have any rights hereunder applicable to Members but not otherwise specifically applicable to Holders.

"Holder Minimum Gain" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i).

"Holder Nonrecourse Deductions" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulations Section 1.704-2(i).

"Indebtedness" means all indebtedness for borrowed money (including purchase money obligations), all indebtedness under revolving credit arrangements, all capitalized lease obligations and all guarantees of any of the foregoing.

"Independent Third Party" means any Person who, immediately prior to a contemplated transaction, is not a Holder or an Affiliate, employee, manager, director or equity holder of a Holder.

"Initial Capital Contributions" means the aggregate amount of all Capital Contributions made by Corbel and Sponsor as of the date of this Agreement.

"Initial Public Offering" means the initial Public Offering registered on Form S-1 (or any successor form under the Securities Act).

"Loan Termination Date" means the date on which there has been payment in full of all principal, interest and fees under the outstanding Note Purchase Agreement.

"Majority" means an amount greater than 50%.

"Management Board Agreement" means the Board Management Agreement, dated the date hereof, among the Company, the Class A Directors party thereto and, upon the Loan Termination Date, the Class B Directors party thereto, as the same may be amended from time to time.

"Member" means each Holder identified on Schedule A hereto as of the date hereof who has executed this Agreement or a counterpart hereof and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Act, in each case so long as such Holder owns, and is shown on the Company's books and records as the owner of, one or more Units. The Members shall constitute the "members" (as that term is defined in the Act) of the Company. Except as expressly provided herein, the Members shall constitute a single class or group of members of the Company for all purposes of the Act and this Agreement.

"Membership Interest" means a Member's interest in the Company, including such Member's Economic Interest and the rights as a Member (including the rights, if any, to participate in the management of the business and affairs of the Company, including the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Members and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly provided in this Agreement or otherwise required by the Act).

"Monitoring Agreement" means the Monitoring Agreement between the Company and Corbel dated the date hereof.

"Nonrecourse Deductions" means the deductions determined according to Treasury Section 1.704-2(b)(1).

"Note Purchase Agreement" means that certain Note Purchase Agreement by and between the Company and Corbel, dated as of the date hereof.

8

"Officer" means each Person designated as an officer of the Company pursuant to Section 4.2 for so long as such Person remains an officer pursuant to the provisions of Section 4.2.

"Permitted Person" means (a) with respect to each Member that is a natural person (and any Permitted Transferee or Successor in Interest of a natural person), (i) any bona fide estate planning vehicle established and maintained solely for the benefit of such Member that is a natural person and his or her immediate family and (ii) any Affiliate of such Member that is a natural person; and (b) with respect to each Member that is not a natural person (other than a Permitted Transferee or Successor in Interest of a natural person), any Affiliate of such Member.

"Permitted Transferee" means a Permitted Person who holds Units pursuant to a Transfer permitted by Section 10.1(a)(iii).

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Pro Rata Share" means, at any time, (a) with respect to each Unit, such Unit's pro rata share of the Total Equity Value at such time based on the Economic Interest represented by such Unit at such time and (b) with respect to each Holder, such Holder's pro rata share of Total Equity Value at such time based on the Economic Interest represented by all Units owned by such Holder at such time, in each case as determined in good faith by the Board, and to the extent applicable, such determination shall account for the exercise or conversion of any then currently exercisable or convertible Equity Securities.

"Profits" and "Losses" means, for each Taxable Year of the Company, the Company's taxable income or loss for such Taxable Year, as determined under Section 703(a) of the Code, with the following adjustments:

(a)     Any income of the Company that is exempt from tax, as described in Section 705(a)(1)(B) of the Code, which is not otherwise taken into account in computing Net Profit or Net Loss, shall be added;

(b)     Any expenditures that are not deductible in computing taxable income, which are not properly chargeable to a Capital Account, as described in Section 705(a)(2)(B) of the Code, and which are not otherwise taken into account in computing Net Profit or Net Loss, shall be deducted;

(c)     In the event the Book Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profit or Loss;

9

(d)     Gain or loss resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such assets disposed of; notwithstanding that the adjusted tax basis of such assets differs from its Book Value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Taxable Year, computed in accordance with the definition of Depreciation;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and,

Amounts allocated pursuant to <u>Section 8.2</u> of this Agreement shall not be taken into account in computing Profit or Loss.

"<u>Public Offering</u>" means any sale of Equity Securities to the public pursuant to an effective registration statement under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act (or any similar rule then in force); <u>provided, that</u> none of the following shall be considered a Public Offering: (a) any issuance of common equity securities as consideration for a merger, acquisition or similar transaction, or (b) any issuance of common equity securities or rights to acquire common equity securities to employees of the Company or its Subsidiaries as part of an incentive or compensation plan.

"<u>Put Units Pro Rata Portion</u>" means the following expressed as a percentage: (i) the Pro Rata Portion applicable to the Class B Holder times (ii) a fraction, (x) the numerator of which is the applicable number of Put Units and (y) the dominator of which is the total number of Class B Units.

"<u>Registrable Securities</u>" means (a) any common stock issued to the Members with respect to the Units in connection with the conversion of the Company from a limited liability company to a corporation, (b) any common stock issued or issuable directly or indirectly with respect to the common stock referred to in clause (a) above by way of a stock dividend, stock split or other division of securities, or in connection with an exchange or combination of shares, recapitalization, merger, consolidation, or other reorganization and (c) any other shares of common stock held by Persons holding securities that are described in clauses (a) and (b) above and which shares of common stock are related to such securities. As to any particular Registrable Securities, such Registrable Securities shall cease to be Registrable Securities when they have been (i) effectively registered under the Securities Act and disposed of in accordance with the

10

registration statement covering them, (ii) sold pursuant to Rule 144 or (iii) repurchased by the Company or otherwise cease to be outstanding.

"Sale of the Company" means (i) the dissolution of the Company in accordance with this Agreement or (ii) the consummation of a transaction, whether in a single transaction or in a series of related transactions, with any Independent Third Party or group of Independent Third Parties pursuant to which such Person or Persons acquire (A) (whether by merger, consolidation, recapitalization, reorganization, redemption, transfer or issuance of Equity Securities or otherwise) Units (or other Equity Securities) of the Company (or any surviving or resulting Person) possessing the voting power to elect a Majority of the Board of the Company (or the board of managers or comparable governing body of such surviving or resulting Person (B) which constitutes a Change of Control or (C) assets constituting all or substantially all of the assets of the Company and its Subsidiaries; provided, that in no event shall a Sale of the Company be deemed to include any transaction effected for the sole purpose of (x) changing, directly or indirectly, the form of organization or the organizational structure of the Company or any of its Subsidiaries or (y) contributing equity securities to entities controlled by the Company.

"SEC" means the Securities and Exchange Commission or any successor agency thereto that administers the Securities Act and the Securities Exchange Act of 1934, as amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Sponsor" means Bioapi S.A.S, and any Affiliate thereof.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a Majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity, a majority of the membership, partnership or other similar ownership interest thereof or the power to elect a Majority of the members or the governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a Majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director, managing member, manager, board of managers or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company. For avoidance of doubt, Skalar Pharma, LLC is a Subsidiary of the Company.

"Successor in Interest" means " any (i) trustee, custodian, receiver or other Person acting in any Bankruptcy or reorganization proceeding with respect to, (ii) assignee for the benefit of

11

the creditors of, (iii) trustee or receiver, or current or former officer, director or partner, or other fiduciary acting for or with respect to the dissolution, liquidation or termination of, or (iv) any executor, administrator, committee, legal representative or other successor or assign of, any Holder, whether by operation of law or otherwise..

"Tax Account" means a savings account established by the Company pursuant to an escrow or other arrangement approved by the Approving Party for the purpose of depositing Estimated Tax Amounts.

"Taxable Year" means the Company's taxable year ending on the last day of each calendar year (or part thereof, in the case of the Company's last taxable year), or such other year as is (a) required by Section 706 of the Code or (b) determined by the Board.

"Total Equity Value" means the amount of total net pre-tax proceeds that would be received by the Holders if the assets of the Company were sold as a going concern in an orderly transaction designed to maximize the proceeds therefrom and the proceeds therefrom were then distributed in accordance with Section 7.2, after payment of, or provision for, all Company obligations in accordance with Section 11.2 as determined in good faith by the Board with due regard for the value implied by any transaction giving rise to the need for a determination of Total Equity Value and, with respect to transactions pursuant to Section 10.5, by adjusting the performance threshold in Section 7.2(a)(iii) to reflect the percentage of the Company sold.

"Transfer" means, with respect to any Unit, (i) when used as a verb, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Unit or any participation or interest therein, whether with or without consideration, whether voluntarily, involuntarily or by operation of law and whether directly or indirectly, or permit, agree or commit to do, any of the foregoing, and (ii) when used as a noun, a direct or indirect sale, assignment, disposition, exchange, pledge, encumbrance, hypothecation or other transfer of such Unit or any participation or interest therein, in each case, whether with or without consideration and whether voluntarily, involuntarily or by operation of law, or any agreement or commitment to do any of the foregoing. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Treasury Regulations" means the Federal income tax regulations, including any temporary or proposed regulations, promulgated under the Code, in effect as of the date hereof. The Board may, in its sole discretion, treat any amendment to such Treasury Regulations as having been in effect as of the date hereof, provided, that such amendment does not result in a material change in the rights or obligations of any Member under this Agreement.

"Unit" means, at any time, an Economic Interest in the Company representing a fractional part of the entire Economic Interest in the Company and shall include Class A Units and Class B Units, and any other class of Equity Securities issued by the Company in accordance with this Agreement; provided, that any class or group of Units issued shall have the relative rights, powers and duties set forth in this Agreement and the Economic Interest represented by such class or group of Units shall be determined in accordance with such relative rights, powers and duties. Except to the extent otherwise provided herein, each Unit of a given class represents

the same fractional interest in such Economic Interest in the Company as each other Unit of such class. Units may be issued in different classes and in whole and fractional numbers.

Section 1.2    Construction. In this Agreement, unless otherwise specified or where the context otherwise requires:

(a)    the gender of all words used in this Agreement includes the masculine, feminine and neuter;

(b)    the words importing the singular only shall include the plural and vice versa;

(c)    the words "including," "includes" and "include" shall be deemed to be followed by "without limitation," except to the extent already so followed;

(d)    the words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    references to "Articles" and "Sections" refer to articles and sections of this Agreement, and all references to "Schedules" and "Exhibits" are to schedules and exhibits attached hereto, each of which is made a part hereof for all purposes;

(f)    references to any Person include the successors and permitted assigns of such Person;

(g)    the use of the words "or," "either" and "any" shall not be exclusive;

(h)    wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict; and

(i)    references to "$" or "dollars" means the lawful currency of the United States of America.

Section 1.3    Discretion. Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, any Person is permitted or required to make a decision in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as he, she or it desires, including his, her or its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company, the Holders or any other Person.

## ARTICLE 2
## ORGANIZATION

Section 2.1    Formation. The Company has been organized as a Puerto Rico limited liability company on the Formation Date by the execution and filing of the Certificate under and pursuant to the Act and shall be continued in accordance with the terms of this Agreement. The

13

rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

Section 2.2     <u>Company Name</u>. The name of the Company is, and shall continue to be, "Skalar Pharma Holding LLC" and all Company Business is, and shall continue to be, conducted in that name or such other names that comply with applicable law as the Board may select from time to time. Notification of any change in the name of the Company shall be given to all Members. The Company's Business may be conducted under its name and/or any other name or names deemed advisable by the Board.

Section 2.3     <u>Filings</u>. The Certificate was filed with the Secretary of State of the Commonwealth of Puerto Rico on the Formation Date and the Members hereby ratify such filing. The Members hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the Commonwealth of Puerto Rico and any other jurisdiction in which the Company may own property or conduct business.

Section 2.4     <u>Term of the Company</u>. The term of the Company commenced on the Formation Date and shall continue in existence until termination and dissolution thereof as determined under <u>Section 11.1</u> of this Agreement.

Section 2.5     <u>Registered Office; Registered Agent; Principal Office; Other Offices</u>. The registered office of the Company required by the Act to be maintained in the Commonwealth of Puerto Rico is, and shall continue to be, the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the Commonwealth of Puerto Rico is, and shall continue to be, the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law. The principal office of the Company is, and shall continue to be, at such place as the Board may designate from time to time, which need not be in the Commonwealth of Puerto Rico, and the Company shall maintain records thereat. The Company may have such other offices as the Board may designate from time to time.

Section 2.6     <u>Purposes and Powers</u>. The nature of the business or purposes to be conducted or promoted by the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the Commonwealth of Puerto Rico. Subject to the provisions of this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purposes set forth in this <u>Section 2.6</u>

14

Section 2.7　　Foreign Qualification. Prior to the Company's conducting business in any jurisdiction other than Puerto Rico, the Board shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Officers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board or any officer, each Member shall execute, acknowledge, swear to and deliver to the Company any or all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**ARTICLE 3**
**MEMBERS AND UNITS**

Section 3.1　　Members.

(a)　　Names, Capital Contributions, etc. The name, residence, business or mailing addresses, amount of Capital Contributions made or deemed made and the type and number of Units of each Member are set forth on Schedule A, as such Schedule shall be amended from time to time in accordance with the terms of this Agreement. Unless otherwise specified, any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time in accordance with the terms of this Agreement. Each Person listed on Schedule A (as in effect on the date hereof) upon (i) his, her or its execution of this Agreement or counterpart thereto and (ii) receipt (or deemed receipt) by the Company of such Person's Capital Contributions as set forth on Schedule A, is hereby admitted to the Company as a Member and shall own the number and type of Units set forth opposite such Member's name on Schedule A, as amended from time to time in accordance with the terms of this Agreement.

(b)　　Loans by Members; Capital Contributions. No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law, this Agreement or any other agreement between such Member and the Company. Subject to compliance with Section 4.1(o), any Holder may make loans to the Company, and any loan by a Holder to the Company shall not be considered to be a Capital Contribution for any purpose and shall not result in an increase in the amount of the Capital Account of such Holder.

(c)　　Representations and Warranties of Members. Each Member, severally and not jointly, and solely as to itself, hereby represents and warrants to the Company and acknowledges that: (i) such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Member has reviewed and evaluated all information it deemed necessary to assess the merits and risks of his, her or its investment in the Company and has had answered to its satisfaction any and all questions regarding such information; (iii) such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) such Member is an "accredited investor" (as such term is used in Regulation D of the Securities Act), or is an employee of the Company or one of its Subsidiaries and has acquired Units in an exempt

15

offering pursuant to Rule 701 of the Securities Act; (v) such Member is acquiring Units in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (vi) the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound; (vii) the determination of such Member to purchase or otherwise acquire Units in the Company has been (or was) made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company and its Subsidiaries which may have been made or given by any other Member or by any agent or employee of any other Member; and (viii) this Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, rehabilitation, moratorium or similar laws, now or hereafter in effect, of general application relating to or affecting creditors' rights, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances and preferential transfers, and for the limitations imposed by general principles of equity (the "Enforceability Exceptions").

(d)     Member Acknowledgments. Each Member hereby acknowledges that the Units in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws or under an exemption therefrom and the provisions of this Agreement have been complied with.

Section 3.2     Units.

(a)     Units; Classes. From time to time, the Company may, subject to the approval of the Board and compliance with Section 4.1(o), issue additional Units having such rights, preferences and designations and for such consideration as the Board approves. Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in this Section 3.2 or otherwise as will be fixed from time to time by the Board by resolution thereof. All issuances of Units require prior approval by the Board and the Approving Party. Subject to compliance with Section 4.1(o), the Board may increase the number of authorized Units of any then-existing class or series. Upon due authorization of such issuances by the Board and the Approving Party, the Company is hereby authorized to take all actions that it deems reasonably necessary or appropriate in connection with, or to effect, the Board actions contemplated under this Section 3.2(a), including amending this Agreement without the approval of any Member, except for any Member approval required under Section 4.1(o) or Section 12.7.

(b)     Unit Certificates. Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates. As of the Effective Date, Units are uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof.

(c)  Unit Designations; Authorized Units.

(i)  One class of Units is hereby designated as "Class A Units." Subject to the approval of the Board the Class A Units may be sub-classified. Notwithstanding any sub-classification of Class A Units, each Class A Unit, whether sub-classified, will be treated as a Class A Unit for those provisions of this Agreement that refer to "Class A Units" without referring to a particular sub-classification. The Company is authorized to issue as many Class A Units as the Board and the Approving Party approve from time to time, and any Class A Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued.

(ii)  One class of Units is hereby designated as "Class B Units." Subject to the approval of the Board, the Class B Units may be sub-classified. Notwithstanding any sub-classification of Class B Units, each Class B Unit, whether sub-classified, will be treated as a Class B Unit for those provisions of this Agreement that refer to "Class B Units" without referring to a particular sub-classification. The Company is authorized to issue as many Class B Units as the Board and the Approving Party approve from time to time, and any Class B Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued.

(iii)  Issued and Outstanding Units; Unit Ledger. The Company will maintain a ledger (the "Unit Ledger ") listing all of the record holders of Units and the number, class or series of Units held thereby. Until the Board determines otherwise, Schedule A will serve as the Unit Ledger. The Company will update the Unit Ledger as Units are issued, forfeited, repurchased or transferred from time to time. Modifications to the Unit Ledger for the foregoing purposes will be deemed to occur upon the closing of any transaction that does not violate the terms of this Agreement and that alters the information contained therein, will not require Member or Board consent or approval and will not be considered amendments to this Agreement. The Unit Ledger will be kept in confidence from Persons other than members of the Board and other Persons authorized by the Board, except as required by law or judicial order.

(d)  Voting Rights.

(i)  The Class A Units will be Voting Units and will vote on all matters submitted for approval of the Members. Each Class A Unit will entitle the holder thereof to one vote for each such Unit.

(ii)  The Class B Units will be Voting Units and will vote on all matters submitted for approval of the Members. Each Class B Unit will entitle the holder thereof to one vote for each such Unit.

(iii)  Notwithstanding anything to the contrary herein, no Person shall be entitled to vote with respect to any Units unless such Person is a Member, the proxy of a Member or an authorized representative of a Member that is not a natural Person.

17

Section 3.3    No Liability of Members.

(a)    No Liability. Except as otherwise required by applicable law or as may be required pursuant to Section 10.6(d), no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company or any of its Subsidiaries, to any of the other Members, to the creditors of the Company or any of its Subsidiaries or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or any of its Subsidiaries or for any losses of the Company or any of its Subsidiaries. Each Member shall be liable only to make such Member's initial Capital Contribution to the Company and the other payments provided expressly herein.

(b)    Distribution. In accordance with the Act and the laws of the Commonwealth of Puerto Rico, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no Distribution to any Member pursuant to ARTICLE VII hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. To the extent permitted by the Act, the Member receiving any such money or property except as set forth in Section 10.6(a) shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of any other Member.

Section 3.4    Limitation on Authority of Members. No Member is an agent of the Company solely by virtue of being a Member, and no Member (other than members of the Board or authorized Officers of the Company acting in such capacities) has authority or power to represent, act for, sign for, bind or make expenditures on behalf of the Company solely by virtue of being a Member. This Section 3.4 supersedes any authority granted to the Members pursuant to the Act. Any Member who represents, takes any action, signs for, binds or makes any expenditure on behalf of the Company in violation of this Section 3.4 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense (provided, that, for the avoidance of doubt, any consent right or similar rights granted to Members hereunder shall not be deemed to constitute the taking of action or the binding of the Company).

Section 3.5    Meetings of the Members.

(a)    A meeting of the Members may be called at any time by the Board or by the Class A Member or Class B Member. Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Board; provided, that at any meeting so called, Members shall be offered the opportunity to participate in such meeting telephonically. Not less than two (2) nor more than ninety (90) days before each meeting, the Board shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy, except when such Member attends a meeting for the express purpose of objecting, and objects at the beginning of the meeting to the transaction of

18

any business because the meeting is not properly called or convened. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding (i) a Majority of the outstanding Class A Units and (ii) a Majority of the outstanding Class B Units entitled to vote shall constitute a quorum; provided, however, that if quorum is failed to be achieved at two duly called consecutive meetings of Members, the presence in person or by proxy of Members holding a Majority of the outstanding Class A Units entitled to vote shall constitute a quorum at any subsequent meeting of Members. A Member entitled to vote may vote either in person or by written proxy signed by the Member or by his, her or its duly authorized attorney in fact. Persons present by telephone shall be deemed to be present "in person" for purposes hereof.

(b)     In lieu of holding a meeting, the Members entitled to vote may vote or otherwise take action by written consent signed by Members holding at least the percentage of the Units that would be required to approve such action if submitted to a vote at a meeting of Members entitled to vote. Prompt notice of the taking of the action without a meeting by less than unanimous consent of the Members entitled to vote shall be given to those Members entitled to vote who have not consented in writing, which notice may be oral, telephonic or via e-mail. Except as otherwise provided in this Agreement, wherever the Act requires unanimous consent to approve or take any action, that consent may be given in writing.

Section 3.6     <u>Resignation and Withdrawal</u>. No Member shall have the right to resign or withdraw as a Member without the prior written consent of the Board (which may be given or withheld at the Board's sole discretion) and the Approving Party, except simultaneously with (i) the Transfer of all of such Member's Units (including all interests therein including voting rights) in a Transfer permitted by this Agreement or (ii) the Transfer to a Successor in Interest in accordance with <u>Section 10.1(c)</u> (a resignation and withdrawal pursuant to (i) and (ii) above being a "<u>Permitted Withdrawal</u>"). Any Member that resigns or withdraws (or attempts to resign or withdraw) without the consent of the Board (other than a Permitted Withdrawal) in contravention of this Section 3.6 shall be liable to the Company for all damages (including all lost profits and special, indirect and consequential damages) directly or indirectly caused by the resignation and/or withdrawal of such Member, and such Member shall be entitled to receive the fair value of his, her or its interest in the Company as of the date of his, her or its resignation (or, if less, the fair value of his, her or its interest as of the date of the occurrence of a liquidation or other winding up of the Company), as conclusively determined by the Board, only promptly following the occurrence of a liquidation or other winding up of the Company.

Section 3.7     <u>Issuance of Additional Units; Additional Members</u>.

(a)     <u>Authorization and Issuance of Additional Units and Other Equity Securities</u>. Subject to this <u>Section 3.2(a)</u>, <u>Section 3.7</u>, <u>Section 3.8</u> and <u>Section 4.1(o)</u>, the Board shall have the right to cause the Company to issue or sell to any Person (including Members and Affiliates of Members) any additional Units or other Equity Securities of the Company (including creating other classes or series of Units or other Equity Securities having such powers, designations, required Capital Contributions, preferences and rights as may be determined by the Board). Subject to <u>Sections 4.1(o) and 12.7</u> below, the Board shall have the power to make such amendments to this Agreement (including <u>Section 7.2</u> below and <u>Schedule A</u> hereto) in order to provide for such powers, designations, preferences and rights as the Board in its sole discretion

19

deems necessary or appropriate to give effect to such additional authorization or issuance; provided, that any such amendment shall not reasonably be expected to have a material and adverse effect on any Holder (as determined by the Board), in its capacity as such, that would be borne disproportionately by such Holder relative to other Holders holding Units or other Equity Securities of the same class under this Agreement (unless such Holder consents in writing thereto).

(b)     Admission as a Member. In order for a Person that is not already a Member to be admitted as a Member of the Company with respect to an issuance of additional Units or other Equity Securities by the Company described in Section 3.7(a) above: (i) such Person shall have delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement and shall have delivered such other documents and instruments as the Board determines to be necessary or appropriate in connection with the issuance to such Person or to effect such Person's admission as a Member; and (ii) the Board or an authorized Officer shall amend Schedule A without the further vote, act or consent of any other Person to reflect such new Person as a Member. Upon the amendment of Schedule A, such Person shall be admitted as a Member and shall be listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. If any such Equity Securities are issued to an existing Member, the Board or an authorized Officer of the Company shall amend Schedule A without the further vote, act or consent or any other Person to reflect the issuance of such Equity Securities.

(c)     Anti-Dilution.  In the event that the Company issues, sells or grants any Units or other equity interests in the Company without consideration or at a price per Unit lower than $2,500, subject to appropriate adjustment in the event of any stock dividend, unit split, combination or other similar recapitalization with respect to such class or series  (a "Dilutive Issuance"), then, promptly following such Dilutive Issuance, the Company shall issue to the Class A Holders that have not received the Dilutive Issuance, for no consideration, that number of additional Units, in the Class of Units that each Holder currently holds Units, required so that (x) the Total Pro Rata Percentage of the Units held by such Holder immediately following (i) such Dilutive Issuance; and (ii) the issuance of Units pursuant to this section 3.7(c) is equal to (y) the Total Pro Rata Percentage of the Units held by such Holder immediately prior to such Dilutive Issuance.

Section 3.8     Preemptive Rights.

(a)     If the Company authorizes the issuance and sale of any additional Units or Convertible Units (other than Exempted Units) (collectively, "Additional Units"), then each Class A Holder and Class B Holder who is an "accredited investor" (as such term is used in Regulation D of the Securities Act) at the time of such issuance and sale (each such Member, an "Eligible Member") shall be entitled to purchase a Pro Rata Share of such Additional Units as provided herein. At least ten (10) days prior to any issuance by the Company of any Additional Units, the Company shall deliver a written notice (the "Issuance Notice") to each Eligible Member specifying in reasonable detail the number and type of Additional Units to be issued and the terms and conditions of the issuance. Each Eligible Member may elect to participate in the contemplated issuance at the same price per Additional Unit (however denominated) and on the same terms by delivering written notice to the Company within ten (10) days after delivery of the

20

Issuance Notice specifying the maximum amount of Additional Units such Member desires to purchase.

(b)     Upon the delivery of the Issuance Notice and subject to the provisions hereof, within thirty (30) days after the delivery of the Issuance Notice, the Company shall sell, and each Eligible Member electing to participate in such issuance shall purchase, the amount of Additional Units determined pursuant to the formula above at a time and place determined by the Board (the "Issuance Closing"). At the Issuance Closing, the Company shall deliver to each such Eligible Member the certificates or other instruments representing the issued securities (if certificated) free and clear of all liens and encumbrances, and each such Eligible Member shall make customary investment representations to the Company and shall deliver to the Company the purchase price therefor by cashier's or certified check payable to the Company or by wire transfer of immediately available funds to an account designated by the Company.

(c)     If the Eligible Members fail to purchase all of the Additional Units being offered, the Company may, within one hundred twenty (120) days following the delivery of the Issuance Notice, sell such remaining Additional Units to other Eligible Members at a price no less than the price per Additional Unit and on other terms and conditions no more favorable to than offered to the Eligible Members in the Issuance Notice. At the closing of any such sale, the Company shall deliver to the purchasers the certificates or other instruments representing the issued securities (if certificated) free and clear of all liens and encumbrances, and each such purchaser shall make customary investment representations to the Company, and deliver to the Company the purchase price therefor by cashier's or certified check payable to the Company or by wire transfer of immediately available funds to an account designated by the Company.

(d)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 3.8 shall not apply to: (i) the issuance of Additional Units in connection with a split, dividend, recapitalization or similar event with respect to any class of Units; (ii) the issuance of Additional Units in connection with a change in form or a restructuring pursuant to Section 10.7 or Section 10.8; (iii) the issuance of Additional Units upon exercise or conversion or exchange of any equity interest that was issued in compliance with this Section 3.8 or that was issued in an issuance which is exempt from this Section 3.8; (iv) the issuance of Additional Units to equipment lessors, banks, financial institutions or other Persons (in each case, that are Independent Third Parties) in connection with any financing, refinancing, restructuring, leasing or similar transactions approved by the Board and the Approving Party; (v) the issuance of Additional Units pursuant to a Public Offering; (vi) the issuance of Additional Units in connection with any transactions involving the Company or any of its Subsidiaries and other Persons that are deemed "strategic" transactions by the Board; or (vii) the issuance of Additional Units consisting of Units or other Equity Securities that have been repurchased by the Company from any Holder in accordance with the terms of this Agreement (each of items (i)-(vii) above, "Exempted Units").

(e)     Notwithstanding anything to the contrary contained herein (but subject to compliance with Section 4.1(o)), the Company may authorize and undertake the issuance and sale of Additional Units, other types of securities (that are not Equity Securities), or contractual Indebtedness obligations regardless of whether Eligible Members have participation rights pursuant to the terms of this Section 3.8, so long as each Eligible Member is given the retroactive

opportunity to participate in such issuance in accordance with this <u>Section 3.8(e)</u>. In the event of any such issuance by the Company for which such Eligible Members have participation rights pursuant to the terms of this <u>Section 3.8</u>, the Company shall:

(i)     provide Eligible Members with notice of the issuance (or any Affiliate thereof) within thirty (30) Business Days thereafter (and in any event prior to making any Distribution in respect of such Additional Units) setting forth the actual price per Additional Unit (including the price for any other securities or contractual Indebtedness obligations being issued as if such other securities or contractual Indebtedness obligations were Additional Units) implied by such issuance;

(ii)    permit each Eligible Member to exercise his, her or its participation rights in respect of such issuance in accordance with the procedures set forth in <u>Section 3.8(a), Section 3.8(b)</u>, <u>Section 3.8(c)</u>, and <u>Section 3.8(d)</u> (assuming for purposes of this <u>Section 3.8(e)(ii)</u> that such Additional Units have not yet been issued and that the notice provided by the Company in accordance with the foregoing <u>Section 3.8(e)(i)</u> constitutes an Issuance Notice;

(iii)   include in the subscription (or equivalent) agreement a provision permitting the Company to repurchase (at the initial issuance price) such Additional Units, other securities or contractual Indebtedness obligations in an amount necessary to satisfy the participation elections of the Eligible Members in response to the notice provided by the Company in accordance with the foregoing <u>Section 3.8(e)(i)</u> (the "Repurchase Right"); and

(iv)    exercise the Repurchase Right upon the receipt of, and up to the amount of, funds from the Eligible Members electing to exercise their participation rights in accordance with this <u>Section 3.8(e)</u>.

(f)     The participation rights contained in this <u>Section 3.8</u> shall terminate upon the consummation of an Initial Public Offering or a Sale of the Company.

Section 3.9     <u>Certification of Units</u>. The Company may, in its sole discretion, issue certificates to the Holders representing the Units held by such Holder. The Units issued hereunder are deemed to be a "security" and shall be governed by the Puerto Rico Commercial Transactions Act, as amended ( but the designation of the Units as securities for purposes of such law does not mean that the Units are securities for any other purposes). Each certificate (if any) evidencing Units held by any Member or his, her or its Permitted Transferees and each certificate (if any) issued in exchange for or upon the Transfer of any such Units shall be stamped or otherwise imprinted with legends in substantially the following forms:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT DATED AS OF NOVEMBER 16, 2021 AMONG THE ISSUER OF SUCH UNITS (THE "COMPANY") AND THE COMPANY'S MEMBERS, AS AMENDED AND MODIFIED FROM TIME TO TIME. A COPY OF SUCH LIMITED LIABILITY

COMPANY AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS OR BLUE SKY LAWS.

Section 3.10     Representations and Warranties by Company. The Company hereby represents and warrants to each Holder that as of the Effective Date:

(a)     Organization and Good Standing. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico and has all requisite limited liability company power and authority to own, lease and operate properties and carry on its Business.

(b)     Authorization of Agreement. The Company has all requisite limited liability company power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on behalf of the Company. This Agreement has been duly executed and delivered by the Company and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, subject to the Enforceability Exceptions.

(c)     Conflicts; Consents of Third Parties.

(i)     None of the execution and delivery by the Company of this Agreement, the consummation of the transactions contemplated hereby, or compliance by the Company with any of the provisions hereof will result in any violation of or default (with or without notice or lapse of time, or both) under, give rise to a right of termination or cancellation under, require a consent or waiver under, require the payment of a penalty or increased liabilities or fees or the loss of a benefit under, or result in the imposition of any lien under, any provision of (i) the organizational documents of the Company; (ii) any contract or permit to which the Company is a party or by which any of the properties or assets of the Company is bound; (iii) any order applicable to the Company or by which any of the properties or assets of the Company is bound; or (iv) any applicable law.

(ii)     No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any governmental authority is required on the part of the Company in connection with the Company's execution and delivery of this

23

Agreement or the compliance by the Company with any of the provisions hereof, or the consummation of the transactions contemplated hereby.

(d)     Units. All of the Units issued to each Holder pursuant to this Agreement have been duly authorized and, upon issuance and delivery to such Holder in accordance with this Agreement, will be validly issued and outstanding, fully paid and non-assessable and free and clear of all liens, claims or encumbrances of any kind whatsoever, other than (i) any liens, claims or encumbrances created by such Holder, (ii) any applicable restrictions pursuant to this Agreement, and (iii) transfer restrictions arising under the Securities Act and state or foreign securities laws.

## ARTICLE 4
## MANAGEMENT POWER, RIGHTS AND DUTIES

Section 4.1     Management by the Board.

(a)     Board Composition.

(i)     The Business and affairs of the Company shall be managed under the direction of a board of directors (the "Board"). The Board shall initially consist of five (5) Persons, each of whom shall be designated by the Class A Holder (the Persons appointed to the Board, the "Directors"). Each Director appointed by the Class A Holder shall have one vote. The initial Directors are Fernando Londoño, Eduardo Posada, Carlos García, Todd Reid and Julio Sarmiento. On the Loan Termination Date, the Board shall be expanded to seven (7) Directors, two of whom shall be designated by the Class B Holder (the "Class B Director"). Each Class B Director shall have 2 votes.

(ii)     Board Observer. Corbel shall have the right to appoint up to two (2) Persons to attend all meetings of the Board of Directors occurring on or before the Loan Termination Date, in a nonvoting observer capacity (the "Board Observers"), and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors at the same time and in the same manner as provided to such directors. The initial Board Observers shall be Michael Jones and Kyle Patel.

(b)     General Powers; Ratification. All powers of the Company shall be exercised by the Board; decisions of the Board within its scope of authority shall be binding upon the Company and each Member, and the Board shall have sole, full, exclusive and complete discretion, power, and authority, subject to any other provisions of this Agreement or by non-waivable provisions of applicable law, to manage, control, administer, and operate the Business and affairs of the Company, and to make all decisions affecting such Business and affairs. Except as otherwise expressly provided for herein, the Members hereby consent to the exercise by the Board of all such powers and rights conferred on them by the Act with respect to the management and control of the Company. Notwithstanding the foregoing and except as explicitly set forth in this Agreement, if a vote, consent or approval of the Members is required by the Act or other applicable law with respect to any act to be taken by the Company or matter considered by the Board, each Member agrees that it shall be deemed to have consented to or

24

approved such act or voted on such matter in accordance with a vote of the Board on such act or matter. Any act or contract approved or ratified by the Board shall be as valid and as binding upon the Company and upon all the Members (in their capacity as Members) as if it had been approved or ratified by each Member of the Company.

(c)     Term of Office. Members of the Board shall serve until their resignation, permanent incapacitation, death or removal in accordance with Section 4.1(f) below.

(d)     Vacancies. Any vacancy on the Board shall be filled in accordance with Section 4.1(a) above, or may remain vacant at the determination of the Person entitled to designate a Director in accordance with Section 4.1(a) above.

(e)     Resignation. A Director may resign as such by delivering his or her written resignation to the Company at the Company's principal office addressed to the Board. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

(f)     Removal. A Director may only be removed as such by the Person or group of Persons having the right to designate or veto such Director, except in the event of fraud or gross negligence by such Director.

(g)     Compensation; Expenses. Except as may otherwise be determined by the Board or as set forth in the Management Agreement or the Note Purchase Agreement, without duplication, a Director shall not be paid compensation by the Company for his or her services as such. The foregoing shall not be deemed to limit or restrict the payment of any reasonable compensation or remuneration to any Person in such Person's capacity as an Officer, employee, Board Observer, advisor or consultant to the Company or any agreement or arrangement with the Company which has been approved by the Board. The Company shall, subject to written approval of the Approving Party within thirty (30) days of such expenses, in its sole discretion, (i) promptly reimburse each Director for reasonable documented out-of-pocket expenses, unless the Company and the Approving Party mutually agree to a different methodology; and (ii) promptly reimburse the Board Observers for all reasonable out-of-pocket travel expenses incurred in connection with attending meetings of the Board.

(h)     Investment Company Act. The Board shall use its best efforts to assure that the Company and its Subsidiaries shall not be subject to registration as an investment company pursuant to the United States Investment Company Act of 1940, as amended.

(i)     Reliance by Third Parties. Any Person dealing with the Company, other than a Member, may rely on the authority of the Board (or any Officer authorized by the Board) in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by the Board (or any Officer authorized by the Board) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (i) at the time of the execution or delivery thereof this Agreement was in full force and effect, (ii) such agreement, instrument or document

25

was duly executed according to this Agreement and is binding upon the Company and (iii) the Board or such Officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.

(j)     _Meetings of the Board; Actions_. At any meeting of the Board, any Director may participate by telephone or similar communication equipment, provided, that each Director can hear the others. Persons present by telephone shall be deemed to be present "in person" for purposes hereof. Meetings shall be called on not less than two (2) business days' notice (which notice may be delivered by email or other electronic means). The presence of at least three (3) members of the Board and at least one Board Observer (if before the Loan Termination Date) or the Class B Director (if on or after the Loan Termination Date), shall constitute a quorum for the transaction of business; provided, however, that if quorum is failed to be achieved at two duly called consecutive meetings of the Board, the presence of at least three (3) members of the Board and at least one Board Observer (if before the Loan Termination Date) or the Class B Director (if on or after the Loan Termination Date), shall constitute a quorum for the transaction of business at any subsequent meeting of the Board. The Board also may make decisions, without holding a meeting, by unanimous written consent of the members of the Board. Meetings shall be held at least once per calendar quarter or more often in accordance with a schedule established by the Board. Minutes of each meeting and a record of each decision shall be kept by a designee of the Board. Decisions of the Board at any meeting of the Board shall require the approval of at least a Majority of all members of the Board present at such meetings. Except as otherwise provided herein, only members of the Board and the Board Observer shall be entitled hereunder to attend meetings of the Board; provided, that, subject to the following proviso, a Majority of the members of the Board may approve the presence of any other Person for all or any portion of such meeting.

(k)     _Committees; Delegation of Duties_. The Board shall have the power and right (but not the obligation) to create and disband committees and to determine the duties, responsibilities, activities and composition. The Board may authorize any Person (including any Member, Officer or Director) to enter into and perform under any document on behalf of the Company.

(l)     _Limitation on Individual Directors_. Except as otherwise provided in this Agreement, no Director has authority or power to represent, act for, sign for, bind or make expenditures on behalf of the Company solely by virtue of being a Director (other than (i) acting together with the other Directors as the Board pursuant to the terms of this Agreement (ii) acting at the direction or authorization of the Board or (iii) acting in the capacity of an authorized Officer of the Company). This Section 4.1(l) supersedes any authority granted to the Members pursuant to the Act.

(m)     _Existence and Good Standing_. The Board may take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the Commonwealth of Puerto Rico (and of each other jurisdiction in which such existence is necessary to enable the Company to conduct the Business in which it is engaged) and (ii) for the maintenance, preservation and operation of the Business of the Company in accordance with the provisions of this Agreement and applicable laws and regulations. The Board may file or cause to be filed for recordation in the office of the

26

appropriate authorities of the Commonwealth of Puerto Rico, and in the proper office or offices in each other jurisdiction in which the Company is formed or qualified, such certificates (including certificates of limited liability companies and fictitious name certificates) and other documents as are required by the applicable statutes, rules or regulations of any such jurisdiction or as are required to reflect the identity of the Members and the amounts of their respective Capital Contributions.

(n)    <u>Securities in Subsidiaries</u>. The Company shall vote, or cause to be voted, all of the securities it holds in any direct or indirect Subsidiary of the Company as directed by the Board or as otherwise required pursuant to this Agreement.

(o)    <u>Restricted Activities</u>. Notwithstanding anything to the contrary in this Agreement, except as set forth in the Company's or any of its Subsidiaries' annual budget previously approved in accordance with this <u>Section 4.1(o)</u>, neither the Company nor any of its Subsidiaries shall undertake, nor shall agree to undertake, any of the following actions without the prior written approval of the Approving Party, in its sole discretion:

(i)    issue, sell, grant, dispose of, pledge or otherwise encumber any of the Company's or any of its Subsidiaries' Units, Equity Securities or other voting securities, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for such Units, Equity Securities or other voting securities, or any rights, warrants, options, calls, commitments or any other agreements of any character to purchase or acquire such Units, Equity Securities or other voting securities; provided, however, that the Company's or any of its Subsidiaries' Units may be pledged or otherwise encumbered in connection with any refinancing of all of the Company's Indebtedness evidenced by the Note Purchase Agreement (in which event only Board approval shall be required);

(ii)    incur, assume or guarantee any Indebtedness or issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of the Company or any of its Subsidiaries, except with respect to the refinancing of all of the Company's Indebtedness evidenced by the Note Purchase Agreement ((in which event only Board approval shall be required);

(iii)    encumber or subject to any lien for Indebtedness (including pursuant to a sale-leaseback transaction or an asset securitization transaction) any of its properties or assets (including securities of its Subsidiaries) to any Person, except with respect to the refinancing of all of the Company's Indebtedness evidenced by the Note Purchase Agreement (in which event only Board approval shall be required);

(iv)    sell, transfer, lease, mortgage, or otherwise dispose of 5% or more of its properties or assets in an individual transaction or series of related transactions to any Person, except sales of inventory or dispositions of obsolete assets for fair consideration in the ordinary course of business consistent with past practice;

(v)    (i)    (A) enter into, terminate or amend any contract, agreement or understanding requiring the Company or any of its Subsidiaries to make expenditures

27

not otherwise contemplated in the Company's annual budget during any Fiscal Year, or (B) enter into or extend the term or scope of any contract, agreement or understanding that purports to materially restrict the Company, or any existing or future Subsidiary or Affiliate of the Company, from engaging in any line of business or in any geographic area, other than distribution agreements that the Company or any of its Subsidiaries enters into in the ordinary course of business consistent with past practice;

(vi)     (A) other than pursuant to a plan previously approved by the Approving Party, (i) make any capital expenditure in 2021 and (ii) for any period following 2021, make any capital expenditure not otherwise contemplated in the Company's annual budget during any Fiscal Year, in each case in excess of $25,000 individually or $300,000 in the aggregate; (B) purchase any real property; or (C) make any material expenditure for goods other than the purchase of materials in the ordinary course of business consistent with any Company annual budget approved in accordance with this Section 4.1;

(vii)     directly or indirectly acquire, whether by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by acquiring any equity interest in, or by any other manner, any Person or division, business or equity interest of any Person;

(viii)     make any investment (by contribution to capital, property transfers, purchase of securities or otherwise) in, or loan or advance (other than travel and similar advances to the employees of the Company or its Subsidiaries in the ordinary course of business consistent with past practice) in excess of $10,000 individually or $25,000 in the aggregate, to any Person other than a direct or indirect wholly owned Subsidiary of the Company;

(ix)     increase or decrease in any manner the compensation, bonus, severance or equity awards to any of the Company's or its Subsidiaries' directors, officers or executive management team (including CEO direct reports); hire or fire any member of the Company's or its Subsidiaries' executive management team (including CEO direct reports), officers or directors; establish, amend or terminate any equity based compensation plans or grant any awards thereunder; enter into any employment, deferred compensation, severance, termination or indemnification agreement (or amend any such agreement) with any member of the executive management team (including CEO direct reports), officer or director of the Company or any of its Subsidiaries; other than, in each case, as required pursuant to applicable law;

(x)     increase or decrease the size of the Board;

(xi)     make any material changes in financial or tax accounting methods, principle or practices (or change any annual accounting period), except as may be required by a change in United States generally accepted accounting principles or applicable law, or change any tax election, file any amended tax return, enter into any closing agreement, settle any tax claim or assessment relating to the Company or any of its Subsidiaries;

28

(xii)     approve or adopt any annual budget or business plan of the Company;

(xiii)    adopt a plan or agreement of complete or partial liquidation, dissolution, restructuring, recapitalization, merger, consolidation or other reorganization; commence any Action, or settle or compromise any Action that would result in material liability to the Company or its Subsidiaries;

(xiv)     amend the Company's or any of its Subsidiaries' governing documents;

(xv)      other than as provided in Section 5.4, engage in any transaction with any Affiliate or Holder (or any equityholder, employee, manager or director of the foregoing);

(xvi)     create or hold capital stock in any subsidiary that is not wholly owned (either directly or through one (1) or more other subsidiaries) by the Company; or

(xvii)    repurchase any Units held by Holders (other than pursuant to Section 3.8);

(xviii)   amend or modify any reimbursement or travel and entertainment policies as they relate to any Affiliate or Holder;

(xix)     replace or terminate the Company's independent auditors;

(xx)      change or cease any line of business of the Company as of the date hereof or enter into any new line of business not engaged in by the Company as of the date here;

(xxi)     release any funds held in escrow for any purpose, unless required by a governmental tax authority;

(xxii)    amend any provision of the Management Board Agreement;

To the extent any action taken by the Company with respect to a Subsidiary of the Company would require the approval of the Approving Party if such action were taken directly by the Company, the Company Subsidiary shall be prohibited from taking such action unless approved by the Approving Party.

Section 4.2     Officers.

(a)      Designation and Appointment. The Board may, from time to time, employ and retain Persons as may be necessary or appropriate for the conduct of the Business (subject to the supervision and control of the Board), including employees, agents and other Persons (any of whom may be a Member) who may be designated as Officers of the Company, with titles including "chairman," "vice-chairman," "chief executive officer," "president," "vice president," "treasurer," "secretary," "general manager," "director," "chief financial officer" and "chief

operating officer," to the extent authorized by the Board. Any number of offices may be held by the same Person. In its sole discretion, the Board may choose not to fill any office for any period as it may deem advisable. Officers need not be Members or residents of the Commonwealth of Puerto Rico. Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular Officers. Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he shall resign or shall have been removed in the manner hereinafter provided. The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board.

(b)     Resignation/Removal. Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, at any time by the Board. Designation of an Officer shall not of itself create any contractual or employment rights.

(c)     Duties of Officers Generally. The Officers, in the performance of their duties as such, shall owe to the Company the customary duties, including the duties of loyalty and due care, of the type owed by the officers of a corporation to such corporation and its equity-holders under the laws of the Commonwealth of Puerto Rico.

## ARTICLE 5
## OBLIGATIONS, EXCULPATION AND INDEMNIFICATION

Section 5.1     Performance of Duties; No Liability of Officers.. No Member, Officer or Director shall be liable to the Company or to any Member for any loss or damage sustained by the Company or to any Member, unless the loss or damage shall have been the result of gross negligence, fraud or intentional misconduct by the Member, Officer or Director in question. In performing his, her or its duties (if any), each such Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid) of the following other Persons or groups: one or more Officers or employees of the Company, any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company or the Board; or any other Person who has been selected with reasonable care by or on behalf of the Company or the Board, in each case as to matters which such relying Person reasonably believes to be within such other Person's competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Article 19.28 of the Act. No Member, Officer or Director shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member, Officer or Director of the Company or any combination of the foregoing.

Section 5.2     Opportunities; Competing Activities, Solicitation, Disparagement.

(a)     Each Holder expressly acknowledges and agrees that (i) Corbel, Sponsor and each of their respective Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships with entities engaged in the Business (an "Other Business"), (ii) Corbel, Sponsor and each of their respective Affiliates and Transferees may have and may develop a strategic relationship with businesses that are and may be competitive or complementary with the Company or any of its Subsidiaries, (iii) none of Corbel, Sponsor or any of their respective Affiliates will be prohibited by virtue of their investments in the Company or its Subsidiaries or their service as a Director or service on any sub-board from pursuing and engaging in any such activities, (iv) none of Corbel, Sponsor or any of their respective Affiliates will be obligated to inform the Company or any of its Subsidiaries or the Board of, or present to the Company or any of its Subsidiaries or the Board, any such opportunity, relationship or investment, (v) the other Holders will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of Corbel, Sponsor or any of their respective Affiliates, and (vi) the involvement of Corbel, Sponsor or any of their respective Affiliates in any Other Business will not constitute a conflict of interest by such Persons with respect to the Company or its Members or Holders or any of the Company's Subsidiaries. Notwithstanding the foregoing, without the prior written consent of the Approving Party, so long as Sponsor owns any Units, none of Sponsor or any of its Affiliates shall be permitted to, directly or indirectly, (whether as employee, director, owner, stockholder, consultant, partner (limited or general), or otherwise) own, manage, control, participate in, consult with or render services for any Person, other than the Company and its Subsidiaries, that operates a Business which competes with the Business .

(b)     Each Member acknowledges and agrees that such Member will not defame or criticize the services, business, integrity, veracity or personal or professional reputation of the Company, its Affiliates, or its and their respective officers, managers, partners, executives, members, lenders or agents, in either a professional or personal manner, or make any comments or statements or render any opinion, either orally or in writing, that is intended to, or could reasonably be construed in a manner, so as to discredit, insure or impair the reputation or impede the business of the Company or any Subsidiary at any time that such Member is a member of the Company and for the period of twenty-four (24) months thereafter.

Section 5.3     Confidential Information. Without limiting the applicability of any other agreement to which any Holder may be subject, no Holder, Officer or Director shall, directly or indirectly disclose or use at any time, either during his, her or its association or employment with the Company or for a period of twenty four (24) months thereafter, any Confidential Information of which such Holder, Officer or Director is or becomes aware. Each Holder, Officer and Director in possession of Confidential Information shall take reasonably appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft. Notwithstanding the above, a Holder, Officer or Director may disclose Confidential Information to the extent (a) the disclosure is necessary for the Holder, Officer or Director and/or the Company's agents, representatives, and advisors to fulfill their duties to the Company pursuant to this Agreement and/or other written agreements, (b) the disclosure is required or requested by any federal, state, provincial or other regulatory authority or examiner, or any insurance industry association, or is reasonably believed by such Holder, Officer or Director to be compelled by any

31

court decree, subpoena or legal or administrative order or process, (c) necessary to enforce rights hereunder, and (d) solely in the case of Corbel, Sponsor and the Directors, disclosure is of the information described in or referred to in Section 9.9 or is of a general nature regarding general business and financial information, return on investment and similar information, including (i) in connection with their communications to their direct and indirect beneficial owners and controlling Persons, (ii) in connection with their marketing or fundraising efforts, and (iii) to any nationally recognized rating agency or investor of the foregoing Persons (and their successors and assigns who become Members) that requires access to information about any such Person's investment portfolio in connection with ratings issued or investment decisions with respect to such a Person. No Holder, Officer or Director shall be prohibited from disclosing any Confidential Information to the extent such information (A) was or becomes generally available to such Holder, Officer or Director and known by the public other than as a result of a disclosure by such Holder, Officer or Director or any of its representatives or agents in violation of this Agreement, (B) was or becomes available to such Holder, Officer or Director on a non-confidential basis from a source other than the Company or any of its representatives or agents, provided, that such source was not known by such Holder, Officer or Director, after reasonable inquiry, to be bound by any agreement with the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Holder, Officer or Director or any of its representatives or agents by a contractual, legal or fiduciary obligation, or (C) was in such Holder's, Officer's or Director's possession prior to being furnished by or on behalf of the Company, provided the source of such information was not known by such Holder, Officer or Director, after reasonable inquiry, to be bound by any agreement with the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Holder, Officer or Director or any of its representatives or agents by a contractual, legal or fiduciary obligation.

Section 5.4    Transactions Between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, each of the Members, the Directors and their respective Affiliates may engage in any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the Company (and/or any of its Subsidiaries) so long as such transaction is at arm's length and approved by the Board. The Company shall provide to Approving Party a copy of any agreement evidencing any such transaction in advance of the effectiveness thereof, with reasonable time to review before the transaction becomes effective. The Company shall not, and shall cause its Subsidiaries to not, amend, alter or otherwise modify such agreements unless the terms of such amendment, alteration or other modification are fair and reasonable and not less favorable to the Company and its Subsidiaries than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate.

Section 5.5    Right to Indemnification.

(a)    Subject to the limitations and conditions as provided in this ARTICLE V, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member,

32

Director or Officer, or an officer, manager or member of the Board of a Subsidiary, shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' and experts' fees) actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation ("Damages"), unless such Damages shall have been the result of gross negligence, fraud or willful misconduct by such Person, in which case such indemnification shall not cover such Damage to the extent resulting from such gross negligence, fraud or willful misconduct. Indemnification under this ARTICLE V shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this ARTICLE V shall be deemed contract rights, and no amendment, modification or repeal of this ARTICLE V shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal.

(b)     Notwithstanding anything in this Agreement to the contrary, in the event that any officer or member of the Board, in each case, of the Company or any Subsidiary, is the subject of any Action brought by the Company or any Subsidiary, as the case may be, against such Person pursuant to which there is a final and non-appealable finding against Person of a breach of any restrictive covenant or obligation under this Agreement, then such Person shall not be entitled to indemnification or reimbursement of expenses of any kind by the Company or any Subsidiary pursuant to (i) this Agreement, including, but not limited to, Section 5.5, Section 5.6 or Section 5.7, or (ii) any insurance policy purchased by the Company or any Subsidiary, including any directors and officers insurance policies, whether purchased pursuant to Section 5.10 or otherwise.

Section 5.6     Advance Payment. The right to indemnification conferred in this ARTICLE V shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person (other than an Officer of the Company or any of its Subsidiaries thereof in respect of claims by the Company or any of its Subsidiaries thereof against such Officer in such Officer's capacity as such) entitled to be indemnified under Section 5.5 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this ARTICLE V and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this ARTICLE V or otherwise.

Section 5.7     Indemnification of Employees and Agents. The Company, at the direction of the Board, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses under Section 5.5 and Section 5.6.

Section 5.8    Appearance as a Witness. Notwithstanding any other provision of this ARTICLE V, the Company may pay or reimburse reasonable out of pocket expenses incurred by a Director, Officer, employee or agent in connection with his or her appearance as a witness or other participation in a Proceeding at a time when he or she is not a named defendant or respondent in the Proceeding.

Section 5.9    Non-Exclusivity of Rights.    The right to indemnification and the advancement and payment of expenses conferred in this ARTICLE V shall not be exclusive of any other right that a Member or Director indemnified pursuant to this ARTICLE V may have or hereafter acquire under any law (common or statutory) or under any agreement. The Company (for itself and its Subsidiaries) hereby acknowledges that Corbel, Sponsor, and the Directors (collectively, the "Institutional Indemnitees") may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more of Corbel, Sponsor and/or certain of their respective Affiliates (collectively, the "Fund Indemnitors"). The Company (for itself and its Subsidiaries) hereby agrees that it: (i) is the indemnitor of first resort (i.e., its obligations to the Institutional Indemnitees are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by an Institutional Indemnitee are secondary); (ii) shall be required to advance the full amount of any expenses incurred by an Institutional Indemnitee and shall be liable for the full amount of all costs, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement (or any other agreement between the Company and such Institutional Indemnitee), without regard to any rights such Institutional Indemnitee may have against the Fund Indemnitors; and (iii) irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company (for itself and its Subsidiaries) further agrees that no advancement or payment by the Fund Indemnitors on behalf of an Institutional Indemnitee with respect to any claim for which such Institutional Indemnitee has sought indemnification from the Company or a Subsidiary shall affect the foregoing and that the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Institutional Indemnitee against the Company or a Subsidiary. The Company (for itself and its Subsidiaries) and the Members agree that the Fund Indemnitors are express third-party beneficiaries of this Section 5.9.

Section 5.10    Insurance. The Company shall obtain and maintain insurance policies as determined by the Board from time to time.

Section 5.11    Savings Clause. If this ARTICLE V or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this ARTICLE V as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this ARTICLE V that shall not have been invalidated and to the fullest extent permitted by applicable law.

34

# ARTICLE 6
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 6.1    <u>Establishment and Determination of Capital Accounts</u>. An initial capital account ("<u>Capital Account</u>") shall be established for each Holder on the books of the Company initially reflecting an amount equal to such Holder's Capital Contribution as set forth on <u>Schedule A</u> attached hereto (as in effect as of the date hereof). Each Holder's Capital Account shall be (a) increased by any additional Capital Contributions made by such Holder pursuant to the terms of this Agreement, such Holder's share of Profits, and the amount of any Company liabilities that are assumed by such Holder (except to the extent taken into account in the determination of the amount distributed to Holders), (b) decreased by such Holder's share of Losses, any distributions to such Holder of cash or the Book Value of any other Company property (net of liabilities assumed by such Holder and liabilities to which such property is subject) distributed to such Holder, the amount of any liabilities of such Holder that are assumed by the Company (except to the extent taken into account in the determination of the amount of a Holder's Capital Contribution) and (c) adjusted as otherwise required by the Code and the regulations thereunder, including the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Any references in this Agreement to the Capital Account of a Holder shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above. A Holder who has more than one Unit in the Company shall have a single Capital Account that reflects all such Units regardless of the class of Unit owned and regardless of the time or manner in which the Units were acquired.

Section 6.2    <u>Negative Capital Accounts</u>. No Holder shall be required to pay to the Company or any other Holder any deficit or negative balance which may exist from time to time in such Holder's Capital Account.

Section 6.3    <u>Company Capital</u>. No Holder shall be paid interest on any Capital Contribution to the Company or on such Holder's Capital Account, and no Holder shall have any right (a) to demand the return of such Holder's Capital Contribution or any other Distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to <u>ARTICLE XI</u> hereof, or (b) to cause a partition of the Company's assets.

Section 6.4    <u>Compliance With Section 1.704-1(b)(2)(iv)</u>. The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Holder), are computed in order to comply with such Treasury Regulations, the Board may make such modification, <u>provided</u>, <u>that</u> it is not likely to have a material effect on the amount distributable to any Holder pursuant to <u>Section 7.2</u> hereof upon the dissolution of the Company and is not inconsistent with <u>Section 9.5</u> hereof. The Board also shall (a) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Holders and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury

Regulations Section 1.704-1(b)(2)(iv)(q), and (b) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b)(2)(iv).

Section 6.5    Transfer of Capital Accounts. The original Capital Account established for each substituted Holder shall be in the same amount as the Capital Account of the Holder (or portion thereof) to which such substituted Holder succeeds, at the time such substituted Holder becomes a Holder. The Capital Account of any Holder whose interest in the Company shall be increased or decreased by means of the transfer to it of all or part of the Units of another Holder (including pursuant to Section 10.2 or Section 10.7) shall be appropriately adjusted to reflect such transfer or repurchase. Any reference in this Agreement to a Capital Contribution of or Distribution to a Holder that has succeeded any other Holder shall include any Capital Contributions or Distributions previously made by or to the former Holder on account of the Units of such former Holder transferred to such Holder.

## ARTICLE 7
## DISTRIBUTIONS

Section 7.1    Generally. Subject to the provisions of Article 19.41 of the Act and to the provisions of this ARTICLE VII, the Board (except in the case of distributions made pursuant to Section 7.3), shall have sole discretion regarding the amounts and timing of Distributions to Holders; provided, however, that prior to the Loan Termination Date, the amounts and timing of all such Distributions shall be subject to the prior written consent of the Approving Party. The making of Distributions hereunder shall be subject to the terms and conditions of any Indebtedness incurred by the Company.

Section 7.2    Distributions.

(a)    Subject to Section 7.1 and the obligation of the Company to make Distributions pursuant to Section 7.3 for taxes, Distributions shall be made when and as declared by the Board to each Holder in the following order and priority:

(i)    *First*, 100% to the Class A Holder until the Class A Holder has received cumulative distributions of $55,000,000;

(ii)    *Second*, 60% to the Class A Holders and 40% to the Class B Holders until the total distributions made under this Section 7.2(a)(iii) is $115,000,000; and

(iii)    *Thereafter*, 70% to the Class A Holder and 30% the Class B Holder.

(b)    Distributions pursuant to Section 7.3 shall not be subject to the order and priority of this Section 7.2, and shall be considered advanced payments of and reduce or offset amounts otherwise distributable to any Holder pursuant to this Section 7.2.

36

Section 7.3     Tax Distributions for Non-Distributed Income or Gain.

(a)     So long as the Board has determined in good faith that a Distribution would not be prohibited or create a default or event of default under the Act (including Article 19.41 of the Act) or any agreement to which the Company is subject governing the terms of Indebtedness, then, to the extent of available cash (as determined by the Board), beginning with the Fiscal Quarter ending December 31, 2021, the Company shall distribute to each Holder such Holder's Tax Amount. The Company shall distribute the Estimated Tax Amount to the Holders on a quarterly basis no later than five (5) business days after the end of the quarter. In addition, the Company shall distribute Estimated Tax Amounts within five (5) business days of the occurrence of any Company transaction outside the ordinary course of business (including transactions pursuant to Section 10.6 and Section 10.15) and shall make all Estimated Tax prior to making any other distributions under this Agreement or payments under this Agreement or the Applicable Documents.

(b)     A Holder's "Tax Amount" for a Taxable Year shall be the excess of (i) the highest federal, state and local income tax rate applicable to any Holder on Schedule A hereto (or, as applicable, in the case the Holder is not subject to income tax, the direct or indirect owners of such Holder that are subject to income tax) or such other jurisdiction where, in the future, upon written notice to the Company, any Holder (or the direct or indirect owners of the Holder) files resident tax returns (irrespective of tax rates actually applicable to such Holder) multiplied by the net taxable income allocated by the Company to such Holder on IRS Form 1065 and Schedule K-1 for such Taxable Year, assuming that such Holder carried forward any taxable loss or tax credit previously allocated by the Company to such Holder (to the extent such carryforward has not expired for federal income tax purposes and not been previously used to offset taxable income pursuant to this clause), taking into account the character of any loss carryover as a capital or ordinary loss and not taking into account any items of income allocated under Code §704(c), over (ii) the amount of any actual cash Distribution made to such Member with respect to such Taxable Year under Section 7.2 hereof. The amounts in respect of tax withholding on payments to or from the Company for which Holders (or owners directly or indirectly of such Holders) are credited under applicable tax law shall be credited against payments of the Tax Amount to such Holders. A Holder's Tax Amount shall be determined initially by the Board on the basis of figures set forth on IRS Form 1065 filed by the Company and the similar state or local forms filed by the Company but shall be subject to subsequent adjustment pursuant to audit, litigation, settlement, amended return, or the like. For the avoidance of doubt, income or gain recognized by a Member due to redemption or distribution of cash in excess of such Member's tax basis in the Company shall not be included for purposes of calculating such Member's Tax Amount.

(c)     An "Estimated Tax Amount" for a Taxable Year (or fiscal period) shall be a Holder's Tax Amount for such Taxable Year (or fiscal period) as estimated from time to time by the Board in its sole discretion. In making such estimate, the Board shall take into account amounts shown on IRS Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and other adjustments as in the reasonable business judgment of the Board are necessary or appropriate to reflect the estimated operations of the Company for the Taxable Year.

EAST\186296037.4

(d)     Each Distribution pursuant to Section 7.3(a) shall be made to the Persons shown on the Company's books and records as Holders as of the date of such Distribution. Distributions pursuant to Section 7.3(a) shall be treated as advances of amounts that Holders are entitled to under Section 7.2.

(e)     In no event will the Company or the Board be responsible for the estimated tax liabilities of any Holder.

Section 7.4     Withholding of Certain Amounts.

(a)     Subject to Section 9.5, but notwithstanding any other provision contained herein to the contrary, the Company, at the discretion of the Board, may withhold from any distribution to any Member contemplated by this Agreement any amounts due and payable by such Member to the Company or to any other Person in connection with the Business to the extent not otherwise paid. Any amount withheld pursuant to this Section 7.4 shall be applied or paid by the Company to discharge the obligation in respect of which such amount was withheld.

(b)     Notwithstanding anything to the contrary contained herein, all amounts withheld by the Company pursuant to Section 7.4(a) with respect to a Member shall be treated as if such amounts were distributed to such Member under this Agreement.

## ARTICLE 8
## ALLOCATIONS OF PROFITS AND LOSSES

Section 8.1     Allocation of Profits and Losses.

(a)     For each Taxable Year of the Company, after adjusting each Holder's Capital Account for all Capital Contributions and Distributions during such Taxable Year and all special allocations pursuant to Section 8.2 with respect to such Taxable Year, all Profits and Losses shall be allocated to the Holders' Capital Accounts in a manner such that, to the extent possible, as of the end of such Taxable Year, the Adjusted Capital Account of each Holder (which may be either a positive or negative balance) shall be equal to (i) the amount which would be distributed to such Holder, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof pursuant to Section 7.2 hereof after the payment of all liabilities (limited, with respect to each nonrecourse liability, to the Book Value of the assets securing such liabilities) minus (ii) such Holder's share of Company Minimum Gain and Holder Minimum Gain, computed immediately before the foregoing hypothetical liquidation of the Company's assets.

(b)     Losses allocated pursuant to Section 8.1(a) shall not exceed the maximum amount that can be so allocated without causing any Holder to have a deficit balance in its Adjusted Capital Account at the end of any Taxable Year (any such excess being "Excess Losses"). If some but not all of the Holders would have deficit balances in their Adjusted Capital Accounts as a consequence of an allocation pursuant to Section 8.1(a), the limitation set forth in this Section 8.1(b) shall be applied on a Holder by Holder basis so as to allocate the maximum permissible Losses to each Holder under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). With respect to each Taxable Year thereafter, 100% of Profits shall be allocated to the Holders up to

38

the aggregate of, and in proportion to, any Excess Losses previously allocated to each Holder in accordance with this Section 8.1(b) in the reverse order in which such Excess Losses were allocated.

Section 8.2    Regulatory and Special Allocations.  Notwithstanding the provisions of Section 8.1:

(a)    Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any Taxable Year, each Holder shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to such Holder's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Holder Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Holder Minimum Gain during any Taxable Year, each Holder that has a share of such Holder Minimum Gain shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Holder's share of the net decrease in Holder Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirements in Treasury Regulations Section 1.7042(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.  If any Holder unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of taxable income and gain shall be specially allocated to such Holder in an amount and manner sufficient to eliminate the adjusted capital account deficit (determined according to Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) created by such adjustments, allocations or Distributions as quickly as possible. This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)    Nonrecourse Deductions and Holder Nonrecourse Deductions. Nonrecourse Deductions (as determined according to Treasury Regulations Section 1.704-2(b)(1)) for any Taxable Year shall be allocated among the Holders in the same manner as Profits and Losses are allocated for the Taxable Year, unless otherwise required by Treasury Regulations Section 1.704-2(b)(1). Holder Nonrecourse Deductions for any Taxable Year shall be allocated to the Holders who bear the economic risk of loss with respect to the partner nonrecourse debt to which Holder Nonrecourse Deductions are attributable in the manner required by Treasury Regulations Section 1.704-2(i).

(e)    Ordering Rules.  Anything contained in this Agreement to the contrary notwithstanding, allocations for any Taxable Year or other period of Nonrecourse Deductions

39

and Holder Nonrecourse Deductions (pursuant to Section 8.2(d)) or of items required to be allocated pursuant to the minimum gain chargeback requirements contained in Section 8.2(a) and Section 8.2(b), shall be made before any other allocations hereunder.

(f)    Offsetting Allocations. If, and to the extent that, any Holder is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Holder and the Company pursuant to Sections 1272, 1274, 7872, 483, 482 or 83 of the Code or any similar provision now or hereafter in effect, and the Board determines that any corresponding Profit or Loss of the Holder who recognizes such item should be allocated to such Holder in order to reflect the Holders' Economic Interests in the Company, then, to the extent permitted by the Code and Treasury Regulations, the Board may so allocate such Profit or Loss.

(g)    Reallocation. The allocations set forth in Section 8.2(a) through Section 8.2(d) above (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Profit and Loss or make Company Distributions. Accordingly, notwithstanding the other provisions of this ARTICLE VIII, but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Holders so as to eliminate the effect of the Regulatory Allocations and thereby to cause the respective Capital Accounts of the Holders to be in the amounts (or as close thereto as possible) they would have been in if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Holders anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Holders so that the net amount of the Regulatory Allocations and such special allocations to each such Holder is zero. In addition, if in any Fiscal Year or other period there is a decrease in Company Minimum Gain, or in Holder Minimum Gain, and application of the minimum gain chargeback requirements set forth in Section 8.2(a) or Section 8.2(b) would cause a distortion in the economic arrangement among the Holders, the Holders may, if they do not expect that the Company will have sufficient other income to correct such distortion, request that the Internal Revenue Service waive either or both of such minimum gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirement.

(h)    Noncompensatory Options. The Members hereto agree that if the Company issues a "noncompensatory option" as that term is defined in Regulation Section 1.721-2, the Company will follow the requirements set forth in Treasury Decision 9612 (effective February 4, 2013), as amended and supplemented from time to time.

Section 8.3    Tax Allocations

(a)    Except as provided in Section 8.3(b), for federal, state and local income tax purposes, each item of income, gain, loss or deduction shall be allocated among the Holders in the same manner and in the same proportion that the corresponding Profits and Losses have been allocated among the Holders' respective Capital Accounts, except that if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent

40

income, gains, losses, and deductions will be allocated among the Holders so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)     In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Holders so as to take account of any variation between the adjusted basis of such asset for federal income tax purposes and its initial Book Value. Such allocations shall be made using any reasonable method specified in Treasury Regulations Section 1.704-3 as the Board determines. In the event the Book Value of any Company asset is adjusted pursuant to clause (b) of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. Such allocation shall be made based on any reasonable method specified in Treasury Regulations Section 1.704-3 as the Board determines.

## ARTICLE 9
## TAX AND ACCOUNTING MATTERS; INFORMATION RIGHTS

Section 9.1     Tax Returns. Without limiting the provisions of and subject to Section 9.5, the Board shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, and shall cause the Company to make any elections and filings it may deem appropriate and in the best interests of the Members. Each Holder shall furnish to the Company all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. The Company shall furnish all pertinent information to the Holders that is necessary to determine amounts includable on their tax returns with respect to the Company (including Schedule K-1) not later than one hundred twenty (120) days following the end of the Taxable Year or any extension period granted by the relevant authority having jurisdiction over such matters.

Section 9.2     Partnership Representative. The "partnership representative" within the meaning of Section 6223(a) of the Code (in such capacity the "Partnership Representative") shall be a Holder (subject to such Holder's written consent) designated (and subject to replacement) by the Board. The initial Partnership Representative, designated as of the Effective Date, shall be Bioapi S.A.S. The Company shall affirmatively appoint the Partnership Representative each year with the filing of its tax return. If the Partnership Representative is not an individual, the Partnership Representative shall designate from time to time a "designated individual" to act on behalf of the Partnership Representative, and such designated individual shall be subject to replacement by the Partnership Representative in accordance with the Code and Regulations. The Partnership Representative may, in its sole discretion, cause the Company to elect out of the application of Section 6221(a) of the Code (the "Section 6226 Election"), in the event that it receives a "notice of final partnership adjustment" that would otherwise permit collection of a deficiency of Tax from the Company, for a relevant year. If such election out is not made, each Holder shall indemnify and hold harmless the Company from and against any liability with respect to the Holder's proportionate share of any imputed underpayment as calculated under Section 6225(b) of the Code, including interest and penalties, resulting in liability of the

41

Company, regardless of whether such Holder is a Holder of the Company in an "adjustment year" (as defined in Section 6225(d)(2) of the Code). If the Partnership Representative causes the Company to make the Section 6226 Election, the Holders covenant to take into account, report, and pay (or reimburse the Company for) the tax liability and any interest and penalties related to any adjustment, determined in accordance with Section 6226 of the Code and any Treasury Regulations adopted therewith (the "Section 6226 Adjustments"), to their items for the reviewed year as notified to them by the Partnership Representative on behalf of the Company in a statement, such amount to be determined by the Partnership Representative in its discretion by taking into account the relevant tax status and circumstances of such Holder, whether or not such Holder owns any Units or remains a Holder in the year of any such statement. Any Holder which fails to report and/or pay (or reimburse the Company for) its share of tax liability and interest and penalties related to such Section 6226 Adjustments on its U.S. federal income tax return for its taxable year including the date of any such statement shall indemnify and hold harmless the Company and the other Holders against any tax, interest and penalties collected from the Company as a result of such Holder's inaction, together with interest thereon. The foregoing covenants and indemnification obligations of the Holders described in this Section 9.2 shall survive indefinitely and shall not terminate, without regard to any transfer of a Holder's interest, withdrawal as a Holder, or liquidation, dissolution or termination of the Company. The Partnership Representative shall act at the direction of the Board with respect to any material tax matter. The Partnership Representative shall keep the Board and Holders reasonably informed of all proceedings and shall provide copies of any documents related thereto to any requesting Holders. The Holders shall have no claim against the Company or the Partnership Representative for any form of damages or liability as a result of actions taken by the Partnership Representative under this Section 9.2.

Section 9.3    Reserves. The Board may from time to time establish such reasonable cash reserves as it shall reasonably determine.

Section 9.4    Partnership Status. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Holder shall be a partner or joint venturer of any other Holder by virtue of this Agreement, for any purposes other than federal and, if applicable, state tax purposes, and neither this Agreement nor any other document entered into by the Company or any Holder shall be construed to suggest otherwise. Unless otherwise determined by the Approving Party together with Members holding a Majority of (i) the outstanding Class A Units entitled to vote and (ii) the outstanding Class B Units entitled to vote, and except in connection with an Initial Public Offering, the Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, that each Holder shall be treated as a partner of the Company for federal and, if applicable, state income tax purposes, and that each Unit shall be treated as an equity interest in the Company for those purposes, and each Holder and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Unless otherwise determined by the Approving Party together with Members holding (i) a Majority of the outstanding Class A Units entitled to vote, and (ii) a Majority of the outstanding Class B Units entitled to vote, and except in connection with an Initial Public Offering, in furtherance of the foregoing the Company shall neither elect, pursuant to Treasury Regulations Section 301.7701-3, to be treated as an entity other than a partnership nor elect, pursuant to Code Section 761(a), to be excluded from the provisions of subchapter K of the Code. Unless otherwise determined by the

42

Approving Party together with Members holding (i) a Majority of the outstanding Class A Units entitled to vote, and (ii) a Majority of the outstanding Class B Units entitled to vote, and except in connection with an Initial Public Offering, to ensure that Units are not traded on an established securities market within the meaning of Treasury Regulations Section 1.7704-1(b) or readily tradable on a secondary market or the substantial equivalent thereof within the meaning of Treasury Regulations Section 1.77041(c), notwithstanding anything to the contrary contained herein, (a) the Company shall not participate in the establishment of any such market or the inclusion of its Units thereon, and (b) the Company shall not recognize any Transfer made on any market by (i) redeeming the Transferor (in the case of a redemption or repurchase by the Company) or (ii) admitting the Transferee as a Member or otherwise recognizing any rights of the Transferee, such as a right of the Transferee to receive Company distributions (directly or indirectly) or to acquire an interest in the capital or profits of the Company.

Section 9.5    <u>Withholding Tax Payments and Obligations</u>. In the event that withholding taxes are paid or required to be paid in respect of amounts allocated to or by the Company or amounts received or distributed by the Company (including federal, state or local withholding taxes imposed with respect to any issuance of Units, federal withholding taxes with respect to foreign Persons, state personal property taxes, state personal property replacement taxes, state unincorporated business taxes, etc.):

(a)    <u>Payments to the Company</u>. If the Company receives proceeds in respect of which a tax has been withheld, the Company shall be treated as having received cash in an amount equal to the amount of such withheld tax, and, for all purposes of this Agreement, subject to <u>Section 9.5(d)</u>, each Member shall be treated as having received a distribution pursuant to <u>Section 7.2</u> hereof equal to the portion of the withholding tax allocable to such Members, as determined by the Board. In the event the Company receives a refund of taxes previously withheld by a third party from one or more payments to the Company, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Board to offset the prior operation of this <u>Section 9.5(a)</u> in respect of such withheld taxes.

(b)    <u>Payments by the Company</u>. The Company is authorized to withhold from any payment made to, or any distributive share of, a Member, any taxes required by law to be withheld. If, and to the extent, the Company is required to make any such tax payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such tax payments (which tax payment shall, subject to <u>Section 9.5(d)</u>, be treated as a distribution to such Member pursuant to <u>Section 7.2</u> hereof) or (ii) such Member shall pay to the Company prior to such distribution an amount of cash equal to such tax payments (which payment of cash shall not be deemed to be a Capital Contribution for purposes hereof).

(c)    <u>Over-withholding</u>. The Company shall not be liable for any excess taxes withheld in respect of any Member's interest in the Company, and, in the event of over-withholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

(d)    <u>Certain Withheld Taxes Treated as Demand Loans</u>. Any taxes withheld pursuant to <u>Section 9.5(a)</u> or <u>Section 9.5(b)</u> shall be treated as if distributed to the relevant

43

Member to the extent an amount equal to such withheld taxes would then be distributable to such Member and, to the extent in excess of such distributable amounts, as a demand loan payable by the Member to the Company with interest at the lesser of (i) the prime rate in effect from time to time plus 2%, compounded quarterly, and (ii) the highest rate per annum permitted by law. The Board, in its sole discretion, may either demand payment of the principal and accrued interest on such demand loan at any time, and enforce payment thereof by legal process, or may withhold from one or more distributions to a Member amounts sufficient to satisfy such Member's obligations under any such demand loan.

(e)　　Indemnity. In the event that the Company, Corbel, Sponsor or any respective Affiliate thereof, becomes liable as a result of a failure to withhold and remit taxes in respect of any Member, then, in addition to, and without limiting, any indemnities for which such Member may otherwise be liable under this Agreement, such Member shall indemnify and hold harmless the Company, Corbel, Sponsor or such Affiliates, as the case may be, in respect of all taxes, including interest and penalties, and any expenses incurred in any examination, determination, resolution and payment of such liability. The provisions contained in this Section 9.5(e) shall survive the termination of the Company and the withdrawal of any Member (Permitted Withdrawal or otherwise). The Company may pursue and enforce all rights and remedies it may have against each such indemnifying Member under this Section 9.5(e), including instituting a lawsuit to collect such contribution with interest calculated at the prime rate as published in the Wall Street Journal from time to time plus five percentage points per annum (but not in excess of the highest rate per annum permitted by law), calculated from the date that is thirty (30) days after such Member receives written notice of a contribution due from it under this Section 9.5.

Section 9.6　　Applicable Code and Treasury Regulations. Any and all references herein to the Code and the Tax Regulations, shall be interpreted as including, to the extent applicable, the corresponding provisions of the Puerto Rico Internal Revenue Code of 2011, as amended, and the regulations issued thereunder.

Section 9.7　　Bank Accounts. Except as may be agreed to by the Board, all funds of the Company shall be deposited and maintained in the Company's name in a bank account or accounts of one or more commercial banks, each having combined capital and surplus of at least $500 million, or shall be invested in obligations of the United States government or any agency thereof or obligations guaranteed by the United States government or commercial paper with a rating of at least "Prime 1" by Moody's Investors Service, Inc. Subject to the foregoing, the Board shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the individuals who will have authority with respect to the accounts and the funds therein.

Section 9.8　　Maintenance of Books. Except as may be agreed to by the Board, the Company shall keep, or cause to be kept, complete and accurate books and records of accounts of the Company in accordance with United States generally accepted accounting principles and shall keep minutes of the proceedings of its Members, the Board and each committee. The books of the Company (other than books required to maintain Capital Accounts) shall be kept on the accrual method of accounting in accordance with generally accepted accounting principles, consistently applied. Except as may be agreed to by the Board, each of the following shall be maintained at the

principal business office of the Company: (a) a current list of the full name and last known business address of each Member, setting forth the amount of cash each Member contributed or has agreed to contribute, a description and statement of the Fair Market Value (at the time of contribution) of property or other services each Member has contributed or agreed to contribute (which, except as otherwise expressly provided herein, shall be the amount reasonably determined by the Board) and the date on which each Member became a Member, (b) a copy of this Agreement and all amendments hereto (and executed copies of all powers of attorney pursuant to which this Agreement or any amendment has been executed), (c) a copy of the Certificate and all certificates of amendment thereto (and executed copies of all powers of attorney pursuant to which the Certificate or any certificate of amendment has been executed), (d) copies of the Company's federal, state and local income tax returns and reports, if any, for the six (6) most recent Fiscal Years, (e) the financial statements of the Company for the six (6) most recent Fiscal Years or such lesser period of the Company's existence, and (f) all other records required to be maintained pursuant to the Act.

Section 9.9    Accounting Year. The Taxable Year shall be the accounting year of the Company for tax and financial reporting purposes.

Section 9.10    Information Rights. The Company shall prepare and deliver to the Members:

(a)    as soon as available but not later than thirty (30) days after the end of each Fiscal Month, a Consolidating and Consolidated internally prepared Financial Statement for the Company and its Subsidiaries, which shall include the Company's and its Subsidiaries' Consolidating and Consolidated balance sheet as of the close of such period, and Company's and its Subsidiaries' Consolidating and Consolidated statement of income and retained earnings and statement of cash flow for such period and year to date, in each case setting forth in comparative form, as applicable, the figures for the corresponding Fiscal Month of the previous Fiscal Year, all in reasonable detail, certified by the Chief Financial Officer or other responsible senior officer of Company, to the best of his or her knowledge after due and diligent inquiry, as being complete and correct and fairly presenting in all material respects the Company's and its Subsidiaries' financial condition and results of operations for such period. The Chief Financial Officer or such other responsible senior officer of Company shall also certify that such Financial Statement has been prepared in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(b)    as soon as available but not later than forty-five (45) days after the end of each Fiscal Quarter, (i) a Consolidating and Consolidated internally prepared Financial Statement for the Company and its Subsidiaries which shall include the Company's and its Subsidiaries' Consolidating and Consolidated balance sheet as of the close of such period, and the Company's and its Subsidiaries' Consolidating and Consolidated statement of income and retained earnings and statement of cash flow for such period and year to date and thirteen week cash flow report, in each case setting forth in comparative form, as applicable, the figures for the corresponding Fiscal Quarter of the previous Fiscal Year, all in reasonable detail, certified by the Chief Financial Officer or other responsible senior officer of Company, to the best of his or her knowledge after due and diligent inquiry, as being complete and correct and fairly presenting in all material respects the Company's and its Subsidiaries' financial condition and results of

45

operations for such period, in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    as soon as available but not later than ten (10) days after the approval of the annual operating budget and in no event later than 30 days prior to the end of each Fiscal Year, an annual operating budget (including monthly balance sheet, statement of income and retained earnings, and statement of cash flows) for the following Fiscal Year; provided that Corbel will have the right to request revisions to or approve each proposed operating budget promptly and in any event within 30 days after receipt thereof and, after an operating budget has been approved by Corbel for any Fiscal Year, the Company shall follow and comply with such approved operating budget

(d)    as soon as available but not later than one-hundred twenty (120) days after the end of each Fiscal Year, beginning with the Fiscal Year ending December 31, 2021, a complete copy of the Company's and its Subsidiaries' Consolidated and Consolidating audited Financial Statement, which shall include at least the Company's and its Subsidiaries' balance sheet as of the close of such Fiscal Year, and the Company's and its Subsidiaries' statement of income and retained earnings and statement of cash flow for such Fiscal Year setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and, with respect to all Fiscal Years from and after December 31, 2022, accompanied by (i) a report and opinion of a certified public accountant of nationally recognized or regionally recognized standing selected by the Company and reasonably satisfactory to the Approving Party, which report and opinion shall not be subject to any "going concern" or like qualification or exception or any qualifications or exceptions as to the scope of such audit, and (ii) a certificate of such certified public accountant certifying such Financial Statements;

(e)    within fifteen (15) days of filing but not later than April 30 of each year (or not later than September 30 of the applicable year if any such tax returns are on extension, in which case the Company shall provide evidence of such extension to the Approving Party), copies of the Company's federal income tax returns (including any Schedule K-1s);

(f)    promptly after the release thereof, copies of all press releases;

(g)    as soon as available but not later than five (5) days after the receipt by the Company thereof, copies of any and all reports and management letters submitted to the Company or any of its Subsidiaries by any certified public accountant in connection with any examination of the Company's or such Subsidiary's financial records made by such accountant; and

(h)    from time to time, operating statistics, operating plans, and any other information as any Class A Holder or Class B Holder may reasonably request, promptly upon such request.

## ARTICLE 10
## HTRANSFERS AND OTHER EVENTS

Section 10.1    Transfers and Restrictions on Transfer.

(a)    Except as provided in this ARTICLE X and subject to any restrictions contained in this Agreement, without the prior written consent of the Board and Approving Party (the Board in the case of the Approving Party, except with respect to Section 10.5) no Holder shall be permitted to Transfer any Units to any Person; provided, that:

(i)    the restrictions on Transfer contained in this Section 10.1(a) shall not apply to Transfers by Holders properly made pursuant to and in accordance with Section 10.6 (Sale of the Company), Section 10.7 (Change in Business Form), Section 10.8 (Change in Structure), or pursuant to any contracts with any current or former employees, Officers, managers, or members of the Board that were approved by the Board;

(ii)    the restrictions on Transfer contained in this Section 10.1(a) shall not apply to Transfers by Members properly made pursuant to and in accordance with Section 10.5 (Tag-Along Rights) in connection with such Members' election to participate in a Transfer initiated by the Transferor thereunder; and

(iii)    the restrictions on Transfer contained in this Section 10.1(a) shall not apply to Transfers by Members (but, for the avoidance of doubt, not including Holders that are not Members) to Permitted Persons; provided, that, as a condition to any Transfer to a Permitted Person, the Transferor hereby covenants, and such Permitted Person shall be required to covenant, to the Company that if such Permitted Person at any time ceases for any reason to be a Permitted Person of the original Transferor, then such Permitted Person shall Transfer his, her or its Units back to such original Transferor or to a Person that at such time is a Permitted Person of such original Transferor.

(iv)    For the avoidance of doubt, Corbel shall be permitted to make Transfers of Units hereunder to any Person, subject to the provisions of Section 10.5 (Tag-Along Rights).

(b)    Notwithstanding anything to the contrary contained herein (including Section 10.1(a)(iii)), no Holder shall be permitted, without the written consent of the Board (and the Approving Party, whose consent shall not be unreasonably withheld, in the event that a Transfer constitutes a Change of Control), to make any Transfer of Units to any Person (other than the Company or Corbel) that participates, directly or indirectly, in any business (including any division, group, or franchise of a larger organization) anywhere in the world (a "Competing Enterprise") that engages in the Business (other than Transfers properly made pursuant to and in accordance with Section 10.5 (Tag-Along Rights) and Section 10.6 (Sale of the Company)). The foregoing restriction shall not apply to the Transfer to: (i) a Person whose participation in such a Competing Enterprise is limited to owning less than five percent (5%) of the voting stock of a publicly-held entity; or (ii) an institutional investment fund, if such fund and its Affiliates have

47

no active participation in the management of such Competing Enterprise and do not have a controlling interest or otherwise control, directly or indirectly, such Competing Enterprise.

(c)     Notwithstanding anything in this Agreement to the contrary, upon the bankruptcy or death of a Holder, (i) the rights of such Holder (other than any rights afforded to Holders that are not Members) and (ii) the restrictions and obligations applicable to such Holder (including the restrictions on Transfer hereunder) shall devolve on such Holder's Successor in Interest for the purpose of settling such Holder's estate or administering such Holder's property, and such Successor in Interest shall be deemed to be subrogated to such rights, restrictions and obligations of such Holder hereunder (for example, such Successor in Interest would be subject to the transfer restrictions as applicable to the bankrupt or deceased Holder) in addition to any other obligations applicable to Successors in Interest hereunder. The Successor in Interest of such Holder shall be liable for all the obligations of such Holder hereunder, and, upon the bankruptcy or death of a Holder, such Holder shall cease to be a Holder (and, if applicable, Member) hereunder. Subject to the terms of this <u>Section 10.1(c)</u>, such Successor in Interest shall be treated as a Holder hereunder, but shall not be admitted as a Member except in accordance with the terms of <u>Section 10.3</u> (as applied assuming such Successor in Interest is a Transferee for purposes thereof).

(d)     Unless otherwise specified in this <u>ARTICLE X</u>, the restrictions contained in this <u>ARTICLE X</u> shall continue to be applicable to all Units and enforceable against any new Holder following any Transfer.

(e)     Anything contained in this Agreement to the contrary notwithstanding, except as provided in <u>Section 10.1(a)(iii)</u>, no Transfer of the Class B Units shall be permitted without the prior approval of the Board (and the Approving Party in the event that a Transfer is to a Competing Enterprise or constitutes a Change of Control).

(f)     No Transferee of any Class B Unit that was acquired pursuant to a Transfer shall be admitted as a Member or have any rights hereunder applicable to Members but not otherwise specifically applicable to Holders, including without limitation any approval or voting rights, with respect to such Class B Units.

Section 10.2     <u>Assignments Generally; Substituted Member.</u>

(a)     <u>Conditions</u>. In addition to any other restrictions contained in this Agreement (including <u>Section 10.1</u> hereof), unless otherwise waived by the Board in writing (in its sole discretion), a Transfer shall be valid and effective hereunder only if:

(i)     the Transferor gives reasonable prior written notice to the Board of any proposed Transfer permitted by <u>Section 10.1</u>, including the identity and contact details of such proposed Permitted Person and such other documentation reasonably requested by the Board to ensure compliance with the terms of this Agreement (other than a Transfer to a Successor in Interest pursuant to <u>Section 10.1(c)</u>, <u>provided</u>, <u>that</u> such Successor in Interest, as a Transferee, must promptly notify the Board upon becoming a Successor in Interest);

(ii)     the Transferor and the Transferee execute and deliver to the Company such documents and instruments of conveyance as may be reasonably requested by the Board to effect such Transfer and to confirm the agreement of the Transferee to be bound by the provisions of this Agreement;

(iii)     the Transferor and Transferee provide to the Board the Transferee's taxpayer identification number and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any interest Transferred until the Board has received such information;

(iv)     (A) the Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended, (B) the Transfer will not cause the Company to be deemed a "publicly traded partnership" within the meaning of Code Section 7704 or ineligible for "safe harbor" treatment under the Treasury Regulations promulgated under Code Section 7704-4 and (C) either the interest Transferred has been registered under the Securities Act and any applicable state securities laws or the Transfer is exempt from all applicable registration requirements and will not violate any applicable laws regulating the Transfer of securities and, unless otherwise permitted by the Board, the Transferor furnishes to the Company an opinion of counsel, which counsel and opinion shall be reasonably satisfactory to the Board, that each of (A), (B) and (C) have been satisfied; and

(v)     in all cases, the Company is reimbursed by the Transferor and/or Transferee for all costs and expenses that the Company incurs in connection with the Transfer.

(b)     <u>Rights and Obligations of Transferees (or Successors in Interest, if applicable) and Transferors.</u>

(i)     A Transfer by a Member or other Person shall not itself dissolve the Company or entitle the Transferee to become a Member or exercise any rights of a Member.

(ii)     Except as set forth herein, a Transfer by a Member shall eliminate the Member's power and right to vote (in proportion to the extent of the interest Transferred) on any matter submitted to the Members, and, for voting purposes, such interest shall not be counted as outstanding in proportion to the extent of the interest Transferred. A Transfer shall also eliminate the Member's right to participate in the issuance of Additional Units pursuant to <u>Section 3.8</u> to the extent of the interest Transferred. A Transfer shall not otherwise eliminate the Member's entitlement to any rights associated with the Member's remaining interest, including rights to information, and shall not cause the Member to be released from any liability to the Company solely as a result of the Transfer.

(c)     Admission of Transferee as Member.

(i)     Subject to the other restrictions contained in this Agreement (including Section 10.10 hereof), a Transferee that is not admitted as a Member pursuant to this Section 10.3(c) shall be treated as a Holder hereunder and shall be entitled only to the Economic Interest with respect to the Units held thereby and shall have no other rights (including rights to any information or accounting of the affairs of the Company or to inspect the books and records of the Company) with respect to the interest Transferred. The Transferee shall nevertheless be subject to all of the obligations applicable to a Holder under this ARTICLE X and shall be deemed to make all acknowledgments and representations and warranties of a Holder hereunder and shall be liable hereunder for any breach thereof. If the Transferee becomes a Member, the voting and other rights associated with the interest held by the Transferee shall be restored and be held by the Member along with all other rights with respect to the interest Transferred.

(ii)     Subject to the other provisions of this ARTICLE X, a Transferee may be admitted to the Company as a Member only upon (x) the valid Transfer of Units to a Transferee pursuant to the terms hereof (provided such Transfer represents a complete Transfer of all of the rights and obligations associated with such Units and does not, among other things, represent or constitute a collateral assignment or grant of security interest in such Units), and (y) satisfaction (or waiver by the Board, in its sole discretion) of all of the following conditions, upon which consent and satisfaction the Transferee shall have the rights and powers, and be subject to the restrictions and liabilities, of a Member under the Act and this Agreement:

(1)     The Transferee has complied with all obligations of a Transferee set forth in Section 10.3(a), including (I) becoming a party to this Agreement as a Member by executing a counterpart signature page to this Agreement and executing such documents and instruments as the Board may reasonably request as necessary or appropriate to confirm such Transferee as a Member in the Company and such Transferee's agreement to be bound by the terms and conditions of this Agreement and (II) paying or reimbursing the Company for all legal, filing, publication and other costs that the Company incurs in connection with the admission of the Transferee as a Member; and

(2)     If the Transferee is not a natural Person of legal majority, the Transferee provides the Company with evidence reasonably satisfactory to the Board of the authority of the Transferee to become a Member and to be bound by the terms and conditions of this Agreement.

(d)     Effect of Admission of Member on Transferor and Company. Notwithstanding the admission of a Transferee as a Member, the Transferor shall not be released from breach of any obligations it had to the Company on or prior to the date of the Transfer, but, subject to Section 10.1(c), such admission shall cause a Transferor that is a Member to cease to be a Member with respect to the interest Transferred when the Transferee becomes a Member. In any such case, the admission of the Transferee as a Member shall constitute the requisite consent

of the Members to continue the Business notwithstanding that such admission will cause the termination of the membership of the Transferor with respect to the interest Transferred.

(e) <u>Distributions and Allocations Regarding Transferred Units</u>. Upon any Transfer during any Taxable Year of the Company made in compliance with the provisions of this <u>ARTICLE X</u>, profits, losses, each item thereof and all other items attributable to such interest for such Taxable Year shall be divided and allocated between the Transferor and the Transferee by taking into account their varying interests during such Taxable Year, using any conventions permitted by law and selected by the Board. All Distributions on or before the date of such Transfer shall be made to the Transferor and all Distributions thereafter shall be made to the Transferee. Solely for purposes of making such allocations and Distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of the effective date of such Transfer; <u>provided, that</u>, if the Company does not receive a notice stating the date such interest was Transferred and such other information as the Board may reasonably require within ten (10) days after the end of the Taxable Year during which the Transfer occurs, then all such items shall be allocated, and all Distributions shall be made, to the Holder that, according to the books and records of the Company, was the owner of the interest on the last day of the Taxable Year during which the Transfer occurs. Neither the Company nor the Board shall incur any liability for making allocations and Distributions in accordance with the provisions of this <u>Section 10.3(e)</u>, whether or not the Company or the Board has knowledge of any Transfer of any interest.

Section 10.3    <u>Required Amendments; Continuation</u>. If and to the extent any Transferee is admitted as a Member pursuant to <u>Section 10.3</u>, this Agreement shall be amended to admit such Transferee as a Member and to reflect the elimination of the Transferor (or the reduction of such Member's interest), and if and to the extent then required by the Act a certificate of amendment to the Certificate reflecting such admission and elimination (or reduction) shall be filed in accordance with the Act. The admission of any substitute Member pursuant to this <u>ARTICLE X</u> shall be deemed effective on the effective date of such amendment to this Agreement.

Section 10.4    <u>Tag-Along Rights for Transfers</u>.

(a) Except for Transfers by a Holder of Class A Units pursuant to <u>Section 10.5</u>, <u>Section 10.6</u>, or <u>Section 10.7</u>, each Member holding Class B Units shall be entitled to participate in any Transfer by a Member of Class A Units. Each Class B Member shall be permitted to transfer his, her or its Units that represent the same percentage of such Class B Member's Pro Rata Portion as the percentage of Transferor's Pro Rata Portion represented by Transferor's Units being Transferred by Transferor. Prior to such Transfer, Transferor shall give at least thirty (30) days' prior written notice to the Company and each Class B Member, which notice (for purposes of this <u>Section 10.4</u>, the "<u>Sale Notice</u>") shall describe in reasonable detail the price, terms and conditions of such proposed Transfer, and the identity of the prospective Transferee. Each of the Class B Members shall be entitled, within ten (10) Business Days after the delivery of the Sale Notice, to give written notice (a "<u>Tag-Along Notice</u>") to Transferor and the Company that such Class B Member desires to participate in such proposed Transfer upon the price, terms and conditions set forth in the Sale Notice, which Tag-Along Notice shall specify the Units such Class B Member desires to include in such proposed Transfer; <u>provided, that</u> if different classes of Units are included in any such Transfer, the consideration to be paid in

51

connection with the Transfer shall be allocated among each Unit, based on such Unit's Pro Rata Share, determined based upon the Total Equity Value implied by the proposed Transfer. Transferor shall use commercially reasonable efforts to obtain the prospective Transferee's agreement to include all Units required to be included in such Transfer hereunder on the terms described herein. To the extent the prospective Transferee refuses to purchase all such Units from each such participating Member, each participating Member shall have the right to Transfer such portion of such Member's Units equal to the number of Units that the Transferee is willing to purchase, multiplied by the ratio of (i) the number of Units such participating Member would have Transferred pursuant to this Section 10.4 if the prospective Transferee had agreed to acquire all of the Units required to be included in such Transfer, divided by (ii) the total number of Units required to be included in such Transfer; and provided further that in the event that any of the Class B Units are held by a blocker company, at the request of the Class B Holder, the Class B Holder shall have the right to transfer Units in the blocker company. Notwithstanding anything to the contrary in this Section 10.4 or otherwise, if the Transferee in a proposed transaction made pursuant to this Section 10.4 does not agree to limit each participating Other Member's indemnification liability to its pro rata share of any damages, capped at the amount of equity proceeds received by the participating Class B Member in connection with such Transfer, then Transferor shall have the right, but not the obligation, to continue with the Transfer by selling Transferee only Units held by Transferor; provided, that, if such Transfer occurs, then simultaneously with such Transfer, Transferor shall purchase from each such participating Class B Member the number of Units each such participating Class B Member otherwise would have been permitted to Transfer to Transferee pursuant to this Section 10.4, at the same price per Unit which Transferor received from Transferee and each such Class B Member's indemnification liability to Transferor under such transaction shall be limited to its pro rata share of any damages, capped at the amount of equity proceeds each such Class B Member received from Transferor in connection with such purchase. In addition, unless the prospective Transferee in a sale made pursuant to this Section 10.4 permits a participating Class B Member to give a guarantee, letter of credit or other similar assurance mechanism other than an escrow arrangement (which shall be addressed on an individual basis), any escrow of proceeds of any such sale shall be withheld, such that the allocable share of each Member participating in such sale of any such withholding shall be an amount equal to the amount by which such Member's equity proceeds from such sale would have been reduced had the aggregate consideration from such sale pursuant to this Section 10.4 been distributed by the Company in accordance with Section 7.2 (assuming for this purpose that the Units being Transferred by the Members pursuant to this Section 10.4 were the only issued and outstanding Units at such time), after deducting from such aggregate consideration the aggregate amount of such withholding. Each Member participating in a sale pursuant to this Section 10.4 will bear his, her or its pro rata share of the reasonable costs and expenses of any sale of Units pursuant to this Section 10.4 to the extent such costs and expenses are incurred for the benefit of all Members participating in such sale and are not otherwise paid by the Company or the Transferee. The allocable share of each such Member participating in a sale pursuant to this Section 10.4 of any such costs and expenses shall be an amount equal to the amount by which such Member's equity proceeds from such sale would have been reduced had the aggregate consideration from such sale pursuant to this Section 10.4 been distributed by the Company in accordance with Section 7.2 (assuming for this purpose that the Units being Transferred by the Members pursuant to this Section 10.4 were the only issued and outstanding Units at such time), after deducting from such aggregate consideration the aggregate amount of such costs and

expenses. Costs and expenses incurred by or on behalf of a Member for his, her or its sole benefit will be borne solely by such Member (i.e., not borne by the Company or any other Members). For avoidance of doubt, in the event that any of the Applicable Units are held by a blocker company that is affiliated with Corbel, at the request of Corbel, the Company shall acquire the blocker company in lieu of acquiring the Applicable Units.

Section 10.5    Sale of the Company.

(a)    Approved Sale. Subject to the terms of this Section 10.6, if the Board approves a Sale of the Company (which definition shall exclude the exercise by Corbel of the put right set forth in Section 10.15 and the dissolution of the Company) (any such Sale of the Company, an "Approved Sale"), then each Holder agrees to (i) vote for (to the extent permitted to vote for), consent to and raise no objections against such Approved Sale or the process by which such Approved Sale was arranged, (ii) waive any dissenters rights, appraisal rights and other similar rights, to the extent applicable to such Approved Sale, (iii) sell or otherwise Transfer, at the election of the Board, all of its Units (or Equity Securities) if the Approved Sale contemplates a sale or Transfer by the Members of at least fifty percent (50%) of the total outstanding Class A Units and Class B Units, and (iv) take all other actions necessary to cause the consummation of such Approved Sale on the terms and conditions proposed by the Board, including the execution of any merger, redemption, sale or other such agreement designed to facilitate such Approved Sale that is approved by the Board, in connection with such Approved Sale; provided, that Corbel shall not be required to be bound by any restrictive covenant in connection with the consummation of such Approved Sale (other than customary confidentiality obligations). Each Holder shall be obligated as requested by the Board on behalf of such Holder to make such representations and warranties concerning such Holder and the Units (if any) to be sold by such Holder as may be set forth in any agreement approved by the Board; provided, that such representations shall be limited to representations regarding such Holder's authority to enter the transaction, title to its Units, the enforceability of such Holder's commitment, and similar customary representations and warranties made by minority investors in similar sales consistent with market standards.

(b)    Condition as to Consideration. The obligations of each Holder hereunder with respect to an Approved Sale are subject to the satisfaction of the following conditions: (i) the consideration payable to such Holder upon consummation of the Sale of the Company is at least equal to such Holder's Pro Rata Share of the total consideration payable upon consummation of such Sale of the Company (accounting for any escrowed amounts, holdbacks, earn-out obligations and like deferred or contingent consideration) (such total consideration being the "Sale Proceeds Amount") provided, however, that, notwithstanding the foregoing,; (ii) upon the consummation of the Sale of the Company, all of the Holders receive the same form of consideration, or if any Holders are given an option as to the form of consideration to be received, all Holders are given the same option, provided, that the condition set forth in this clause (ii) to the extent such Holder holds Convertible Units, such Holder is given an opportunity to exercise such Convertible Units prior to the consummation of the Approved Sale (to the extent such Convertible Units would otherwise be exercisable in connection with or prior to the Approved Sale) and participate in such sale as a Holder of the related underlying Units or, in the Board's sole discretion, upon the consummation of the Approved Sale, receives in exchange for each such Convertible Unit consideration equal to the product of (A) the consideration per Unit

to be received by Holders of such type and class of underlying Unit into which such Convertible Unit is exercisable or convertible <u>less</u> the exercise price (or equivalent) of such Convertible Unit <u>multiplied</u> by (B) the number of underlying Units represented by such Convertible Unit.

(c)    <u>Rule 506</u>. If the Company enters into any negotiation or transaction for which Rule 506 promulgated by the SEC (or any similar rule then in effect) may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Holder that is not an "accredited investor" (within the meaning of Rule 501(a) promulgated by the SEC) will, at the request of the Board, appoint a purchaser representative (as such term is defined in Rule 501 promulgated by the SEC) approved by the Board and the Company will pay the fees of such purchaser representative.

(d)    <u>Indemnification and Expenses</u>. Notwithstanding anything to the contrary in this <u>Section 10.6</u> or otherwise, the Holders shall be severally (whether through a contribution agreement or otherwise) obligated to join in any indemnification obligation the Board has agreed to in connection with such Approved Sale (other than any such obligations that relate specifically to a particular Holder, such as indemnification with respect to representations and warranties given by a Holder regarding such Holder's title to and ownership of Units, which representations and warranties shall be substantially the same for each Holder); <u>provided</u>, <u>that</u> in no event shall the indemnification obligations of any Holder exceed the amount of equity proceeds received by such Holder in the Approved Sale. The allocable share of each Holder of any amounts payable in connection with any claim by the purchaser(s) in such Approved Sale related to any Company representations, warranties, covenants, indemnities or agreements (any such amount payable, a "<u>Company Loss</u>") shall be an amount equal to the amount by which such Holder's Sale Proceeds Amount would have been reduced had the aggregate consideration from such Sale of the Company been distributed by the Company in accordance with <u>Section 7.2</u> after deducting from such aggregate consideration the aggregate amount of such Company Loss. In addition, unless a prospective Transferee in an Approved Sale permits a Holder to give a guarantee, letter of credit or other similar assurance mechanism other than an escrow arrangement (which shall be addressed on an individual basis), any escrow of proceeds of any such Approved Sale shall be withheld, such that the allocable share of each Holder of any such withholding shall be an amount equal to the amount by which such Holder's Sale Proceeds Amount would have been reduced had the aggregate consideration from such Sale of the Company been distributed by the Company in accordance with <u>Section 7.2</u> after deducting from such aggregate consideration the aggregate amount of such withholding. Each Holder will bear his, her or its pro rata share of the reasonable costs (the "<u>Expenses</u>") of any sale of Units pursuant to an Approved Sale to the extent such Expenses are incurred for the benefit of all Holders and are not otherwise paid by the Company or the acquiring party. The allocable share of each Holder of any Expenses shall be an amount equal to the amount by which such Holder's Sale Proceeds Amount would have been reduced had the aggregate consideration from such Sale of the Company been distributed by the Company in accordance with <u>Section 7.2</u>, after deducting from such aggregate consideration the aggregate amount of such Expenses. Costs incurred by or on behalf of a Holder for his, her or its sole benefit will be borne by such respective Holder (i.e., not borne by the Company or any other Holders).

(e)    <u>Power of Attorney</u>. EACH HOLDER HEREBY EXPRESSLY AND IRREVOCABLY APPOINTS THE BOARD (OR ANY PERSON DESIGNATED BY THE

54

BOARD) AS SUCH HOLDER'S PROXY AND ATTORNEY-IN-FACT TO VOTE SUCH HOLDER'S UNITS AND TAKE ANY AND ALL SUCH OTHER ACTION (INCLUDING, WITHOUT LIMITATION, THE EXECUTION OF ANY DOCUMENTS ON BEHALF OF SUCH HOLDER) WITH RESPECT TO SUCH HOLDER'S UNITS AND OTHER SECURITIES OF THE COMPANY AS THE BOARD AND THE APPROVING PARTY MAY DIRECT IN CONNECTION WITH AN APPROVED SALE EFFECTED IN ACCORDANCE WITH THIS SECTION 10.6. THIS PROXY AND POWER OF ATTORNEY IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE. NOTWITHSTANDING THE FOREGOING, NO SUCH PROXY OR POWER-OF-ATTORNEY SHALL BE DEEMED EFFECTIVE WITH RESPECT TO CORBEL OR SPONSOR UNTIL SUCH PERSON HAS BEEN REQUESTED TO TAKE AN ACTION REQUIRED TO BE TAKEN PURSUANT TO THIS SECTION 10.6 AND HAS FAILED TO TAKE SUCH ACTION WITHIN FIVE (5) BUSINESS DAYS FOLLOWING SUCH REQUEST.

Section 10.6    Change in Business Form. The Board, with the prior written consent of the Approving Party, may cause the conversion of the Company into another form of legal entity (including a corporation) at any time, and in which event all or a portion of the Units may either be combined into a single class or type of equity and/or the rights and preferences of all or a portion of the classes or types of equity may be preserved as nearly as possible under such new structure, in each case, provided, that (i) the Fair Market Value of each type or class of equity interest as of immediately following such change received by each Holder shall be no less than the Fair Market Value of the equity interest exchanged therefor as of immediately prior to such change (ignoring, for purposes hereof, any change in value resulting from a change in the tax status of the Company); and (ii) each Holder shall have substantially the same rights and obligations as it had prior to such change in business form. Each Holder shall take all action reasonably requested by the Board or the Approving Party to effectuate any such restructuring.

Section 10.7    Change in Structure. The Board may cause a change in the manner in which Membership Interests in the Company are denominated (e.g., as percentage interests, units of a class or otherwise), and may create one or more new classes or types of equity and cause or permit all or certain of the Holders to exchange or convert their Units into such new classes or types, in each case, provided, that (i) the Fair Market Value of each type or class of equity interest as of immediately following such change received by each Holder thereof shall be no less than the Fair Market Value of the equity interest exchanged therefor as of immediately prior to such change; and (ii) each Holder shall have substantially the same rights and obligations as it had prior to such change in structure. Each Holder shall take all action reasonably requested by the Board to effectuate any such redenomination, exchange or conversion.

Section 10.8    No Appraisal Rights. No Holder shall be entitled to any appraisal rights with respect to such Holder's Units, whether individually or as part of any class or group of Holders, in the event of a merger, consolidation, Approved Sale or other transaction involving the Company or its securities unless such rights are expressly provided herein or by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

Section 10.9    Void Assignment. Any Transfer by any Holder in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, the purported

Transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Holder.

Section 10.10 <u>Put Right</u>.

(a) At any time on or after the Loan Termination Date, Corbel shall have the right, but not the obligation, by delivery of a written notice to the Company (the "<u>Put Notice</u>"), to cause the Company to purchase, and the Company shall purchase from Corbel, up to that number of Class B Units held by Corbel (the number of shares referenced in the Put Notice being referred to herein as the "<u>Put Units</u>"), at a price equal to the greater (the "<u>Put Price</u>") of:

(i) the Fair Market Value of the Put Units (taking into account the provisions of Section 7.2(a) above, including, but not limited to, whether or not $55 million has been distributed to the Class A Holders pursuant to Section 7.2(a)(i) above), or

(ii) the value of the Put Units determined based upon an enterprise value of the Company of 6.0x the Company's Consolidated Adjusted EBIDTA (as defined in the Note Purchase Agreement) for the twelve full-month period immediately preceding the date of the Put Notice, less an amount equal to (x) $55 million less (y) all amounts previously distributed to the Class A Holders pursuant to Section 7.2(a)(i) above.

(b) Within five (5) Business Days following receipt by the Company of a Put Notice (i) a representative appointed by the Class A Member and a representative appointed by a the Class B Member shall commence discussions to seek to determine the Fair Market Value of the Units subject to the Put Notice (the "<u>Applicable Units</u>") in accordance with the definition thereof.

(c) The Company shall acquire the Applicable Units promptly, but in no event more than ninety (90) days following the determination of Fair Market Value of the Applicable Units; provided, however, that if the closing of the acquisition of the Applicable Units takes more than five (5) Business Days, Company shall issue to Corbel a senior secured note in form acceptable to Corbel, which senior secured note shall have a principal amount equal to the Put Price and shall bear interest at a rate of eight percent (8%) per annum. In the event that the Company certifies to Corbel that is does not have the resources to acquire the Applicable Units, at the election of the Corbel provided by written notice to the Company:

(i) The Company shall engage an investment bank reasonably satisfactory to Corbel to conduct a Sale of the Company (other than a dissolution of the Company) or all of its assets to an Independent Third Party (the "<u>Company Sale Process</u>"). All Holders shall cooperate fully and in good faith in any Company Sale Process and, subject to the provisions set forth below, shall be obligated to vote in favor of, and sell their Units in, any transaction part of the Company Sale Process.

(ii) If at any time within 120 days after the commencement of the Company Sale Process (which for the purposes of this agreement shall be deemed to

56

commence at such time as the investment bank first delivers a confidential information memorandum or other offering document to prospective purchasers), the investment bank has received a bid acceptable to Corbel, then, the Company shall proceed in good faith to consummate the transaction contemplated by that bid.

(d)     If after 120 days after commencement of the Company Sale Process the investment bank has received a bid which is not acceptable to Corbel, the Company may reject the bid.

(e)     For avoidance of doubt, in the event that any of the Applicable Units are held by a blocker company that is affiliated with Corbel, at the request of Corbel, the Company shall acquire the blocker company in lieu of acquiring the Applicable Units.

Section 10.11    Registration Rights.

(i)     Right to Piggyback.

(1)     Whenever the Company proposes to register any of its securities on behalf of any Member and the registration form to be used may be used for the registration of Registrable Securities (a "Piggyback Registration"), the Company shall give prompt written notice to all holders of Registrable Securities of its intention to effect such a registration and shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) days after the receipt of the Company's notice.

(2)     If the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in a Piggyback Registration exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a Majority of the Registrable Securities to be included in such registration, then the Company shall include in such registration (i) first, the number of securities proposed to be sold by the Company, (ii) second, the Registrable Securities requested to be included in such registration, pro rata among the holders of such Registrable Securities on the basis of the number of shares owned by each such holder, and (iii) third, the other securities requested to be included in such registration.

(3)     If any Piggyback Registration is an underwritten offering, then the selection of investment banker(s) and manager(s) for the offering must be approved by the Approving Party.

(ii)     Holdback Agreements.    Each holder of Registrable Securities agrees not to offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any equity securities of the Company, or any securities convertible into or

57

exchangeable or exercisable for such securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of such securities, whether any such aforementioned transaction is to be settled by delivery of such securities or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, in each case during the seven (7) days before and the ninety (90) day period (but in the case of an Initial Public Offering, the one hundred eighty (180) day period) beginning on the effective date of any underwritten public offering of the Company's equity securities (including Piggyback Registrations) (or such longer or shorter period as may be requested in writing by the managing underwriter and agreed to in writing by the Company) (the "Market Standoff Period"), except as part of such underwritten registration if otherwise permitted. In addition, each holder of Registrable Securities agrees to execute any further letters, agreements and/or other documents requested by the Company or its underwriters which are consistent with the terms of this Section 10.11. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

Section 10.12    Participation in Underwritten Registrations.

        (i)      Generally.

        (1)      No Person may participate in any underwritten registration hereunder unless such Person (A) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s), provided, that no holder of Registrable Securities will be required to sell more than the number of Registrable Securities that such holder has requested the Company to include in any registration) and (B) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements, and other documents reasonably required under the terms of such underwriting arrangements; provided, that holders of Registrable Securities shall not have any indemnification obligations for matters or information, except for matters or information as set forth in written materials provided by each such holder and used in conformance therewith, relating to the sale of such Registrable Securities, nor for any amount in excess of their pro rata share of the proceeds from the sale of such Registrable Securities.

        (2)      Each Person that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event as a result of which the prospectus included in such registration statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading in light of the circumstances under which they were made, such Person will immediately discontinue the disposition of its Registrable Securities pursuant to the registration

statement until such Person's receipt of a supplement or amendment to such prospectus.

(ii)     Miscellaneous.

(1)     The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the holders of Registrable Securities in this Agreement.

(2)     The Company shall not take any action, or permit any change to occur, with respect to its securities that would adversely affect the ability of the holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement or that would adversely affect the marketability of such Registrable Securities in any such registration (including effecting a stock split or a combination of shares).

(3)     All expenses incident to the Company's performance of or compliance with this Section 10.12, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel for the Company and all independent certified public accountants, underwriters (excluding discounts and commissions) and other Persons retained by the Company will be borne by the Company. The Company will bear the cost of one counsel for the holders of Registrable Securities participating in any registration. All underwriting discounts and commissions will be borne by the seller of the securities sold pursuant to the registration.

(4)     It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Agreement that the selling Holders shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be reasonably required to effect the registration of their Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

(5)     Notwithstanding anything herein or under the Act to the contrary, the provisions of this Section 10.12 shall survive the dissolution of the Company or change in form of the Company, in either case, if undertaken to facilitate the sale and registration of Equity Securities contemplated by this Section 10.12.

Section 10.13. Right of First Negotiation. The Company shall not enter into negotiations or consummate any transaction relating to the Company's acquisition of another company, including without limitation with respect to financing add-on businesses, with any party other than Corbel except in accordance with this Section 10.13. The Company shall engage in exclusive good faith negotiations with Corbel to review the proposed terms for an acquisition to reach agreement on the terms and conditions for Corbel's

59

financing of the acquisition. If the parties are not able to reach agreement, then the Company may enter into negotiations with an Independent Third Party regarding financing the acquisition (the "Proposed Financing") and Corbel's right of first negotiation under this Section 10.13 shall be deemed automatically terminated and of no further force and effect upon the closing of such Proposed Financing with such Independent Third Party. If such Proposed Financing is not consummated within sixty (60) days, the terms and conditions of this Section 10.13 will continue to apply and Corbel's right of first negotiation under this Section 10.13 shall remain in effect, and the Company shall not enter into any Proposed Financing without complying with this Section 10.13. Notwithstanding the foregoing, the Company shall provide Corbel written notice of any bona fide offer from a third party for financing an acquisition of another company (the "ROFN Notice"), including the identity of the Independent Third Party and the material financial and other terms of the Independent Third Party's offer (the "Third Party Terms"), and if Corbel desires to accept such Third Party Terms, Corbel shall within ten (10) Business Days of receipt of the Third Party Terms notify the Company in writing. Each ROFN Notice constitutes an offer made by the Company to enter into an agreement with Corbel on the same material terms as the Third Party Terms.

## ARTICLE 11
## LIQUIDATION AND TERMINATION

Section 11.1    Dissolution. The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

(a)    a determination of the Board; and

(b)    the entry of a decree of judicial dissolution of the Company under Article 19.48 of the Act.   The death, retirement, resignation, expulsion, incapacity, bankruptcy or dissolution of a Holder, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company, and the Company shall continue in existence subject to the terms and conditions of this Agreement. Neither the dissolution of the Company pursuant to this Section 11.1 nor the bankruptcy or insolvency of any Member shall result in a Member ceasing to be a Member of the Company.

Section 11.2    Liquidation and Termination. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more Members as liquidator(s). The liquidators(s) shall proceed diligently to wind up the affairs of the Company and make final Distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final Distribution, the liquidator(s) shall continue to operate the Company's properties with all of the power and authority of the Board. The steps to be accomplished by the liquidator(s) are as follows:

(a)    As promptly as possible after dissolution and again after final liquidation, the liquidator(s) shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the

60

calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)    The liquidator(s) shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator(s) may reasonably determine).

(c)    The balance, if any, of the Company's remaining assets shall be distributed to the Holders in accordance with Section 7.2; provided, that it is the Members' intent that, after giving effect to all allocations of Profit or Loss for the current and all prior Taxable Years of the Company under Section 8.1, the Holders' positive Capital Account balances shall be in proportion to the amounts to be distributed pursuant to this Section 11.2(d). In furtherance thereof, notwithstanding the provisions of Section 8.1, Profits and Losses for the final Taxable Year of the Company shall be allocated to the Holders' Capital Accounts in such a manner that, to the extent possible, the Holders' positive Capital Account balances shall be, immediately prior to the Distribution pursuant to this Section 11.2(d), in such proportion. Distributions pursuant to this Section 11.2(d) shall be made by the end of the Taxable Year of the Company during which the liquidation occurs (or, if later, ninety (90) days after the date of the liquidation).

(d)    The liquidator(s) shall cause cash, evidences of Indebtedness and other securities to be distributed in any liquidation; provided, that to the extent non-cash distributions of assets are made, they shall be made on a pro rata basis, subject to the provisions of Section 11.2(d). The Distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to such Member of his, her or its Capital Contributions and a complete Distribution to the Member of his, her or its interest in the Company and all the Company's property. The Distribution of cash and/or property to a Holder who is not a Member in accordance with the provisions of this Section 11.2 constitutes a complete Distribution to such Holder of his, her or its interest in the Company and all the Company's property.. To the extent that a Member returns funds to the Company, he, she or it has no claim against any other Member for those funds.

Section 11.3    Deemed Distribution and Recontribution. Notwithstanding any other provision of this ARTICLE XI, in the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), the Company's assets shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, the Company shall be deemed to have contributed its assets to a newly created limited liability company in exchange for such company's assumption of the Company's liabilities and equity interests in such new company. Immediately thereafter, the Company shall be deemed to have distributed the new limited liability company equity interests to the Holders in accordance with their Capital Accounts.

Section 11.4    Deficit Capital Accounts. Notwithstanding any custom or rule of law to the contrary, to the extent that any Member has a deficit Capital Account balance, upon dissolution of the Company such deficit shall not be an asset of the Company and any such

Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

Section 11.5    Cancellation of Certificate. On completion of the distribution of Company assets as provided herein, the Company is terminated, and shall file a certificate of cancellation with the Secretary of State of the Commonwealth of Puerto Rico, cancel any other filings made pursuant to Section 2.1 and take such other actions as may be necessary to terminate the Company.

Section 11.6    Hart-Scott-Rodino.    Notwithstanding any other provision in this Agreement, in the event the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), is applicable to any Member by reason of the fact that any assets of the Company will be distributed to such Member in connection with the dissolution of the Company, the dissolution of the Company shall not be consummated until such time as the applicable waiting periods (and extensions thereof) under the HSR Act have expired or otherwise been terminated with respect to each such Member.

## ARTICLE 12
## MISCELLANEOUS PROVISIONS

Section 12.1    Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates (unless such Person is otherwise a Holder), and no creditor (other than a Holder) who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in the Company's profits, losses, distributions, capital or property other than as a secured creditor. Notwithstanding the foregoing, the Company, on behalf of itself and its Subsidiaries, acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, nothing contained therein shall affect, limit or impair the contractual or statutory rights and remedies of any Holder in its capacity as a lender to the Company or any of its Subsidiaries pursuant to any agreement under which the Company or any of its Subsidiaries has incurred, or from time to time will incur, Indebtedness. Without limiting the generality of the foregoing, no Holder, in exercising its contractual or statutory rights as a lender or other creditor, including making its decision on whether to foreclose on any collateral security, shall have any fiduciary duty to consider (a) its status as a Holder, (b) the interests of the Company or any of its Subsidiaries, or (c) any duty such Holder may have to any other Holder, except as may be required under the applicable loan documents or by commercial law applicable to creditors generally. In addition, no consent given (or deemed to be given) or action taken (or deemed to be taken) by any Holder under this Agreement or any other document related to its equity investment in the Company shall be deemed to constitute any consent or action under any loan document.

Section 12.2    Offset. Whenever the Company is required to pay any sum to any Member, any amounts that such Member owes to the Company may, at the election of the Company, be deducted from that sum before payment; provided, that the full amount that would otherwise be distributed shall be debited from the Member's Capital Account pursuant to Section 6.1.

Section 12.3   Notices. Except as expressly set forth to the contrary in this Agreement, all notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement must be in writing (which shall include electronic mail) and shall be deemed delivered: (a) upon delivery if delivered in person; (b) three (3) Business Days after deposit in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested; (c) upon transmission if sent via email, with a confirmation copy sent via overnight mail, provided, that confirmation of such overnight delivery is received; or (d) one (1) Business Day after (i) transmission if sent via electronic mail and (ii) deposit with a national overnight courier, provided, that confirmation of such overnight delivery is received. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Schedule A, or such other address as that Member may specify by notice to the other Members in accordance with this Section 12.3. Any notice, request or consent to the Company or the Board must be given to the Board or, if appointed, the secretary of the Company at the Company's executive office. Whenever any notice is required to be given by law or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Any notice given to the Company shall be sent to:

> Skalar Pharma LLC
> P.O. Box 3019
> Guaynabo, PR 00970
> Attn: Fernando Londoño Benveniste
> Email: fernando.londono@skalarpharma.com

Section 12.4   Public Announcements. No Member shall make any public announcement or filing with respect to the transactions provided for herein without the prior consent of the Board and the Approving Party, or unless such party has been advised by counsel in writing that such disclosure is required by applicable law. To the extent reasonably feasible, any press release or other announcement or notice regarding the transactions contemplated by this Agreement shall be made by the Board or any other party designated by the Board.

Section 12.5   Entire Agreement. This Agreement and other written agreements among the Members and their Affiliates relating to the Company of even date herewith constitute the entire agreement among the Members or Holders in their capacity as such relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

Section 12.6   Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person hereunder or with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default hereunder or with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

EAST\186296037.4

Section 12.7     Amendment or Modification. This Agreement and any provision hereof may be amended or modified from time to time only by a written instrument adopted by (a) the Board and (b) (i) those Members holding a Majority of the Class A Units and (ii) those Members holding a Majority of the Class B Units; provided, that, except as otherwise expressly provided herein, an amendment or modification (i) reducing or otherwise impairing or restricting a Member's Units or other interest in Distributions or other rights under this Agreement in a manner which is disproportionately adverse to such Member relative to the rights of other Members in respect of Units of the same class or type, (ii) increasing a Member's Capital Contribution, or (iii) increasing any other obligation of a Member to the Company in respect of any Units in a manner that is disproportionately adverse to such Member relative to such obligations of other Members in respect of Units of the same class or type, shall in each case be effective only with that Member's consent. Notwithstanding the preceding sentence, (1) the Board may amend and modify the provisions of this Agreement (including ARTICLE VII) and Schedule A hereto to the extent necessary to reflect the issuance of Units (including new classes of Units, and including the issuance or exercise of Convertible Units) in the Company, the admission or substitution of any Member permitted under this Agreement, (2) notwithstanding anything to the contrary in this Agreement, this Agreement may be amended or modified by the Board to the extent necessary to effectuate the issuance of Equity Securities pursuant to Section 3.7 and (3) this Agreement may be amended by the Board in order to give effect to the transactions contemplated in Section 10.7 or Section 10.8.

Section 12.8     Severability. Should any provision of this Agreement be held enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each Member with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Members further agree that any court or arbitrator is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Members as embodied herein to the maximum extent permitted by law. The Members expressly agree that this Agreement as so modified shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect under applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

Section 12.9     Successors and Assigns. Except as otherwise provided herein, this Agreement is binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, administrators, executors, successors and permitted assigns; provided, that no Person claiming by, through or under a Member (whether as such Member's Successor in Interest or otherwise), as distinct from such Member itself, shall have any rights as, or in respect to, a Member (including the right to approve or vote on any matter or to notice thereof) unless such Person is properly admitted as a Member hereunder.

Section 12.10 <u>Further Assurances</u>. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts or refrain from performing additional acts, as applicable, as it may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 12.11 <u>Notice to Members of Provisions</u>. By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions hereof (including the restrictions on Transfer set forth herein) and (b) all of the provisions of the Certificate.

Section 12.12 <u>Third Parties</u>. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person or entity, other than the parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 12.13 <u>Governing Law</u>. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE COMMONWEALTH OF PUERTO RICO EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

Section 12.14 <u>Waiver of Jury Trial</u>. The parties to this Agreement each hereby waives, to the fullest extent permitted by law, any right to trial by jury of any claim, demand, action, or cause of action (a) arising under this Agreement or (b) in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the transactions related hereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise. The parties to this Agreement each hereby agrees and consents that any such claim, demand, action, or cause of action shall be decided by court trial without a jury and that the parties to this Agreement may file an original counterpart of a copy of this Agreement with any court as written evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

Section 12.15 <u>Consent to Jurisdiction</u>. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE COURTS OF THE COMMONWEALTH OF PUERTO RICO OR THE UNITED STATES DISTRICT COURT FOR PUERTO RICO, AS APPLICABLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR

PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM .

Section 12.16  <u>Waiver of Certain Rights</u>. Each Member irrevocably waives any right it may have to demand any Distributions or withdrawal of property from the Company or to maintain any action for dissolution (except pursuant to Article 19.42 of the Act) of the Company or for partition of the property of the Company.

Section 12.17  <u>Counterparts; Delivery by Email</u>. This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of an email with scanned attachment, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

Section 12.18  <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Company (and only the Company), in its sole discretion, shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (and the other parties hereto hereby waive as defense that there would otherwise be an adequate remedy at law) and to enforce specifically the terms and provisions hereof (without posting a bond or other security), in addition to any other remedy to which it is entitled at law or in equity.

Section 12.19  <u>Descriptive Headings</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.

Section 12.20  <u>Severability with the Act</u>. In the event of a direct conflict between the provision of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control.

Section 12.21  <u>Computation of Time</u>. Whenever the last day for the exercise of any privilege or the discharge or any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in New York, New York are authorized to be closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a Business Day.

Section 12.22  <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or

interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 12.23  DLA Piper. The Members acknowledge and agree DLA Piper LLP has represented Corbel in connection with this Agreement and other transactions related hereto (the "Transactions"). Except for DLA Piper LLP's representation of Corbel with respect to the Transactions, in no event shall an attorney-client relationship exist between DLA Piper LLP, on the one hand, and any other Member and/or their Affiliates, on the other hand. Except as otherwise provided in written agreements DLA Piper LLP and any Member, the Members further agree and consent that DLA Piper LLP shall be permitted to render legal advice and to provide legal services to the Members or the Company from time to time, and each of the Members covenant and agree that such representation of a Member or the Company DLA Piper LLP from time to time shall not disqualify DLA Piper LLP, respectively, from providing legal advice and legal services to its client Members or Affiliates in matters related or unrelated to this Agreement and the Transactions.

Section 12.24  Title to Company Assets. Company assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof. Legal title to any or all Company assets shall be held in the name of the Company, and all Company assets shall be recorded as the property of the Company on its books and records.

[Signature Pages Follow]

67

IN WITNESS WHEREOF, the undersigned have executed this Limited Liability Company Agreement as of the day and year first above written.

**COMPANY:**

SKALAR PHARMA HOLDINGS LLC

By: _____

Name: Fernando Londoño Benveniste
Title: Authorized Representative

DocuSign Envelope ID: B9F49A7E-4595-40B3-A47A-2075268658DD

**MEMBERS:**

**CORBEL DISTRESSED AND SPECIAL
OPPORTUNITIES FUND, L.P.**

By: CORBEL DSOF GP LLC, its General Partner
By: CORBEL DSOF CAPITAL
MANAGEMENT, LLC, its Managing Member

By: _____
Name: Michael H. Jones
Title: Authorized Signatory


**CORBEL DISTRESSED AND SPECIAL
OPPORTUNITIES FUND (SPV SKALAR),
L.P.,**

By: CORBEL DSOF GP (SPV SKALAR), LLC, its
general partner
By: CORBEL DSOF CAPITAL MANAGEMENT,
LLC, its sole member


By: _____
Name: Jeffrey Schwartz
Title: Manager

*[Signature Page to LLC Operating Agreement]*

DocuSign Envelope ID: 3516BD66-FB95-40B2-A679-3B2253EFB57D

**MEMBERS:**

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**

By: CORBEL DSOF GP LLC, its General Partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC, its Managing Member


By: _____
Name: Michael H. Jones
Title: Authorized Signatory


**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND (SPV SKALAR), L.P.,**

By: CORBEL DSOF GP (SPV SKALAR), LLC, its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC, its sole member

By: _____
Name: Jeffrey Schwartz
Title: Manager

*[Signature Page to LLC Operating Agreement]*

**BIOAPI S.A.S.**

By:_____
Name: Fernando Londoño Benveniste
Title: Authorized Representative

2

## SCHEDULE A

### Members

| Member Name and Address | Taxing Jurisdiction | Amount of Capital Contributions | Class A Units | Class B Units |
|---|---|---|---|---|
| Corbel Distressed and Special Opportunities Fund, L.P. 11777 San Vicente Blvd., Suite 777 Los Angeles, CA 90049 Attn: Michael Jones Email: Michael@Corbelcap.com | Delaware | $100,000 | 0 | 20 |
| Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. c/o Corbel Capital Partners 11777 San Vicente Blvd., Suite 777 Los Angeles, CA 90049 Attn: Michael Jones Email: Michael@Corbelcap.com | Delaware | $100,000 | 0 | 20 |
| Bioapi S.A.S. P.O. Box 3019 Guaynabo, PR 00970 Attn: Fernando Londoño Benveniste Email: fernando.londono@skalarpharma.com | Puerto Rico | $1,000 | 60 | 0 |