Exhibit 3

**NOTE PURCHASE AGREEMENT**

**November 16, 2021**

**SKALAR PHARMA HOLDING LLC,**
**as Parent and an Issuer,**

**SKALAR PHARMA LLC,**
**as the Company and an Issuer,**

**the other Issuers from time to time party hereto,**

**the Purchasers named herein,**

**and**

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
**as the Agent**

**$30,000,000**

# TABLE OF CONTENTS

**Page**

ARTICLE I  THE NOTES ................................................................................................ 1

    1.1      **Authorization of Notes; Issuance of Notes Generally** ........................... 1
    1.2      **[Intentionally Omitted]** ................................................................................ 1
    1.3      **[Intentionally Omitted]** ................................................................................ 1
    1.4      **Interest Rates; Payments of Interest** ......................................................... 1
    1.5      **[Intentionally Omitted]** ................................................................................ 3
    1.6      **Statements of Obligations** ............................................................................ 3
    1.7      **Holidays** ............................................................................................................ 3
    1.8      **Repayment of Notes** ....................................................................................... 3
    1.9      **Payment of Other Obligations** .................................................................... 7
    1.10    **Fees** ..................................................................................................................... 7
    1.11    **Recovery of Additional Costs** ..................................................................... 7
    1.12    **Taxes on Payments** ......................................................................................... 7

ARTICLE II  [INTENTIONALLY OMITTED] ............................................................ 8

ARTICLE III  CONDITIONS TO CLOSING ............................................................... 8

    3.1      **Conditions to the Purchase of the Notes on the Closing Date** ............... 8

ARTICLE IV  REPRESENTATIONS AND WARRANTIES ....................................... 8

    4.1      **Legal Status** ..................................................................................................... 8
    4.2      **No Violation; Compliance** ............................................................................ 8
    4.3      **Authorization; Enforceability** ..................................................................... 9
    4.4      **Approvals; Consents** ...................................................................................... 9
    4.5      **Liens** .................................................................................................................. 9
    4.6      **Debt** ................................................................................................................... 9
    4.7      **Litigation; Observance of Agreements, Statutes and Orders** ................ 9
    4.8      **No Default** ......................................................................................................... 9
    4.9      **Capitalization** ................................................................................................. 9
    4.10    **Taxes** ................................................................................................................. 10
    4.11    **Correctness of Financial Information; No Material Adverse Change** ................ 10
    4.12    **ERISA** ............................................................................................................... 10
    4.13    **Full Disclosure** ............................................................................................... 11
    4.14    **Other Obligations** .......................................................................................... 11
    4.15    **Investment Company Act** .............................................................................. 11
    4.16    **FDA Approval** ................................................................................................. 11
    4.17    **Patents, Trademarks, Copyrights, and Intellectual Property, etc** ................ 11
    4.18    **Environmental Condition** ............................................................................ 12
    4.19    **Solvency** ........................................................................................................... 12
    4.20    **Labor Matters** ................................................................................................ 12
    4.21    **Real Property; Assets** .................................................................................... 12
    4.22    **Brokers** ............................................................................................................. 13
    4.23    **Insurance** ......................................................................................................... 13
    4.24    **Material Contracts** ........................................................................................ 13
    4.25    **OFAC and Anti-Corruption Matters** ........................................................ 13
    4.26    **Closing Date of the Facility** ......................................................................... 14

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **4.27** | **No Material Adverse Effect** | 14 |
| **4.28** | **No Undisclosed Liabilities** | 14 |

ARTICLE V  AFFIRMATIVE COVENANTS .................................................................................. 14

| | | |
|---|---|---|
| **5.1** | **Punctual Payments** | 14 |
| **5.2** | **Books and Records; Inspection Rights** | 14 |
| **5.3** | **Financial Statements** | 15 |
| **5.4** | **Existence; Conduct of Business; Operations; Preservation of Licenses; Compliance with Law** | 16 |
| **5.5** | **Insurance** | 17 |
| **5.6** | **Assets** | 18 |
| **5.7** | **Taxes** | 18 |
| **5.8** | **Notices to the Agent and the Purchasers** | 18 |
| **5.9** | **Further Assurances** | 19 |
| **5.10** | **Board Observation Rights** | 20 |
| **5.11** | **Subordinated Debentures** | 20 |
| **5.12** | **Additional Collateral** | 21 |
| **5.13** | **Additional Issuers and Guarantors** | 21 |
| **5.14** | **Post-Closing Matters** | 22 |

ARTICLE VI  NEGATIVE COVENANTS ....................................................................................... 22

| | | |
|---|---|---|
| **6.1** | **Use of Funds; Margin Regulation** | 22 |
| **6.2** | **Debt** | 22 |
| **6.3** | **Liens** | 22 |
| **6.4** | **Merger, Consolidation, Transfer of Assets** | 22 |
| **6.5** | **Agent Escrow Account Balance** | 23 |
| **6.6** | **Sales and Leasebacks** | 23 |
| **6.7** | **Dispositions** | 23 |
| **6.8** | **Investments** | 23 |
| **6.9** | **Character of Business** | 23 |
| **6.10** | **Restricted Payments** | 23 |
| **6.11** | **Guarantee** | 23 |
| **6.12** | **Employment Agreements** | 23 |
| **6.13** | **Transactions with Affiliates** | 24 |
| **6.14** | **Accounting Changes** | 24 |
| **6.15** | **Financial Condition** | 24 |
| **6.16** | **OFAC** | 25 |
| **6.17** | **Fiscal Year** | 25 |
| **6.18** | **Board Management Agreement; Board Fees** | 25 |
| **6.19** | **Burdensome Agreements; Modifications of Certain Agreements** | 26 |
| **6.20** | **Parent as a Holding Company** | 26 |
| **6.21** | **Capital Expenditures** | 27 |

ARTICLE VII  EVENTS OF DEFAULT AND REMEDIES ............................................................ 27

| | | |
|---|---|---|
| **7.1** | **Events of Default** | 27 |
| **7.2** | **Remedies** | 29 |

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| 7.3 | Appointment of Receiver or Trustee | | 30 |
| 7.4 | Power of Attorney | | 30 |
| 7.5 | Remedies Cumulative | | 30 |

ARTICLE VIII  AGENCY ................................................................................ 30

| | | | |
|---|---|---|---|
| 8.1 | Appointment and Authority | | 30 |
| 8.2 | Rights as a Purchaser | | 31 |
| 8.3 | Exculpatory Provisions | | 31 |
| 8.4 | Reliance by the Agent | | 32 |
| 8.5 | Delegation of Duties | | 32 |
| 8.6 | Resignation of the Agent | | 32 |
| 8.7 | Non-Reliance on the Agent and Other Purchasers | | 33 |
| 8.8 | No Other Duties, etc | | 33 |
| 8.9 | The Agent May File Proofs of Claim | | 33 |
| 8.10 | Collateral and Guaranty Matters | | 33 |

ARTICLE IX  MISCELLANEOUS ...................................................................... 34

| | | | |
|---|---|---|---|
| 9.1 | Notices | | 34 |
| 9.2 | No Waivers | | 34 |
| 9.3 | Expenses; Documentary Taxes; Indemnification | | 34 |
| 9.4 | Amendments and Waivers | | 36 |
| 9.5 | Successors and Assigns; Participations; Disclosure; Register | | 37 |
| 9.6 | Confidentiality | | 38 |
| 9.7 | Counterparts; Integration | | 39 |
| 9.8 | Severability | | 39 |
| 9.9 | Knowledge | | 39 |
| 9.10 | Additional Waivers | | 40 |
| 9.11 | Destruction Of the Issuers' Documents | | 40 |
| 9.12 | Choice of Law and Venue; Jury Trial Waiver | | 40 |
| 9.13 | [Intentionally Omitted] | | 41 |
| 9.14 | Revival and Reinstatement of Obligations | | 41 |
| 9.15 | No Advisory or Fiduciary Responsibility; Release of Claims | | 41 |
| 9.16 | Patriot Act Notification | | 42 |
| 9.17 | Survival | | 42 |
| 9.18 | Electronic Signatures | | 42 |

ARTICLE X  JOINT AND SEVERAL LIABILITY ................................................ 43

| | | | |
|---|---|---|---|
| 10.1 | Joint and Several Liability | | 43 |
| 10.2 | Primary Obligation; Waiver of Marshaling | | 43 |
| 10.3 | Financial Condition of Issuers | | 44 |
| 10.4 | Continuing Liability | | 44 |
| 10.5 | Additional Waivers | | 44 |
| 10.6 | Settlements or Releases | | 46 |
| 10.7 | No Election | | 46 |
| 10.8 | Indefeasible Payment | | 46 |
| 10.9 | Single Loan Account | | 46 |

# TABLE OF CONTENTS

**Page**

**10.10**   **Apportionment of Proceeds of Notes**........................................................................47

**10.11**   **Company as Agent for Issuers** ..............................................................................47

**Annexes, Exhibits and Schedules**

| Annex 1 | Definitions and Construction |
| Annex 2 | Closing Conditions |

| Exhibit A | Form of Note |
| Exhibit 1 | Form of Addendum |
| Exhibit 5.3(c) | Form of Compliance Certificate |

| Schedule 1.1 | Purchasers Commitments |
| Schedule 4.1 | Legal Status |
| Schedule 4.7 | Litigation |
| Schedule 4.9(a) | Ownership of Parent |
| Schedule 4.9(b) | Ownership of Subsidiaries |
| Schedule 4.11 | Financial Statements |
| Schedule 4.11(a) | Budget |
| Schedule 4.12 | Employee Benefit Plans |
| Schedule 4.21(a) | Real Property |
| Schedule 4.21(b) | Assets |
| Schedule 4.22 | Brokers |
| Schedule 4.24 | Material Contracts |
| Schedule 4.28 | Liabilities |
| Schedule 5.14 | Post-Closing Matters |
| Schedule 1A | Restart Plan |
| Schedule 2A | Documentation Checklist |

This NOTE PURCHASE AGREEMENT, dated as of November 16, 2021, is entered into among **SKALAR PHARMA HOLDING LLC**, a Puerto Rico limited liability company ("*Parent*"), **SKALAR PHARMA LLC**, a Puerto Rico limited liability company (the "*Company*"), the other Persons listed on the signature pages hereto as "Issuers" and one or more additional direct or indirect Subsidiaries of Parent hereafter acquired or formed, which may become party to this Agreement by executing an Addendum (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), each purchaser listed on Schedule I and each other purchaser from time to time party hereto in accordance with the terms hereof (collectively, the "*Purchasers*") and **CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.** ("*Corbel*"), in its capacity as the administrative agent (the "*Agent*"). Capitalized terms used in this Agreement have the meanings ascribed to such terms in **Annex 1**. In addition, interpretation of UCC terms, accounting terms, and other matters of construction are set forth in **Annex 1**.

The parties hereto hereby agree as follows:

# ARTICLE I

## THE NOTES

**1.1     Authorization of Notes; Issuance of Notes Generally**.

(a)     Authorization of Notes.  The Issuers have authorized the issue and sale of $30,000,000 aggregate original principal amount of their Senior Secured Notes due November 16, 2026 (the "*Notes*").  The Notes shall be dated the date hereof, expressed to bear interest from such date as hereinafter set forth and be otherwise substantially in the form attached hereto as **Exhibit A**.  No amount repaid or prepaid under any Note may be borrowed again.  The term "*Notes*" as used herein shall include each such Note delivered pursuant to any provision of this Agreement and each such Note delivered in substitution or exchange for any other Note pursuant to any such provision.

(b)     Issuance of Notes.  On the Closing Date, the Issuers hereby agree to sell to each Purchaser and, subject to the terms and conditions set forth herein and in the other Note Documents, and in reliance upon the representations, warranties and covenants set forth herein and therein, each Purchaser severally agrees to purchase from the Issuers Notes in the original principal amount set forth opposite such Purchaser's name on **Schedule 1.1** at 100% of such original principal amount.  On the Closing Date, the Issuers will deliver to each Purchaser one or more Notes registered in such Purchaser's name, evidencing the aggregate original principal amount of Notes to be purchased by such Purchaser on the Closing Date, and in the denomination or denominations specified on **Schedule 1.1**, against payment of the purchase price thereof by wire transfer of immediately available funds in accordance with the Flow of Funds Agreement. The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**1.2     [Intentionally Omitted].**

**1.3     [Intentionally Omitted].**

**1.4     Interest Rates; Payments of Interest**.

(a)     Interest Rate.

(i)        _Cash Interest_.  Subject to Section 1.4(b), the Notes will accrue cash interest from the date hereof on the aggregate principal amount thereof at a rate equal to nine percent (9.0%) per annum.  Such interest on the Notes will be computed as set forth in Section 1.4(c).  Subject to Section 1.4(a)(ii) and Section 1.4(d) below, on each Payment Date prior to the Maturity Date and on the Maturity Date (including any maturity resulting from acceleration), the Issuers shall pay and discharge in cash to the Agent the interest accrued on the then outstanding principal amount of the Notes at the rate set forth in this Section 1.4(a)(i).

(ii)        _PIK Optionality_.  The Required Purchasers may elect, with the consent of the Issuers, to have payments of a portion of the cash interest on the Notes (as calculated pursuant to Section 1.4(a)(i) above) for such cash interest payment then due to be paid in kind rather than in cash ("_PIK Optionality Interest_"), of which all such PIK Optionality Interest shall be capitalized by adding such amount to the then outstanding principal amount of the Notes on the applicable Payment Date.  Any PIK Optionality Interest added to the then outstanding principal balance of the Notes shall begin accruing interest at the rate of interest applicable to the Notes as provided in Section 1.4(a)(i) above, beginning on and including the Payment Date on which such PIK Optionality Interest is added to the principal amount of the Notes.  All PIK Optionality Interest added to the principal balance of the Notes pursuant to this Section 1.4(a)(ii) will, for all purposes of this Agreement and the Notes, constitute outstanding principal on the Notes.

(b)        _Default Rate_.  Upon the occurrence and during the continuance of any Event of Default, in addition to and not in substitution of any of the Agent's or any Purchaser's other rights and remedies with respect to any such Event of Default, at the election of the Required Purchasers, (i) the entire principal balance of the Notes (and all other Obligations due hereunder and not paid when due) shall bear cash interest at the interest rate set forth in Section 1.4(a)(i) plus 300 basis points until such Event of Default has been cured or waived to the satisfaction of the Agent and (ii) the Issuers shall, within three (3) Business Days following such failure, pay in cash to each Purchase the Default Deferral Fee.  In addition, all other Obligations due hereunder and not paid when due shall bear cash interest at the interest rate set forth in Section 1.4(a)(i) plus 300 basis points until such overdue payment is paid in full.  The payment of any such default rates of interest or the Default Deferral Fee under this Section 1.4(b) shall not constitute, and shall not be deemed to result in, a waiver of any Default or Event of Default arising as a result of such failure or any other Default or Event of Default under the Note Documents or preclude the exercise of any other rights or remedies of the Agent and the Purchasers hereunder or under the Note Documents, and, notwithstanding the payment of such default rates of interest or the Default Deferral Fee, the Agent and the Purchasers shall be entitled to exercise any and all rights and remedies available to it or them under this Agreement and the Note Documents at law, in equity, or otherwise with respect to any Default or Event of Default arising therefrom.

(c)        _Computation of Interest_.  All computations of interest shall be calculated on the basis of a year of 360 days for the actual days elapsed.  Interest shall accrue from the Closing Date to the date of repayment in full of the Notes in accordance with the provisions of this Agreement; provided, however, that, if a Note is repaid on the same day on which it is made, then one (1) day's interest shall be paid on that Note.  Any and all interest not paid when due shall be added to the principal balance of the applicable Note and shall bear interest thereafter as provided for in Section 1.4(b).  Except with respect to PIK Optionality Interest permitted to be paid in kind pursuant to Section 1.4(a)(ii), the adding of cash interest to the principal balance of the applicable Note shall not cure any Default or Event of Default arising from the failure to pay such interest.

(d)        _Interest Holdback_.  On the Closing Date, eighteen (18) months of interest will be retained by the Agent (the "_Interest Holdback_") and, during such 18-month period, applied against the amount of interest due on each Interest Payment Date; provided that if all amounts outstanding under the Notes are paid in full prior to the end of such 18-month period, any excess interest retained but not due

2

shall be returned to the Issuers by the Agent; provided, further, that no interest shall be payable by the Agent on the Interest Holdback. For the avoidance of doubt, the Agent is not required to hold the amount of the Interest Holdback in a segregated account.

(e)　　Maximum Interest Rate. Under no circumstances shall the interest rate or rates charged hereunder or under the Notes, plus any other amounts paid hereunder or under the Notes, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If such a court determines that the Purchasers have received or charged interest hereunder in excess of the highest legally permissible interest rate, any payments with respect to such excess amount shall be deemed received on account of, and shall automatically be applied to reduce the Obligations, in the inverse order of maturity, and the provisions hereof shall be deemed amended to provide for the highest permissible rate applicable at the time or in the context in question. If there are no Obligations then outstanding, the Purchasers shall refund to the Issuers the amount of interest in excess of the maximum legally permissible rate.

**1.5　　[Intentionally Omitted].**

**1.6　　Statements of Obligations**. Each Purchaser shall maintain in accordance with its usual and customary practices account(s) evidencing the Obligations of the Issuers hereunder. Any failure of any Purchaser to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of the Issuers to pay any amount owing hereunder. Entries made in a loan account shall constitute presumptive evidence of the information contained therein. If any information contained in a loan account is provided to or inspected by any Person, the information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies the applicable Purchaser in writing within thirty (30) days after receipt or inspection that specific information is subject to dispute.

**1.7　　Holidays**. Any principal or interest in respect of the Notes which would otherwise become due on a day other than a Business Day, shall instead become due on the next succeeding Business Day and such adjustment shall be reflected in the computation of interest; provided, however, that in the event that such due date shall, subsequent to the specification thereof by the Purchasers, for any reason no longer constitute a Business Day, the Purchasers may change such specified due date in accordance with this Section 1.7.

**1.8　　Repayment of Notes**.

(a)　　General Payment Provisions. All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind and in immediately available funds, not later than 3:00pm Eastern time on the due date. Any payment after such time shall be deemed made on the next Business Day. The Issuers will not, and will not permit any Affiliate to, purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes, except upon the payment or prepayment of the Notes in accordance with this Agreement and the Notes. The Issuers will promptly cancel all Notes acquired by it or any of its Affiliates pursuant to any payment, prepayment or purchase of Notes pursuant to this Agreement and no Notes may be issued in substitution or exchange for any such Notes.

(b)　　Repayment of the Notes.

(i)　　The Issuers shall repay the entire unpaid principal balance of each Note (including any PIK Optionality Interest added to the outstanding principal balance of the Notes) in cash on

the Maturity Date (unless accelerated in accordance with Section 7.2 or redeemed or prepaid in accordance with this Section 1.8).

(ii)     The Issuers may not repay or prepay the Notes without the consent of the Purchasers if thereafter (x) the remaining outstanding principal amount of the Notes would be less than $500,000 and (y) any portion of the Corbel Capital Amount or interest thereon remains unpaid and outstanding.

(c)     *Voluntary Prepayments*.  Subject to Section 1.8(b)(ii):

(i)     At any time after the Closing Date, the Issuers may voluntarily prepay the Notes in part or in whole (including all PIK Optionality Interest that has been added to principal and the aggregate amount of accrued PIK Optionality Interest that has not yet been added to principal), without any premium or penalty and regardless of the origin of the funds, as set forth in this Section 1.8(c)(i).  Such voluntary prepayment shall be equal to the sum of (A) the aggregate unpaid outstanding principal amount of the Notes being prepaid, (B) all accrued and unpaid cash interest with respect to such principal amount (unless the Notes are being paid in full pursuant to this Section 1.8(c)(i), in which case the Issuers shall also pay all PIK Optionality Interest that has been added to principal and the aggregate amount of accrued PIK Optionality Interest that has not yet been added to principal) and all accrued and unpaid fees, and (C) all other amounts then due under the Note Documents at the time of such prepayment.  The Issuers shall give the Purchasers irrevocable written notice of any voluntary prepayment pursuant to this Section 1.8(c)(i) not fewer than five (5) Business Days and not more than ten (10) Business Days prior to the prepayment date, specifying (w) such prepayment date, (x) the aggregate principal amount of the Notes to be prepaid on such date, (y) the principal amount of the Notes of each Purchaser to be prepaid on that date (which must be pro rata as to all Purchasers), and (z) that such voluntary prepayment is to be made pursuant to this Section 1.8(c)(i).  Notice of a voluntary prepayment having been given as aforesaid, interest on the principal amount of the Notes to be prepaid to the prepayment date, shall become due and payable on such prepayment date.

(ii)     [Intentionally Omitted]

(d)     *Mandatory Prepayments*.

(i)     [Intentionally Omitted]

(ii)     *Excess Cash Flow*.  Beginning with the Fiscal Quarter ending June 30, 2022, (x) no earlier than the date of delivery of the quarterly financial statements pursuant to Section 5.3(b) and the related Compliance Certificate pursuant to Section 5.3(c), unless otherwise agreed by the Agent in writing, and (y) notwithstanding the preceding clause (x), no later than ten (10) Business Days after the earlier to occur of the delivery of quarterly financial statements under Section 5.3(b) and the date such delivery is required under Section 5.3(b), the Issuers shall prepay an aggregate principal amount of the Notes equal to the excess (if any) of (A) fifty percent (50%) of Excess Cash Flow less Qualified Technology Transfers for the Fiscal Quarter covered by such financial statements less (B) the aggregate principal amount of the Notes prepaid pursuant to Section 1.8(c) during the applicable Fiscal Quarter.  If the Issuers do not have Excess Cash Flow at the end of a Fiscal Quarter, then the Issuers do not need to make a payment under this Section 1.8(d)(ii) for such Fiscal Quarter.

If the calculations of the amount of Excess Cash Flow set forth in the Compliance Certificate delivered for financial statements delivered pursuant to Section 5.3(e) (the "*Annual Compliance Certificate*") show an aggregate amount of Excess Cash Flow for the Fiscal Year with respect to which such annual financial statements are delivered that is greater than the aggregate amount of Excess Cash Flow indicated by the Issuers in the Compliance Certificates delivered for financial statements delivered

4

pursuant to Section 5.3(b) for the four Fiscal Quarters of such prior Fiscal Year (collectively, the "*Quarterly Compliance Certificates*"), then the Issuers shall prepay, (x) no earlier than the date of delivery of the Annual Compliance Certificate, unless otherwise agreed by Agent in writing, and (y) notwithstanding the preceding clause (x), no later than ten (10) Business Days after the earlier to occur of the delivery of Annual Compliance Certificate and the date such delivery is required under Section 5.3(e), an additional aggregate amount of the Notes ("*Additional Excess Cash Flow Payment*") equal to (A) the amount required to be prepaid pursuant to the terms of this Section 1.8(d)(ii) based on the amount of Excess Cash Flow set forth in such Annual Compliance Certificate, less (B) the amount of Excess Cash Flow prepaid pursuant to the terms of this Section 1.8(d)(ii) based on the aggregate amount of Excess Cash Flow set forth in the Quarterly Compliance Certificates.

If the calculations of the amount of Excess Cash Flow set forth in the Annual Compliance Certificate show an aggregate amount of Excess Cash Flow for the Fiscal Year with respect to which such annual financial statements are delivered that is less than the aggregate amount of Excess Cash Flow indicated by the Issuers in the Quarterly Compliance Certificates, then the Issuers may deduct from the next payment or payments, as the case may be, required pursuant to the terms of this Section 1.8(d)(ii) an amount equal to the difference between (A) the amount of Excess Cash Flow prepaid pursuant to the terms of this Section 1.8(d)(ii) based on the aggregate amount of Excess Cash Flow set forth in the Quarterly Compliance Certificates and (B) the amount required to be prepaid pursuant to the terms of this Section 1.8(d)(ii) based on the amount of Excess Cash Flow set forth in such Annual Compliance Certificate; provided that under no circumstances shall the Agent or the Purchasers be required to return any amount of Excess Cash Flow previously received.

No payments made pursuant to this Section 1.8(d)(ii) shall be subject to any premiums otherwise required pursuant to Section 1.8(c).

(iii)    Dispositions.  If any Issuer or any Subsidiary thereof sells, transfers, licenses, leases or otherwise disposes (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction) of any property pursuant to the definition of "Permitted Dispositions" which results in the realization by such Person of Net Proceeds, the Issuers shall prepay an aggregate principal amount of the Notes equal to 100% of such Net Proceeds in accordance with Section 1.8(e)(i) promptly (and in any event within two (2) Business Days) following receipt thereof by such Person.

(iv)    Debt Issuance.  Upon the incurrence or issuance by any Issuer or any Subsidiary thereof of any Debt (other than Permitted Debt), such Issuer or such Subsidiary shall prepay an aggregate principal amount of the Notes equal to 100% of all Net Proceeds received therefrom in accordance with Section 1.8(e)(i) promptly (and in any event within two (2) Business Days) following receipt thereof by such Issuer or such Subsidiary.

(v)    Extraordinary Receipts.  Upon any Extraordinary Receipt received by or paid to or for the account of any Issuer or any Subsidiary thereof, such Issuer or such Subsidiary shall prepay an aggregate principal amount of the Notes equal to 100% of all Net Proceeds received therefrom in accordance with Section 1.8(e)(i) promptly (and in any event within two (2) Business Days) following receipt thereof by such Issuer or such Subsidiary; provided, however, that with respect to any proceeds of insurance (other than a Key Man Insurance Policy) or condemnation awards (or payments in lieu thereof), at the election of any Issuer (as notified in writing by such Issuer to the Agent within two (2) Business Days following the date of receipt of such insurance proceeds or condemnation awards), and so long as (x) no Default or Event of Default shall have occurred and be continuing, and (y) (A) the aggregate amount of such proceeds received and not applied to prepay the Notes does not exceed $75,000, individually and (B) the aggregate amount of all such proceeds received and not applied to prepay the Notes does not exceed $150,000, in the aggregate over the term of this Agreement, any such Issuer or such Subsidiary may apply

all or any portion of such Net Proceeds to replace or repair the equipment, fixed assets or real property in respect of which such cash proceeds were received or for general corporate purposes; and provided, further, however, that any Net Proceeds that are not the subject of such election or not so used shall be immediately applied to the prepayment of the Notes as set forth in this Section 1.8(d)(v).

(vi)     Mandatory Prepayment Amount. Any prepayment made pursuant to this Section 1.8(d) shall be at 100% of the principal amount so prepaid, plus accrued and unpaid interest thereon to the date of such prepayment; provided that payment of all such interest shall be made in cash only, subject to Section 1.4(a)(ii). If a mandatory prepayment is made (A) pursuant to Section 1.8(d)(iv) or (B) in connection with a transaction or event which causes or gives rise to a Default or Event of Default, such prepayment shall be made with a premium equal to the amount of premium that would have been paid had such prepayment been a voluntary prepayment under the applicable subclause under Section 1.8(c). Notwithstanding the foregoing, the Agent may, in its sole discretion, by providing written notice to the Issuers, decline all or any portion of any payment required pursuant to clauses (iii) through (v) of this Section 1.8(d) (such proceeds, "*Declined Proceeds*") and any such Declined Proceeds may be retained by the Issuers and used for any purpose permitted by the terms of this Agreement.

(vii)     Prepayment Certificate. Concurrently with any prepayment of the Notes pursuant to Sections 1.8(d)(iii), (iv) or (v), the Issuers shall deliver to the Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable Net Proceeds. In the event that any Issuer shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Issuers shall promptly make an additional prepayment of the Notes in an amount equal to such excess, and the Issuers shall concurrently therewith deliver to the Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(e)     Application and Allocation of Payments.

(i)     Application. Payments made by any Issuer hereunder shall be applied (A) in the case of voluntary prepayments, as directed by an Issuer, and (B) in the case of mandatory prepayments under Section 1.8(d)(ii), Section 1.8(d)(iii), Section 1.8(d)(iv) and Section 1.8(d)(v), on a pro rata basis. Payments shall be applied to pay fees then due and owing, then interest then due and owing, then principal.

(ii)     Post-Default Allocation. Notwithstanding anything in any Note Document to the contrary, during the continuance of an Event of Default, monies to be applied to the Obligations, whether arising from payments by the Note Parties, setoff or otherwise, shall be allocated as follows:

(A)     first, to all costs and expenses owing to the Purchasers;

(B)     second, to all Obligations constituting fees;

(C)     third, to all Obligations constituting interest, including PIK Optionality Interest that has not yet been capitalized;

(D)     fourth, to all Notes, including the principal balance thereof constituting PIK Optionality Interest that has been capitalized; and

(E)     fifth, to all remaining Obligations.

Amounts shall be applied to payment of each category of Obligations only after payment in full of all preceding categories. If amounts are insufficient to satisfy a category, Obligations in the category shall

EAST\185762164.11

be paid on a pro rata basis. The allocations set forth in this <u>Section 1.8(e)</u> are solely to determine the rights and priorities among the Purchasers, and may be changed by agreement among them without the consent of any Note Party. This <u>Section 1.8(e)</u> is not for the benefit of or enforceable by any Note Party, and the Issuers irrevocably waive the right to direct the application of any payments subject to this <u>Section 1.8(e)</u>.

(iii) <u>Erroneous Application</u>. No Purchaser shall be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Purchaser or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Purchaser, such Purchaser hereby agrees to return it).

(iv) <u>Pro Rata Treatment.</u> Except as otherwise provided in this Agreement, each payment from or on behalf of the Issuers in respect of any Obligations hereunder to the Purchasers shall be made to the Purchasers entitled thereto (other than any Purchaser that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the outstanding principal amount of the Notes with respect to which such payment was received.

(f) <u>Marshaling; Payments Set Aside</u>. The Purchasers shall not be under any obligation to marshal any assets in favor of any Note Party or against any Obligations. If any payment by or on behalf of Issuers is made to any Purchaser, or any Purchaser exercises a right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Purchaser in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such recovery, the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**1.9** **Payment of Other Obligations**. All Obligations will be paid by the Issuers as provided in the Note Documents or, if no payment date is specified, shall be due and payable within ten (10) Business Days of written demand by the Agent.

**1.10** **Fees**. The Issuers shall pay to the Agent and the Purchasers all fees set forth in the Fee Letter and any other fee letter executed in connection with this Agreement.

**1.11** **Recovery of Additional Costs**. If the imposition of or any Change in Law or the interpretation or application thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except Excluded Taxes) reserve requirements, capital adequacy requirements, liquidity requirements or other obligations which would (a) increase the cost to the Agent and the Purchasers for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to the Agent and the Purchasers under this Agreement or any other Note Documents, or (c) reduce the rate of return on the Agent and the Purchasers' capital as a consequence of the Agent and the Purchasers' obligations with respect to the credit facilities to which this Agreement relates, then the Issuers shall pay to the Agent and the Purchasers such additional amounts as will compensate the Agent and the Purchasers therefore, within fifteen (15) days after the Agent and such Purchaser's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by the Issuers, which explanation and calculations shall be conclusive in the absence of manifest error.

**1.12** **Taxes on Payments**. All payments in respect of the Obligations shall be made free and clear of and without any deduction or withholding for or on account of any present and future taxes, levies,

imposts, deductions, charges, withholdings, assessments or governmental charges, and all liabilities with respect thereto, imposed by the United States of America, any foreign government, or any political subdivision or taxing authority thereof or therein, excluding any Excluded Taxes (all such non-Excluded Taxes being hereinafter referred to as "*Taxes*"). If any Taxes are imposed and required by law to be deducted or withheld from any amount payable to the Agent and the Purchasers, then the Issuers shall (a) increase the amount of such payment so that the Agent and the Purchasers will receive a net amount (after deduction of all Taxes) equal to the amount due hereunder, and (b) pay such Taxes to the appropriate taxing authority for the account of the Agent and the Purchasers prior to the date on which penalties attach thereto or interest accrues thereon; provided, however, that if any such penalties or interest shall become due, the Issuers shall make prompt payment thereof to the appropriate taxing authority. The Issuers shall indemnify the Agent and the Purchasers for the full amount of Taxes (including penalties, interest, expenses and Taxes arising from or with respect to any indemnification payment) arising therefrom or with respect thereto, whether or not the Taxes were correctly or legally asserted. This indemnification shall be made on demand.

## ARTICLE II

## [INTENTIONALLY OMITTED]

## ARTICLE III

## CONDITIONS TO CLOSING

**3.1    Conditions to the Purchase of the Notes on the Closing Date**. The Purchasers' obligation to purchase the initial Notes on the Closing Date is subject to and contingent upon the fulfillment of each of the conditions set forth in **Annex 2** to the reasonable satisfaction of the Agent and/or the Purchasers (as specified on **Annex 2**) and their respective counsel

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

In order to induce the Agent and the Purchasers to enter into this Agreement and to purchase the Notes, each Issuer represents and warrants to the Agent and each Purchaser that on the Closing Date:

**4.1    Legal Status**. Each Note Party is the type of organization indicated in **Schedule 4.1**, and is duly organized and existing under the laws of the state of its organization, as indicated in **Schedule 4.1**. Each Note Party has the power and authority to own its own Assets and to transact the business in which it is engaged, and is properly licensed, qualified to do business and in good standing in every jurisdiction in which it is doing business where failure to so qualify would reasonably be expected to have a Material Adverse Effect, as set forth in **Schedule 4.1**. Each Note Party has delivered to the Agent accurate and complete copies of its Governing Documents which are operative and in effect as of the Closing Date.

**4.2    No Violation; Compliance**. The execution, delivery and performance of the Note Documents to which each Note Party is a party, and the consummation of the transactions contemplated hereby and thereby, are within such Note Party's powers, are not in conflict with the terms of the Governing Documents of such Note Party, and do not result in a breach of or constitute a default under any material contract, obligation, indenture or other material instrument to which such Note Party is a party or by which such Note Party is bound or affected. There is no law, rule or regulation (including Regulations T, U and X of the Federal Reserve Board), nor is there any judgment, decree or order of any court or Governmental Authority binding on any Note Party which would be contravened by the execution, delivery, performance or enforcement of the Note Documents to which any Note Party is a party.

8

**4.3** **Authorization; Enforceability**. Each Note Party has taken all corporate, partnership or limited liability company, as applicable, action necessary to authorize the execution and delivery of the Note Documents to which such Note Party is a party, and the consummation of the transactions contemplated hereby and thereby. Upon their execution and delivery in accordance with the terms hereof, the Note Documents to which each Note Party is a party will constitute legal, valid and binding agreements and obligations of such Note Party enforceable against such Note Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

**4.4** **Approvals; Consents**. No approval, consent, exemption or other action by, or notice to or filing with, any Governmental Authority is necessary in connection with the execution, delivery, performance or enforcement of the Note Documents except those that have been obtained and those filings contemplated by the Note Documents to be made. All requisite Governmental Authorities and third parties have approved or consented to the transactions contemplated by the Note Documents, and all applicable waiting periods have expired. There is no governmental or judicial action, actual or threatened, that has or could have a reasonable likelihood of restraining, preventing or imposing materially burdensome conditions on the transactions contemplated by the Note Documents.

**4.5** **Liens**. Each Note Party and each of the Subsidiaries has good and marketable title to, or valid leasehold interests in, all of its Assets, free and clear of all Liens or rights of others, except for Permitted Liens.

**4.6** **Debt**. Each Note Party and each of the Subsidiaries has no Debt other than Permitted Debt.

**4.7** **Litigation; Observance of Agreements, Statutes and Orders**.

(a) Except as set forth in **Schedule 4.7**, there are no suits, proceedings, claims or disputes pending or, to the knowledge of the Issuers, threatened in writing, against or affecting any Note Party or any of any Note Party's Assets, or any Subsidiary or any of such Subsidiary's Assets, which are not fully covered by applicable insurance, and as to which no reservation of rights has been taken by the insurer thereunder.

(b) No Issuer nor any Subsidiary is (i) in default under any material agreement or instrument to which it is a party or by which it is bound, (ii) in violation of any writ, order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or (iii) in violation of any material applicable law, ordinance, rule or regulation of any Governmental Authority, in each case, to the extent any of the foregoing could reasonably be expected to have a Material Adverse Effect.

**4.8** **No Default**. No Event of Default or Default has occurred and is continuing or would result from the incurrence or performance of any obligations by any Note Party or any Subsidiary under this Agreement or the other Note Documents.

**4.9** **Capitalization**.

(a) Set forth on **Schedule 4.9(a)** is a complete and accurate list showing the number of shares or membership interests, as the case may be, of each class of Ownership Interests of Parent authorized, the number outstanding, the number and percentage of the outstanding shares or membership interests, as the case may be, of each such class owned (directly or indirectly) by each Owner of Parent (or their Affiliates). All of the outstanding Ownership Interests of Parent have been validly issued, are fully paid and non-assessable, and are owned by the Owner indicated on **Schedule 4.9(a)**, free and clear of all Liens, options, warrants, rights of conversion or purchase or any similar rights. Except as set forth on

9

**Schedule 4.9(a)**, neither Parent nor any Owner of Parent is a party to, or has knowledge of, any agreement restricting the transfer or hypothecation of any Ownership Interests of Parent.

(b)       Set forth on **Schedule 4.9(b)** is a complete and accurate list showing all Subsidiaries of Parent and, as to each such Subsidiary, the jurisdiction of its organization, the number of shares or membership interests, as the case may be, of each class of Ownership Interests authorized (if applicable), the number outstanding, and the number and percentage of the outstanding shares or membership interests, as the case may be, of each such class owned (directly or indirectly) by its Owner(s). All of the outstanding Ownership Interests of each Subsidiary of Parent owned (directly or indirectly) by Parent have been validly issued, are fully paid and non-assessable (to the extent applicable) and are owned by Parent or a Subsidiary of Parent, free and clear of all Liens (other than Permitted Liens), options, warrants, rights of conversion or purchase or any similar rights. Except as set forth on **Schedule 4.9(b)**, neither Parent nor any Subsidiary of Parent is a party to, or has knowledge of, any agreement restricting the transfer or hypothecation of any Ownership Interests of any such Subsidiary, other than the Note Documents.   Neither Parent nor any Subsidiary of Parent owns or holds, directly or indirectly, any Ownership Interests of any Person other than such Subsidiaries and Permitted Investments.

### 4.10    Taxes.

(a)       All material tax returns required to be filed by each Note Party and each of the Subsidiaries in any jurisdiction have in fact been filed.  All material taxes, assessments, fees and other governmental charges, including but not limited to all real property taxes, upon each Note Party and each of the Subsidiaries or upon any of their Assets, income or franchises, which are due and payable have been paid, other than such taxes, assessments, fees and other governmental charges being contested in good faith by appropriate proceedings, and for which adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest or nonpayment, no material property is subject to a material risk of loss or forfeiture.  The provisions for taxes on the books of each Note Party and each of the Subsidiaries are adequate for all open years, and for each Note Party's and each of the Subsidiaries' current fiscal periods.   There are no claims, audits, investigations or other proceedings regarding Taxes or Tax-related matters pending with respect to any Note Party, and to the knowledge of the Issuers no such claims, audits, investigations or other proceedings are threatened in writing nor are there any facts or circumstances which reasonably could provide the basis therefor.

(b)       The Tax Decree is in full force and effect as of the date hereof.

### 4.11    Correctness of Financial Information; No Material Adverse Change.  All of the financial information regarding the Company that is available to the Company is attached on **Schedule 4.11**; such financial information, (a) is materially true, correct and complete; (b) is prepared from and consistent with such financial statements as have been prepared and used by the Company in the ordinary course of managing its business and measuring and reporting its operating results; (c) is prepared in accordance with GAAP applied on a consistent basis and with the books and records of the Company; and (d) fairly presents in all material respects the assets, liabilities, financial position, results of operations and cash flows of the Company as of the dates and for the periods indicated.  The forecasts of future financial performance, including the Budget attached on **Schedule 4.11(a)**, delivered by the Issuers to the Agent and the Purchasers have been made in good faith and are based on reasonable assumptions and investigations by the Issuers.

### 4.12    ERISA.  None of any Issuer nor any member of the ERISA Group maintains or contributes to any Plan or Multiemployer Plan, other than those listed on **Schedule 4.12**.  Each Issuer and each member

of the ERISA Group has satisfied the minimum funding standards of ERISA and the Internal Revenue Code with respect to each Plan and Multiemployer Plan to which it is obligated to contribute. No ERISA Event has occurred nor has any other event occurred that may result in an ERISA Event that would be reasonably expected to result in a Material Adverse Effect. None of any Issuer, any member of the ERISA Group, or any fiduciary of any Plan is subject to any direct or indirect liability with respect to any Plan (other than to make regularly scheduled required contributions and to pay Plan benefits in the normal course) under any Applicable Law or agreement. Neither any Issuer nor any member of the ERISA Group is required to provide security to any Plan under Section 401(a)(29) of the Internal Revenue Code. Each Plan will be able to fulfill its benefit obligations as they come due in accordance with the Plan documents and under GAAP.

**4.13     Full Disclosure**.  Each Note Party has disclosed to the Agent and the Purchasers all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. All information furnished in writing by or on behalf of any Note Party and delivered to the Agent in connection with this Agreement or the consummation of the transactions contemplated hereunder (such information taken as a whole, and other than information of an industry nature) does not, as of the time of delivery of such information, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not materially misleading (excluding projections and other forward-looking information prepared by the Issuers in good faith which are forwarded to the Agent for which the Issuers may represent and warrant that the same were prepared on the basis of information and estimates that the Issuers believed to be reasonable at the time made, and such projections do not constitute a representation or warranty that the results set forth therewith will be met; it being acknowledged and agreed by the Agent and the Purchasers that uncertainty is inherent in any forecasts, projections and other forward-looking information, projections as to future events or conditions are not to be viewed as facts, and the actual results during the period or periods covered by such forecasts may differ materially from the projected results).

**4.14     Other Obligations**.  Neither any Note Party nor any Subsidiary is in default on any (a) Debt or (b) any other lease, commitment, contract, instrument or obligation which is material to the operation of its business, other than, in the case of both of the foregoing clauses (a) and (b), defaults which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.15     Investment Company Act**.  No Note Party is an investment company, or a company controlled by an investment company, within the meaning of the Investment Company Act of 1940, as amended.

**4.16     FDA Approval**.  To the knowledge of the Note Parties, there are no impediments to the Company's obtaining all necessary permits and/or authorizations of the United States Food and Drug Administration to effectuate the Restart Plan.

**4.17     Patents, Trademarks, Copyrights, and Intellectual Property, etc**.  Except as set forth in **Schedule 4.7**, each Note Party has all material patents, patent rights, licenses, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, software, permits, and franchises in order for it to conduct its business and to operate its Assets, without infringement or conflict with the rights of third Persons, and all of same are valid and subsisting. Other than the Liens granted to the Agent pursuant to the Note Documents, the consummation of the transactions contemplated by this Agreement will not alter or impair any of such rights of any Note Party or any Subsidiary. Except as set forth in **Schedule 4.7**, each Note Party and each Subsidiary has not been charged or, to the Issuers' knowledge, threatened in writing to be charged with any infringement in any material respect or, after due inquiry, infringed on any,

11

unexpired trademark, trademark registration, trade name, patent, copyright, copyright registration, or other proprietary right of any Person in any material respect.

**4.18    Environmental Condition**.  To the Issuers' knowledge, (a) the operations and properties of the Note Parties are in compliance, in all material respects, with federal, state or local environmental codes, ordinances, rules and regulations ("*Environmental Laws*"), except for immaterial instances of non-compliance, which in the aggregate could not reasonably be expected to have a Material Adverse Effect; (b) neither any Note Party nor any Subsidiary has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by any Note Party or any Subsidiary resulting in the releasing or disposing of Hazardous Materials into the environment that would reasonably be expected to result in a Material Adverse Effect; and (c) neither any Note Party nor any Subsidiary has any actual or claimed liabilities under any Environmental Laws, and no facts or circumstances exist that could reasonably be expected to result in any liability under any Environmental Laws, that would reasonably be expected to result in a Material Adverse Effect.

**4.19    Solvency**.  Each Issuer and each other Note Party and each Subsidiary is, and after giving effect to the transactions contemplated hereby, will be, Solvent.  No transfer of property is being made by any Note Party or any Subsidiary and no obligation is being incurred by any Note Party or any Subsidiary in connection with the transactions contemplated by this Agreement or the other Note Documents with the intent to hinder, delay, or defraud either present or future creditors of any Note Party or any Subsidiary.

**4.20    Labor Matters**.  There are no strikes, lockouts, slowdowns or other material labor disputes against the Issuers pending or, to the knowledge of the Issuers, threatened, in each case that would reasonably be expected to have a Material Adverse Effect.  All payments due from the Issuers, or for which any claim may be made against the Issuers, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of the Issuers except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  The Issuers are not a party to or bound by any collective bargaining agreement. There are no representation proceedings pending or, to the Issuers' knowledge, threatened in writing to be filed with the National Labor Relations Board, and no labor organization or group of employees of the Issuers have made a pending demand for recognition that would reasonably be expected to result in a Material Adverse Effect.

**4.21    Real Property; Assets**.

(a)    Set forth on **Schedule 4.21(a)**, is a complete list of all real property owned and leased by any Issuer or any Subsidiary thereof as of the Closing Date, whether such property is owned or leased, and the legal names and addresses of any landlords or other owners (including without limitation, any third party logistics providers) of any other third party locations at which any Collateral having a value in excess of $75,000 is located.  Each of the Issuers and each Subsidiary thereof has good and marketable title to all material real properties (and to all buildings, fixtures and improvements located thereon) owned by it in all material respects, if any, free and clear of all Liens, other than Permitted Liens.

(b)    All tangible property owned by the Issuers and their Subsidiaries necessary to the business of the Issuers and their Subsidiaries is in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, and, to the knowledge of the Issuers and their Subsidiaries, all repairs to such property material to its functioning are set forth on **Schedule 4.21(b)**.

(c)     Within three (3) years prior to the Closing Date, the Company successfully produced a kilo batch of ibuprofen in compliance with all Applicable Laws and of premium quality so as to be marketable to pharmaceutical companies, as previously disclosed to the Agent.

**4.22     Brokers**.  Except as set forth on **Schedule 4.22**, no broker or finder brought about the obtaining, making or closing of the purchase of the Notes or transactions contemplated by the Note Documents, and neither the Issuers nor any Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**4.23     Insurance**.  Subject to **Schedule 5.14**, the Issuers and their Subsidiaries have obtained, and currently maintain in effect, the insurance coverage required pursuant to Section 5.5 hereof.  The Issuers and their Subsidiaries have not received any notice from any insurer or underwriter threatening to terminate, not renew, or materially increase the cost of or materially decrease the coverage provided under, nor to the knowledge of Issuers are there any facts or circumstances which reasonably would be expected to result in any of the foregoing.

**4.24     Material Contracts**.  **Schedule 4.24** attached hereto sets forth all Material Contracts to which any Issuer or any Subsidiary thereof is a party or is bound.  Neither any Issuer nor any such Subsidiary is in breach or in default in any material respect of or under any Material Contract and, to the knowledge of the Issuers, no counterparty to any Material Contract is in breach or in default in any material respect of or under any Material Contract, and neither any Issuer nor any such Subsidiary have received any notice of the intention of any other party to any Material Contract to terminate or not renew any Material Contract prior to the end of the stated term.

**4.25     OFAC and Anti-Corruption Matters**.

(a)     Neither any Note Party nor any Controlled Entity (i) is a Blocked Person, (ii) has been notified that its name appears or may in the future appear on a State Sanctions List or (iii) is a target of sanctions that have been imposed by the United Nations or the European Union.

(b)     Neither any Note Party nor any Controlled Entity (i) has violated, been found in violation of, or been charged or convicted under, any applicable U.S. Economic Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws or (ii) to each Note Party's knowledge, is under investigation by any Governmental Authority for possible violation of any U.S. Economic Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws.

(c)     No part of the proceeds from the sale of the Notes hereunder:

(i)     constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by any Note Party or any Controlled Entity, directly or indirectly, (A) in connection with any investment in, or any transactions or dealings with, any Blocked Person, (B) for any purpose that would cause any Purchaser to be in violation of any U.S. Economic Sanctions Laws or (C) otherwise in violation of any U.S. Economic Sanctions Laws;

(ii)     will be used, directly or indirectly, in violation of, or cause any Purchaser to be in violation of, any applicable Anti-Money Laundering Laws; or

(iii)     will be used, directly or indirectly, for the purpose of making any improper payments, including bribes, to any Governmental Official or commercial counterparty in order to obtain, retain or direct business or obtain any improper advantage, in each case which would be in violation of, or cause the Agent or any Purchaser to be in violation of, any applicable Anti-Corruption Laws.

13

**4.26    Closing Date of the Facility**.  Since the acquisition of the Facility by Bioapi, the Facility has not commenced the operations contemplated under the tax decree issued by virtue of Act 73-2008.

**4.27    No Material Adverse Effect**.  Since the acquisition of the Facility by Bioapi, there has been no event, change, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

**4.28    No Undisclosed Liabilities**.  No Issuer has any liabilities, except for (a) contractual obligations arising under this Agreement, (b) liabilities incurred in the ordinary course of business (other than as a result of breach of contract, tort, or malfeasance) and (c) liabilities set forth on **Schedule 4.28**.

# ARTICLE V

# AFFIRMATIVE COVENANTS

Each Issuer covenants and agrees that from the Closing Date and thereafter until the payment, performance and satisfaction in full, in cash, of the Obligations, and all of the Agent's and each Purchaser's obligations hereunder have been terminated (other than inchoate indemnification obligations), such Issuer shall and shall cause each other Note Party to:

**5.1    Punctual Payments**.  Punctually pay the interest and principal on the Notes, the fees payable hereunder and all Expenses and any other fees and liabilities due under this Agreement and the Note Documents at the times and place and in the manner specified in this Agreement or the other Note Documents.

**5.2    Books and Records; Inspection Rights**.

(a)    Maintain, and cause each of the Subsidiaries to maintain, books and records in accordance with GAAP.

(b)    Permit representatives and independent contractors of the Agent and each Purchaser to visit and inspect any of its properties, to examine the Collateral, the Note Parties' corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss the Note Parties' affairs, finances and accounts with their directors, officers, and independent public accountants, all at the expense of the Issuers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Issuers; provided that, unless an Event of Default has occurred and is continuing, only one such visit, inspection, examination and discussion may be conducted at the expense of the Issuers during any calendar year.

(c)    For as long as any Purchaser owns any Notes or other debt securities of any Issuer, each Issuer shall provide Agent and any Purchaser with sufficient financial information, as reasonably requested by Agent or any such Purchaser to enable Agent or such Purchaser, as applicable, to (i) evaluate the Issuers' financial condition in order to value each or any Purchaser's investment in the Issuers; (ii) determine the continued eligibility of the Issuers for financing by each or any Purchaser; and (iii) verify the use of proceeds of the Purchasers' investment in the Issuers, regardless of the amount and type of securities thereof owned by any particular Purchaser.  All information provided pursuant to this Section 5.2(c) must be certified by the Company's President or Chief Executive Officer or its Treasurer or Chief Financial Officer or other responsible senior officer of Company (or Parent) acceptable to Agent.

(d)    Permit each Purchaser or its representative to visit and inspect the properties and assets of each Issuer, to examine its books and records and to discuss the Issuers' affairs with the Issuers'

14

management at such reasonable times as may be requested by Agent or any Purchaser for the purpose of verifying information provided pursuant to Corbel.

(e)     Permit Agent and each Purchaser to have access to the Issuers' books and records for the purpose of verifying how the proceeds of the issuance of the Notes and related equity interests have been or are being used, and to assure that the proceeds have been used for the purposes specified herein.

**5.3     Financial Statements**.  Deliver to the Agent the following, all in form and detail satisfactory to the Agent:

(a)     as soon as available but not later than fourteen (14) days after the end of each Fiscal Month, Consolidated internally prepared Financial Statements for Parent and its Subsidiaries, which shall include Parent and its Subsidiaries' Consolidated balance sheet as of the close of such period, and Parent and its Subsidiaries' Consolidated statement of income and retained earnings and statement of cash flow for such period and year to date, in each case setting forth, in comparative form, as applicable, the figures for the corresponding Fiscal Month of the previous Fiscal Year, all in reasonable detail, certified by the Chief Financial Officer or other responsible senior officer of Parent, to the best of his or her knowledge after due and diligent inquiry, as being complete and correct and fairly presenting in all material respects Parent and its Subsidiaries' financial condition and results of operations for such period.  The Chief Financial Officer or such other responsible senior officer of Parent shall also certify that such Financial Statement has been prepared in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(b)     as soon as available but not later than thirty (30) days after the end of each Fiscal Quarter, a Consolidated internally prepared Financial Statement for Parent and its Subsidiaries which shall include Parent and its Subsidiaries' Consolidated balance sheet as of the close of such period, and Parent and its Subsidiaries' Consolidated statement of income and retained earnings and statement of cash flow for such period and year to date, in each case setting forth in comparative form, as applicable, the figures for the corresponding Fiscal Quarter of the previous Fiscal Year, all in reasonable detail, certified by the Chief Financial Officer or other responsible senior officer of Parent, to the best of his or her knowledge after due and diligent inquiry, as being complete and correct and fairly presenting in all material respects Parent and its Subsidiaries' financial condition and results of operations for such period, in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with the delivery of the financial statements pursuant to Sections 5.3(a) and 5.3(b) above and Section 5.3(e) below, a Compliance Certificate from the Chief Financial Officer or other senior officer of an Issuer, stating, among other things, that he or she has reviewed the provisions of this Agreement and the Note Documents and that, to the best of his or her knowledge after due and diligent inquiry there exists no Event of Default or Default and containing the calculations and other details necessary to show (i) the amount, if any, of Excess Cash Flow or Additional Excess Cash Flow Payment, as the case may be, and the amount of the payment required to be made pursuant to Section 1.8(d)(ii), (ii) with respect to Compliance Certificates delivered with the delivery of the financial statements pursuant to Section 5.3(b), the amount, if any, of Tax Distributions to be paid with respect to the Fiscal Quarter most recently ended and the prior four Fiscal Quarters and calculations in reasonable detail showing how the amount of such Tax Distributions was derived and (iii) compliance with Section 6.15;

(d)     as soon as available but not later than ten (10) Business Days prior to the approval of the annual operating budget and in no event later thirty (30) days prior to the end of each Fiscal Year, an annual operating budget (including monthly balance sheet, statement of income and retained earnings, and statement of cash flows) for the following Fiscal Year; provided that the Agent

15

will have the right to request revisions to or approve each proposed operating budget promptly and in any event within thirty (30) days after receipt thereof and, after an operating budget has been approved by the Agent for any Fiscal Year, the Issuers shall follow and comply with such approved operating budget, including, without limitation, any limitations contained therein with respect to payment of Capital Expenditures (as such operating budget may be subsequently amended with the consent of the Agent from time to time);

(e)     as soon as available but not later than one hundred twenty (120) days after the end of each Fiscal Year, a complete copy of Parent's and its Subsidiaries' Consolidated audited Financial Statement, which shall include at least Parent's and its Subsidiaries' balance sheet as of the close of such Fiscal Year, and Parent's and its Subsidiaries' statement of income and retained earnings and statement of cash flow for such Fiscal Year setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, accompanied by (i) a report and opinion of a certified public accountant selected by the Company and reasonably satisfactory to the Agent, which report and opinion shall not be subject to any "going concern" or like qualification or exception or any qualifications or exceptions as to the scope of such audit, and (ii) a certificate of such certified public accountant certifying such Financial Statements and, if such firm has obtained knowledge of the existence of any Default or Event of Default during the course of its audit (if an audit was conducted), stating the nature and status of such event;

(f)     within fifteen (15) days of the Filing Date, copies of the Issuers' federal income tax returns (including any Schedule K-1s), and, if any such tax returns are on extension, the Issuers shall promptly provide the Agent evidence thereof but in any event no later than September 30 of the applicable year;

(g)     as soon as available but not later than two (2) days after the receipt by the Issuers thereof, copies of any and all reports and management letters submitted to Parent or any Subsidiary by any certified public accountant in connection with any examination of Parent's or any Subsidiary's financial records made by such accountant; and

(h)     from time to time, operating statistics, operating plans, and any other information as the Agent may reasonably request, promptly upon such request.

5.4     **Existence; Conduct of Business; Operations; Preservation of Licenses; Compliance with Law**.

(a)     Preserve and maintain, and cause each Subsidiary to preserve and maintain, its corporate existence and good standing in the state of its organization (other than as permitted pursuant to Section 6.4), qualify and remain qualified, and cause each Subsidiary to qualify and remain qualified, as a foreign corporation in every jurisdiction in which such Issuer, Note Party and/or Subsidiary is required to so qualify, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect;

(b)     Demonstrate within seven (7) months after the Closing Date, ongoing capacity to produce greater than zero (0) metric tons per month of commercial salable active pharmaceutical ingredients with sufficient quality standards, as acceptable to the Agent (such acceptance not to be unreasonably withheld); and

(c)     Continue, and cause each of its Subsidiaries to continue, engaging in business of the same general type as conducted by the Note Parties as of the Closing Date and businesses reasonably related thereto; preserve, and cause each of the Subsidiaries to preserve, all of its material licenses, permits,

16

governmental approvals, rights, privileges and franchises issued by a Governmental Authority; and comply, and cause each of the Subsidiaries to comply, with the provisions of its Governing Documents; and comply, and cause each of the Subsidiaries to comply, with the material requirements of all Applicable Laws of any Governmental Authority having authority or jurisdiction over it; and comply, and cause each of the Subsidiaries to comply, with all material requirements for the maintenance of its business, insurance, licenses, permits, governmental approvals, rights, privileges and franchises.

**5.5** **Insurance**.

(a) Maintain, at the Issuers' expense, and cause Parent and each Subsidiary to maintain at its expense, insurance with respect to its Assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. The Issuers shall also use best efforts to maintain, and cause each Subsidiary to maintain, cyber, public liability, employment practices liability, directors and officers liability, theft, employee benefits liability and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation, except as the Agent may otherwise agree. All such policies of insurance shall be in such amounts and with such insurance companies as are reasonably satisfactory to the Agent. The Issuers shall deliver copies of all such policies to the Agent with a satisfactory lender's loss payable endorsements (but only in respect of Collateral) and additional insured endorsements (with respect to general liability coverage), and shall contain a waiver of warranties. Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than thirty (30) days' (or ten (10) days' in the case of non-payment) prior written notice to the Agent in the event of cancellation of the policy, and the insurer's agreement that any loss payable thereunder shall be payable notwithstanding any act or negligence of the Issuers or the Agent or any Purchaser which might, absent such agreement, result in a forfeiture of all or a part of such insurance payment.

(b) Maintain at all times on or after the date that is ninety (90) days after the Closing Date (or such later date as the Agent shall permit) Key Man Life Insurance policies (each, a "*Key Man Insurance Policy*") with respect to José Alonso and Esteban Londoño (or such other officers of the Issuers as may be reasonably required by the Agent) in an amount not less than $30,000,000 in the aggregate for all such policies, issued by a financially sound and reputable insurer and otherwise in form and substance reasonably satisfactory to the Agent, so long as an insurer makes such Key Man Insurance Policy available and the terms thereof are customary and reasonable; provided that, in the event the principal amount of the Notes is increased pursuant to the terms of this Agreement or the Purchasers elect to receive PIK Optionality Interest pursuant to Section 1.4(a)(ii), such coverage amount shall be increased at the Agent's discretion. Such insurance policies shall name an Issuer as beneficiary thereunder. Each policy of life insurance or endorsement shall contain a clause requiring the insurer to give not less than thirty (30) days' (or ten (10) days' in the case of non-payment) prior written notice to the Agent in the event of cancellation of the policy. The Agent shall be entitled to receive 100% of any proceeds paid in connection with a Key Man Insurance Policy, which proceeds shall be applied in accordance with this Agreement.

(c) Copies of policies or certificates thereof reasonably satisfactory to the Agent evidencing such insurance shall be delivered to the Agent at least thirty (30) days prior to the expiration of the existing or preceding policies (or such later date as the Agent may permit). The Issuers shall give the Agent prompt notice of any loss covered by such insurance. Upon the occurrence and during the continuance of an Event of Default, the Agent shall have the exclusive right to adjust any losses payable under any such insurance policies, without any liability to the Issuers whatsoever in respect of such adjustments. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies, cyber insurance to the extent such proceeds constitute compensation for lost earnings or business interruption insurance) or as payment of any award or compensation for condemnation or taking by eminent domain, shall, subject to the reinvestment provisions provided herein,

EAST\185762164.11

be paid over to the Agent and the Purchasers to be applied at the option of the Agent either to the prepayment of the Obligations or shall be disbursed to the Issuers under staged payment terms reasonably satisfactory to the Agent for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction. The Issuers shall, concurrently with the annual Financial Statements required to be delivered by the Issuers pursuant to Section 5.3(e), deliver to the Agent, as the Agent may reasonably request, copies of certificates describing all insurance of Parent, the Issuers and the Subsidiaries then in effect.

**5.6    Assets**.

(a)    General. Maintain, keep and preserve, and cause each Subsidiary to maintain, keep and preserve, all of its Assets (tangible or intangible) which are necessary to its business in good repair and condition (normal wear and tear, and casualty excepted), and except where the failure to maintain, keep and preserve such Assets could not reasonably be expected to have a Material Adverse Effect, and from time to time make necessary repairs, renewals and replacements thereto so that such Assets shall be fully and efficiently preserved and maintained.

(b)    Intellectual Property. (i) Own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, trade secrets, software, domain names, franchises, licenses and other intellectual property rights that are reasonably necessary for the operation of their respective businesses without infringement or other conflict with the rights of any other Person with respect thereto, (ii) maintain any registrations or pending applications for any patents, trademarks, copyrights, domain names, (iii) keep any trade secrets and material information confidential and (iv) take all steps reasonably necessary to prevent the introduction of "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software routines or hardware components designed to permit unauthorized access or to disable or erase software, hardware or data, in the case of each of the foregoing clauses (i) through (iv), except to the extent the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**5.7    Taxes**. Pay and discharge when due, and cause each Subsidiary to pay and discharge when due, any and all material assessments and taxes, both real or personal and including federal income taxes and material state and local income taxes, other than such taxes and assessments being contested in good faith by appropriate proceedings, and for which adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest or nonpayment, there will be no impairment of the enforceability, validity or priority of any of the Agent's Liens with respect to the Collateral.

**5.8    Notices to the Agent and the Purchasers**.

(a)    Promptly, upon the Issuers acquiring knowledge thereof, give written notice to the Agent of:

(i)    all litigation affecting any Note Party or any Subsidiary that, if adversely determined against a Note Party, could be reasonably expected to result in a settlement or judgment in excess of $100,000;

(ii)    any dispute which may exist between any Note Party or any Subsidiary, on the one hand, and any Governmental Authority, on the other, that could be reasonably expected to have a Material Adverse Effect;

(iii)    any labor controversy resulting in or threatening to result in a strike against any Note Party or any Subsidiary;

(iv)    [Intentionally Omitted];

(v)    any Reportable Event under Section 4043(c)(5), (6) or (13) of ERISA with respect to any Plan, any decision to terminate or withdraw from a Plan, any finding made with respect to a Plan under Section 4041(c) or (e) of ERISA, the commencement of any proceeding with respect to a Plan under Section 4042 of ERISA, or any material increase in the actuarial present value of unfunded vested benefits under all Plans over the preceding year;

(vi)    any written notice of a release or discharge of Hazardous Materials or environmental claim or complaint received from any Governmental Authority or any other Person which could be reasonably expected to result in a liability of a Note Party in excess of $100,000;

(vii)    any material release or discharge of Hazardous Material from or affecting its premises not in compliance in all material respects with applicable Environmental Laws which could be reasonably expected to result in a liability of a Note Party in excess of $100,000;

(viii)    all notices alleging default received or sent by a Note Party or any Subsidiary thereof to or from the holders of any material Subordinate Debt;

(ix)    any amendment, supplement, waiver or other modification with respect to any document in respect of any Subordinate Debt;

(x)    any Event of Default or Default;

(xi)    any known or threatened in writing dispute, litigation or other proceeding with one or more customers or vendors (including without limitation any liquidated damages claims) involving an amount of $100,000 or more;

(xii)    the cancellation, termination, or failure to maintain any Material Contract or any determination or claim by any party thereto that any Material Contract is invalid, illegal or unenforceable, any action challenging the validity or enforceability thereof, any repudiation of any such Material Contract by the Issuers or any other party thereto, any notice alleging breach or default of any Material Contract, any written notice of the intention of any other party thereto to terminate any Material Contract prior to the stated term, knowledge of any breach or default of any material provision of any Material Contract or any event that could reasonably give rise to any of the foregoing; and

(xiii)    any other matter which has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)    Concurrently with the delivery of each Compliance Certificate delivered for financial statements delivered pursuant to Section 5.3(b) or Section 5.3(e), as the case may be, notice and the amount of any required prepayment of Excess Cash Flow or Additional Excess Cash Flow Payment, as the case may be, and calculations in reasonable detail showing how the amount of Excess Cash Flow or Additional Excess Cash Flow Payment, as the case may be, was derived.

**5.9    Further Assurances.**  Execute and deliver, or cause to be executed and delivered, upon the request of the Agent and at the Issuers' expense, such additional documents, instruments and agreements as the Agent may reasonably determine to be necessary or advisable to carry out the provisions of this

Agreement and the Note Documents, and the transactions and actions contemplated hereunder and thereunder.

**5.10** **Board Observation Rights**.

(a) Until the payment in full of the Obligations, and without in any way limiting the rights of the Agent or its Affiliates under the Governing Documents of Parent, the Purchasers shall have the right to appoint two (2) non-voting observers to the boards of directors, boards of managers or similar governing bodies of Parent to exercise the rights as conferred pursuant to this Section 5.10 (such representatives being referred to as the "*Purchasers' Observers*") and shall notify Parent and the Issuers of the identity of such Persons.

(b) The boards of directors, boards of managers or similar governing bodies of Parent shall hold a general meeting, at the option of the majority member of Parent, either virtually or in person, at Parent's principal place of business or such other location as may be mutually agreed at least one (1) time each calendar quarter (provided that at least one (1) meeting in each calendar year shall be in person) for the purpose of discussing the business and operations of the Note Parties. In addition, the Note Parties shall provide monthly briefings and respond to questions from the Purchasers via telephonic meeting or other agreed method to the Purchasers' Observers. The Purchasers' Observers shall be permitted to attend and participate in all meetings and other activities of the board of directors or equivalent governing body of the Note Parties, including all committees and sub-committees thereof; provided that such Purchasers' Observers shall, if requested, execute a customary confidentiality agreement with respect to the information and matters disclosed and discussed. Each Note Party shall notify the Purchasers' Observers of the date and time for each general or special meeting (including any telephonic meeting) of its board of directors, board of managers or similar governing body (or committee thereof) or of the adoption of any resolutions by any such body or committee by written consent (describing in reasonable detail the nature and substance of such action) at the time notice is provided to the other directors or managers of such Note Party, and deliver to the Purchasers' Observers concurrently with the delivery of any materials delivered to directors or managers of such Note Party, including a draft of any resolutions proposed to be adopted by written consent. The Purchasers' Observers (or their representative) shall be entitled to receive all written materials and other information given to the participants at or in advance of such meetings (it being understood that the Purchasers may and are authorized to provide the Purchasers' Observers with the financial information required to be delivered pursuant to Section 5.3). Without limiting the foregoing, the Issuers will furnish the Purchasers' Observers with (i) a copy of any written consent adopted by the board of directors, board of managers or similar governing body (or committee thereof) of any Note Party promptly following after it has been signed by its last signatory and (ii) as soon as available (but in any event prior to the next succeeding board meeting) copies of the minutes of all such meetings of any such board and/or committee of any Note Party. The Purchasers' Observers shall be free during the period prior to the meeting to contact the directors of such Note Party and discuss the pending actions to be taken. Notwithstanding anything to the contrary set forth herein, Parent and the Issuers may require that the Purchasers' Observers not participate in any portions of any meetings, or not receive any materials or other information, that directly relate to the Note Parties' relationship with the Agent or any Purchaser or which involve the exchange of privileged attorney-client information or work product.

(c) All reasonable and documented expenses of the Purchasers' Observers incurred in connection with their attendance of any meeting as contemplated by Section 5.10(b) shall be promptly reimbursed by the Issuers upon demand by the Agent.

**5.11** **Subordinated Debentures**. The Obligations shall at all times be considered Senior Debt (as defined in each Subordinated Debenture) under each Subordinated Debenture for all purposes thereunder.

**5.12** **Additional Collateral**.

(a) With respect to any Assets (or any interest therein) (other than, for the avoidance of doubt, any Excluded Assets) acquired after the Closing Date by Parent, any Issuer or any Subsidiary that are of a type covered by the Lien created by any of the Note Documents but which are not so subject, promptly (and in any event within thirty (30) days after the acquisition thereof or such later date as the Agent may permit): (i) execute and deliver, or cause such Subsidiary to execute and deliver, to the Agent such amendments to the relevant Note Documents or such other documents as the Agent shall reasonably deem necessary or advisable to grant to the Agent a Lien on such Assets (or such interest therein), (ii) take all actions, or cause Parent or such Subsidiary to take all actions, necessary or advisable to cause such Lien to be duly perfected in accordance with all Applicable Laws, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Agent, (iii) if reasonably requested by the Agent, deliver to the Agent legal opinions relating to the matters described in the immediately preceding clauses (i) and (ii), which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent, and (iv) if reasonably requested by the Agent, deliver to the Agent evidence of insurance as required by Section 5.5.

(b) If any fee simple interest in real property is acquired by any Note Party after the Closing Date, the Issuers will notify the Agent thereof and will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the other Note Parties to take, such actions as shall be necessary or reasonably requested by the Agent to grant and/or perfect such Liens, including actions described in Section 5.12(a) all at the sole cost and expense of the Issuers. Any mortgage delivered to the Agent in accordance with the preceding sentence shall be in form and substance satisfactory to Agent and shall be accompanied by (i) a policy or policies (or unconditional binding commitment thereof) of title insurance issued by a nationally recognized title insurance company insuring the Lien of each mortgage as a valid Lien (with the priority described therein) on the real property described therein, free of any other Liens except as expressly permitted by Section 6.3, together with such endorsements and reinsurance as the Agent may reasonably request and (ii) an opinion of local counsel to the applicable Note Parties in form and substance reasonably satisfactory to the Agent.

**5.13** **Additional Issuers and Guarantors**. Cause each and every now existing and hereafter acquired or formed Domestic Subsidiaries to become either an Issuer or a Guarantor, and execute and deliver to the Agent each of the following, concurrent with any such acquisition or formation:

(a) An Addendum if such Domestic Subsidiary will be an Issuer, or the Guaranty Agreement in all other cases;

(b) a joinder to the Security Agreement in the form of Annex 2 thereto;

(c) a supplement to the Intercompany Subordination Agreement in the form of Annex 1 thereto;

(d) such other collateral assignments, security agreements, pledge agreements, mortgages, leasehold mortgages, warehouse receipts, bailee letters, consents, waivers, financing statements and other instruments and documents, each in form and substance reasonably satisfactory to the Agent, as may be reasonably requested by Agent in connection with the granting of a first priority, perfected Lien on the Assets of the Issuers and Guarantors in favor of the Agent; and

(e) a certificate of the secretary (or other appropriate senior officer) of such Issuer or Guarantor certifying its charter and by-laws (or comparable Governing Documents), resolutions of the board of directors (or comparable governing body) of such Person authorizing the execution and delivery

of such Addendum, the Guaranty Agreement and any documents executed by such Person pursuant to Section 5.13(d) hereof and incumbency and specimen signatures of the officers of such Person executing such documents, and such other certificates, documents, instruments and legal opinions in connection therewith as may be reasonably requested by the Agent, each in form and substance reasonably satisfactory to the Agent.

**5.14**    **Post-Closing Matters**.  Execute and deliver, or cause to be executed and delivered, to the Agent such agreements and other documents described on **Schedule 5.14** and take or cause to be taken such actions, and otherwise comply with such obligations, as are specified on **Schedule 5.14**, in each case, on or before the deadlines specified on **Schedule 5.14** specified for such documents, actions or obligations, as the same may be extended by the Agent in its sole discretion.

# ARTICLE VI

## NEGATIVE COVENANTS

The Issuers further covenant and agree that from the Closing Date and thereafter until the payment, performance and satisfaction in full, in cash, of the Obligations, all of the Agent's and each Purchaser's, obligations hereunder and under the other Note Documents have been terminated (other than inchoate indemnification obligations), the Issuers shall not and shall cause each other Note Party and each Subsidiary of a Note Party not to:

**6.1**    **Use of Funds; Margin Regulation**.

(a)    Use any proceeds of the Notes for any purpose other than to support the restart of the Facility, to provide capital to the balance sheet, to pay fees and expenses incurred in connection with the transactions contemplated in this Agreement and for other general corporate purposes; or

(b)    Use any portion of the proceeds of the Notes in any manner which might cause the Notes, the application of the proceeds thereof, or the transactions contemplated by this Agreement to violate Regulation T, U, or X of the Board of Governors of the Federal Reserve System, or any other regulation of such board, or to violate the Securities and Exchange Act of 1934, as amended or supplemented.

**6.2**    **Debt**.  Create, incur, assume or suffer to exist, or permit Parent or any Subsidiary to create, incur, assume or suffer to exist, any Debt except Permitted Debt.

**6.3**    **Liens**.  Create, incur, assume or suffer to exist, or permit Parent or any Subsidiary to create, incur, assume or suffer to exist, any Lien (including the Lien of an attachment, judgment or execution) on any of its Assets, whether now owned or hereafter acquired, except Permitted Liens; or authorize, or permit Parent or any Subsidiary to authorize, the filing under the UCC as adopted in any jurisdiction, a financing statement which names such Issuer, Parent or such Subsidiary as a debtor, except with respect to Permitted Liens, or sign, or permit any Note Party or Subsidiary to sign, any security agreement authorizing any secured party thereunder to file such a financing statement, except with respect to Permitted Liens.

**6.4**    **Merger, Consolidation, Transfer of Assets**.  Wind up, liquidate or dissolve, reorganize, reincorporate, merge or consolidate with or into any other Person, or acquire all or substantially all of the Assets or the business of any other Person, or permit any Subsidiary to do so; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom, upon prior written notice to the Agent (or such later date as the Agent may permit):

22

(a)     any Subsidiary that is not a Note Party may merge with, or sell or transfer all or substantially all of its assets to: (i) a Note Party; provided that the Note Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries that are not Note Parties; provided that when any wholly-owned Subsidiary is merging with, or selling or transferring all or substantially all of its assets to, another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person; and

(b)     any Subsidiary of the Company that is a Note Party may merge into, or sell or transfer all or substantially all of its assets to, any Subsidiary that is a Note Party or into an Issuer; provided that in any merger involving an Issuer, such Issuer shall be the continuing or surviving Person.

**6.5     Agent Escrow Account Balance**.  The Company shall maintain a balance in the Agent Escrow Account of at least (a) $5,000,000, from the date the Escrow Holdback is deposited in the Agent Escrow Account until and including June 30, 2023 and (b) $2,000,000, from July 1, 2023 until and including the Maturity Date; provided that, in the case of clause (a), (x) the minimum balance shall be reduced to $2,000,000 if the Net Leverage Ratio for the trailing twelve-month period as of the last day of any Fiscal Quarter prior to June 30, 2023 is less than or equal to 5.00:1.00 and (y) the minimum balance may be reduced to $2,000,000 upon emergency action of the board of directors of the Company, with the consent of the Agent.

**6.6     Sales and Leasebacks**.  Sell, transfer, or otherwise dispose of, or permit Parent or any Subsidiary thereof to sell, transfer, or otherwise dispose of, any real or personal property to any Person, and thereafter directly or indirectly leaseback the same or similar property.

**6.7     Dispositions**.  Conduct, or permit Parent or any Subsidiary to conduct, any Dispositions, other than Permitted Dispositions.

**6.8     Investments**.  Make, or permit Parent or any Subsidiary to make, directly or indirectly, any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment, other than Permitted Investments.

**6.9     Character of Business**.  Engage in any business activities or operations substantially different from or unrelated to its present business activities and operations, or permit Parent or any Subsidiary to do so.

**6.10     Restricted Payments**.  Declare or pay, or permit Parent or any Subsidiary to declare or pay, any Distributions, or pay any other Restricted Payments, other than Permitted Restricted Payments.

**6.11     Guarantee**.  Except for Permitted Debt or any Guarantee of Permitted Debt, assume, Guarantee, endorse (other than checks and drafts received by the Issuers in the ordinary course of business), or otherwise be or become directly or contingently responsible or liable for, or permit Parent or any Subsidiary to assume, Guarantee, endorse, or otherwise be or become directly or contingently responsible or liable for (including any agreement to purchase any obligation, stock, Assets, goods, or services or to supply or advance any funds, Assets, goods, or services, or any agreement to maintain or cause such Person to maintain, a minimum working capital or net worth, or otherwise to assure the creditors of any Person against loss) the obligations of any other Person; or pledge or hypothecate, or permit Parent or any Subsidiary to pledge or hypothecate, any of its Assets as security for any liabilities or obligations of any other Person.

**6.12     Employment Agreements**.

(a)     Amend, supplement or modify any employment agreement with any executive officer of the Company, plant manager or person whose compensation exceeds $100,000 in a manner that is a materially adverse to the Purchasers, without the prior written consent of the Agent (not to be unreasonably withheld, conditioned or delayed); or

(b)     Enter into any employment agreement with any Person whose compensation exceeds $100,000 without the prior written consent of the Agent.

**6.13    Transactions with Affiliates**.  Enter into any transaction, including borrowing or lending and the purchase, sale, or exchange of property or the rendering of any service (including management services), with any Affiliate, or permit Parent or any Subsidiary to enter into any transaction, including borrowing or lending and the purchase, sale, or exchange of property or the rendering of any service (including management services), with any Affiliate, other than (i) transactions among Note Parties, (ii) in the ordinary course of and pursuant to the reasonable requirements of the Issuers' or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Issuers or such Subsidiary than might be obtained in a comparable arm's length transaction with a Person not an Affiliate, (iii) Permitted Investments, Permitted Restricted Payments, and intra-group mergers and transfers permitted hereunder, and (iv) the payment of reasonable fees to directors, managers, officers and like Persons and customary indemnities and reimbursements provided for such Persons in the ordinary course of business.

**6.14    Accounting Changes**.  Permit or cause any Note Party to make any material change in its accounting policies or reporting practices, except as may be required by GAAP.

**6.15    Financial Condition**.

(a)     Permit or suffer the Fixed Charge Coverage Ratio for the trailing twelve-month period as of the last day of any Fiscal Quarter during any period set forth below, commencing with the Fiscal Quarter ending September 30, 2024, to be less than the ratio set forth opposite such period below:

| Period | Minimum Fixed Charge Coverage Ratio |
|---|---|
| Fiscal Quarter ending September 30, 2024 through<br>Fiscal Quarter ending December 31, 2024 | 1.00:1.00 |
| Fiscal Quarter ending March 31, 2025 through<br>Fiscal Quarter ending June 30, 2025 | 1.25:1.00 |
| Fiscal Quarter ending September 30, 2025 through<br>Maturity Date | 1.50:1.00 |

(b)     Permit or suffer the Net Leverage Ratio for the trailing twelve-month period as of the last day of any Fiscal Quarter during any period set forth below, commencing with the Fiscal Quarter ending June 30, 2023, to be greater than the ratio set forth opposite such period below:

24

| Period | Maximum Net Leverage Ratio |
|---|---|
| Fiscal Quarter ending June 30, 2023 | 5.00:1.00 |
| Fiscal Quarter ending September 30, 2023 | 4.50:1.00 |
| Fiscal Quarter ending December 31, 2023 | 4.00:1.00 |
| Fiscal Quarter ending March 31, 2024 | 3.50:1.00 |
| Fiscal Quarter ending June 30, 2024 | 3.00:1.00 |
| Fiscal Quarter ending September 30, 2024 | 2.50:1.00 |
| Fiscal Quarter ending December 31, 2024 | 2.00:1.00 |
| Fiscal Quarter ending March 31, 2025 through Maturity Date | 1.50:1.00 |

(c)      Permit or suffer Liquidity, measured as of the last day of each Fiscal Month, commencing with the Fiscal Month ending December 31, 2021, to be less than $1,000,000.

Notwithstanding the foregoing, in the event of any Acquisition, the financial covenants contained in this Section 6.15 will be recalculated giving pro forma effect to the relevant financial information of the acquired Person or assets and liabilities as of such Acquisition occurred on the first day of the relevant testing period.

**6.16**    **OFAC**.  Permit or cause Issuer or any Controlled Entity to, (a) be or become subject at any time to any statute, rule, law, regulation, ordinance, order, restriction, or list of any Governmental Authority that prohibits or limits the Agent or any of the Purchasers from holding the Notes or any Ownership Interests or from otherwise conducting business with the Note Parties; (b) directly or indirectly have any investment in or engage in any dealing or transaction with any Person if such investment, dealing or transaction (i) would cause the Agent or any Purchaser to be in violation of any law or regulation applicable to the Agent or such Purchaser, or (ii) is prohibited by or subject to sanctions under any U.S. Economic Sanctions Laws; or (c) engage, or permit any Subsidiary or Affiliate to engage, in any activity that could subject such Person, the Agent or any Purchaser to sanctions under the Comprehensive Iran Sanctions, Accountability and Divestment Act or any similar (federal or state) law or regulation with respect to Iran or any other country that is subject to U.S. Economic Sanctions Laws.

**6.17**    **Fiscal Year**.  Change its Fiscal Year.

**6.18**    **Board Management Agreement; Board Fees**.  Amend the fees, expenses or indemnification provisions set forth in the Board Management Agreement in order to increase amounts payable thereunder, or otherwise in a manner adverse to the Agent and the Purchasers; or (b) regardless if due, pay any Board Fees, Board Expenses or any other fees, expenses or any other amounts owing to the directors or managers of Parent or the Company or any of their respective affiliates or designees, whether pursuant to the Board Management Agreement or otherwise, in each case, (i) if a Default or Event of Default then exists or would result from such payment on a Pro Forma Basis (and it being understood and agreed

that to the extent any portion of such payments would result in a Default or Event of Default on a Pro Forma Basis, all such payments shall not be permitted) or (ii) if such Board Fees, Board Expenses or any other fees, expenses or any other amounts owing to the directors or managers of Parent or the Company or any of their respective affiliates or designees on a per person basis is in excess of Corbel Monitoring Fees; provided that (x) no payments may be made under this Section 6.18 until after delivery of Quarterly Compliance Certificates (it being understood and agreed that fees payable before the delivery of the Compliance Certificate for the Fiscal Quarter ending December 31, 2021 shall accrue). Fees shall be payable promptly following receipt by the Agent of the Compliance Certificate for the applicable Fiscal Quarter, and not earlier than the date on which any payment is made to the Agent pursuant to Section 1.8(d)(ii). The parties hereto further acknowledge and agree that any fees payable under this Section 6.18 shall only be paid in arrears. Furthermore, no fees may be paid under the Board Management Agreement unless the Corbel Monitoring Fees are paid in full.

6.19    **Burdensome Agreements; Modifications of Certain Agreements**.

(a)    Enter into or permit to exist any contractual obligation (other than this Agreement or any other Note Document) that: (i) limits the ability (A) of any Subsidiary to make Restricted Payments or other Distributions to any Note Party or to otherwise transfer property to or invest in a Note Party, (B) of any Subsidiary to Guarantee the Obligations, (C) of any Subsidiary to make or repay loans to a Note Party, or (D) of the Note Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent and the Purchasers; or (ii) requires the grant of a Lien (other than a Permitted Lien) to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; provided, however, that in no event shall the foregoing clauses (i) and (ii) preclude (1) limitations in respect of specific property encumbered to secure payment of particular Debt (including Capital Leases and purchase money Debt) or to be sold pursuant to an executed agreement with respect to a Permitted Disposition, (2) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and other agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or other agreements or the applicable lease, license or agreement itself, as the case may be), (3) limitations pursuant to applicable requirements of law or (4) limitations customarily contained in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar Person.

(b)    Amend or otherwise modify (i) any Governing Document of any Note Party if any such amendment could be deemed adverse to the interests of the Agent and the Purchasers or (ii) any Subordinate Debt in a manner not permitted by the relevant Subordination Agreement.

6.20    **Parent as a Holding Company**.  Permit Parent to engage in any business or activity other than (a) the ownership of all outstanding Ownership Interests in the Company and the other Note Parties and other immaterial assets (e.g. books and records); (b) maintaining its corporate existence; (c) participating in tax, accounting, management and other administrative activities as the parent of the consolidated group of companies, including the Note Parties; (d) the execution and delivery of the Note Documents to which it is a party and the performance of its obligations thereunder; (e) issuance of Ownership Interests; (f) as otherwise required by law; (g) holding any cash received in accordance with the terms of this Agreement and making distributions and/or payments with the same as permitted under this Agreement; (h) preparing reports to Governmental Authorities and to the holders of its Ownership Interests; (i) holding manager and equityholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable laws; (j)

26

activities and transactions in connection with any management equity plan; and (k) activities incidental to the businesses or activities described in clauses (a) through (j) of this Section 6.20.

**6.21** **Capital Expenditures**. Incur Capital Expenditures (other than those outlined in the Restart Plan) in excess of $300,000 in any Fiscal Year or other than as included in the approved annual operating budget.

# ARTICLE VII

# EVENTS OF DEFAULT AND REMEDIES

**7.1** **Events of Default**. The occurrence of any one or more of the following events, acts or occurrences shall constitute an event of default (an "*Event of Default*") hereunder:

(a) the Issuers fail to pay (i) when due any payment of principal or (ii) within three (3) Business Days of when due, any interest due on the Notes, the fees payable hereunder, any Expenses, or any other amount payable hereunder or under any Note Document;

(b) the Issuers fail to observe or perform any of the covenants and agreements set forth in Section 5.2, Section 5.3(b), Section 5.3(c), Section 5.3(e), Section 5.4 (with respect to preservation of existence), Section 5.8(a)(x), Section 5.14 or any Section within Article VI;

(c) Parent or any of its Subsidiaries fails to observe or perform any covenant or agreement set forth in this Agreement or the Note Documents (other than those covenants and agreements described in Sections 7.1(a) and 7.1(b)), and such failure continues for thirty (30) days after the earlier to occur of (i) the Issuers obtaining knowledge of such failure or (ii) the Agent's dispatch of notice to the Administrative Issuer of such failure;

(d) Any representation, warranty or certification made by any Note Party or any officer or employee of any Note Party in this Agreement or any Note Document, in any certificate, financial statement or other document delivered pursuant to this Agreement or any Note Document proves to have been misleading or untrue in any material respect when made or if any such representation, warranty or certification is withdrawn;

(e) Any Note Party fails to pay on the earlier of (i) thirty (30) days following the date when due, or (ii) an actual default thereon, any payment in respect of any Debt (other than under this Agreement) in excess of $100,000;

(f) Any event or condition occurs that: (i) results in the acceleration of the maturity of any Note Party's Debt (other than under this Agreement); or (ii) permits (or, with the giving of notice or lapse of time or both, would permit) the holder or holders of such Debt or any Person acting on behalf of such holder or holders to accelerate the maturity thereof, in each case in respect of any other Debt (other than under this Agreement) with an aggregate principal amount in excess of $100,000;

(g) Any Note Party (i) commences a voluntary Insolvency Proceeding seeking liquidation, reorganization or other relief with respect to itself or its Debt or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in an involuntary Insolvency Proceeding, (ii) fails generally or admits in writing its inability to pay its Debt as it becomes due, makes an assignment for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any

27

substantial part of its property, (iv) is adjudicated as insolvent or to be liquidated, or (v) or takes any action to authorize any of the foregoing;

(h)  An involuntary Insolvency Proceeding is commenced against any Note Party seeking liquidation, reorganization or other relief with respect to it or its Debt or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property and any of the following events occur:  (i) the petition commencing the Insolvency Proceeding is not timely controverted; (ii) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof; (iii) an interim trustee is appointed to take possession of all or a substantial portion of the Assets of, or to operate all or any substantial portion of the business of, such Note Party; or (iv) an order for relief shall have been issued or entered therein;

(i)  Any one or more Note Parties suffers (i) one or more judgments by any court which continue without having been discharged, vacated or stayed for a period of thirty (30) consecutive days after the entry thereof and such judgments are in the aggregate amount in excess of $150,000 (to the extent not paid or otherwise covered by insurance as to which the relevant insurance company has acknowledged the claim and has not disputed coverage) or (ii) one or more writs, warrant of attachment, or similar process with respect to all or a material part of its property which are not released, vacated or fully bonded within thirty (30) days of its issue or levy;

(j)  [Intentionally Omitted];

(k)  Any order, judgment or decree is entered decreeing the dissolution of any Issuer;

(l)  Any Note Party is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or any Note Party voluntarily ceases to conduct its business as a going concern (other than to the extent permitted by Section 6.4);

(m)  A notice of lien, *medida cautelar*, embargo, levy or assessment issued or is filed of record with respect to any or all of any Note Party's Assets by any Governmental Authority, or any taxes or debts owing at any time hereafter to any Governmental Authority becomes a Lien, whether inchoate or otherwise, upon any or all of any Note Party's Assets and the same is not paid on the payment date thereof, in each case except for Permitted Liens;

(n)  Any Note Party makes any payment on account of any Subordinate Debt except as otherwise permitted under the terms of the applicable Subordination Agreement;

(o)  Any Reportable Event, which the Required Purchasers determine constitutes grounds for the termination of any Plan by the PBGC or for the appointment by the appropriate United States District Court of a trustee to administer any such Plan, shall have occurred and be continuing thirty (30) days after written notice of such determination shall have been given to the Issuers by the Agent, or any such Plan shall be terminated within the meaning of Title IV of ERISA, or a trustee shall be appointed by the appropriate United States District Court to administer any such Plan, or the PBGC shall institute proceedings to terminate any Plan in any such ERISA Event or Events or action or actions, individually or in the aggregate, would result in a claim against or liability of the Issuers or any of the Subsidiaries;

(p)  Any event occurs that would permit the PBGC to terminate any Plan;

(q)  Any Note Party shall fail to hold (either through revocation, forfeiture, failure of renewal, or otherwise) all material authorizations and licenses necessary for the conduct of the Note Party's business;

(r)     Any one or more environmental claims shall have been asserted against any Note Party or any Note Party shall have incurred or could reasonably be expected to incur liability, interruption of operations or other adverse effects as a result thereof, and such environmental claims, liability or other effect, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect;

(s)     [Intentionally Omitted];

(t)     Any Change of Control occurs;

(u)     Any of the Note Documents fails to be in full force and effect for any reason, or the Agent fails to have a first priority perfected Lien in and upon all of the Collateral;

(v)     Any Guarantor revokes or disputes the validity of, or liability under, the Guaranty Agreement;

(w)     Any "Event of Default" (or like term) or other breach shall occur and be continuing under and as defined in any Subordinate Debt and is not cured or waived within any applicable cure period;

(x)     [Intentionally Omitted];

(y)     Any strike, sit-in, or material labor dispute occurs in respect of the operations or facilities of any Note Party, and any of the foregoing has or could reasonably be expected to have a Material Adverse Effect; or

(z)     The occurrence of any Material Event.

**7.2    Remedies**.  Upon the occurrence of any Event of Default described in <u>Section 7.1(g)</u> or <u>Section 7.1(h)</u>, the Purchasers' obligation hereunder to purchase any Notes or make any other financial accommodations to the Issuers shall immediately terminate, and the Obligations, including without limitation any prepayment premiums, shall become immediately due and payable without any election or action on the part of the Agent or the Purchasers, without presentment, demand, protest or notice of any kind, all of which the Issuers hereby expressly waive.  Upon the occurrence and continuance of any other Event of Default, any or all of the following actions may be taken upon the election of the Required Purchasers: (a) without notice of their election and without demand, immediately terminate the commitments, whereupon the Purchasers' obligation hereunder to purchase any Notes or make any other financial accommodations to the Issuers shall immediately terminate; and (b) may upon their election and without notice of their election and without demand, declare the Obligations, including without limitation any prepayment premiums, to be due and payable, whereupon the Obligations, including without limitation any prepayment premiums, shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which the Issuers hereby expressly waive.  Upon the occurrence and continuance of any other Event of Default, the Purchasers shall be entitled to remove and replace any or all members of the boards of directors, boards of managers or similar governing bodies of the Parent and each Note Party with Persons designated by the Purchasers.  All Notes subject to redemption by the Issuers pursuant to this <u>Section 7.2</u> shall be redeemed by the Issuers at a price equal to the outstanding principal amount of the Notes, plus accrued and unpaid interest, plus any applicable prepayment premiums that would have been payable pursuant to <u>Section 1.8(c)</u> in connection with any voluntary prepayment of the Notes prior to the Maturity Date for any redemption caused by acceleration under this <u>Section 7.2</u>, and all other amounts due under the Note Documents.

29

**7.3** **Appointment of Receiver or Trustee**. Each Issuer hereby irrevocably agrees that the Agent and the Required Purchasers have the right under this Agreement, upon the occurrence and during the continuance of an Event of Default, to seek the appointment of a receiver, trustee or similar official over such Issuer to effect the transactions contemplated by this Agreement, and that the Agent and the Required Purchasers are entitled to seek such relief. Each Issuer hereby irrevocably agrees not to object to such appointment on any grounds other than that no Event of Default is then continuing.

**7.4** **Power of Attorney**. Each Issuer hereby appoints the Agent (and all Persons designated by the Agent) as such Issuer's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section 7.4. The Agent, or its designee, may, without notice and in either its or such Issuer's name, but at the cost and expense of the Issuer:

(a) endorse such Issuer's name on any payment item or other proceeds of Collateral (including proceeds of insurance) that come into the Agent's possession or control; and

(b) During the continuance of an Event of Default, (i) notify any account debtors of the assignment of their accounts, demand and enforce payment of accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to accounts; (ii) settle, adjust, modify, compromise, discharge or release any accounts or other Collateral, or any legal proceedings brought to collect accounts or Collateral; (iii) sell or assign any accounts and other Collateral upon such terms, for such amounts and at such times as the Required Purchasers deem advisable; (iv) collect, liquidate and receive balances in deposit accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign such Issuer's name to a proof of claim or other document in a bankruptcy of an account debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to such Issuer, and notify postal authorities to deliver any such mail to an address designated by the Agent; (vii) endorse any chattel paper, document, instrument, bill of lading, or other document or agreement relating to any accounts, inventory or other Collateral; (viii) use such Issuer's stationery and sign its name to verifications of accounts and notices to account debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which such Issuer is a beneficiary; and (xii) take all other actions as the Purchasers reasonably deem appropriate to fulfill such Issuer's obligations under this Agreement and the Note Documents.

**7.5** **Remedies Cumulative**. The rights and remedies of the Agent and the Purchasers herein and in the other Note Documents are cumulative, and are not exclusive of any other rights, powers, privileges, or remedies, now or hereafter existing, at law, in equity or otherwise.

# ARTICLE VIII

## AGENCY

**8.1** **Appointment and Authority**. Each of the Purchasers hereby irrevocably appoints Corbel to act on its behalf as the Agent hereunder and under the other Note Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article VIII are solely for the benefit of the Agent and the Purchasers, and neither the Issuers nor any other Note Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Note Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or

express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

8.2 **Rights as a Purchaser**. The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Purchaser as any other Purchaser and may exercise the same as though it were not the Agent, and the term "*Purchaser*" or "*Purchasers*" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Parent or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Purchasers.

8.3 **Exculpatory Provisions**.

(a) The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Note Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Agent:

(i) shall not be subject to any fiduciary or other express or implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Note Documents that the Agent is required to exercise as directed in writing by the Required Purchasers (or such other number or percentage of the Purchasers as shall be expressly provided for herein or in the other Note Documents); provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Note Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under the Bankruptcy Code or any other Applicable Law; and

(iii) shall not, except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuers or any of their respectiveAffiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(b) The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.4), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment. The Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent in writing by an Issuer or a Purchaser.

(c) The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, or (v) the

satisfaction of any condition set forth in <u>Article III</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**8.4** **Reliance by the Agent**. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the purchase of Notes or any other extension of credit that by its terms must be fulfilled to the satisfaction of a Purchaser, the Agent may presume that such condition is satisfactory to such Purchaser unless the Agent shall have received notice to the contrary from such Purchaser prior to the purchase of such Note or making of any other extension of credit. The Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**8.5** **Delegation of Duties**. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more sub agents appointed by the Agent. The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this <u>Article VIII</u> shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to the activities as the Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

**8.6** **Resignation of the Agent**.

(a) The Agent may at any time give notice of its resignation to the Purchasers and the Issuers. Upon receipt of any such notice of resignation, the Required Purchasers shall have the right, in consultation with the Issuers, to appoint a successor. If no such successor shall have been so appointed by the Required Purchasers and shall have accepted such appointment within thirty (30) days after the resigning Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Purchasers) (the "*Resignation Effective Date*"), then the resigning Agent may (but shall not be obligated to), on behalf of the Purchasers, appoint a successor Agent meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) With effect from the Resignation Effective Date: (i) the resigning Agent shall be discharged from its duties and obligations hereunder and under the other Note Documents (except that in the case of any collateral security held by the Agent on behalf of the Purchasers under any of the Note Documents, the resigning Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) except for any indemnity payments owed to the resigning Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Purchaser directly, until such time, if any, as the Required Purchasers appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as the Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the resigning Agent (other than any rights to indemnity payments owed to the resigning Agent), and the resigning Agent shall be discharged from all of its duties and obligations hereunder or under the other Note Documents. The fees payable by the Issuers to a successor Agent shall be the same as those payable to its

predecessor unless otherwise agreed between the Issuers and such successor. After the resigning Agent's resignation hereunder and under the other Note Documents, the provisions of this Article VIII and Section 9.3 shall continue in effect for the benefit of such resigning Agent, its sub agents and respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the resigning Agent was acting as the Agent.

8.7     **Non-Reliance on the Agent and Other Purchasers**. Each Purchaser acknowledges that it has, independently and without reliance upon the Agent or any other Purchaser or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Purchaser also acknowledges that it will, independently and without reliance upon the Agent or any other Purchaser or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or any related agreement or any document furnished hereunder or thereunder.

8.8     **No Other Duties, etc**. Anything herein to the contrary notwithstanding, none of the Persons listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Note Documents, except in its capacity, as applicable, as the Agent or a Purchaser hereunder.

8.9     **The Agent May File Proofs of Claim**. In case of the pendency of any proceeding under the Bankruptcy Code or any other Applicable Law or any other judicial proceeding relative to any Note Party, the Agent (irrespective of whether the principal of any Note shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on any Purchaser) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Purchasers and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Purchasers and the Agent and their respective agents and counsel and all other amounts due the Purchasers and the Agent under Sections 1.10 and 9.3) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Purchaser to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Purchasers, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 1.10 and 9.3.

8.10     **Collateral and Guaranty Matters**.

(a)     The Purchasers irrevocably authorize the Agent, at its option and in its discretion,

(i)     to release any Lien on any property granted to or held by the Agent under any Note Document (A) upon termination of all commitments and payment in full of all Obligations (other than contingent indemnification obligations), (B) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Note

Documents, or (C) subject to <u>Section 9.4</u>, if approved, authorized or ratified in writing by the Required Purchasers;

(ii) to subordinate any Lien on any property granted to or held by the Agent under any Note Document to the holder of any Lien on such property that is a Permitted Lien; and

(iii) to release any Guarantor from its obligations under the Guaranty and the other Note Documents to which it is a party if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Note Documents.

Upon request by the Agent at any time, the Required Purchasers will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty and the other Note Documents pursuant to this <u>Section 8.10</u>.

(b) The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Note Party in connection therewith, nor shall the Agent be responsible or liable to the Purchasers for any failure to monitor or maintain any portion of the Collateral.

# ARTICLE IX

## MISCELLANEOUS

**9.1    Notices**.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or other electronic transmission or similar writing) and shall be given to such party at its address or facsimile number set forth on the signature pages hereof or such other address or facsimile number as such party may hereafter specify by notice to the other party in accordance with this <u>Section 9.1</u>.  Each such notice, request or other communication shall be effective (a) if delivered in person, when delivered, (b) if delivered by facsimile transmission, on the date of transmission if transmitted on a Business Day before 7:00 p.m., Eastern time, otherwise on the next Business Day, (c) if delivered electronically, upon receipt thereof by the recipient; (d) if delivered by overnight courier, one (1) Business Day after delivery to the courier properly addressed and (e) if mailed, upon the third (3rd) Business Day after the date deposited into the U.S. Mail, certified or registered; provided that actual notice, however and from whomever given or received, shall always be effective on receipt; provided, further, that notices to the Agent or any Purchaser pursuant to <u>Article I</u> shall not be effective until received by the relationship manager of the Purchasers for the Issuers; provided, further, that notices sent by the Agent or any Purchaser in connection with such Person's exercise of its enforcement rights against any of its collateral shall be deemed given when deposited in the mail or personally delivered, or, where permitted by law, transmitted by facsimile or other electronic transmission.

**9.2    No Waivers**.  No failure or delay by the Agent or any Purchaser in exercising any right, power or privilege hereunder or under any other Note Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**9.3    Expenses; Documentary Taxes; Indemnification**.

(a) The Issuers shall pay all reasonable, documented out-of-pocket Expenses of the Agent and the Purchasers (including the Purchasers' Observers) on demand.

(b) The Issuers shall pay all and indemnify the Agent and each Purchaser against any and all transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority and imposed by reason of the execution and delivery of this Agreement, any of the other Note Documents, or any other document, instrument or agreement entered into in connection herewith.

(c) The Issuers shall and hereby agree to indemnify, protect, defend and hold harmless the Agent, each Purchaser and each of their Related Parties (collectively, the "*Indemnified Persons*" and individually, an "*Indemnified Person*") from and against (i) any and all losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses (including reasonable costs of investigation and reasonable attorneys' fees and expenses, including those incurred in connection with any indemnification claim or pursuant to or in connection with proceedings arising under the Bankruptcy Code) incurred by any Indemnified Person (except to the extent that any such losses, claims, damages, liabilities, deficiencies, judgments, costs or expenses are finally judicially determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of any Indemnified Person or breach in bad faith by any Indemnified Person) arising out of or by reason of any litigations, investigations, claims or proceedings (whether administrative, judicial or otherwise), including discovery, whether or not such Indemnified Person is designated a party thereto, which arise out of or are in any way related to (A) this Agreement, the other Note Documents or the transactions contemplated hereby or thereby, (B) any breach of or inaccuracy in any representation, warranty or certification made by any Note Party or any officer of any Note Party in this Agreement or any other Note Document, (C) any actual or proposed use by the Issuers of the proceeds of the Notes, or (D) the Agent's and each Purchaser's entering into this Agreement, the other Note Documents or any other agreements and documents relating hereto; (ii) any such losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses arising out of or by reason of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence on, under or about the Issuers' operations or property or property leased by the Issuers of any material, substance or waste which is or becomes designated as Hazardous Materials; (iii) any such losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses incurred in connection with any remedial or other action taken by the Issuers or the Agent in connection with compliance by the Issuers with any federal, state or local Environmental Laws, acts, rules, regulations, orders, directions, ordinances, criteria or guidelines (except to the extent that any such losses, claims, damages, liabilities, deficiencies, judgments, costs or expenses are finally judicially determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of any Indemnified Person) or (iv) any Purchaser's or the Agent's status as a holder of Ownership Interests directly or indirectly in an Issuer. If and to the extent that the obligations of the Issuers hereunder are unenforceable for any reason, the Issuers hereby agree to make the maximum contribution to the payment and satisfaction of such obligations to the Agent and the Purchasers which is permissible under Applicable Law.

(d) To the fullest extent permitted by Applicable Law, the Issuers shall not assert, and hereby waive, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Note Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Note or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Person through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Note Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final and nonappealable judgment of a court of competent jurisdiction.

EAST\185762164.11

(e)     The Issuers' obligations under this Section 9.3 and Section 1.12 shall survive any termination of this Agreement and the Note Documents and the payment in full of the Obligations, and are in addition to, and not in substitution of, any other of its obligations set forth in this Agreement.

**9.4     Amendments and Waivers**.

(a)     No amendment, waiver or other modification of any provision of this Agreement or any other Note Document (other than any fee letter entered into in connection herewith), and no consent with respect to any departure by any Note Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Purchasers (or by the Agent at the written request of the Required Purchasers) and the Note Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Purchasers directly affected thereby and all of the Note Parties that are party thereto, do any of the following:

(i)     increase the amount of or extend the expiration date of any commitment of any Purchaser;

(ii)     postpone or delay any date fixed by this Agreement or any other Note Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Note Document,

(iii)     reduce the principal of, or the rate of interest on, any Notes or other extension of credit hereunder, or reduce any fees, prepayment premiums or other amounts payable hereunder or under any other Note Document; provided that only the consent of the Required Purchasers shall be necessary to waive any obligation of the Issuers to pay interest at the default rate during the continuance of an Event of Default;

(iv)     amend, modify, or eliminate this Section 9.4 or any provision of this Agreement providing for consent or other action by all Purchasers;

(v)     amend, modify, or eliminate Section 8.10;

(vi)     other than as permitted by Section 8.10 or Section 17 of the Security Agreement, release the Agent's Lien in and to any of the Collateral;

(vii)     amend, modify, or eliminate the definitions of "Required Purchasers";

(viii)     contractually subordinate any of the Agent's Liens; or

(ix)     other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Note Documents, release any Issuer or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by any Issuer or any Guarantor of any of its rights or duties under this Agreement or the other Note Documents; or

(b)     No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate:

36

(i)      the definition of, or any of the terms or provisions of, any fee letter entered into in connection with this Agreement, without the written consent of the Agent and the Issuers (and shall not require the written consent of any of the Purchasers);

(ii)      any provision of <u>Article VIII</u> pertaining to the Agent, or any other rights or duties of the Agent under this Agreement or the other Note Documents, without the written consent of the Agent, the Issuers, and the Required Purchasers; and

(c)      Anything in this <u>Section 9.4</u> to the contrary notwithstanding, any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Note Document that relates only to the relationship of the Agent and the Purchasers among themselves, and that does not affect the rights or obligations of Parent or any other Note Party, shall not require consent by or the agreement of any Note Party.

**9.5      Successors and Assigns; Participations; Disclosure; Register**.

(a)      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Issuers may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agent and the Purchasers and any such prohibited assignment or transfer by the Issuers shall be void.

(b)      Each Purchaser may make, carry or transfer the Obligations at, to or for the account of, any of its branch offices or the office of an Affiliate of such Purchaser or to any Federal Reserve Bank, all without the Issuers' consent.

(c)      Each Purchaser may, at its own expense, assign, to one or more financial institutions (or any Affiliate of such Purchaser) or any Person the primary business of which is lending money or holding debt (in each case other than to a natural person or an Affiliate of the Issuers), or a portion of its rights (including voting rights) and obligations under this Agreement and the other Note Documents. In the event of any such assignment by the Purchasers pursuant to this <u>Section 9.5(c)</u>, such Purchaser's obligations under this Agreement arising after the effective date of such assignment shall be released and concurrently therewith, transferred to and assumed by such assignee to the extent provided for in the document evidencing such assignment.  The provisions of this <u>Section 9.5</u> relate only to absolute assignments (whether or not arising as the result of foreclosure of a security interest) and that such provisions do not prohibit assignments creating security interests, including, without limitation, any pledge or assignment by any Purchaser of any Obligation or any Note to any Federal Reserve Bank in accordance with Applicable Law. No assignment may be made to an Issuer, any natural person, or any Affiliates of the foregoing.

(d)      Each Purchaser may at any time sell to one or more banks or other financial institutions (each a "*Participant*") participating interests in the Notes and in any other interest of such Purchaser hereunder.  In the event of any such sale by such Purchaser of a participating interest to a Participant, such Purchaser's obligations under this Agreement shall remain unchanged, such Purchaser shall remain solely responsible for the performance thereof, and the Issuers shall continue to deal solely and directly with such Purchaser in connection with such Purchaser's rights and obligations under this Agreement.

(e)      The Issuers authorize each Purchaser to disclose to any assignee under <u>Section 9.5(c)</u> or any Participant (either, a "*Transferee*") and any prospective Transferee any and all financial information in such Purchaser's possession concerning the Issuers that has been delivered to such Purchaser by the Issuers pursuant to this Agreement or that has been delivered to such Purchaser by the

37

Issuers in connection with such Purchaser's credit evaluation prior to entering into this Agreement; provided that such Transferee or prospective Transferee has first agreed to be bound by the provisions of Section 9.6.

(f)     The Agent, acting solely for this purpose as an agent of the Issuers, shall maintain at its office a register for the recordation of the names and addresses of each Purchaser, and the commitments of, and principal amounts of the loans owing to such Purchaser pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Issuers and the Purchasers shall treat the Person whose name is recorded in the Register pursuant to the terms hereof as a lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Issuers and Purchasers at any reasonable time and from time to time upon reasonable prior notice.  The obligations of the Issuers under this Agreement and the other Note Documents are registered obligations and the right, title and interest of the Purchasers and their assignees in and to such obligations shall be transferable only upon notation of such transfer in the Register.  This Section 9.5(f) shall be construed so that such obligations are at all times maintained in "registered from" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related regulations (and any other relevant or successor provisions of the Internal Revenue Code or such regulations).

(g)     Each Purchaser, upon execution and delivery hereof or upon succeeding to an interest in the Notes, as the case may be, represents and warrants as of the Closing Date or as of the effective date of the applicable assignment that (i) it has experience and expertise in the making of or investing in commitments, loans or investments such as the Notes; and (ii) it will make or invest in its Notes for its own account in the ordinary course of its business and without a view to distribution of such Notes within the meaning of the U.S. Securities Act of 1933, as amended or the U.S. Securities and Exchange Act of 1934, as amended, or other federal securities laws (it being understood that, subject to the provisions of this Section 9.5, the disposition of such Notes or any interests therein shall at all times remain within its exclusive control).

(h)     Anything in this Agreement to the contrary notwithstanding, with the prior written consent of the Issuers, Agent and each Purchaser may disclose information concerning the terms and conditions of this Agreement and the other Note Documents to pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of Issuers or the other Note Parties and the Notes purchased hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent or such Purchaser.

    **9.6     Confidentiality**.  The Agent and each Purchaser agrees that (a) all information received prior to the Closing Date from Parent, the Issuers or the Target or their representatives other than information that was available to the Agent and the Purchasers on a non-confidential basis prior to the disclosure by Parent, the Issuers or the Target or the representatives; and (b) after the Closing Date, all material non-public information regarding Note Parties and their Subsidiaries, their operations, assets, and existing and contemplated business plans ("*Confidential Information*") shall be treated by the Agent and each Purchaser in a confidential manner, and shall not be disclosed by the Agent or any Purchaser to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to the Agent and the Purchasers who are subject to reasonably customary confidentiality restrictions or are advised to keep such information confidential in accordance with this Section 9.6, (ii) to Subsidiaries and Affiliates of the Agent and the Purchasers; provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 9.6, (iii) as may be required by regulatory authorities purporting to have authority over the Agent or such Purchaser in the

ordinary course of inspections and audits, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide the Issuers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Issuers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation, and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance by the Issuers or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process; provided that (x) prior to any disclosure under this clause (v) the disclosing party agrees to provide the Issuers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Issuers pursuant to the terms of the subpoena or other legal process, and (y) any disclosure under this clause (v) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vi) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by the Agent or any Purchaser or any of their Related Parties), (vii) in connection with any assignment, prospective assignment, sale, prospective sale, participation, prospective participation, pledge or prospective pledge of the Purchasers' interest under this Agreement; provided that any such Transferee or prospective Transferee shall have agreed in writing to receive such information hereunder subject to the terms of this <u>Section 9.6</u>, (viii) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Note Documents; provided that, prior to any disclosure to any Person (other than any Note Party, the Agent, the Purchasers, any of their respective Affiliates, or their respective counsel) under this clause (viii) with respect to litigation involving any Person (other than any Note Party, the Agent, the Purchasers, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide the Issuers with prior notice thereof, and (ix) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Note Document.

9.7    **Counterparts; Integration**.    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of an original counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic transmission also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  This Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

9.8    **Severability**.  The provisions of this Agreement are severable.  The invalidity, in whole or in part, of any provision of this Agreement shall not affect the validity or enforceability of any other of its provisions.  If one or more provisions hereof shall be declared invalid or unenforceable, the remaining provisions shall remain in full force and effect and shall be construed in the broadest possible manner to effectuate the purposes hereof.

9.9    **Knowledge**.  For purposes of this Agreement, an individual will be deemed to have knowledge of a particular fact or other matter if such individual is actually aware of such fact or other matter.  The Issuers will be deemed to have knowledge of a particular fact or other matter if the president, chief executive officer, chief operating officer, chief financial officer, controller, treasurer, president or other Authorized Officer of the Issuers have, or at any time had knowledge of such fact or other matter.

9.10    **Additional Waivers**.

(a)    The Issuers agree that checks and other instruments received by the Agent and the Purchasers in payment or on account of the Obligations constitute only conditional payment until such items are actually paid to the Agent and the Purchasers and the Issuers waive the right to direct the application of any and all payments at any time or times hereafter received by the Agent and the Purchasers on account of the Obligations and the Issuers agree that the Agent and the Purchasers shall have the continuing exclusive right to apply and reapply such payments in any manner as the Agent and the Purchasers may deem advisable, notwithstanding any entry by the Agent and the Purchasers upon their books.

(b)    The Issuers waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, documents, instruments, chattel paper, and guarantees at any time held by the Agent and the Purchasers on which the Issuers may in any way be liable.

(c)    The Agent and the Purchasers shall not in any way or manner be liable or responsible for (i) the safekeeping of the Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by the Issuers.

(d)    The Issuers waive the right and the right to assert a confidential relationship, if any, it may have with any accountant, accounting firm and/or service bureau or consultant in connection with any information requested by the Agent and the Purchasers pursuant to or in accordance with this Agreement, and agrees that the Agent and the Purchasers may contact directly any such accountants, accounting firm and/or service bureau or consultant in order to obtain such information.  The Issuers shall be permitted to attend any meeting with such accountants, accounting firm and/or service bureau or consultant; provided that no Event of Default has occurred and is continuing.

9.11    **Destruction Of the Issuers' Documents**.  Any documents, schedules, invoices or other papers delivered to the Agent and the Purchasers may be destroyed or otherwise disposed of by the Agent and the Purchasers six (6) months after they are delivered to or received by the Agent and the Purchasers, unless the Issuers request, in writing, the return of the said documents, schedules, invoices or other papers and makes arrangements, at the Issuer's expense, for their return.

9.12    **Choice of Law and Venue; Jury Trial Waiver**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ISSUER, THE PURCHASERS AND THE AGENT CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH ISSUER, EACH PURCHASER AND THE AGENT IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE

GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY NOTE DOCUMENT OR OTHER DOCUMENT RELATED THERETO. EACH ISSUER, EACH PURCHASER AND THE AGENT WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

(c)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 9.1</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(d)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER NOTE DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.12</u>.

**9.13    [Intentionally Omitted].**

**9.14    Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by any Note Party or the transfer to the Agent or any Purchaser of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "*Voidable Transfer*"), and if the Agent or such Purchaser is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Agent or such Purchaser is required or elects to repay or restore, and as to all reasonable costs, Expenses, and reasonable attorneys' fees of the Agent or such Purchaser related thereto, the liability of each Note Party automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**9.15    No Advisory or Fiduciary Responsibility; Release of Claims**.  In connection with all aspects of each transaction contemplated hereby or any other Note Document (including in connection with any amendment, waiver or other modification hereof or of any other Note Document), each Note Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agent and the Purchasers are arm's-length commercial transactions between the Note Parties and their respective Affiliates, on the one hand, and the Agent and the Purchasers on the other hand, (B) each Note Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Note Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Note Documents; (ii) (A) the Agent and the each Purchaser each is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Note Party or any of their respective Affiliates, or any other Person and (B) neither the Agent nor

any Purchaser has any obligation to the Note Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Note Documents; and (iii) the Agent, the Purchasers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Note Parties and their respective Affiliates, and neither the Agent nor any Purchaser has any obligation to disclose any of such interests to the Note Parties or any of their respective Affiliates. Each Note Party acknowledges that Affiliates of the Purchasers are also Owners of Ownership Interests of Parent as of the Closing Date and to the fullest extent permitted by law, each Note Party hereby waives and releases any claims that it may have against the Agent, the Purchasers or any of their respective officers, directors or employees with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby. Additionally, each Note Party hereby waives and releases any claims that it may have against the Agent, the Purchasers or any of their respective officers, directors or employees resulting from the fact that Affiliates of the Purchasers are also Owners of Ownership Interests of Parent.

**9.16    Patriot Act Notification**.  The Agent and the Purchasers are subject to Patriot Act and hereby notifies the Issuers that pursuant to the requirements of the Patriot Act, the Agent and the Purchasers are required to obtain, verify and record information that identifies the Issuers, which information includes the names and addresses of the Issuers and other information that will allow the Agent and the Purchasers to identify the Issuers in accordance with the Patriot Act.

**9.17    Survival**.  All agreements, representations and warranties contained herein and in the other Note Documents shall be deemed to have been relied upon by the Purchasers in entering into this Agreement and purchasing the Notes and shall survive the execution and delivery of this Agreement and each of the other Note Documents, the issue, sale and delivery of the Notes and payment therefor and any disposition of the Notes by any Purchaser, whether or not any investigation at any time is made by such Purchaser or on its behalf, until the full, complete and final payment and performance of the Obligations. Notwithstanding anything contained in this Agreement or the other Note Documents to the contrary, (a) (i) all expense and indemnification provisions, including, without limitation, those contained in Section 1.12 and Section 9.3 and (ii) Section 9.5(g), Section 9.12 and Section 9.13, shall, for both clauses (a)(i) and (a)(ii) of this Section 9.17, survive any termination of this Agreement and the Note Documents and the payment in full of the Obligations and (b) the following provisions of this Agreement shall survive until the latest to occur of (i) the payment, performance and satisfaction in full, in cash, of the Obligations, and all of the Agent's and each Purchaser's obligations hereunder have been terminated (other than inchoate indemnification obligations), and (ii) the Agent and its Affiliates no longer holding any direct or indirect Ownership Interests in Parent: Section 5.3 (but not including Section 5.3(c)), Section 5.4, Section 5.8, Section 5.10, and Section 9.4.

**9.18    Electronic Signatures**.

(a)    Each of the parties hereto consents to do business electronically in connection with this Agreement, any other Note Document and the transactions contemplated hereby or thereby.  Delivery of an executed counterpart of a signature page of this Agreement or any other Note Documents by telecopy, emailed pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement or such other Note Document.

(b)    The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document, instrument, amendment, restatement, modification, reaffirmation, assignment and acceptance or other agreement to be signed in connection with this Agreement, any other Note Document and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal

effect, validity and enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, Uniform Real Property Electronic Recording Act, if applicable, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act, if applicable; provided that nothing herein shall require Agent or any Purchaser to accept Electronic Signatures in any form or format without its prior written consent, which consent can be withheld in its sole discretion. The Purchasers and Agent hereby consent to Electronic Signatures being provided by DocuSign or similar software.

(c)     Without limiting the generality of the foregoing, and to the extent permitted by applicable law, each of the parties hereto hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings, other proceedings or litigation arising out of or related to this Agreement, the other Note Documents and the transactions contemplated hereby or thereby, electronic images of this Agreement or any other Note Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of this Agreement, the Note Documents or the transactions contemplated hereby or thereby based solely on the lack of paper original copies of any Note Documents, including with respect to any signatures thereon. For the avoidance of doubt, the parties hereto hereby agree that this provision shall apply in equal force and have the same enforceability and validity to each other Note Document and any amendment, restatement, modification, reaffirmation, assignment and acceptance or other document related to this Agreement or such other Note Document whether or not expressly stated therein.

(d)     As used in this Section, "Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

# ARTICLE X

## JOINT AND SEVERAL LIABILITY

**10.1     Joint and Several Liability**.  Each Issuer agrees that it is jointly and severally, directly and primarily liable to the Agent and the Purchasers for payment, performance and satisfaction in full of the Obligations and that such liability is independent of the duties, obligations, and liabilities of the other Issuer.  The Agent and the Purchasers may bring a separate action or actions on each, any, or all of the Obligations against any Issuer, whether action is brought against the other Issuers or whether the other Issuers are joined in such action.  In the event that any Issuer fails to make any payment of any Obligations on or before the due date thereof, the other Issuers immediately shall cause such payment to be made or each of such Obligations to be performed, kept, observed, or fulfilled.

**10.2     Primary Obligation; Waiver of Marshaling**.  This Agreement and the other Note Documents to which the Issuers are a party are a primary and original obligation of each Issuer, are not the creation of a surety relationship, and are an absolute, unconditional, and continuing promise of payment and performance which shall remain in full force and effect without respect to future changes in conditions, including any change of law or any invalidity or irregularity with respect to this Agreement or the other Note Documents to which the Issuers are a party.  Each Issuer agrees that its liability under this Agreement and the other Note Documents which the Issuers are a party shall be immediate and shall not be contingent upon the exercise or enforcement by the Agent and the Purchasers of whatever remedies they may have against the other Issuers, or the enforcement of any lien or realization upon any security the Agent and the

43

Purchasers may at any time possess. Each Issuer consents and agrees that the Agent and the Purchasers shall be under no obligation to marshal any assets of any Issuer against or in payment of any or all of the Obligations.

**10.3** **Financial Condition of Issuers**. Each Issuer acknowledges that it is presently informed as to the financial condition of the other Issuers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Issuer hereby covenants that it will continue to keep informed as to the financial condition of the other Issuer, the status of the other Issuers and of all circumstances which bear upon the risk of nonpayment. Absent a written request from any Issuer to the Agent and the Purchasers for information, each Issuer hereby waives any and all rights it may have to require the Agent and the Purchasers to disclose to such Issuer any information which the Agent and the Purchasers may now or hereafter acquire concerning the condition or circumstances of the other Issuers.

**10.4** **Continuing Liability**. The liability of each Issuer under this Agreement and the other Note Documents to which the Issuers are a party includes Obligations arising under successive transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Obligations after prior Obligations have been satisfied in whole or in part. To the maximum extent permitted by law, each Issuer hereby waives any right to revoke its liability under this Agreement and other Note Documents as to future indebtedness, and in connection therewith, each Issuer hereby waives any rights it may have under Section 2815 of the California Civil Code.

**10.5** **Additional Waivers**. Each Issuer absolutely, unconditionally, knowingly, and expressly waives:

(a)     (i) notice of acceptance hereof; (ii) notice of any financial accommodations made or extended under this Agreement and the other Note Documents to which the Issuers are a party or the creation or existence of any Obligations; (iii) notice of the amount of the Obligations, subject, however, to each Issuer's right to make inquiry of the Agent and the Purchasers to ascertain the amount of the Obligations at any reasonable time; (iv) notice of any adverse change in the financial condition of the other Issuers or of any other fact that might increase such Issuer's risk hereunder; (v) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Note Documents to which the Issuers are a party; and (vi) all other notices (except if such notice is specifically required to be given to the Issuers hereunder or under the Note Documents to which the Issuers are a party) and demands to which such Issuer might otherwise be entitled.

(b)     its right, under Sections 2845 or 2850 of the California Civil Code, or otherwise, to require the Agent and the Purchasers to institute suit against, or to exhaust any rights and remedies which the Agent and the Purchasers have or may have against, the other Issuers or any third party, or against any collateral for the Obligations provided by the other Issuers, or any third party. Each Issuer further waives any defense arising by reason of any disability or other defense (other than the defense that the Obligations shall have been fully and finally performed and indefeasibly paid) of the other Issuers or by reason of the cessation from any cause whatsoever of the liability of the other Issuers in respect thereof.

(c)     (i) any rights to assert against the Agent and the Purchasers any defense (legal or equitable), set-off, counterclaim, or claim which such Issuer may now or at any time hereafter have against the other Issuers or any other party liable to the Agent and the Purchasers; (ii) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Obligations or any security therefor; (iii) any defense such Issuer has to performance hereunder, and any right such Issuer has to be exonerated, provided

44

by Sections 2819, 2822, or 2825 of the California Civil Code, or otherwise, arising by reason of: the impairment or suspension of the Agent's or the Purchasers' rights or remedies against the other Issuers; the alteration by the Agent and the Purchasers of the Obligations; any discharge of the other Issuers' obligations to the Agent and the Purchasers by operation of law as a result of the Agent's and the Purchasers' intervention or omission; or the acceptance by the Agent and the Purchasers of anything in partial satisfaction of the Obligations; and (iv) the benefit of any statute of limitations affecting such Issuer's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Issuer's liability hereunder.

(d)     Each Issuer absolutely, unconditionally, knowingly, and expressly waives any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by the Agent and the Purchasers including any defense based upon an election of remedies by the Agent and the Purchasers under the provisions of Sections 580a, 580b, 580d, and 726 of the California Code of Civil Procedure or any similar law of California or any other jurisdiction; or (ii) any election by the Agent and the Purchasers under Section 1111(b) of the Bankruptcy Code to limit the amount of, or any collateral securing, its claim against the Issuers. Pursuant to California Civil Code Section 2856(b):

(i)     Each Issuer waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Issuer's rights of subrogation and reimbursement against the other Issuers by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(ii)     Each Issuer waives all rights and defenses that such Issuer may have because the Obligations are secured by real property. This means, among other things: (A) the Agent and the Purchasers may collect from such Issuer without first foreclosing on any real or personal property collateral pledged by the other Issuers; and (B) if the Agent and the Purchasers foreclose on any real property collateral pledged by the other Issuers: (1) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (2) the Agent and the Purchasers may collect from such Issuer even if the Agent and the Purchasers, by foreclosing on the real property collateral, has destroyed any right such Issuer may have to collect from the other Issuers. This is an unconditional and irrevocable waiver of any rights and defenses each Issuer may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(e)     Each Issuer hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right of subrogation such Issuer has or may have as against the other Issuers with respect to the Obligations; (ii) any right to proceed against the other Issuers or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which such Issuer may now have or hereafter have as against the other Issuers with respect to the Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of the other Issuers.

(f)     WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS AGREEMENT, EACH ISSUER HEREBY ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES AND AGREES NOT TO ASSERT ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810,

45

2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580c, 580d, AND 726, CALIFORNIA UNIFORM COMMERCIAL CODE SECTIONS 3116, 3118, 3119, 3419, 3605, 9504, 9505, AND 9507, AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

**10.6    Settlements or Releases**.  Each Issuer consents and agrees that, without notice to or by such Issuer, and without affecting or impairing the liability of such Issuer hereunder, the Agent and the Purchasers may, by action or inaction:

(a)    compromise, settle, extend the duration or the time for the payment of, or discharge the performance of, or may refuse to or otherwise not enforce this Agreement and the other Note Documents, or any part thereof, with respect to the other Issuers or any Guarantor;

(b)    release the other Issuers or any Guarantor or grant other indulgences to the other Issuers or any Guarantor in respect thereof;

(c)    amend or modify in any manner and at any time (or from time to time) this Agreement or any of the other Note Documents; or

(d)    release or substitute any Guarantor, if any, of the Obligations, or enforce, exchange, release, or waive any security for the Obligations or any other guaranty of the Obligations, or any portion thereof.

**10.7    No Election**.  The Agent and the Purchasers shall have the right to seek recourse against each Issuer to the fullest extent provided for herein, and no election by the Agent and the Purchasers to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of the Agent's and the Purchasers' right to proceed in any other form of action or proceeding or against other parties unless the Agent and the Purchasers have expressly waived such right in writing.  Specifically, but without limiting the generality of the foregoing, no action or proceeding by the Agent or the Purchasers under this Agreement and the other Note Documents shall serve to diminish the liability of any Issuer under this Agreement and the other Note Documents to which the Issuers are a party except to the extent that the Agent and the Purchasers finally and unconditionally shall have realized indefeasible payment by such action or proceeding.

**10.8    Indefeasible Payment**.  The Obligations shall not be considered indefeasibly paid unless and until all payments to the Agent and the Purchasers are no longer subject to any right on the part of any Person, including any Issuer, any Issuer as a debtor in possession, or any trustee (whether appointed pursuant to the Bankruptcy Code, or otherwise) of any Issuer's Assets to invalidate or set aside such payments or to seek to recoup the amount of such payments or any portion thereof, or to declare same to be fraudulent or preferential.  Upon such full and final performance and indefeasible payment of the Obligations, the Agent and the Purchasers shall have no obligation whatsoever to transfer or assign its interest in this Agreement and the other Note Documents to any Issuer.  In the event that, for any reason, any portion of such payments to the Agent and the Purchasers is set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made, and any Issuer shall be liable for the full amount the Agent and the Purchasers is required to repay plus any and all costs and expenses (including attorneys' fees and attorneys' fees incurred in proceedings brought under the Bankruptcy Code) paid by the Agent and the Purchasers in connection therewith.

**10.9    Single Loan Account**.  At the request of the Issuers to facilitate and expedite the administration and accounting processes and procedures of the Obligations, the Agent and the Purchasers

46

have agreed, in lieu of maintaining separate loan accounts on their books in the name of each of the Issuers, that Agent and the Purchasers may maintain a single loan account under the name of all of the Issuers (the "*Loan Account*"). All credit extensions shall be made jointly and severally to the Issuers and shall be charged to the Loan Account, together with all interest and other charges as permitted under and pursuant to this Agreement. The Loan Account shall be credited with all repayments of Obligations received by the Agent and the Purchasers, on behalf of the Issuers, from any Issuer pursuant to the terms of this Agreement.

**10.10    Apportionment of Proceeds of Notes**. Each Issuer expressly agrees and acknowledges that the Agent and the Purchasers shall have no responsibility to inquire into the correctness of the apportionment or allocation of or any disposition by any of the Issuers of (a) the Notes or any credit extensions, or (b) any of the expenses and other items charged to the Loan Account pursuant to this Agreement. The Notes and all such credit extensions and such expenses and other items shall be made for the collective, joint, and several account of the Issuers and shall be charged to the Loan Account.

**10.11    Company as Agent for Issuers**. Each Issuer hereby irrevocably appoints the Company as the borrowing agent and attorney-in-fact for all Issuers ("*Administrative Issuer*") which appointment shall remain in full force and effect unless and until the Agent and the Purchasers shall have received prior written notice signed by each Issuer that such appointment has been revoked and that another Issuer has been appointed Administrative Issuer. Each Issuer hereby irrevocably appoints and authorizes the Administrative Issuer (a) to provide the Agent and the Purchasers with all notices with respect to the Notes and all other notices and instructions under this Agreement and (b) to take such action as the Administrative Notes deems appropriate on its behalf to obtain the Notes and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Notes and Collateral of the Issuers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Issuers in order to utilize the collective borrowing powers of the Issuers in the most efficient and economical manner and at their request, and that the Agent and the Purchasers shall not incur liability to any Issuer as a result hereof. Each Issuer expects to derive benefit, directly or indirectly, from the handling of the Notes and the Collateral in a combined fashion since the successful operation of each Issuer is dependent on the continued successful performance of the integrated group. To induce the Agent and the Purchasers to do so, and in consideration thereof, each Issuer hereby jointly and severally agrees to indemnify the Agent and the Purchasers, and hold the Agent and the Purchasers harmless against, any and all liability, expense, loss or claim of damage, or injury, made against the Agent and the Purchasers by any Issuer or by any third Person whosoever, arising from or incurred by reason of (i) the handling of the Notes and Collateral of the Issuers as herein provided, (ii) the Agent's and the Purchasers' relying on any instructions of the Administrative Issuer, or (iii) any other action taken by the Agent and the Purchasers hereunder or under the other Note Documents, except that the Issuers will have no liability to the Agent and the Purchasers under this <u>Section 10.11</u> with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Agent and the Purchasers.

\*    \*    \*

[remainder of this page intentionally left blank]

\*    \*    \*

47

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**ISSUERS**:

**SKALAR PHARMA HOLDING LLC**

By: _____

Name: Fernando Londoño Benveniste

Title: Authorized Representative

Address for notices:
P.O. Box 3019
Guaynabo, PR 00970
Attn: Fernando Londoño Benveniste
Email: fernando.londono@skalarpharma.com

**SKALAR PHARMA LLC**

By: _____

Name: Fernando Londoño Benveniste

Title: Authorized Representative

Address for notices:
P.O. Box 3019
Guaynabo, PR 00970
Attn: Fernando Londoño Benveniste
Email: fernando.londono@skalarpharma.com

DocuSign Envelope ID: B9F49A7E-4595-40B3-A47A-2075268658DD

**THE AGENT AND THE PURCHASERS**:

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
as the Agent and as a Purchaser

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its Managing Member

By: _____
Name: Michael H. Jones
Title: Authorized Signatory

Address for notices:

Corbel Distressed and Special Opportunities Fund, L.P.
11777 San Vicente Blvd., Suite 777
Los Angeles, CA 90049
Attn: Michael Jones
Email: Michael@corbelcap.com


**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND (SPV SKALAR), L.P.,**
as a Purchaser

By: CORBEL DSOF GP (SPV SKALAR), LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its sole member

By: _____
Name: Jeffrey Schwartz
Title: Manager

Address for notices:

c/o Corbel Distressed and Special Opportunities Fund, L.P.
11777 San Vicente Blvd., Suite 777
Los Angeles, CA 90049
Attn: Michael Jones
Email: Michael@corbelcap.com

DocuSign Envelope ID: 3516BD66-FB95-40B2-A679-3B2253EFB57D

**THE AGENT AND THE PURCHASERS**:

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
as the Agent and as a Purchaser

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL
MANAGEMENT, LLC,
its Managing Member


By: _____
Name: Michael H. Jones
Title: Authorized Signatory

Address for notices:

Corbel Distressed and Special Opportunities
Fund, L.P.
11777 San Vicente Blvd., Suite 777
Los Angeles, CA 90049
Attn: Michael Jones
Email: Michael@corbelcap.com


**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND (SPV SKALAR), L.P.,**
as a Purchaser

By: CORBEL DSOF GP (SPV SKALAR), LLC,
its general partner
By: CORBEL DSOF CAPITAL
MANAGEMENT, LLC,
its sole member

By: _____
Name: Jeffrey Schwartz
Title: Manager

Address for notices:

c/o Corbel Distressed and Special Opportunities
Fund, L.P.
11777 San Vicente Blvd., Suite 777
Los Angeles, CA 90049
Attn: Michael Jones
Email: Michael@corbelcap.com

*[Signature Page to Note Purchase Agreement]*

**Definitions and Construction**

     1.1   <u>Definitions</u>.  Initially capitalized terms used in this Agreement shall have the following meanings:

     *"Acquisition"* means any acquisition (x) by an Issuer of all of the Ownership Interests of any Person (other than a then existing Subsidiary), or (y) by an Issuer or any of its wholly-owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the Assets of, all of the Ownership Interests of, or a business line or unit or a division of, any Person (other than a then existing Subsidiary).

     *"Act"* means the Securities Act of 1933, as amended from time to time.

     *"Addendum"* means an Addendum to Note Purchase Agreement substantially in the form of **Exhibit 1**.

     *"Additional Excess Cash Flow Payment"* has the meaning set forth in <u>Section 1.8(d)(ii)</u>.

     *"Administrative Issuer"* has the meaning set forth in <u>Section 10.11</u>.

     *"Affiliate"* means, with respect to any Person, any other Person (a) that, directly or indirectly, controls, is controlled by or is under common control with such Person; (b) that directly or indirectly beneficially owns or controls 10% or more of any class of Ownership Interests of such Person; or (c) 10% or more of the voting stock of which is directly or indirectly beneficially owned or held by such Person.  For purposes of the foregoing, control (including controlled by and under common control with) shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

     *"Agent"* is defined in the Preamble.

     *"Agent Escrow Account"* means an escrow account at East West Bank subject to that certain Holding Escrow Agreement, dated as of the date such account is established, by and among the Company, the Agent and East West Bank.

     *"Agreement"* means this Note Purchase Agreement, as amended or restated from time to time in accordance with its terms.

     *"Annual Compliance Certificate"* has the meaning set forth in <u>Section 1.8(d)(ii)</u>.

     *"Anti-Corruption Laws"* means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding bribery or any other corrupt activity, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010.

     *"Anti-Money Laundering Laws"* means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding money laundering, drug trafficking, terrorist-related activities or other money

laundering predicate crimes, including the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), the Patriot Act.

*"Applicable Laws"* means all applicable laws, rules, regulations and orders of any Governmental Authority, including without limitation, the Patriot Act, all Environmental Laws and regulations issued by the Office of the Comptroller of the Currency, Credit Protection Laws, the Fair Labor Standards Act, and the Americans With Disabilities Act.

*"Asset"* means any interest of a Person in any kind of property or asset, whether real, personal, or mixed real and personal, and whether tangible or intangible.

*"Attributable Indebtedness"* means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

*"Authorized Officer"* means, with respect to any Note Party, any officer of such Note Party authorized by specific resolution to authorize the issuance of the Notes and otherwise request credit extensions, the granting of liens and security interests and otherwise perform its obligations under the Note Documents, in each case as set forth in such Note Party's resolutions delivered to the Agent on the Closing Date (and updated from time to time as necessary).

*"Bankruptcy Code"* means title 11 of the United States Code, as in effect from time to time, or any successor statute, and any and all rules and regulations issued or promulgated in connection therewith.

*"Bioapi"* means Bioapi S.A.S., a simplified stock corporation organized and existing under the laws of the Republic of Colombia, or any predecessor entity thereof.

*"Blocked Person"* means (a) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC, (b) a Person, entity, organization, country or regime that is blocked or a target of sanctions that have been imposed under U.S. Economic Sanctions Laws or (c) a Person that is an agent, department or instrumentality of, or is otherwise beneficially owned by, Controlled by or acting on behalf of, directly or indirectly, any Person, entity, organization, country or regime described in clause (a) or (b).

*"Board Expenses"* has the meaning set forth in the Board Management Agreement.

*"Board Fees"* has the meaning set forth in the Board Management Agreement.

*"Board Management Agreement"* means that certain Board Monitoring and Board Management Services Agreement, dated the Closing Date among Parent and each Class A Director (as defined therein), as in effect on the date hereof.

*"Budget"* means the Issuer's budget set forth in **Schedule 4.11(a)**.

*"Business Day"* means any day other than a Saturday, a Sunday, or a day on which commercial banks in Los Angeles, California, are authorized or required by law or executive order or decree to close.

*"Capital Expenditures"* means expenditures by any Person for the acquisition of any fixed Assets or improvements, replacements, substitutions, or additions thereto that have a useful life of more than one (1) year, including the direct or indirect acquisition of such Assets by way of increased product or service charges, offset items, or otherwise, and the principal portion of payments with respect to Capital Lease Obligations, calculated in accordance with GAAP.

*"Capital Lease"* means any lease of an Asset by a Person as lessee which would, in conformity with GAAP, be required to be accounted for as an Asset and corresponding liability on the balance sheet of that Person.

*"Capital Lease Obligations"* of a Person means the amount of the obligations of such Person under all Capital Leases which would be shown as a liability on a balance sheet of such Person prepared in accordance with GAAP.

*"Change in Law"* means the occurrence after the date of the Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that, notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

*"Change of Control"* means the time at which (a) except as otherwise permitted by <u>Section 6.4</u>, there shall be consummated any consolidation or merger of any Note Party pursuant to which such Note Party's Ownership Interests would be converted into cash, securities or other property, other than a merger or consolidation of such Note Party in which the holders of such Ownership Interests immediately prior to the merger have the same proportionate ownership, directly or indirectly, of Ownership Interests of the surviving Person immediately after the merger as they had immediately prior to such merger, (b) all or substantially all of the Issuers' Assets shall be sold, leased, conveyed or otherwise disposed of as an entirety or substantially as an entirety to any Person (including any Affiliate or associate of the Issuer) in one or a series of transactions, or (c) any Issuer ceases to be a wholly-owned direct or indirect Subsidiary of Parent.

*"Closing Date"* means the date when all of the conditions set forth in <u>Section 3.1</u> have been fulfilled to the reasonable satisfaction of the Agent, the Purchasers and their counsel.

*"Collateral"* has the meaning given to such term in the Security Agreement or in any other Note Document.

*"Company"* is defined in the Preamble.

*"Compliance Certificate"* means a certificate of compliance to be delivered in accordance with <u>Section 5.3(c)</u>, substantially in the form of **Exhibit 5.3(c)**.

*"Confidential Information"* has the meaning set forth in <u>Section 9.6</u>.

*"Consolidated"* means the consolidation in accordance with GAAP of the accounts or other items as to which such term applies.

*"Consolidated Adjusted EBITDA"* means, for the applicable period of time, the sum of (without duplication) (a) Consolidated Net Income for such period (excluding extraordinary or non-operating gains or losses); plus each of the following, in each case to the extent deducted from Consolidated Net Income; (b) Consolidated Interest Expense during such period; (c) federal, state and local income taxes reported by Parent and the Subsidiaries during such period which are included in the determination of Consolidated Net Income; (d) Parent's and the Subsidiaries' Consolidated depreciation and amortization during such period; (e) non-recurring fees, costs and expenses in connection with the transaction contemplated under this Agreement incurred on or before the Closing Date and reflected on the funds flow in effect as of the Closing Date (or paid within ninety (90) days of the Closing Date), to the extent not financed; (f) Corbel Monitoring Fees accrued during such period; and (g) non-cash expenses, charges or losses reducing Consolidated Net Income during such period, in each case calculated in accordance with GAAP. For avoidance of doubt, as used in this definition, "Subsidiaries" include any Person that becomes an Obligor through an Acquisition permitted hereunder.

*"Consolidated EBITDA"* means, with respect to any period, the sum of (without duplication) (a) Consolidated Net Income for such period (excluding extraordinary or non-operating gains and losses); (b) Consolidated Interest Expense during such period; (c) federal and state income taxes reported by Parent and its Subsidiaries during such period which are included in the determination of Consolidated Net Income; and (d) Parent's and the Subsidiaries' Consolidated depreciation and amortization during such period, in each case calculated in accordance with GAAP.

*"Consolidated Interest Expense"* means, with respect to any period, the current interest due during such period on the aggregate amount of Parent's and its Subsidiaries' Consolidated Debt, including the interest portion of Parent's and its Subsidiaries' Consolidated Capital Lease Obligations.

*"Consolidated Net Income"* means, with respect to any period, the Consolidated net income of Parent and its Subsidiaries after all federal, state and local income taxes reflected on the Issuers' Consolidated Financial Statement for such period, calculated in accordance with GAAP.

*"Controlled Entity"* means (a) any of the Subsidiaries of any Issuer and any of their or any Issuer's respective controlled Affiliates and (ii) if an Issuer has a parent company, such parent company and its controlled Affiliates.

*"Corbel"* is defined in the Preamble.

*"Corbel Capital Amount"* has the meaning given to such term in the Parent LLC Agreement.

*"Corbel Monitoring Agreement"* means the Monitoring and Services Agreement, dated the Closing Date between Corbel and the Issuers, as in effect on the date hereof.

*"Corbel Monitoring Fees"* means obligations owed to Corbel under the Corbel Monitoring Agreement.

"*Current Assets*" means, as of any date of determination, the total assets of Parent and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and cash equivalents.

"*Current Liabilities*" means, as of any date of determination, the total liabilities of Parent and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long-term debt.

"*Debt*" means, as of the date of determination, the sum, but without duplication, of any and all of a Person's: (a) indebtedness heretofore or hereafter created, issued, incurred or assumed by such Person (directly or indirectly) for or in respect of money borrowed; (b) Attributable Indebtedness; (c) obligations evidenced by bonds, debentures, notes, or other similar instruments; (d) obligations for the deferred purchase price of property or services (other than trade payables which are not more than ninety (90) days past due incurred in the ordinary course of business); (e) current liabilities in respect of unfunded vested benefits under any Plan; (f) contingent obligations under letters of credit; (g) obligations under acceptance facilities; (h) Guarantees; (i) obligations secured by any Lien on any Asset of such Person, whether or not such obligations have been assumed; (j) the net obligations under swaps and like instruments (the net obligation shall be deemed to be the swap termination value of such swaps); (k) [Intentionally Omitted]; and (l) obligations to purchase, redeem, retire, defease or otherwise make any payment in respect of any Ownership Interests in such Person or any other Person, or any warrant, right or option to acquire such Ownership Interests, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends.

"*Debt Service*" means, as of the date of determination, Consolidated Interest Expense due in cash by Parent and its Subsidiaries for the rolling four (4) Fiscal Quarter period ended on the date of determination (including without limitation payments of Consolidated Interest Expense in respect of any Subordinate Debt).

"*Declined Proceeds*" has the meaning set forth in <u>Section 1.8(d)(vi)</u>.

"*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"*Default Deferral Fee*" means a fee equal to one and one-half percent (1.50%) of the outstanding principal amount of the Notes held by each Purchaser.

"*Disposition*" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Ownership Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Distributions*" means dividends or distributions (including on equity of earnings or net cash flow) made by a Person to its Owners; provided that, for the avoidance of doubt, (a) any dividends, accruals or payments or return of capital on Ownership Interests shall constitute Distributions hereunder and (b) any fees payable pursuant to the Fee Letter shall not constitute Distributions hereunder.

"*Dollars*" or "*$*" means lawful currency of the United States of America.

Annex 1-5

*"Domestic Subsidiary"* means any direct or indirect Subsidiary of Parent organized under the laws of any state of the United States or the District of Columbia.

*"Environmental Laws"* has the meaning set forth in <u>Section 4.18</u>.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor statute, and any and all regulations thereunder.

*"ERISA Event"* means (a) a Reportable Event with respect to a Plan or Multiemployer Plan, (b) the withdrawal of a member of the ERISA Group from a Plan during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA), (c) the providing of notice of intent to terminate a Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan, (e) any event or condition (i) that provides a basis under Section 4042(a)(1), (2), or (3) of ERISA for the termination of or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (ii) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA, (f) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA of a member of the ERISA Group from a Multiemployer Plan, or (g) providing any security to any Plan under Section 401(a)(29) of the Internal Revenue Code by a member of the ERISA Group.

*"ERISA Group"* means the Issuers and all members of a controlled group of corporations and all trades or business (whether or not incorporated) under common control which, together with the Issuers are treated as a single employer under Section 414 of the Internal Revenue Code.

*"Escrow Holdback"* means $5,000,000 of the proceeds of the Notes that will be retained by the Agent on the Closing Date until the date on which the Company establishes the Agent Escrow Account in accordance with the terms hereof.

*"Event of Default"* has the meaning set forth in <u>Section 7.1</u>.

*"Excess Cash Flow"* means, for any Fiscal Quarter of Parent and its Subsidiaries, the positive difference (if any) of (a) the sum of (without duplication) (i) Consolidated EBITDA for such Fiscal Quarter, (ii) non-cash expenses, charges or losses reducing Consolidated Net Income during such period, and in each case calculated in accordance with GAAP and (iii) decreases in Working Capital for such Fiscal Quarter, <u>minus</u> (without duplication, and in each case calculated in accordance with GAAP) (b) the sum (for such Fiscal Quarter and solely to the extent included in the determination of (a) for such period and without duplication) of (i) Consolidated Interest Expense paid in cash by Parent and its Subsidiaries, (ii) federal and state income taxes paid by Parent and its Subsidiaries during such period which are included in the determination of Consolidated Net Income and, without duplication, any Tax Distributions made during such period, (iii) Capital Expenditures actually made by Parent and its Subsidiaries to the extent made from operating cash flow and not financed by the proceeds of any equity or debt financing and (iv) Corbel Monitoring Fees paid by Parent and its Subsidiaries in cash during such period, <u>minus</u> (for such Fiscal Quarter and without duplication and calculated in accordance with GAAP) (c) costs, expenses and consideration paid in cash by Parent and its Subsidiaries during the applicable Fiscal Quarter in connection with an Acquisition permitted hereunder to the extent not financed with debt or equity proceeds, <u>minus</u> (for such Fiscal Quarter and without duplication and calculated in accordance with GAAP) (d) extraordinary or non-operating losses paid in cash by Parent and its Subsidiaries during such period, <u>plus</u> (for such Fiscal Quarter and without duplication and calculated in accordance with GAAP) (e) extraordinary or non-operating gains paid in cash by Parent and its Subsidiaries during such period, and <u>minus</u> (f) increases to Working Capital for such Fiscal Quarter.

*"Excluded Accounts"* means (a) any payroll account and any other accounts used solely for payment of bonuses, other compensation or employee benefits and related expenses, (b) segregated withholding tax and fiduciary accounts, and (c) escrow accounts (other than the Agent Escrow Account) used in respect of Acquisitions or asset dispositions permitted hereunder.

*"Excluded Assets"* means, collectively, (a) any permit, license, contract or any other agreement of any Note Party (i) that prohibits, or requires the consent of any Person which has not been obtained as a condition to the creation by such Note Party of, a Lien on any right, title or interest in such permit, license, contract or other agreement or (ii) to the extent that applicable law prohibits the creation of a Lien thereon, but only, with respect to the prohibition in the foregoing clauses (a)(i) and (a)(ii), to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other applicable law, (b) property owned by any Note Party that is subject to a purchase money Lien or a Capital Lease permitted under this Agreement if the agreement pursuant to which such Lien is granted (or in the document providing for such Capital Lease) prohibits, or requires the consent of any Person which has not been obtained as a condition to the creation of, any other Lien on such property, (c) any foreign intellectual property and any "intent-to-use" trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, (d) any property or asset the grant or perfection of a security interest in which would require Governmental Authority consent, approval, license or authorization which has not been obtained (in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), and (e) Excluded Accounts; provided, however, that "Excluded Assets" shall not include any proceeds, products, substitutions or replacements of Excluded Assets (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets).

*"Excluded Taxes"* means (a) any tax imposed on the net income or net profits of the Agent or a Purchaser or a Transferee, including any federal, state or local income taxes, franchise taxes, branch profits taxes or similar taxes, (b) United States federal withholding taxes resulting from the Agent's or a Purchaser's or a Transferee's failure to claim an exemption or reduction therefrom to which the Agent or such Purchaser or such Transferee is entitled, (c) any United States federal withholding taxes that would be imposed on amounts payable to a Transferee based upon the applicable withholding rate in effect at the time such a Transferee becomes a party to this Agreement (or designates a new lending office), and (d) any United States federal withholding taxes imposed under FATCA.

*"Expenses"* means (a) all expenses of the Agent and Corbel, in its capacity as a Purchaser, paid or incurred in connection with their due diligence and investigation of Note Parties, including travel, appraisal, filing, recording, documentation, publication and search fees and other such expenses, and all reasonable and documented attorneys' fees and expenses (including attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) incurred in connection with the structuring, negotiation, drafting, preparation, execution, delivery and administration of this Agreement, the other Note Documents, and any and all other documents, instruments and agreements entered into in connection herewith; (b) all expenses of the Agent and Corbel, in its capacity as a Purchaser, including reasonable and documented attorneys' fees and expenses (including attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) paid or incurred in connection with the negotiation, preparation, execution and delivery of any waiver, forbearance, consent, amendment or addition to this Agreement or any other Note Document, or the termination hereof and thereof; (c) all costs or expenses paid or advanced by the Agent or any Purchaser which are required to be paid by the Note Parties under this Agreement or the other Note Documents, including Taxes and insurance premiums of every nature and kind of the Agent and the Purchasers; (d) all reasonable and documented expenses incurred by any Purchasers' Observer in connection with its attendance at any meeting of the board of directors, board of managers or similar

governing bodies of the Note Parties (or any committee or sub-committee thereof) in accordance with Section 5.10 hereof; and (e) if an Event of Default occurs or any revival of the Obligations occurs after payment therefor or in connection with any Voidable Transfer, all expenses paid or incurred by the Agent and the Purchasers, including attorneys' fees and expenses (including attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code), costs of collection, suit, arbitration, judicial reference and other enforcement proceedings, and any other out-of-pocket expenses incurred in connection therewith or resulting therefrom, whether or not suit is brought, or in connection with any refinancing or restructuring of the Obligations and the liabilities of the Issuers under this Agreement, any of the other Note Documents, or any other document, instrument or agreement entered into in connection herewith in the nature of a workout.

*"Extraordinary Receipt"* means any cash received by or paid to or for the account of any Person in the form of (a) proceeds of insurance (including the proceeds of any Key Man Insurance Policy, but excluding (x) proceeds of cyber insurance to the extent such proceeds constitute compensation for lost earnings or (y) proceeds other business interruption insurance) and condemnation awards (and payments in lieu thereof) or (b) proceeds received from a Governmental Authority in the form of a grant, subsidy or similar non-recourse capital.

*"Facility"* means that certain pharmaceutical company/manufacturing facility located in Guayama, Puerto Rico.

*"FATCA"* means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

*"Fee Letter"* means the Fee Letter, dated as of the Closing Date, between the Company and the Agent.

*"Filing Date"* means the date on which Parent files tax returns, subject to any filing deadline extensions granted by relevant taxing authorities.

*"Financial Statement(s)"* means, with respect to any accounting period of any Person, statements of income and statements of cash flows of such Person for such period, and balance sheets of such Person as of the end of such period, setting forth in each case in comparative form figures for the corresponding period in the preceding Fiscal Year or, if such period is a full Fiscal Year, corresponding figures from the preceding Fiscal Year's annual Financial Statements, all prepared in reasonable detail and in accordance with GAAP, subject to year-end adjustments and the absence of footnotes in the case of monthly and quarterly Financial Statements. Financial Statement(s) shall include the schedules thereto and annual Financial Statements shall also include the footnotes thereto.

*"Fiscal Month"* means any of the monthly accounting periods of Parent.

*"Fiscal Quarter"* means any of the quarterly accounting periods of Parent.

*"Fiscal Year"* means the 12-Fiscal Month period of Parent ending December 31 of each year. Subsequent changes of the Fiscal Year of Parent shall not change the term "Fiscal Year" unless the Agent shall consent in writing to such change.

*"Fixed Charge Coverage Ratio"* means the ratio that is calculated by dividing (a) (i) Issuers' Operating Cash Flow plus (ii) Issuers' Qualified Technology Transfers by (b) Issuers' Fixed Charges, all determined in accordance with GAAP.

"*Fixed Charges*" means the sum of (a) interest paid (including interest paid in respect of the Corbel Capital Amount), (b) current maturities of capital lease payments paid, (c) current maturities of long term debt paid, and (d) repayment of short term debt for borrowed money.

"*Flow of Funds Agreement*" means that certain Flow of Funds Agreement, dated as of the Closing Date, among the Agent and the Note Parties.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied, which are in effect as of the date of this Agreement. If any changes in accounting principles from those in effect on the date hereof are hereafter occasioned by promulgation of rules, regulations, pronouncements or opinions by or are otherwise required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or successors thereto or agencies with similar functions), and any of such changes results in a change in the method of calculation of, or affects the results of such calculation of, any of the financial covenants, standards or terms found herein, then the parties hereto agree to enter into and diligently pursue negotiations in order to amend such financial covenants, standards or terms so as to equitably reflect such changes, with the desired result that the criteria for evaluating financial condition and results of operations of Parent and the Subsidiaries shall be the same after such changes as if such changes had not been made; provided, however that, notwithstanding anything to the contrary herein, if a change in GAAP requires obligations under operating leases to be treated as Capital Lease Obligations or operating leases to be treated as Capital Leases, then for purposes of this Agreement, such obligations shall not constitute Capital Lease Obligations hereunder and such operating leases shall not constitute Capital Leases hereunder.

"*Governing Documents*" means the certificate or articles or certificate of incorporation, formation or organization, by-laws, limited liability company agreement, operating agreement, limited partnership agreements or other similar organizational or governing documents of any Person.

"*Governmental Authority*" means any federal, state, local or other governmental department, commission, board, bureau, agency, central bank, court, tribunal or other instrumentality or authority or subdivision thereof, domestic or foreign, exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"*Governmental Official*" means any governmental official or employee, employee of any government-owned or government-controlled entity, political party, any official of a political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity.

"*Guarantee*" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Debt or other obligation of any other Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related

primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

*"Guarantor(s)"* means, individually or collectively as the context requires, Parent, all Domestic Subsidiaries, and every other Person who now or hereafter executes the Guaranty Agreement in favor of the Agent and the Purchasers with respect to the Obligations.

*"Guaranty Agreement"* means, individually or collectively as the context requires, that certain Continuing Guaranty Agreement executed by each Guarantor in favor of the Agent and the Purchasers.

*"Hazardous Materials"* means all or any of the following: (a) substances that are defined or listed in, or otherwise classified pursuant to, any Environmental Laws as hazardous substances, hazardous materials, hazardous wastes, toxic substances, or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or EP toxicity or are otherwise regulated for the protection of persons, property or the environment; (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; and (d) asbestos in any form or electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million.

*"Indemnified Person(s)"* has the meaning set forth in <u>Section 9.3(c)</u>.

*"Insolvency Proceeding"* means any proceeding commenced by or against any Person, under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including, but not limited to, assignments for the benefit of creditors, formal or informal moratoriums, compositions, or extensions with some or all creditors.

*"Intellectual Property"* means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

*"Intellectual Property Security Agreement"* means each certain Copyright Security Agreement, Patent Security Agreement, and Trademark Security Agreement (as each of such terms are defined in the Security Agreement).

*"Intercompany Subordination Agreement"* means that certain Intercompany Subordination Agreement, dated as of even date herewith, among Note Parties and the Agent.

"*Interest Holdback*" has the meaning set forth in <u>Section 1.4(d)</u>.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute, and any and all regulations thereunder.

"*Investment*" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, Guarantees, advances, capital contributions, and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. Investments shall include acquisitions of the equity of a business and the acquisition of all or substantially all of the Assets of a business and shall also include the acquisition of cryptocurrency.

"*Issuer*" is defined in the Preamble.

"*Key Man Insurance Policy*" shall have the meaning specified in <u>Section 5.5(b)</u>.

"*Key Man Insurance Assignment*" means the Key Man Insurance Assignment in form and substance reasonably acceptable to the Agent executed and delivered by the Issuers to the Agent for the benefit of the Agent and the Purchasers.

"*Lien*" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement or other preferential arrangement, charge or encumbrance (including, any conditional sale or other title retention agreement, or finance lease) of any kind.

"*Liquidity*" means, as of any date, (x) the aggregate amount of Unrestricted Cash of the Issuers as of such date <u>minus</u> (y) the aggregate amount of accounts payable of the Issuers and their Subsidiaries which are thirty (30) or more days overdue (other than any such amounts (a) which are subject to a good faith dispute and (b) for which adequate reserves have been made to the extent required under GAAP).

"*Material Adverse Effect*" means a material adverse effect on (i) the business, Assets, financial condition or results of operations of the Note Parties and their Subsidiaries, taken as a whole; (ii) the ability of any Note Party to perform its material obligations under the Note Documents to which it is a party, (iii) the validity or enforceability of the Note Documents, or the rights or remedies of the Agent and the Purchasers hereunder and thereunder, (iv) the value of the Collateral, or (v) the perfection or priority of the Agent's Liens with respect to the Collateral.

"*Material Contract*" means any contract or agreement to which any Issuer or any of its Subsidiaries is a party (other than the Note Documents) for which breach, nonperformance, cancellation, or termination would reasonably be expected to result in a Material Adverse Effect on the Note Parties taken as a whole.

"*Material Event*" means the occurrence of one or more of the following events: (i) the retroactive assessment of any property taxes by the Municipal Revenue Collection Center (CRIM, in Spanish), (ii) the issuance of any judgment or order of embargo issued by a Court of Law in Colombia, which may directly and/or indirectly affect any assets of the Note Parties, (iii) the inability to obtain any permit required for the Restart Plan or the continued operation of the Facility, (iv) the issuance of any judgment or order of embargo issued by the Courts of the Commonwealth of Puerto Rico and/or the Federal District Court for Puerto Rico, which may directly and/or indirectly affect the assets of the Note Parties and (v) any administrative order or judgement issued by either an administrative agency of the Commonwealth of Puerto Rico a Federal agency, which may impair the Restart Plan or the continued use of the Facility.

"*Maturity Date*" means November 16, 2026; provided that such date may be extended to November 16, 2027 and again to November 16, 2028, in each case, upon mutual agreement among the parties hereto, and "*Maturity Date*" shall, in the event of any such extension, refer to such extended date.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA or Section 3(37) of ERISA to which any member of the ERISA Group has contributed, or was obligated to contribute, within the preceding six (6) plan years (while a member of such ERISA Group) including for these purposes any Person which ceased to be a member of the ERISA Group during such six (6) year period.

"*Net Leverage Ratio*" means for the Relevant Covenant Period the ratio of: (a) (i) Debt of the Note Parties as of the last day of such Relevant Covenant Period plus (ii) the Corbel Capital Amount minus (iii) Unrestricted Cash included in the Consolidated balance sheet of Parent and its Subsidiaries as of the last day of such Relevant Covenant Period; to (b) Consolidated Adjusted EBITDA, all as determined in accordance with GAAP.

"*Net Proceeds*" means (a) with respect to any Disposition by any Note Party or any of its Subsidiaries or any Extraordinary Receipt received or paid to the account of any Note Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such Disposition (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) or such Extraordinary Receipt, over (ii) the sum of (A) the principal amount of any Debt that is secured by a Lien permitted hereunder on the applicable asset which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) with such proceeds (other than Debt under the Note Documents), and (B) the reasonable and customary out-of-pocket fees and expenses incurred by such Note Party or such Subsidiary in connection with such event or transaction (including, without limitation, appraisals, and brokerage, investment banking, accounting, legal, title and recording or transfer Tax, fees and expenses, other Taxes paid or to be paid in cash in connection with the consummation of such transaction, and commissions) paid or to be paid by any Note Party to third parties (other than Affiliates); or (b) with respect to the sale or issuance of any Ownership Interests by any Note Party or any of its Subsidiaries, or the incurrence or issuance of any Debt by any Note Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary fees and expenses (including legal and accounting fees and Taxes paid or to be paid), incurred by such Note Party or such Subsidiary in connection therewith.

"*Net Worth*" means the net worth as shown on Issuers' financial statements and in accordance with GAAP.

"*Note Document(s)*" means this Agreement and each of the following documents, instruments, and agreements individually or collectively, as the context requires:

(a)     the Flow of Funds Agreement;

(b)     the Notes;

(c)     the Security Agreement;

(d)     any Intellectual Property Security Agreement;

(e)     the Guaranty Agreement;

(f)     the Fee Letter;

(g)     Key Man Insurance Assignment;

(h)     the Intercompany Subordination Agreement;

(i)     the Corbel Monitoring Agreement;

(j)     the Board Management Agreement;

(k)     the Omnibus Amendment; and

(l)     such other documents, instruments, and agreements (including intellectual property security agreements, control agreements, financing statements, intercreditor agreements and fixture filings) as the Agent may reasonably request in connection with the transactions contemplated hereunder or to perfect or protect the liens and security interests granted to Agent in connection herewith.

*"Note Parties"* means collectively, the Issuers and Guarantors (each a *"Note Party"*).

*"Notes"* has the meaning set forth in <u>Section 1.1(a)</u>.

*"Obligations"* means (a) any and all obligations of the Note Parties (or any of them) to the Agent and the Purchasers with respect to the Notes, including without limitation all principal, interest, any applicable premium and other amounts, costs and Fees and Expenses payable under this Agreement and the Note Documents; and (b) all other indebtedness, liabilities, and obligations of the Issuers owing to the Agent and/or the Purchasers in connection with the Note Documents, and to their successors and assigns, previously, now, or hereafter incurred, and howsoever evidenced, whether direct or indirect, absolute or contingent, joint or several, liquidated or unliquidated, voluntary or involuntary, due or not due, legal or equitable, whether incurred before, during, or after any Insolvency Proceeding and whether recovery thereof is or becomes barred by a statute of limitations or is or becomes otherwise unenforceable or unallowable as claims in any Insolvency Proceeding, together with all interest thereupon (including interest under <u>Section 1.4(b)</u> and including any interest that, but for the provisions of the Bankruptcy Code, would have accrued during the pendency of an Insolvency Proceeding).  The Obligations shall include, without limiting the generality of the foregoing, all principal and interest and other payment obligations owing under the Notes, all Expenses, the Fees, any other fees and expenses due hereunder and under the Note Documents (including any fees or expenses that, but for the provisions of the Bankruptcy Code, would have accrued during the pendency of an Insolvency Proceeding), and all other indebtedness evidenced by this Agreement and the Note Documents.

*"OFAC"* means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

*"OFAC Sanctions Program"* means any economic or trade sanction that OFAC is responsible for administering and enforcing.  A list of OFAC Sanctions Programs may be found at <u>http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx</u>.

*"Omnibus Amendment"* means an omnibus amendment to the Subordinated Debentures, in form and substance satisfactory to the Agent.

Annex 1-13

*"Operating Cash Flow"* means Consolidated Adjusted EBITDA minus (a) Distributions, (b) cash used for Capital Expenditures, (c) Corbel Monitoring Fees paid, (d) Excess Cash Flow paid in accordance with Section 1.8(d)(ii), (e) any increase in Working Capital and (f) the greater of (i) Taxes paid or (ii) the prevailing corporate federal and state tax rates multiplied by pre-tax net income.

*"Owner"* means, with respect to any Person, any other Person owning, directly or indirectly, Ownership Interests of such Person.

*"Ownership Interests"* means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

*"Parent"* is defined in the Preamble.

*"Parent LLC Agreement"* means the Limited Liability Company Agreement of Parent, dated as of the Closing Date.

*"Participant"* has the meaning set forth in Section 9.5(d).

*"Patriot Act"* means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the rules and regulations promulgated thereunder from time to time in effect.

*"Payment Date"* the last day of each Fiscal Month of each Fiscal Year.

*"PBGC"* means the Pension Benefit Guaranty Corporation.

*"Permitted Debt"* means:

(a)     Debt owing to the Agent and the Purchasers in accordance with the terms of the Note Documents;

(b)     unsecured Debt to trade creditors incurred in the ordinary course of business;

(c)     [Intentionally Omitted];

(d)     Debt arising from the honoring of a check, draft or similar instrument against insufficient funds or from the endorsement of instruments for collection in the ordinary course of business or in respect of netting services, overdraft protection, and other like services;

(e)     Debt with respect to surety, appeal, indemnity, performance or other similar bonds in the ordinary course of business;

(f)     unsecured Subordinate Debt; provided that (i) no Default or Event of Default has occurred and is continuing at the time of the incurrence of such Debt or would exist immediately after giving effect thereto, (ii) such Debt shall be subject to a Subordination Agreement, (iii) the terms of such Debt do not provide for any cash interest payment or any scheduled repayment, mandatory redemption or similar principal payment or any final maturity, in each case prior to the date that is six (6) months after the Maturity Date, (iv) the covenants and events of default applicable thereto shall not (A) when taken as a whole, be more restrictive in any material respect than those set forth in this Agreement and (B) contain

Annex 1-14

any financial covenant or cross default (although cross acceleration provisions may be included), (v) such Debt shall not be recourse to, or guaranteed by, any Person that is not a Note Party and (vi) prior to the incurrence of such Debt, the Issuers shall have delivered to the Agent a certificate from an Authorized Officer certifying as to compliance with the foregoing;

(g) Debt consisting of obligations under swaps, hedges and like instruments so long as such obligations are (i) non-speculative in nature and (ii) is for the purpose of hedging an Issuer's reasonably estimated interest rate, currency or commodity price exposure;

(h) Debt by and among Note Parties, subject to the Intercompany Subordination Agreement;

(i) Debt secured by Liens permitted by clause (e) of the definition of Permitted Liens so long as the aggregate outstanding principal amount of such Debt for all Note Parties does not exceed $50,000 at any time;

(j) Debt owed to any Person providing insurance, so long as the amount of such Debt is not in excess of the amount of the unpaid cost such insurance;

(k) Permitted Mortgage Debt;

(l) Debt outstanding on corporate credit cards of one or more of the Note Parties in the ordinary course of business in an aggregate principal amount not to exceed $100,000 at any time;

(m) customary reimbursement or indemnification obligations owed to any Person providing worker's compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Note Party or any Subsidiary incurred in connection with such Person providing such benefits or insurance;

(n) customary indemnification obligations in connection with Dispositions permitted under this Agreement, which liability shall not exceed the amount of consideration received for such Disposition;

(o) Debt existing as of the Closing Date which is identified in **Schedule 6.2** and any refinancing, refunding, renewal, extension or replacement thereof so long as the principal amount thereof (including any unused commitments thereunder) is not increased at the time of such refinancing, refunding, renewal, extension or replacement, except by an amount equal to any original issue discount thereon and the amount of unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such refinancing, refunding, renewal, extension or replacement, and by an amount equal to any existing commitments thereunder that have not been utilized at the time of such refinancing, refunding, renewal, extension or replacement;

(p) [Intentionally Omitted]; and

(q) guarantees and other contingent obligations of each of the foregoing to the extent either the underlying Debt is otherwise permitted as Permitted Debt or if such guarantees are made to suppliers, licensees or customers in the ordinary course of business consistent with past practice.

*"Permitted Dispositions"* means:

(a) Dispositions in the ordinary course of business of equipment that is worn, damaged, or obsolete or no longer useful;

(b) sales of inventory to buyers in the ordinary course of business;

(c) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business;

(d) Dispositions of Assets by (i) any Subsidiary of an Issuer to an Issuer, (ii) any Note Party to any other Note Party, and (iii) any Subsidiary of any Note Party to such Note Party;

(e) Dispositions of cash and cash equivalents and Investments in the ordinary course of business;

(f) Dispositions of equipment or other property (i) to the extent that such property is exchanged for credit against the purchase or similar replacement property or the proceeds of such disposition are reasonably promptly applied to the purchase price of replacement property or (ii) subject to casualty loss upon receipt of the proceeds of such casualty loss;

(g) Dispositions of Intellectual Property no longer material to the business of the Note Parties;

(h) (i) the discounting, without recourse, of delinquent Accounts in the ordinary course of business in connection with the compromise or collection thereof and (ii) Dispositions of accounts receivable in connection with supply chain finance programs in existence on the Closing Date and any replacement of such program; provided that in the case of the foregoing clause (ii), any such Disposition must be made without recourse for credit risk to the Note Parties and otherwise on terms customary for supply chain finance arrangements;

(i) Dispositions otherwise permitted by Section 6.4, 6.8 or 6.10;

(j) the leasing or subleasing, as lessor or sublessor, of real or personal property to others in the ordinary course of business not detracting from the value of such real or personal property or interfering in any material respect with the business of any Note Party or any of its Subsidiaries;

(k) other Dispositions in an aggregate amount for all Note Parties not in excess of $100,000 per Fiscal Year; and

(l) subject to the terms and conditions therefor contained in the Governing Documents of Parent, the issuance of common equity of Parent to the extent not constituting a Change of Control.

*"Permitted Investments"* means:

(a) Marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, commercial paper maturing no more than one year from the date of creation thereof and having a rating of at Least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, Inc., certificates of deposit maturing no more than one from the date of investment therein, money market accounts or Investments in similarly non-speculative assets;

(b)　　　Investments of any Subsidiary existing at the time it becomes a Subsidiary as long as such Investments were not made in anticipation of such Person becoming a Subsidiary of an Issuer;

(c)　　　Investments constituting Permitted Debt;

(d)　　　Investments (i) received in satisfaction or partial satisfaction thereof from financially troubled account debtors or in satisfaction of judgments, (ii) constituting deposits, prepayments and other credits to suppliers made in the ordinary course of business; (iii) constituting extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, (iv) in the ordinary course of business consisting of endorsements for collection or deposit and (v) consisting of workers compensation, utility, lease and similar deposits made in the ordinary course of business;

(e)　　　Loans and advances to directors, officers and employees made in the ordinary course of business for bona fide business purposes in an aggregate principal amount not to exceed $10,000 at any time outstanding;

(f)　　　Investments constituting hedges or swaps otherwise permitted as Permitted Debt;

(g)　　　Equity Investments of the Note Parties in their Subsidiaries and, subject to the Intercompany Subordination Agreement, intercompany Debt among Note Parties; provided that if any Subsidiary that is not a Note Party executes and delivers to any Note Party a note (collectively, the "*Intercompany Notes*") to evidence any Investments described in this clause (g), such Intercompany Notes shall be pledged and, if in a principal amount in excess of $50,000, at the request of the Agent, delivered to the Agent as additional collateral security for the Obligations;

(h)　　　[Intentionally Omitted];

(i)　　　Investments existing on the Closing Date and identified in **Schedule 6.8**, including any increase in the amount thereof as a result of appreciation in values; and

(j)　　　other Investments in an amount outstanding at any one time not in excess of $100,000.

"*Permitted Liens*" means:

(a)　　　Liens for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty, or are being contested in good faith by appropriate proceedings; provided that, if delinquent, adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest or nonpayment, the Agent has reasonably determined that there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens with respect to the Collateral;

(b)　　　Liens in favor of the Agent and the Purchasers;

(c)　　　statutory Liens, such as inchoate mechanics', inchoate materialmen's, landlord's, warehousemen's, and carriers' liens, and other similar liens, other than those described in clause (a) above, arising in the ordinary course of business with respect to obligations which are not delinquent or are being contested in good faith by appropriate proceedings; provided that, if delinquent, adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest or nonpayment, the

Agent has reasonably determined that there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens with respect to the Collateral;

(d)        judgment Liens that do not constitute an Event of Default under <u>Section 7.1(j)</u>;

(e)        Liens (i) upon or in any fixed or capital asset (including equipment) or inventory or raw materials acquired or held by any Note Party or any Subsidiary thereof to secure the purchase price thereof or Debt incurred solely for the purpose of financing the acquisition thereof, (ii) existing on any fixed or capital asset (including equipment) or inventory of any Note Party or any Subsidiary at the time of its acquisition that is limited solely to the property so acquired and improvements thereon, and the proceeds thereof and (iii) rights of a lessor under a Capital Lease;

(f)        pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(g)        deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)        attachment, judgment or other similar Liens arising in connection with litigation or other legal proceedings (and not otherwise constituting an Event of Default hereunder) in the ordinary course of business that is currently being contested in good faith by appropriate proceedings, adequate reserves have been set aside therefor, and no material property is subject to a material risk of loss or forfeiture;

(i)        Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

(j)        (i) purported Liens evidenced by the filing of UCC precautionary financing statements relating to operating leases and (ii) Liens in respect of transactions of the type contemplated by clause (h) in the definition of Permitted Dispositions;

(k)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with ordinary course importation of goods;

(l)        (i) non-exclusive licenses of Intellectual Property granted by any Note Party or its Subsidiaries in the ordinary course of business and (ii) Liens arising under leases and subleases granted to others and, in any case, that do not materially interfere in any material respect with the ordinary conduct of the business of the Note Parties or their Subsidiaries;

(m)        Liens granted in the ordinary course of business securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Debt;

(n)        [Intentionally Omitted];

(o)        easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

EAST\185762164.11

(p)     Liens existing as of the Closing Date and disclosed in **Schedule 6.3** securing Permitted Debt on **Schedule 6.2**; provided that no such Lien shall encumber any additional property and the principal amount of Debt secured by such Lien shall not be increased or its term extended from that existing on the Closing Date except to the extent permitted by the definition of Permitted Debt;

(q)     [Intentionally Omitted]; and

(r)     Liens not otherwise permitted hereunder on the property or assets of Note Parties and their Subsidiaries securing Permitted Debt in an aggregate outstanding amount not to exceed $50,000 at any time.

*"Permitted Mortgage Debt"* means Debt which (i) is recourse only to a Subsidiary of the Company, the sole assets of which are fee simple interests in real property upon which one or more stores operated by the Company and its Subsidiaries are located (ii) matures not less than six (6) months after the Maturity Date and (iii) was incurred to fund all or a portion of the purchase price of such real property.

*"Permitted Restricted Payments"* means:

(a)     Distributions payable solely in Ownership Interests of a Note Party (other than of any Pledged Note Party);

(b)     regularly scheduled payments on the Subordinate Debt solely to the extent permitted by the relevant Subordination Agreement;

(c)     any dividend or other distribution from a Subsidiary to (i) an Issuer or a Guarantor (other than Parent) and (ii) the Parent the proceeds of which are used by the Parent to make other Permitted Restricted Payments;

(d)     Corbel Monitoring Fees; and

(e)     Tax Distributions.

*"Person"* means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

*"PIK Optionality Interest"* has the meaning set forth in <u>Section 1.4(a)(ii)</u>.

*"Plan"* means an employee benefit plan as defined in Section 3(3) of ERISA in which any personnel of any member of the ERISA Group participate or from which any such personnel may derive a benefit or with respect to which any member of the ERISA Group may incur liability, excluding any Multiemployer Plan, but including any plan either established or maintained by any member of the ERISA Group or to which such Person contributes under the laws of any foreign country.

*"Pledged Note Party"* means the Issuers (other than Parent) and any other Note Party the Ownership Interests of which has been pledged to the Agent to secure the Obligations pursuant to the terms and conditions hereof or any Note Document.

*"Pro Forma Basis"* means, for purposes of paying Board Fees, Board Expenses, any other amounts owing to any director or manager of Parent or the Company as permitted by Section 6.18, and any other Board Fees, the calculation of the Fixed Charge Coverage Ratio requirement in Section 6.18 shall be calculated on a pro forma basis after giving effect to such Board Fees, Board Expenses or other amounts owing to any director or manager of Parent or the Company and any other Board Fees, as if any of the foregoing had been paid on the first day of the four (4) consecutive Fiscal Quarter period most recently ended for which the Financial Statements are available, determined by the Issuers in good faith.

*"Property"* means the Facility and the four parcels of land adjacent thereto, which in each case will be transferred by Bioapi to the Company on or prior to the Closing Date, pursuant to the terms and conditions of the Property Transfer Documents.

*"Property Transfer Documents"* means (i) that certain Deed of Exchange executed by and between Bioapi and the Company on the date hereof, (ii) that certain Exchange Agreement executed by and between Bioapi and the Company on the date hereof and (iii) that certain Bill of Sale and Assignment executed by and between Bioapi and the Company on the date hereof.

*"Qualified Technology Transfers"* means expenditures for active pharmaceutical ingredient intellectual property and related technology transfers, in each case, as approved by the board of directors or equivalent governing body of each Note Party and the Agent.

*"Quarterly Compliance Certificate"* has the meaning set forth in Section 1.8(d)(ii).

*"Regulation D"* means Regulation D of the Board of Governors of the Federal Reserve System, as such regulation may be amended or supplemented from time to time.

*"Related Parties"* means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

*"Relevant Covenant Period"* means the rolling twelve Fiscal Month period ending as of the end of the applicable Fiscal Month.

*"Reportable Event"* means any of the events described in Section 4043(c) of ERISA other than a Reportable Event as to which the provision of thirty (30) days' notice to the PBGC is waived under applicable regulations.

*"Required Purchasers"* means, at any time, Purchasers holding in the aggregate not less than a majority of the aggregate unpaid principal amount of the Notes.

*"Restart Plan"* means the operational budget with respect to the Facility attached hereto as **Schedule 1A**.

*"Restricted Payment"* means (a) any payment of principal, interest or fees, or any purchase, redemption, retirement, acquisition or defeasance with respect to, any Subordinate Debt, (b) any Distribution on account of any Ownership Interests of any Note Party, now or hereafter outstanding, (c) any purchase, redemption, retirement, sinking fund, or other direct or indirect acquisition for value of any Ownership Interests of any Note Party now or hereafter outstanding, (d) any distribution of Assets to any Owners of any Note Party, whether in cash, Assets, or in obligations of such Note Party, (e) any allocation or other set apart of any sum for the payment of any Distribution on, or for the purchase, redemption or

retirement of, any Ownership Interests of any Note Party, or (f) any other distribution by reduction of capital or otherwise in respect of any Ownership Interests of any Note Party.

"*Security Agreement*" means that certain Security Agreement, dated as of even date herewith, among Note Parties and the Agent.

"*Solvent*" means, with respect to any Person on the date any determination thereof is to be made, that on such date: (a) the present fair valuation of the Assets of such Person is greater than such Person's probable liability in respect of existing debts; (b) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature; and (c) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, which would leave such Person with Assets remaining which would constitute unreasonably small capital after giving effect to the nature of the particular business or transaction. For purposes of this definition (i) the fair valuation of any property or assets means the amount realizable within a reasonable time, either through collection or sale of such Assets at their regular market value, which is the amount obtainable by a capable and diligent Person from an interested buyer willing to purchase such property or assets within a reasonable time under ordinary circumstances; (ii) the term debts includes any payment obligation, whether or not reduced to judgment, equitable or legal, matured or unmatured, liquidated or unliquidated, disputed or undisputed, secured or unsecured, absolute, fixed or contingent; and (iii) all rights of contribution and indemnification among Note Parties shall be considered in respect of any representation made by any other Note Party regarding solvency.

"*State Sanctions List*" means a list that is adopted by any state Governmental Authority within the United States of America pertaining to Persons that engage in investment or other commercial activities in Iran or any other country that is a target of economic sanctions imposed under U.S. Economic Sanctions Laws.

"*Subordinate Debt*" means indebtedness of any Issuer subject to any Subordination Agreement.

"*Subordinated Debenture*" means each of (i) that certain Convertible Debenture, dated as of November 30, 2018, by the Company in favor of Carlos García Iragorri, in the initial principal amount of $250,000.00, (ii) that certain Convertible Debenture, dated as of November 30, 2018, by the Company in favor of Consultoria y Adquisiciones y CIA S de RL de CV, in the initial principal amount of $500,000.00, (iii) that certain Convertible Debenture, dated as of April 2, 2019, by the Company in favor of Consultoria y Adquisiciones y CIA S de RL de CV, in the initial principal amount of $100,000.00, (iv) that certain Convertible Debenture, dated as of May 17, 2019, by the Company in favor of Consultoria y Adquisiciones y CIA S de RL de CV, in the initial principal amount of $100,000.00, (v) that certain Convertible Debenture, dated as of June 4, 2019, by the Company in favor of Carlos García Iragorri, in the initial principal amount of $100,000.00, (vi) that certain Convertible Debenture, dated as of July 16, 2019, by the Company in favor of Consuelo Reid, in the initial principal amount of $50,000.00, (vii) that certain Convertible Debenture, dated as of August 27, 2019, by the Company in favor of Prevision Fundation Corporation, in the initial principal amount of $56,000.00, (viii) that certain Convertible Debenture, dated as of September 17, 2019, by the Company in favor of Ramón Alberto Lozada de la Cruz, Julieta Urrego Caro and Miguel Angel Lozada Urrego, in the initial principal amount of $100,000.00, (ix) that certain Convertible Debenture, dated as of October 25, 2019, by the Company in favor of Consultoria y Adquisiciones y CIA S de RL de CV, in the initial principal amount of $150,000.00, (x) that certain Convertible Debenture, dated as of October 26, 2019, by the Company in favor of Carlos García Iragorri, in the initial principal amount of $150,000.00, (xi) that certain Convertible Debenture, dated as of May 22, 2020, by the Company in favor of Consuelo Reid, in the initial principal amount of $20,000.00, (xii) that certain Convertible Debenture, dated as of July 13, 2020, by the Company in favor of Carlos García Iragorri,

in the initial principal amount of $50,000.00, (xiii) that certain Convertible Debenture, dated as of July 13, 2020, by the Company in favor of Consultoria y Adquisiciones y CIA S de RL de CV, in the initial principal amount of $50,000.00, (xiv) that certain Convertible Debenture, dated as of August 8, 2020, by the Company in favor of Sangoloteo Ltd, in the initial principal amount of $112,791.00, (xv) that certain Convertible Debenture, dated as of August 25, 2020, by the Company in favor of Diana Beatriz Lopez Duran, Heyde Lopez Duran and Diego Canal Lopez, in the initial principal amount of $77,720.21, (xvi) that certain Convertible Debenture, dated as of September 16, 2020, by the Company in favor of Consuelo Reid, in the initial principal amount of $38,237.58, (xvii) that certain Convertible Debenture, dated as of September 21, 2020, by the Company in favor of Sangoloteo Ltd, in the initial principal amount of $50,000.00, (xviii) that certain Convertible Debenture, dated as of October 1, 2020, by the Company in favor of Grupo Leona SAS, in the initial principal amount of $5,000.00, (xix) that certain Convertible Debenture, dated as of December 19, 2020, by the Company in favor of Consuelo Reid, in the initial principal amount of $21,253.95, (xx) that certain Convertible Debenture, dated as of February 5, 2021, by the Company in favor of Consuelo Reid, in the initial principal amount of $25,149.16, (xxi) that certain Convertible Debenture, dated as of April 30, 2021, by the Company in favor of Consuelo Reid, in the initial principal amount of $3,492.20, (xxii) that certain Convertible Debenture, dated as of September 10, 2021, by the Company in favor of Consuelo Reid, in the initial principal amount of $21,236.95 and (xxiii) each other convertible debenture issued by the Company in substitution or replacement for, or upon transfer of, any of the foregoing.

"*Subordination Agreement*" means, any subordination agreement on terms and conditions accepted by the Agent from time to time in its discretion.

"*Subsidiary*" means any corporation, limited liability company, partnership, trust or other entity (whether now existing or hereafter organized or acquired) of which Parent or one or more Subsidiaries of Parent at the time owns or controls directly or indirectly more than 50% of the shares of stock or partnership or other ownership interest having general voting power under ordinary circumstances to elect a majority of the board of directors, managers or trustees or otherwise exercising control of such corporation, limited liability company, partnership, trust or other entity (irrespective of whether at the time stock or any other form of ownership of any other class or classes shall have or might have voting power by reason of the happening of any contingency). Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Parent.

"*Synthetic Lease Obligation*" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"*Tax Decree*" that certain tax decree No. 16-71-1-51, issued in favor of Bioapi by the Puerto Rico Office of Industrial Tax Exemption.

"*Tax Distributions*" means Distributions declared and paid by a Note Party to its Owners in accordance with Sections 7.2 and 7.3 of the Parent LLC Agreement as in effect on the Closing Date; provided that the amount of such Distributions shall be determined in good faith by the governing body of such Note Party.

"*Taxes*" has the meaning set forth in <u>Section 1.12</u>.

"*Transferee*" has the meaning set forth in <u>Section 9.5(e)</u>.

"*UCC*" means the New York Uniform Commercial Code, as amended or supplemented from time to time.

"*Unrestricted Cash*" means any cash and cash equivalents not subject to any (a) Lien (other than Liens in favor of Agent and granted pursuant to the Note Documents), (b) escrow arrangement (including, for the avoidance of doubt, the Agent Escrow Account) or (c) any preferential arrangement in favor of any Person (other than customary setoff rights of depositary banks).

"*U.S. Economic Sanctions Laws*" means those laws, executive orders, enabling legislation or regulations administered and enforced by the United States pursuant to which economic sanctions have been imposed on any Person, entity, organization, country or regime, including the Trading with the Enemy Act, the International Emergency Economic Powers Act, the Iran Sanctions Act, the Sudan Accountability and Divestment Act and any other OFAC Sanctions Program.

"*Working Capital*" means, as of any date of determination, the excess of Current Assets over Current Liabilities.

1.2     Accounting Terms and Determinations.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.  For purposes of determining compliance with this Agreement (including Article VI and the definition of "*Debt*"), any election by any Issuer to measure any financial liability using fair value (as permitted by Financial Accounting Standards Board Accounting Standards Codification Topic No. 825-10-25 – *Fair Value Option* or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made.

1.3     UCC Terms.  Any and all terms used in this Agreement or in any other Note Document which are defined in the UCC shall be construed and defined in accordance with the meaning and definition ascribed to such terms under the UCC, unless otherwise defined herein or in such Note Document.

1.4     Computation of Time Periods.  In this Agreement, with respect to the computation of periods of time from a specified date to a later specified date, the word from means from and including and the words to and until each mean to but excluding.  Periods of days referred to in this Agreement shall be counted in calendar days unless otherwise stated.

1.5     Construction.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, references to any gender include any other gender, the part includes the whole, the term including is not limiting, and the term or has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  References in this Agreement to determination by the Agent or the Purchasers include good faith estimates by the Agent and the Purchasers (in the case of quantitative determinations), and good faith beliefs by the Agent and the Purchasers (in the case of qualitative determinations).  The words hereof, herein, hereby, hereunder, and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, exhibit and schedule references are to this Agreement, unless otherwise specified.  Any reference in this Agreement or any of the Note Documents to this Agreement or any of the Note Documents includes any and all permitted alterations, amendments, restatements, changes, extensions, modifications, renewals, or supplements thereto or thereof, as applicable.

1.6     Exhibits and Schedules.  All of the annexes, exhibits and schedules attached hereto shall be deemed incorporated herein by reference.

1.7     <u>No Presumption Against Any Party</u>.  Neither this Agreement, any of the other Note Documents, any other document, agreement, or instrument entered into in connection herewith, nor any uncertainty or ambiguity herein or therein shall be construed or resolved using any presumption against any party hereto, whether under any rule of construction or otherwise.  On the contrary, this Agreement, the other Note Documents, and the other documents, instruments, and agreements entered into in connection herewith have been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meanings of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

1.8     <u>Independence of Provisions</u>.  All agreements and covenants hereunder, under the Note Documents, and the other documents, instruments, and agreements entered into in connection herewith shall be given independent effect such that if a particular action or condition is prohibited by the terms of any such agreement or covenant, the fact that such action or condition would be permitted within the limitations of another agreement or covenant shall not be construed as allowing such action to be taken or condition to exist.

EAST\185762164.11

**Annex 2**
**To**
**Note Agreement**

**Closing Conditions**

The Agent must receive each of the following, each in form and substance satisfactory to the Agent.

1.　　　Each of the Note Documents (other than the Omnibus Amendment), all duly executed by the Issuers and/or the other Persons party thereto, and acknowledged where required;

2.　　　A Certificate of the Secretary of each Note Party, dated as of the Closing Date, certifying (i) the incumbency and signatures of the Authorized Officers who are executing the Note Documents on behalf of such Note Party; (ii) the operating agreement of such Note Party and all amendments thereto as being true and correct and in full force and effect; and (iii) the resolutions of the Owners of such Note Party as being true and correct and in full force and effect, authorizing the execution and delivery of the Note Documents, and authorizing the transactions contemplated hereunder and thereunder, and authorizing the Authorized Officers to execute the same on behalf of such Note Party;

3.　　　Each Note Party's Certificate of Formation and all amendments thereto certified by the applicable Secretary of State and dated a recent date prior to the Closing Date;

4.　　　A certificate of status and good standing for each Note Party, dated a recent date prior to the Closing Date, showing that such Note Party is in good standing under the laws of the state indicated in Schedule 4.1;

5.　　　Certificates of foreign qualification and good standing for each Note Party, dated a recent date prior to the Closing Date, showing that such Note Party is in good standing under the laws of the states indicated in Schedule 4.1;

6.　　　A certificate signed by one or more authorized officers of each Note Party, dated as of the Closing Date, certifying that (i) both immediately before and immediately after giving effect to the transactions contemplated by the Note Documents, such Note Party is and will be Solvent; (ii) to the best of their knowledge, the representations and warranties of Note Party contained in the Note Documents are true and correct in all material respects, except for any representation and warranty that is qualified by materiality or reference to Material Adverse Effect, which such representation and warranty shall be true and correct in all respects, and (iii) to the best of their knowledge after due and diligent inquiry, both immediately before and immediately after giving effect to the transactions contemplated by this Agreement, the Note Documents, no Event of Default, Default or Material Adverse Effect is continuing or shall occur;

7.　　　Uniform Commercial Code and other public record searches with respect to Note Parties (other than Parent);

8.　　　A proforma of a lender's title insurance policy issued by a nationally recognized title insurance company, with such exceptions to coverage as agreed to by the parties hereto;

9.　　　[Intentionally Omitted];

10.　　　[Intentionally Omitted];

EAST\185762164.11

11.      All fees payable pursuant to the Fee Letter and all Expenses owing on the Closing Date shall have been paid;

12.      Evidence satisfactory to the Agent that no Material Adverse Effect shall have occurred;

13.      Certificates of insurance maintained by the Issuers and their Subsidiaries, in each case (i) in such amounts and with such insurance companies as are reasonably satisfactory to the Agent and (ii) with such coverages as are required by Section 5.5;

14.      The favorable legal opinion of counsel to the Company regarding customary matters for transactions of this type;

15.      Satisfactory documentation in respect of the equity investment in Parent by the Agent or Affiliates of the Agent and evidence of the issuance of equity in amounts and on terms and conditions satisfactory to the Agent;

16.      Evidence satisfactory to the Agent that the Property and its equipment have been transferred to the Company;

17.      The Company will be an eligible corporation as defined in Section 1202 of the Internal Revenue Code;

18.      Each other item set forth on the documentation checklist attached hereto as Schedule 2A; and

19.      Such other documents, instruments and agreements as the Agent may reasonably request in connection with the transactions contemplated hereunder or to perfect or protect the Liens granted to the Agent.

**Exhibit A**
**To**
**Note Purchase Agreement**
**Form of Note**

[see attached]

**FORM OF**
**9.0% SECURED NOTE**

**Due November 16, 2026**

$[_____]                                                    [_____] [__], 202[_]

1.      FOR VALUE RECEIVED, the undersigned (collectively, the "*Issuer*"), jointly and severally promise to pay to the order of [_____] ("*Purchaser*") on or before the Maturity Date the principal sum of [_____] ($[_____]) plus the amount of additional principal resulting from PIK Optionality Interest or, if less, the aggregate outstanding principal amount of this 9.0% Secured Note (this *"Note"*) pursuant to the Agreement (as defined below).

2.      Issuer promises to pay interest from the date of this Note, in immediately available funds, on the aggregate outstanding principal amount hereof at the rates and on the dates provided in the Agreement.  Subject to the terms of the Agreement regarding PIK Optionality Interest, interest shall be payable in cash as provided in the Agreement.  All computations of interest shall be in accordance with the provisions of the Agreement.  Notwithstanding anything to the contrary herein, under no circumstances shall the interest rate of this Note ever be more than the maximum rate permitted under Paragraph 6 below.

3.      Issuer hereby authorizes Purchaser to maintain in accordance with its usual and customary practices loan account(s) evidencing the Obligations of the Issuer hereunder and under the Agreement, and Issuer agrees that all such notations shall, in the absence of manifest error, be conclusive as to the matters so noted; *provided, however*, any failure by Purchaser to make such notation with respect to this Note or payment hereof shall not limit or otherwise affect Issuer's obligations under the Agreement or this Note.

4.      Upon the occurrence and during the continuance of any Event of Default, in addition to and not in substitution of any of Purchaser's other rights and remedies with respect to any such Event of Default, default rates of interest may be applicable to the Notes as more fully set forth in the Agreement.

5.      Issuer shall make all payments hereunder in lawful money of the United States of America and in immediately available funds to Purchaser as directed by Purchaser from time to time in accordance with the terms of the Agreement.

6.      In no event shall the interest rate and other charges hereunder exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  In the event that such a court determines that Purchaser has received interest and other charges hereunder in excess of the highest rate applicable hereto, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the principal balance hereof, and the provisions hereof shall be deemed amended to provide for the highest permissible rate.  If there is no principal balance outstanding, Purchaser shall refund to Issuer such excess.

7.      This Note is one of the "*Notes*" issued pursuant to that certain Note Purchase Agreement, dated as of November 16, 2021 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "*Agreement*"), by and among Skalar Pharma Holding LLC, Skalar Pharma LLC, the other Issuers from time to time party thereto, Corbel Distressed and Special Opportunities Fund, L.P., in its capacity as the administrative agent (in such capacity, "*Agent*"), and the purchasers from time to time party thereto, and is governed by the terms thereof.  Initially capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement.  The Agreement, among other things, contains

provisions for acceleration of the maturity of this Note upon the happening of certain stated events and also for prepayments on account of principal of this Note prior to the maturity hereof upon the terms and conditions specified in the Agreement. This Note may be assigned or otherwise transferred in whole or in part by Purchaser pursuant to the terms of the Agreement. In the event of any conflict between the terms of this Note and the terms of the Agreement, the terms of the Agreement shall control.

8.     This Note is secured by the Liens granted to Agent and the Purchaser under the Note Documents.

9.     Issuer hereby waives presentment for payment, notice of dishonor, protest and notice of protest.

10.     This Note is a Note Document and is subject to all of the terms and conditions applicable to Note Documents set forth in the Agreement, including Section 9.12 of the Agreement, which is incorporated herein by reference.

*[remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, Issuer have duly executed this Note as of the date first above written.

**SKALAR PHARMA HOLDING LLC**

By:_____
Name:_____
Title:_____

**SKALAR PHARMA LLC**

By:_____
Name:_____
Title:_____

**Exhibit 1**
**To**
**Note Purchase Agreement**
**Form of Addendum**

**ADDENDUM __ TO NOTE PURCHASE AGREEMENT**

Reference is hereby made to the Note Purchase Agreement, made as of November 16, 2021 (as amended, and in effect from time to time, the "*Agreement*"), by and among **SKALAR PHARMA HOLDINGS LLC**, a Puerto Rico limited liability company ("*Parent*"), **SKALAR PHARMA LLC**, a Puerto Rico limited liability company (the "*Company*"), the other Persons listed on the signature pages thereto as "Issuers" and one or more additional direct or indirect Subsidiaries of Parent thereafter acquired or formed, which may become party to the Agreement by executing an Addendum (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers (as defined therein) and **CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**, in its capacity as the administrative agent (the "*Agent*"). Capitalized terms used herein and not defined herein shall have the meanings given to them in the Agreement. By its execution below, the undersigned [NAME OF NEW ISSUER], a [_____], agrees to become, and does hereby become, an Issuer under the Agreement and under each Note, and agrees to be bound by such Agreement and such Notes as if originally a party thereto. By its execution below, the undersigned represents and warrants as to itself that all of the representations and warranties contained in Article IV of the Agreement are true and correct in all respects as of the date hereof (except to the extent such representations and warranties expressly relate solely to an earlier date). [NAME OF NEW ISSUER] represents and warrants that the schedules attached hereto are true and correct in all respects and such schedules set forth all information required to be scheduled under the Agreement.

IN WITNESS WHEREOF [NAME OF NEW ISSUER], a [_____], has executed and delivered this Addendum __ counterpart to the Agreement as of this _____ day of _____, _____.

[NAME OF NEW ISSUER],
a [_____]


By:_____
Name:
Title:

Exhibit 1

**Exhibit 5.3(c)**

**To**

**Note Purchase Agreement**

**Form of Compliance Certificate**

[see attached]

Exhibit 5.3(c)

EAST\185762164.11

**Exhibit 5.3(c)**

**Form of Compliance Certificate**

**[_____], 20[__]**

| To: | Corbel Distressed and Special Opportunities Fund, L.P. |
| | 11777 San Vicente Blvd., Suite 777 |
| | Los Angeles, CA 90049 |
| | Attn: Michael Jones |
| | Email: Michael@corbelcap.com |

This Compliance Certificate is given pursuant to Section 5.3(c) of that certain Note Purchase Agreement, dated as of November 16, 2021 (as amended or restated from time to time in accordance with its terms, the "**Agreement**"), among SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("**Parent**"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "**Company**"), the other Issuers party thereto from time to time and one or more additional direct or indirect Subsidiaries of Parent hereafter acquired or formed, which may become party to the Agreement by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "**Issuer**" and collectively referred to herein as the "**Issuers**"), the Purchasers (as defined in the Agreement) and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., in its capacity as the administrative agent (the "**Agent**"). All initially capitalized terms used but not defined in this Compliance Certificate shall have the meanings assigned to such terms in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

(1)     He/She is the duly elected Chief Financial Officer of Parent, and is an Authorized Officer;

(2)     He/She reviewed the terms of the Agreement and the Note Documents and has made, or has caused to be made under his/her supervision, a detailed review of the transactions and condition of Parent and its Subsidiaries during the accounting period covered by the attached financial statements;

(3)     The examinations described in Paragraph (2) above did not disclose, and after due and diligent inquiry, he/she has no Knowledge of the existence of any condition or event which constitutes a Default or Event of Default during, or at the end of, the accounting period covered by the attached financial statements or as of the date of this Compliance Certificate, except as set forth below;

(4)     Schedule 1 attached hereto and incorporated herein by this reference sets forth the financial data and computations evidencing Parent's and its Subsidiaries' compliance with the covenants set forth in Sections 6.15(a), 6.15(b) and 6.15(c) of the Agreement, all of which data and computations are complete and correct and fairly present in all material respects Parent's and its Subsidiaries' financial condition and results of operations for such period;

(5)     Schedule 2 attached hereto and incorporated herein by this reference sets forth the financial data and computations of the Excess Cash Flow or Additional Excess Cash Flow Payment, as the case may be, and the amount of the payment required to be made pursuant to Section 1.8(d)(ii) of the Agreement;

(6)      [Schedule [3] attached hereto and incorporated herein by this reference sets forth the financial data and computations of the amount of Tax Distributions to be paid with respect to the fiscal quarter most recently ended and the prior four fiscal quarters and calculations in reasonable detail showing how the amount of such Tax Distributions was derived.][1]

(7)      The financial statements attached as Schedule [4] hereto, to the Knowledge of the undersigned after due and diligent inquiry, are complete and correct and fairly present in all material respects Parent's and its Subsidiaries' financial condition and results of operations for the period set forth therein.[2]

Described below are the exceptions, if any, to Paragraph (3) above which list, in detail, the nature of the condition or event, the period during which it has existed and the action which Parent and its Subsidiaries have taken, are taking, or propose to take with respect to each such condition or event:

_____

_____

_____

---

[1] To be used with the quarterly financial statements delivered pursuant to Section 5.3(b) of the Agreement.

[2] With respect to quarterly or annual financial statements delivered pursuant to Section 5.3(b) or Section 5.3(e), as applicable, of the Agreement, shall also certify that such financial statements have been prepared in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

This Compliance Certificate, together with the computations set forth in the schedules hereto and the financial statements delivered concurrently herewith in support hereof, are made and delivered as of the date first written above.

**SKALAR PHARMA HOLDING LLC**

By:_____
Name:
Title: Chief Financial Officer

COMPLIANCE CERTIFICATE
SCHEDULE 1
Schedule of Compliance
for the period ended on _____, 20___

**I**      **Fixed Charge Coverage Ratio (Section 6.15(a))[3]**

1. Consolidated Net Income (excluding extraordinary or non-operating gains or losses) for the period ending on the test date (calculated in accordance with GAAP):                                                                 $_____

2. Consolidated Interest Expense during the period ending on the test date (calculated in accordance with GAAP):                                              $_____

3. Federal, state and local income taxes reported by Parent and the Subsidiaries during the period ending on the test date which are included in the determination of Consolidated Net Income during such period (calculated in accordance with GAAP):                                                      $_____

4. Parent's and the Subsidiaries' Consolidated depreciation and amortization during the period ending on the test date (calculated in accordance with GAAP):                                                                                         $_____

5. Non-recurring fees, costs and expenses in connection with the transaction contemplated under the Agreement incurred on or before the Closing Date and reflected on the funds flow in effect as of the Closing Date (or paid within ninety (90) days of the Closing Date), to the extent not financed, during the period ending on the test date (calculated in accordance with GAAP):                                                                                         $_____

6. Corbel Monitoring Fees accrued during the period ending on the test date (calculated in accordance with GAAP):                                              $_____

7. Non-cash expenses, charges or losses reducing Consolidated Net Income during the period ending on the test date (calculated in accordance with GAAP):                                                                                         $_____

8. Distributions paid during the period ending on the test date:                    $_____

9. Cash used for Capital Expenditures during the period ending on the test date:   $_____

10. Corbel Monitoring Fees paid during the period ending on the test date:          $_____

11. Excess Cash Flow paid in accordance with Section 1.8(d)(ii) of the Agreement during the period ending on the test date:                                 $_____

12. Any increase in Working Capital during the period ending on the test date:     $_____

---

[3] Beginning with the Fiscal Quarter ending September 30, 2024, to be used with the quarterly financial statements delivered pursuant to Section 5.3(b) of the Agreement.

13. The greater of (i) Taxes paid or (ii) the prevailing corporate federal and state tax rates multiplied by pre-tax net income, in each case, during the period ending on the test date: $_____

14. Interest paid (including interest paid in respect of the Corbel Capital Amount) during the period ending on the test date: $_____

15. Current maturities of capital lease payments paid during the period ending on the test date: $_____

16. Current maturities of long term debt paid during the period ending on the test date: $_____

17. Repayment of short term debt for borrowed money during the period ending on the test date: $_____

18. Qualified Technology Transfers during the period ending on the test date: $_____

19. Sum of Lines 1 through 7 (Consolidated Adjusted EBITDA): $_____

20. Line 19 minus Lines 8 through 13 (Operating Cash Flow): $_____

21. Line 20 plus Line 18 (Fixed Charge Coverage Ratio numerator): $_____

22. Sum of Lines 14 through 17 (Fixed Charges): $_____

23. Ratio of Line 21 to Line 22 (Fixed Charge Coverage Ratio): ___:1.0

24. Is the ratio in Line 23 greater than or equal to [_____]:1.00? ☐ yes ☐ no

25. Borrower is in compliance with Section 6.15(a): ☐ yes ☐ no

## II    Net Leverage Ratio (Section 6.15(b))[4]

1. Debt of the Note Parties as of the last day of period ending on the test date (calculated in accordance with GAAP): $_____

2. The Corbel Capital Amount (calculated in accordance with GAAP): $_____

3. Unrestricted Cash included in the Consolidated balance sheet of Parent and its Subsidiaries as of the last day of the period ending on the test date (calculated in accordance with GAAP): $_____

4. Sum of Line 1 plus Line 2 minus Line 3: $_____

5. Line 19 from Table I (Consolidated Adjusted EBITDA): $_____

6. Ratio of Line 4 to Line 5 (Net Leverage Ratio): ___:1.0

---

[4] Beginning with the Fiscal Quarter ending June 30, 2023, to be used with the quarterly financial statements delivered pursuant to Section 5.3(b) of the Agreement.

7.  Is the ratio in Line 6 less than or equal to [_____]:1.00?          ☐ yes ☐ no

8.  Borrower is in compliance with Section 6.15(b):          ☐ yes ☐ no


**III    Liquidity (Section 6.15(c))[5]**

1.  Aggregate amount of Unrestricted Cash of the Issuers as of the last day of the period ending on the test date:          $_____

2.  Aggregate amount of accounts payable of the Issuers and their Subsidiaries which are thirty (30) or more days overdue (other than such any such amounts (a) which are subject to a good faith dispute and (b) for which adequate reserves have been made to the extent required under GAAP) as of the last day of the period ending on the test date:          $_____

3.  Line 1 minus Line 2:          $_____

4.  Is the amount in Line 3 greater than or equal to $1,000,000?          ☐ yes ☐ no

5.  Borrower is in compliance with Section 6.15(c):          ☐ yes ☐ no

---

[5] Beginning with the Fiscal Month ending December 31, 2021, to be used with the monthly financial statements delivered pursuant to Section 5.3(a) of the Agreement.

COMPLIANCE CERTIFICATE
SCHEDULE 2[6]
Excess Cash Flow Calculations
for the period ended on _____, 20____

*See attached.*

---

[6] Beginning with the Fiscal Quarter ending June 30, 2022, to be used with the quarterly or annual, as applicable, financial statements delivered pursuant to Section 5.3(b) or Section 5.3(e), as applicable, of the Agreement.

EAST\186250199.4

[COMPLIANCE CERTIFICATE

SCHEDULE [3][7]
Tax Distributions Calculations
for the period ended on _____, 20____

*See attached*.]

---

[7] To be used with the quarterly financial statements delivered pursuant to Section 5.3(b) of the Agreement.

COMPLIANCE CERTIFICATE

SCHEDULE [4][8]
Financial Statements

[8] To be used with the quarterly or annual, as applicable, financial statements delivered pursuant to Section 5.3(b) or Section 5.3(e), as applicable, of the Agreement.

EAST\186250199.4

**Schedule 1.1**
**To**
**Note Purchase Agreement**

**Purchasers' Commitments**

| Purchaser | | Commitment | Percentage of Total Commitments |
|---|---|---|---|
| Corbel Distressed and Special Opportunities Fund, L.P. | | $15,000,000 | 50.00% |
| Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. | | $15,000,000 | 50.00% |
| | Total | $30,000,000 | 100.00% |

EAST\185762164.11

**Schedule 4.1**

**To**

**Note Purchase Agreement**

**Legal Status**

| <u>**Note Party**</u> | <u>**Type of Entity**</u> | <u>**Jurisdiction of Organization**</u> | <u>**Jurisdictions of Foreign Qualification**</u> |
|---|---|---|---|
| Skalar Pharma LLC | Limited Liability Company | Puerto Rico | N/A |
| Skalar Pharma Holding LLC | Limited Liability Company | Puerto Rico | N/A |

EAST\185762164.11

**Schedule 4.7**

**To**

**Note Purchase Agreement**

**Litigation**

1. HECTOR BRITO DIAZ, JOSE A LEBRON FELIX, JUAN M PILLOT MAISONETTE, ROBERTO ACOSTA GONZALEZ, PAOLA COTTO DIAZ, MONICA ENID APONTE RIVERA, WILNETTE MARTINEZ VEGA, DAISY CRUZ BASTIAN, WANDA GARCIA NATAL, CARLOS MATOS CRUZ, MIGUEL A ALVAREZ, DAVID SIVENS MARINI, NEYSA ZAYAS MONTANEZ, EMANUEL VALENTIN HERNANDEZ, DENNISSE KANORLY MORALES DE JESUS, MARIANGELI DIAZ SALGADO, RAMON SOLIVAN, LUCAS HERNANDEZ, SYRVIATEK CORP. v. SKALAR PHARMA LLC; BIOAPI S.A.S. t/c/p BIOGEN S.A.S.; FERNANDO LONDOÑO, SILVIA HENAO Y LA COMUNIDAD DE GANANCIALES COMPUESTA POR AMBOS; Individuos X, Y y Z; ASEGURADORAS X, Y y Z; COMPAÑÍA DE FIANZA X, Y y Z; ENTIDADES X, Y y Z, Civil No. GM2020CV00404, for breach of contract and collection of monies, pending before the Puerto Rico Court of First Instance, Superior Court of Guayama.

   Description of Case: This is a collections case brought against Skalar by several independent contractors. Plaintiffs also seek to tear the corporate veil to collect the monies owed by Skalar from its parent company. Bioapi answered the complaint and brought a counterclaim against one of the plaintiffs. Skalar submitted a motion to dismiss for improper service of process. The motion was denied by the trial court, which also declared Skalar in default. The appellate court issued certiorari but confirmed the trial court's ruling. The Supreme Court denied certiorari. The case returned to the trial court. Skalar filed its answer to complaint and counterclaim against three of the plaintiffs (Syrviatek, Lucas Hernández, and Mariangeli Díaz). Plaintiffs asked for a more detailed answer to the complaint and an extension to answer the counterclaim, which was granted.

   Amount Claimed: Approximately $15,454,000.

   Stage of Case: The case is in the discovery stage.

2. MANPOWERGROUP, INC. ON BEHALF OF ITS EXPERIS PUERTO RICO DIVISION v. SKALAR PHARMA, LLC., Civil No. 3:20-cv-01167, for breach of contract and collection of monies, pending before the United States District Court for the District of Puerto Rico.

   Description of Case: This is a collections case based on invoices that Manpower issued to Skalar under a certain "Fast Track Agreement - Professional Resourcing". Skalar's principal argument is that the invoices are invalid because Manpower, sole drafter of the aforesaid agreement, failed to apply the contractual formula and instead systematically overcharged Skalar by approximately $735,000. Skalar also contends that the contractual late payment penalty is excessive and unenforceable. Plaintiff sought but was denied provisional remedies to secure satisfaction of judgment.

   Amount Claimed: Approximately $2,143,424, plus interest.

   Stage of Case: The discovery period has ended.

**Summary Third parties/contractors Accounts payable**

| Item | Total | |
|---|---|---|
| Lawyers | $ | 303.365,66 |
| Water | $ | 112.339,53 |
| sewerage | $ | 51.186,53 |
| Contractor Esteban Londoño R | $ | 73.558,45 |
| Energy | $ | 1.110.839,53 |
| Master Control | $ | 463.040,87 |
| Security | $ | 290.547,96 |
| **TOTAL** | **$** | **2.404.878,53** |

| Lawsuit | Value (U$ Thousands) | Estimated settlement value |
|---|---|---|
| Manpower | 2100 | 800 |
| Brito y otros | 15000 | 380 |
| Nieves y otros | 270 | 300 |
| **TOTAL** | **17.370** | **1.480** |

**Grand Total**         **3.884.879**

**Schedule 4.9(a)**

**To**

**Note Purchase Agreement**

**Ownership of Parent**

| Class of Stock | Number of Membership Interests Authorized | Owner | Number of Membership Interests Issued and Outstanding to Owner | % of Total |
|---|---|---|---|---|
| Class A Units | 60 | Bioapi S.A.S. | 60 | 100% |
| Class B Units | 20 | Corbel Distressed and Special Opportunities Fund, L.P. | 20 | 50% |
| Class B Units | 20 | Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P. | 20 | 50% |

Schedule 4.9(a)

**Schedule 4.9(b)**

**To**

**Note Purchase Agreement**

**Ownership of Subsidiaries**

| **Subsidiary** | **Jurisdiction of Organization** | **Number of Shares Authorized (by class)** | **Owner** | **Number of Shares Issued and Outstanding to Owner** | **% of Total** |
|---|---|---|---|---|---|
| Skalar Pharma LLC | Puerto Rico | N/A | Skalar Pharma Holding LLC | N/A | 100% |

EAST\185762164.11

**Schedule 4.11**

**To**

**Note Purchase Agreement**

**Financial Statements**

[To be attached]

# Departamento de Hacienda

## Planilla de Contribución sobre Ingresos de Corporaciones
### Confirmación de Radicación Electrónica

Rev. 02.20

Corporation Income Tax Return
Confirmation of Electronic Filing

| Período Contributivo - Taxable Year |
|---|
| **01/01/2019 - 31/12/2019** |

**Nombre del Contribuyente** ..................................... | **SKALAR PHARMA LLC**
*Taxpayer Name*

**Número de Identificación Patronal** ....................... | **66-0902281**
*Employer Identification Number*

**Número de Confirmación de Planilla** ................... | **X1909585920**
*Confirmation Number of Return*

**Fecha y Hora de Radicación** ................................ | **20/08/2020 3:04:52 PM**
*Date and Time of Filing*

**Fecha de Pago** ...................................................... |
*Payment Date*

**Cantidad Pagada Electrónicamente con Planilla** .. | $0
*Amount Paid Electronically with Return*

**Número de Ruta / Tránsito** ................................... |
*Routing Number*

**Número de Cuenta** ............................................... |
*Account Number*

**Balance Pendiente de Pago** ................................ | $0
*Amount Due*

**Contribución Pagada en Exceso** ......................... | $0
*Amount Overpaid*

✎ **Acreditar a Contribución Estimada del Próximo Año** ................................... | $0
*Credit to Estimated Tax for Next Year*

✎ **Aportación al Fondo Especial para el Estuario de la Bahía de San Juan** .. | $0
*Amount to be Contributed to the San Juan Bay Estuary Special Fund*

✎ **Aportación al Fondo Especial para la Universidad de Puerto Rico** ............ | $0
*Amount to be Contributed to the University of Puerto Rico Special Fund*

✎ **Cantidad a Reintegrar** .......................................................................... | $0
*Refund Amount*

**Esta planilla requiere que se sometan evidencias**   **Sí / Yes** [X]
*This return requires to submit evidences*   **No** [ ]

**La evidencia deberá ser radicada *únicamente* de forma electrónica a través del Sistema Unificado de Rentas Internas (SURI) accediendo: *https://suri.hacienda.pr.gov*. Para la radicación de evidencia deberá ingresar el número de confirmación de planilla aquí provisto.**
*The evidence must be filed only electronically through the Internal Revenue Integrated System (SURI, for its Spanish acronym) available at: https://suri.hacienda.pr.gov. For the filing of evidence you must enter the return confirmation number herein provided.*

Reproducido por CEGsoft (www.cegsoft.com)

Formulario 480.2 Rev. 10.19

| Liquidador: | Revisor: |
| --- | --- |

Investigado por: _____

Fecha _____ / _____ / _____

R   M   N

**2019**

GOBIERNO DE PUERTO RICO
DEPARTAMENTO DE HACIENDA

# Planilla de Contribución sobre Ingresos de Corporaciones

AÑO CONTRIBUTIVO COMENZADO EL
**01** de **ene.** de **2019** Y TERMINADO EL **31** de **dic.** de **2019**

**2019**

Número de Serie

☐ **PLANILLA ENMENDADA**

AÑO CONTRIBUTIVO:
1 ☒ NATURAL  2 ☐ ECONÓMICO  3 ☐ 52-53 SEMANAS

Sello de Pago

**20/08/2020 3:04:52 PM**

Nombre del Contribuyente
**SKALAR PHARMA LLC**

Dirección Postal
**ESTATE ROAD 53 KM 84**

**BO JOBOS**

**Guayama**          **PR**          Código Postal **00784**

**Número de Identificación Patronal**
**66-0902281**

Núm. de Registro del Departamento de Estado
**411680**

| Clave Industrial | Cod. Municipal |
| --- | --- |
| **3254** | **71** |

Número de Registro de Comerciante
**11298060013**

Localización de la Industria o Negocio Principal - Número, Calle, Pueblo
**ESTATE ROAD 53 KM 84**

**BO JOBOS Guayama PR 00784**

Número de Teléfono - Extensión

**(787) 649 - 5826**

Naturaleza de la Industria o Negocio Principal (Ej. Ferretería, Cafetería, etc.)
**FABRICACION DE PRODUCTOS FARMACEUTICOS Y MEDICINALES**

Fecha de Incorporación

Número de Recibo: _____

Importe: _____

Día **25** / Mes **06** / Año **2018**

| Número de Manufacturero | Código NAICS | Lugar de Incorporación | Tipo de Entidad |
| --- | --- | --- | --- |
| | **32541** | 1 ☒ Doméstica (PR) | **LCCORP** |

Marque en el encasillado correspondiente, si aplica

1 ☐ Primera planilla   2 ☐ Última planilla

CAMBIO DE DIRECCIÓN: ☐ Sí  ☒ No
SOLICITÓ PRÓRROGA: ☐ Sí  ☒ No

2 ☐ Extranjera

Indique si es miembro de un grupo de entidades relacionadas
☐ Sí  ☒ No

Número de grupo

Contratos con Organismos Gubernamentales
☐ Sí   ☒ No

Correo Electrónico de Persona Contacto (E-mail)
**fernando.londono@skalarpharma.com**

| | PASE A LA PÁGINA 3 PARA DETERMINAR SU REINTEGRO O PAGO. | | |
| --- | --- | --- | --- |
| **Reintegro** | 1. **CONTRIBUCIÓN PAGADA EN EXCESO** (Parte IV, línea 21. Indique distribución en las líneas A, B, C y D) ......... (1) | **0** | 00 |
| | A) Acreditar a la contribución estimada 2020 ................................................................. (1A) | **0** | 00 |
| | B) Aportación al Fondo Especial para el Estuario de la Bahía de San Juan .................... (1B) | **0** | 00 |
| | C) Aportación al Fondo Especial para la Universidad de Puerto Rico .......................... (1C) | **0** | 00 |
| | D) **A REINTEGRAR** ................................................................................................... (1D) | **0** | 00 |
| **Pago** | 2. TOTAL NO PAGADO DE LA CONTRIBUCIÓN (Parte IV, línea 21) ................................... (2) | **0** | 00 |
| | 3. **Menos:** Cantidad pagada **(a)** Con Planilla ................................................................ (3a) | **0** | 00 |
| | (b) **Intereses** (Véanse instrucciones) ................................... (3b) | **0** 00 | |
| | (c) Recargos _____ **0** y Penalidades _____ **0** (Véanse instrucciones) ............ (3c) | **0** 00 | |
| | 4. **BALANCE PENDIENTE DE PAGO** (Línea 2 menos línea 3(a) más líneas 3(b) y 3(c)) ......... (4) | **0** | 00 |

## JURAMENTO

Yo, el suscribiente (presidente, vicepresidente, tesorero, tesorero auxiliar u otro oficial principal o de finanzas de la corporación a nombre de la cual se hace esta planilla de contribución sobre ingresos), bajo el más solemne juramento y so pena de perjurio, declaro que he examinado la misma (incluyendo anejos y estados que la acompañan), y que según mi mejor conocimiento y creencia es una planilla exacta, correcta y completa, hecha de buena fe, de acuerdo con el Código de Rentas Internas de Puerto Rico de 2011, según enmendado, y sus Reglamentos.

**FERNANDO LONDONO**
_____
Nombre y Título del Oficial Autorizado

_____
Firma del Oficial Autorizado

_____
Fecha

## PARA USO DEL ESPECIALISTA SOLAMENTE

Declaro bajo penalidad de perjurio que he examinado esta planilla (incluyendo los anejos y estados que se acompañan) y que según mi mejor información y creencia es cierta, correcta y completa. La declaración de la persona que prepara la planilla es con respecto a la información recibida y dicha información puede ser verificada.

Nombre del especialista (Letra de molde)
**LIZA RUIZ**

Marque si ☐ es especialista por cuenta propia

Número de Registro
**0017984**

**PARA USO DEL CPA SOLAMENTE**

Nombre de la firma
**COMPLIANCE RESOURCES GROUP INC**

Dirección
**PO BOX 13669**
**SAN JUAN PR**

Código postal
**00908**

Firma del especialista
**Firmado Electrónicamente**

Fecha
**20/08/2020**

Número de Licencia del CPA

Número de Estampilla del Colegio de CPA

Estampilla del Colegio de CPA

## NOTA AL CONTRIBUYENTE
Indique si hizo pagos por la preparación de su planilla: ☒ Sí  ☐ No. Si contestó "Sí", exija la firma y el número de registro del Especialista.

Período de Conservación: Diez (10) años

Reproducido por CEGsoft (www.cegsoft.com)

NUMERO DE CONFIRMACION: X1909585920

| **Parte I** | **Determinación del Ingreso Bruto de Operaciones** | | |
|---|---|---|---|

**A. Ingreso de venta de bienes**

| | | | |
|---|---|---|---|
| 1. Ventas netas de bienes o productos (Véanse instrucciones) | (1) | 0 | 00 |
| 2. Menos: Costos de ventas o costos directos de producción (De la Parte V, línea 7) | (2) | 0 | 00 |
| 3. Ganancia (o pérdida) bruta de la venta de bienes o productos (Línea 1 menos línea 2) | (3) | 0 | 00 |
| (Porcentaje margen ganancia bruta: 2018 __0__% 2019 __0__%. Véanse instrucciones) | | | |

**B. Ingreso de manufactura**

| | | | |
|---|---|---|---|
| 4. Ingresos | (4) | 0 | 00 |
| 5. Menos: Costos de ventas o costos directos de producción (De la Parte V, línea 7) | (5) | 0 | 00 |
| 6. Ganancia bruta (o pérdida) de manufactura (Línea 4 menos línea 5) | (6) | 0 | 00 |
| (Porcentaje margen ganancia bruta: 2018 __0__% 2019 __0__%. (Véanse instrucciones) | | | |

**C. Ingreso de servicios**

| | | | |
|---|---|---|---|
| 7. Ingreso bruto generado en la venta de servicios | (7) | 0 | 00 |

**D. Otros ingresos**

| | | | |
|---|---|---|---|
| 8. Ganancia neta de capital (Anejo D Corporación, Parte IV, línea 21) | (8) | 0 | 00 |
| 9. Ganancia neta (o pérdida) en la venta de propiedad que no sea activo de capital (Anejo D Corporación, Parte V, línea 22) | (9) | 0 | 00 |
| 10. Renta (Total $_____0) (Véanse instrucciones) | (10) | 0 | 00 |
| 11. Intereses: (a) Sujetos a la tasa preferencial de 10% $_____0 (b) Otros _____0 | (11) | 0 | 00 |
| 12. Ingreso por comisiones | (12) | 0 | 00 |
| 13. Dividendos de corporaciones: (a) Domésticas _____0 (b) Extranjeras _____0 | (13) | 0 | 00 |
| 14. Participación distribuible en el ingreso neto de sociedades y sociedades especiales (Anejo R Corporación, Parte III, línea 5) | (14) | 0 | 00 |
| 15. Participación distribuible en el ingreso neto sujeto a tasas preferenciales proveniente de sociedades y sociedades especiales (Véanse instrucciones) | (15) | 0 | 00 |
| 16. Ingreso neto derivado de las operaciones de una entidad financiera internacional que opera como una unidad de un banco | (16) | 0 | 00 |
| 17. Fletes y pasajes | (17) | 0 | 00 |
| 18. Regalías | (18) | 0 | 00 |
| 19. Condonación de deudas (Formulario 480.6A) | (19) | 0 | 00 |
| 20. Espectáculos públicos | (20) | 0 | 00 |
| 21. Otros pagos reportados en un Formulario 480.6A o 480.6B | (21) | 0 | 00 |
| 22. Ingresos misceláneos (Someta detalle) | (22) | 0 | 00 |
| 23. **Total de ingresos** (Sume líneas 3 y 6 a la 22) | (23) | 0 | 00 |
| 24. **Menos:** Cantidad exenta bajo la Ley 135-2014 (Véanse instrucciones) (Ingreso de servicios) $_____ | (24) | 0 | 00 |
| 25. Total de ingreso después de la exención bajo la Ley 135-2014 (Línea 23 menos línea 24) | (25) | 0 | 00 |

| **Parte II** | **Deducciones** | **Contribución Regular** | **Contribución Alternativa Mínima** |
|---|---|---|---|

**A. Deducciones reportadas en declaraciones informativas:**

| | | Contribución Regular | | Contribución Alternativa Mínima | |
|---|---|---|---|---|---|
| 1. Compensación a directores (Véanse instrucciones Parte X) | (1) | 0 | 00 | 0 | 00 |
| 2. Compensación a oficiales (Véanse instrucciones Parte XI) | (2) | 0 | 00 | 0 | 00 |
| 3. Salarios, comisiones y bonificaciones a empleados | (3) | 0 | 00 | 0 | 00 |
| 4. Salarios pagados a jóvenes universitarios (Total $_____0) Programa de Pasantías del Departamento de Hacienda (Total $_____0) | (4) | 0 | 00 | | |
| 5. Servicios prestados | (5) | 0 | 00 | | |
| 6. Servicios subcontratados | (6) | 0 | 00 | | |
| 7. Comisiones a negocios | (7) | 0 | 00 | | |
| 8. Alquiler, renta y cánones pagados (Véanse instrucciones) (a) Mueble $_____0 (b) Inmueble $_____0 | (8) | 0 | 00 | | |
| 9. Planes de salud o accidentes | (9) | 0 | 00 | | |
| 10. Seguros de propiedad, contingencia, responsabilidad pública y fianzas (Véanse instrucciones) | (10) | 0 | 00 | | |
| 11. Servicios de telecomunicaciones | (11) | 0 | 00 | | |
| 12. Servicios de internet y televisión por cable o satélite | (12) | 0 | 00 | | |
| 13. Energía eléctrica | (13) | 0 | 00 | | |
| 14. Agua y alcantarillado | (14) | 0 | 00 | | |
| 15. Anuncios | (15) | 0 | 00 | | |
| 16. Regalías | (16) | 0 | 00 | | |
| 17. Aportación especial por servicios profesionales y consultivos bajo la Ley 48-2013 (Véanse instrucciones) | (17) | 0 | 00 | | |
| 18. Intereses hipotecarios (Véanse instrucciones) | (18) | 0 | 00 | | |
| 19. Intereses pagados en arrendamiento financiero de automóviles | (19) | 0 | 00 | | |
| 20. Cuotas de colegiación pagadas a beneficio de empleados | (20) | 0 | 00 | | |
| 21. Cuotas de mantenimiento pagadas a asociaciones de residentes o condómines | (21) | 0 | 00 | | |
| 22. Ciertos otros gastos (Véanse instrucciones) | (22) | 0 | 00 | | |
| 23. Subtotal (Sume líneas 1 a la 22) | (23) | 0 | 00 | 0 | 00 |

**B. Partidas no reportadas en declaraciones informativas:**

| | | Contribución Regular | | Contribución Alternativa Mínima | |
|---|---|---|---|---|---|
| 24. Intereses sobre deudas del negocio | (24) | 0 | 00 | 0 | 00 |
| 25. Contribuciones, patentes y licencias: | | | | | |
| (a) Contribución sobre la propiedad: Mueble $_____0 Inmueble $_____0 | (25a) | 0 | 00 | 0 | 00 |
| (b) Otras contribuciones: Patentes $_____0 Licencias $_____0 Otros $_____0 | (25b) | 0 | 00 | 0 | 00 |
| (c) Póliza del Fondo del Seguro del Estado | (25c) | 0 | 00 | | |
| (d) Impuesto sobre ventas y uso (Véanse instrucciones) | (25d) | 0 | 00 | | |
| 26. Depreciación y amortización (Véanse instrucciones. Someta Anejo E) | (26) | 0 | 00 | | |
| 27. Depreciación para negocios con volumen menor o igual a $3,000,000 (Someta Anejo E1) | (27) | 0 | 00 | | |
| 28. Aportaciones a planes de pensiones u otros planes calificados (Véanse instrucciones. Someta Modelo SC 6042) | (28) | 0 | 00 | | |
| 29. Deducción a patronos que emplean personas impedidas (Véanse instrucciones) | (29) | 0 | 00 | | |
| 30. Subtotal (Sume líneas 24 a la 29) | (30) | 0 | 00 | 0 | 00 |

NUMERO DE CONFIRMACION:X1909585920      Reproducido por CEGsoft (www.cegsoft.com)

**C. Otras deducciones:** Indique las deducciones que fueron validadas con un Informe de Procedimientos Previamente Acordados ("AUP")

| | Contribución Regular | | Contribución Alternativa Mínima | |
|---|---|---|---|---|
| 31. Seguro social federal (FICA) ............................................................................................ (31) | 0 | 00 | 0 | 00 |
| 32. Seguro de desempleo ..................................................................................................... (32) | 0 | 00 | 0 | 00 |
| 33. Gastos de automóviles (Millaje_____0_____) (Véanse instrucciones) .......... AUP ⬭ (33) | 0 | 00 | 0 | 00 |
| 34. Gastos de otros vehículos de motor (Véanse instrucciones) ........................ AUP ⬭ (34) | 0 | 00 | 0 | 00 |
| 35. Reparaciones y mantenimiento (Véanse instrucciones) ............................... AUP ⬭ (35) | 0 | 00 | 0 | 00 |
| 36. Gastos de viajes (Total de gastos $_____0_____) ............................................... (36) | 0 | 00 | 0 | 00 |
| 37. Gastos de comida y entretenimiento (Total de gastos $_____0_____) (Véanse instrucciones) .... (37) | 0 | 00 | 0 | 00 |
| 38. Materiales y efectos de oficina .................................................................................... (38) | 0 | 00 | 0 | 00 |
| 39. Materiales utilizados directamente en la industria o negocio .................... AUP ⬭ (39) | 0 | 00 | 0 | 00 |
| 40. Sellos, comprobantes y aranceles ............................................................................. (40) | 0 | 00 | 0 | 00 |
| 41. Cargos de envío y franqueo ......................................................................................... (41) | 0 | 00 | 0 | 00 |
| 42. Uniformes ......................................................................................................................... (42) | 0 | 00 | 0 | 00 |
| 43. Estacionamientos y peaje ............................................................................................. (43) | 0 | 00 | 0 | 00 |
| 44. Gastos de oficina (Véanse instrucciones) .............................................................. (44) | 0 | 00 | 0 | 00 |
| 45. Cargos bancarios ........................................................................................................... (45) | 0 | 00 | 0 | 00 |
| 46. Aportaciones a cuentas de aportación educativa para los beneficiarios de sus empleados (Véanse instrucciones) AUP ⬭ (46) | 0 | 00 | 0 | 00 |
| 47. Gastos incurridos o pagados a accionistas, personas o entidades relacionadas fuera de Puerto Rico (Véanse instrucciones) (Total $_____0_____) ........................................ AUP ⬭ (47) | 0 | 00 | 0 | 00 |
| 48. Deducción por gastos incurridos o pagados a accionistas, personas o entidades relacionadas, totalmente deducibles (Véanse instrucciones) ...................................... AUP ⬭ (48) | 0 | 00 | 0 | 00 |
| 49. Pérdidas ocasionadas por fuego, huracán, otros siniestros o por robo (Véanse instrucciones) AUP ⬭ (49) | 0 | 00 | 0 | 00 |
| 50. Deudas incobrables (Véanse instrucciones) .......................................... AUP ⬭ (50) | 0 | 00 | 0 | 00 |
| 51. Cargos de administración ............................................................................................. (51) | 0 | 00 | 0 | 00 |
| 52. Gastos en propiedades arrendadas a la Compañía de Fomento Industrial de Puerto Rico o almacén de la Compañía de Comercio y Exportación (Véanse instrucciones) ........ AUP ⬭ (52) | 0 | 00 | 0 | 00 |
| 53. Gastos por concepto de subscripciones y membresías ......................................... (53) | 0 | 00 | 0 | 00 |
| 54. Gastos relacionados con licencias y programas de computadoras no capitalizadas (Véanse instrucciones) ... AUP ⬭ (54) | 0 | 00 | 0 | 00 |
| 55. Otras deducciones (Someta detalle) ............................................... AUP ⬭ (55) | 0 | 00 | 0 | 00 |
| 56. Subtotal (Sume líneas 31 a la 55) .............................................................................. (56) | 0 | 00 | 0 | 00 |
| 57. Donativos ...................................................................................... AUP ⬭ (57) | 0 | 00 | 0 | 00 |
| 58. Deducción bajo la Ley 185-2014 (Véanse instrucciones) .................... AUP ⬭ (58) | 0 | 00 | 0 | 00 |
| 59. Total de deducciones (Sume líneas 23, 30, 56, 57 y 58) .................................... (59) | 0 | 00 | 0 | 00 |

**Parte III    Determinación del Ingreso Neto (o Pérdida) Sujeto a Contribución Normal y Contribución Adicional**

| | Contribución Regular | | Contribución Alternativa Mínima | |
|---|---|---|---|---|
| 1. Total de ingresos (De la Parte I, línea 25) ............................................................... (1) | 0 | 00 | 0 | 00 |
| 2. Total de deducciones (De la Parte II, línea 59) ...................................................... (2) | 0 | 00 | 0 | 00 |
| 3. **Ingreso neto (o pérdida) de operaciones** (Línea 1 menos línea 2) ................. (3) | 0 | 00 | 0 | 00 |
| 4. Menos: Deducción por pérdida neta en las operaciones del año anterior (Someta Anejo G Corporación. No exceder del 90% de la línea 3) ............. (4) | 0 | 00 | | |
| 5. Total de ingreso (o pérdida) luego de la pérdida neta en las operaciones del año anterior ..... (5) | 0 | 00 | 0 | 00 |
| 6. Beneficio tributable de agricultura (Anejo S Corporación, Parte II, línea 7) ... (6) | 0 | 00 | | |
| 7. **Ingreso neto (o pérdida)** (Sume líneas 5 y 6) ....................................................... (7) | 0 | 00 | 0 | 00 |
| 8. Menos: Dividendos o beneficios recibidos de corporaciones domésticas (Véanse instrucciones) ... (8) | 0 | 00 | | |
| 9. **Ingreso neto sujeto a contribución normal** (Línea 7 menos línea 8) ............... (9) | 0 | 00 | | |
| 10. Menos: Deducción para fines de la contribución adicional (Marque aquí si viene del Modelo SC 2652 ☐) .... (10) | 0 | 00 | | |
| 11. **Ingreso neto sujeto a contribución adicional** (Línea 9 menos línea 10) ........ (11) | 0 | 00 | | |

**Parte IV    Cómputo de la Contribución**

| | Contribución Regular | | Contribución Alternativa Mínima | |
|---|---|---|---|---|
| 1. Contribución normal (Multiplique línea 9, Parte III por: 1 ☐ 18.5% 2 ☐ 15% 3 ☐ 10% 4 ☐ 5% 5 ☐ Cont. opcional (Anejo X Corp., Sec. 1022.07) 6 ☐ ___%) (1) | 0 | 00 | | |
| 2. Contribución adicional (Véanse instrucciones) ..................................................... (2) | 0 | 00 | | |
| 3. **Contribución Total** (Sume líneas 1 y 2) .................................................................... (3) | 0 | 00 | | |
| 4. Contribución Alternativa - Ganancias de Capital y Tasas Preferenciales (Anejo D1 Corporación, línea 9) ... (4) | 0 | 00 | | |
| 5. **Contribución determinada antes del crédito por contribuciones pagadas a países extranjeros, los Estados Unidos, sus estados, posesiones y territorios** (Línea 3 ó 4, la que sea menor, siempre que la línea 4 sea mayor de cero) .... (5) | 0 | 00 | | |
| 6. Crédito por contribuciones pagadas a países extranjeros, los Estados Unidos, sus estados, territorios y posesiones (Anejo C Corporación, Parte III, línea 6(b)) (6) | 0 | 00 | | |
| 7. **Contribución determinada antes de la contribución alternativa mínima** (Línea 5 menos línea 6) ... (7) | 0 | 00 | | |
| 8. Contribución alternativa mínima en exceso de la contribución regular (Anejo A Corporación, Parte V, línea 34) ... (8) | 0 | 00 | | |
| 9. **Responsabilidad contributiva antes de créditos contributivos** (Sume líneas 7 y 8) ... (9) | 0 | 00 | | |
| 10. Recobro de crédito reclamado en exceso (Anejo B Corporación, Parte I, línea 3) .... (10) | 0 | 00 | | |
| 11. Crédito por contribución alternativa mínima pagada en años anteriores (Anejo A Corporación, Parte VI, línea 4) ... (11) | 0 | 00 | | |
| 12. Créditos contributivos (Anejo B Corporación, Parte II, línea 27) ...................... (12) | 0 | 00 | | |
| 13. **Responsabilidad contributiva antes del monto equivalente a dividendo o distribución de beneficios y de la contribución sobre dividendo implícito** (Sume línea 9 y 10 menos líneas 11 y 12) ... (13) | 0 | 00 | | |
| 14. Contribución sobre monto equivalente a dividendo o distribución de beneficios (Modelo SC 2879, Contribución sobre Monto Equivalente a Dividendo, línea 11) (14) | 0 | 00 | | |
| 15. Contribución sobre dividendo implícito (Véanse instrucciones) (Modelo SC 2877, Contribución sobre Dividendo Implícito, línea 13) (15) | 0 | 00 | | |
| 16. **Responsabilidad Contributiva Total** (Sume líneas 13 a la 15) ........................... (16) | 0 | 00 | | |
| 17. Menos: Otros Pagos y Retenciones (Anejo B Corporación, Parte III, línea 11) ... (17) | 0 | 00 | | |
| 18. **Total no pagado de la contribución** (Si la línea 17 es menor que la línea 16, anote la diferencia aquí, de lo contrario en la línea 19) (18) | 0 | 00 | | |
| 19. Exceso de contribución pagada o retenida (Véanse instrucciones) .................. (19) | 0 | 00 | | |
| 20. **Adición a la Contribución por Falta de Pago de la Contribución Estimada** (Anejo T Corporación, Parte II, línea 21) ... (20) | 0 | 00 | | |
| 21. BALANCE: • Si línea 19 es mayor que la suma de líneas 18 y 20, usted tiene un sobrepago. Anote diferencia aquí y en la línea 1 de página 1. • Si línea 19 es menor que la suma de líneas 18 y 20, usted tiene un balance pendiente de pago. Anote diferencia aquí y en la línea 2 de página 1. • Si diferencia entre línea 19 y la suma de línea 18 y 20 es igual a cero, anote cero aquí y pase a firmar su planilla en la página 1. (21) | 0 | 00 | | |

**LA CANTIDAD REFLEJADA EN LA LÍNEA 21 DEBERÁ TRASLADARSE A LA LÍNEA CORRESPONDIENTE DE LA PÁGINA 1.**

Período de Conservación: Diez (10) años

Reproducido por CEGsoft (www.cegsoft.com)

## Parte V — Costo de Ventas

| | | | Importe | |
|---|---|---|---:|:--|
| 1. | Inventario al comienzo del año **1** ☐ "C"   **2** ☐ "C" o "VM" | (1) | 0 | 00 |
| 2. | Compra de materiales o mercadería | (2) | 0 | 00 |
| 3. | Jornales directos | (3) | 0 | 00 |
| 4. | Otros costos directos (De la Parte VI, línea 17) | (4) | 0 | 00 |
| 5. | Costo de bienes disponibles para la venta (Sume líneas 1 a la 4) | (5) | 0 | 00 |
| 6. | Menos: Inventario al finalizar el año **1** ☐ "C"   **2** ☐ "C" o "VM" | (6) | 0 | 00 |
| 7. | Total de costos de ventas o costos directos de producción (Línea 5 menos línea 6. Traslade a la Parte I, línea 2 o 5, según aplique). | (7) | 0 | 00 |

## Parte VI — Otros Costos Directos

| Partida | | Importe | | Partida | | Importe | |
|---|---|---:|:--|---|---|---:|:--|
| 1. Jornales, sueldos y bonificaciones | (1) | 0 | 00 | 10. Energía eléctrica | (10) | 0 | 00 |
| 2. Seguro social federal (FICA) | (2) | 0 | 00 | 11. Agua y alcantarillado | (11) | 0 | 00 |
| 3. Seguro de desempleo | (3) | 0 | 00 | 12. Renta | (12) | 0 | 00 |
| 4. Primas Fondo Seguro del Estado | (4) | 0 | 00 | 13. Gastos de empaque de productos | (13) | 0 | 00 |
| 5. Planes de salud o accidentes | (5) | 0 | 00 | 14. Gastos de comida pagados a empleados de producción (Total $ 0 ) | (14) | 0 | 00 |
| 6. Seguros de propiedad, contingencia, responsabilidad pública y finanzas | (6) | 0 | 00 | 15. Depreciación (Someta Anejo E) | (15) | 0 | 00 |
| 7. Arbitrios / Impuesto sobre uso | (7) | 0 | 00 | 16. Otros costos directos (Someta detalle) | (16) | 0 | 00 |
| 8. Impuesto sobre ventas y uso en importaciones | (8) | 0 | 00 | 17. **Total otros costos directos** (Sume líneas 1 a la 16. Traslade a la Parte V, línea 4.) | (17) | 0 | 00 |
| 9. Reparaciones y mantenimiento | (9) | 0 | 00 | | | | |

## Parte VII — Estado de Situación Comparado

| Activos | | Al comenzar el año Total | | Al terminar el año Total | |
|---|---|---:|:--|---:|:--|
| 1. Efectivo en caja y bancos | (1) | 107,536 | 00 | 492,013 | 00 |
| 2. Cuentas a cobrar | (2) | 0 | 00 | 0 | 00 |
| 3. Menos: Reserva para cuentas incobrables | (3) | ( 0 ) 00 | | ( 0 ) 00 | |
| 4. Inventarios | (4) | 0 | 00 | 0 | 00 |
| 5. Otros activos corrientes | (5) | 1,401,806 | 00 | 7,485,189 | 00 |
| 6. Obligaciones a cobrar | (6) | 0 | 00 | 0 | 00 |
| 7. Inversiones | (7) | 0 | 00 | 0 | 00 |
| 8. Activos depreciables | (8) | 0 | 00 | 0 | 00 |
| 9. Menos: Reserva para depreciación | (9) | ( 0 ) 00 | | ( 0 ) 00 | |
| 10. Préstamos por cobrar de accionistas o entidades relacionadas | (10) | 0 | 00 | 0 | 00 |
| 11. Terrenos | (11) | 0 | 00 | 0 | 00 |
| 12. Otros activos a largo plazo | (12) | 0 | 00 | 0 | 00 |
| 13. **Total de Activos** | (13) | 1,509,342 | 00 | 7,977,202 | 00 |
| **Pasivos y Capital** | | | | | |
| **Pasivos** | | | | | |
| 14. Cuentas a pagar | (14) | 0 | 00 | 0 | 00 |
| 15. Gastos incurridos y no pagados | (15) | | | | |
| 16. Otros pasivos corrientes | (16) | 912,081 | 00 | 5,931,784 | 00 |
| 17. Obligaciones a pagar a largo plazo | (17) | 0 | 00 | 0 | 00 |
| 18. Obligaciones a pagar a accionistas o entidades relacionadas | (18) | 0 | 00 | 0 | 00 |
| 19. Otras obligaciones a largo plazo | (19) | 0 | 00 | 0 | 00 |
| 20. **Total de Pasivos** | (20) | 912,081 | 00 | 5,931,784 | 00 |
| **Capital** | | | | | |
| 21. Capital en acciones | | | | | |
| (a) Acciones preferidas | (21a) | 0 | 00 | 0 | 00 |
| (b) Acciones comunes | (21b) | 0 | 00 | 0 | 00 |
| 22. Sobrante de capital | (22) | 597,261 | 00 | 2,045,418 | 00 |
| 23. Ganancias retenidas | (23) | 0 | 00 | 0 | 00 |
| 24. Reserva | (24) | 0 | 00 | 0 | 00 |
| 25. **Total de Capital** | (25) | 597,261 | 00 | 2,045,418 | 00 |
| 26. **Total Pasivos y Capital** | (26) | 1,509,342 | 00 | 7,977,202 | 00 |

Periodo de Conservación: Diez (10) años

RADICADO ELECTRÓNICAMENTE

**SKALAR PHARMA LLC**

**66-0902281**

**GOBIERNO DE PUERTO RICO**

**DETALLE ADJUNTO DEL FORMULARIO 480.2**

**PLANILLA DE CONTRIBUCION SOBRE INGRESOS DE CORPORACIONES**

**PARA EL AÑO TERMINADO EN 31/12/2019**

**Página 4, Parte VII, Línea 5 - Otros Activos Corrientes (Al Comenzar el Año)**

| Descripción | Cantidad |
|---|---|
| PRE OPERATING COSTS | $1,401,806 |
| **Total** | **$1,401,806** |

Reproducido por CEGsoft (www.cegsoft.com)

**SKALAR PHARMA LLC**

**66-0902281**

**GOBIERNO DE PUERTO RICO**

**DETALLE ADJUNTO DEL FORMULARIO 480.2**

**PLANILLA DE CONTRIBUCION SOBRE INGRESOS DE CORPORACIONES**

**PARA EL AÑO TERMINADO EN 31/12/2019**

**Página 4, Parte VII, Línea 5 - Otros Activos Corrientes (Al Terminar el Año)**

| Descripción | Cantidad |
|---|---|
| PRE OPERATING COSTS | $7,485,189 |
| **Total** | **$7,485,189** |

Reproducido por CEGsoft (www.cegsoft.com)

## Parte VIII   Reconciliación del Ingreso Neto (o Pérdida) según Libros con el Ingreso Neto Tributable (o Pérdida) según Planilla

1. Ingreso neto (o pérdida) según libros ................. (1)   0 | 00
2. Contribución sobre ingresos según libros ............. (2)   0 | 00
3. Exceso de pérdidas de capital sobre ganancias de capital ........................................ (3)   0 | 00
4. Ingreso tributable no registrado en los libros este año (Detalle, use anejo si es necesario)
   - (a) _____ $ _____
   - (b) _____ $ _____
   - (c) _____ $ _____
   - (d) _____ $ _____
   - (e) _____ $ _____
   - (f) _____ $ _____
   - Total ............................................................. (4)   0 | 00
5. Gastos registrados en los libros este año no reclamados en esta planilla (Detalle, use anejo si es necesario)
   - (a) Comida y entretenimiento (porción no deducible) $ _____ 0
   - (b) Depreciación $ _____ 0
   - (c) Embarcaciones, aeronaves y propiedad localizada fuera de P. R. $ _____ 0
   - (d) Gastos incurridos o pagados a accionistas, personas o entidades relacionadas (porción no deducible) $ _____ 0
   - (e) Gastos de viaje y hospedaje (porción no deducible) $ _____ 0
   - (f) Indemnización por casos de hostigamiento y gastos relacionados $ _____ 0
   - (g) _____ $ _____
   - (h) _____ $ _____
   - (i) _____ $ _____
   - (j) _____ $ _____
   - Total ............................................................. (5)   0 | 00
6. **Total** (Sume líneas 1 a la 5) .......................... (6)   0 | 00

7. Ingreso registrado en los libros este año no incluido en esta planilla (Detalle, use anejo si es necesario)
   - (a) Ingresos exentos (Anejo IE Corp., Parte II, línea 22) $ _____ 0
   - (b) Ingresos excluidos (Anejo IE Corp., Parte I, línea 5) $ _____ 0
   - (c) _____ $ _____
   - (d) _____ $ _____
   - (e) _____ $ _____
   - (f) _____ $ _____
   - (g) _____ $ _____
   - Total ............................................................. (7)   0 | 00
8. Deducciones en esta planilla no llevadas contra el ingreso en los libros este año (Detalle, use anejo si es necesario)
   - (a) Depreciación $ _____ 0
   - (b) _____ $ _____
   - (c) _____ $ _____
   - (d) _____ $ _____
   - (e) _____ $ _____
   - (f) _____ $ _____
   - (g) _____ $ _____
   - (h) _____ $ _____
   - (i) _____ $ _____
   - Total ............................................................. (8)   0 | 00
9. **Total** (Sume líneas 7 y 8) .............................. (9)   0 | 00
10. **Ingreso neto tributable (o pérdida) según planilla** (Línea 6 menos línea 9) ................................. (10)   0 | 00

## Parte IX   Análisis del Sobrante según Libros

1. Balance al comenzar el año ................................ (1)   0 | 00
2. Ingreso neto según libros .................................. (2)   0 | 00
3. Otros aumentos (Detalle, use anejo si es necesario) _____ _____ (3)   0 | 00
4. **Total** (Sume líneas 1, 2 y 3) .......................... (4)   0 | 00

5. Distribuciones:   (a) Efectivo ........................... (5a)   0 | 00
             (b) Propiedad ....................... (5b)   0 | 00
             (c) Acciones .......................... (5c)   0 | 00
6. Otras rebajas (Use anejo si es necesario) _____ _____ (6)   0 | 00
7. Total (Sume líneas 5 y 6) ................................. (7)   0 | 00
8. **Balance al finalizar el año** (Línea 4 menos línea 7) .... (8)   0 | 00

## Parte X   Compensación a Directores

| Nombre del director | Número de seguro social | Porcentaje del tiempo dedicado a industria o negocio | Porcentaje de las acciones poseídas | | Compensación |
|---|---|---|---|---|---|
| | | | Comunes | Preferidas | |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |

Total de compensación a directores (Traslade a la Parte II, línea 1) .................................................   0 | 00

## Parte XI   Compensación a Oficiales

| Nombre del oficial | Número de seguro social | Porcentaje del tiempo dedicado a industria o negocio | Porcentaje de las acciones poseídas | | Compensación |
|---|---|---|---|---|---|
| | | | Comunes | Preferidas | |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |

Total de compensación a oficiales (Traslade a la Parte II, línea 2) .................................................   0 | 00

NUMERO DE CONFIRMACION: X1909585920      Reproducido por CEGsoft (www.cegsoft.com)

## Parte XII  Cuestionario

| | SÍ | NO | N/A |
|---|---|---|---|
| 1. Si es una corporación extranjera, indique si la industria o negocio operó como sucursal ......................................................................................................... (1) | | | X |
| 2. Si es una sucursal, indique el porcentaje que representa el ingreso de fuentes de Puerto Rico del total de ingreso de la corporación: **0.0000** % | | | |
| 3. ¿Mantuvo la corporación durante este año parte de sus récords en un sistema computadorizado? ............................................................................................... (3) | X | | |
| 4. Los libros de la corporación están a cargo de: | | | |

Nombre **THE COMPANY - FERNANDO LONDONO**
Dirección **STATE ROAD 53 KM 84**
**BO JOBOS GUAYAMA PR 00784**
Correo electrónico (E-mail) **fernando.londono@skalarpharma.com**
Teléfono **(787) 649 - 5826**

5. Indique el método de contabilidad utilizado en los libros para propósitos contributivos:  **1** ☐ Recibido y Pagado  **2** ☒ Acumulación  **3** ☐ Otro (especifique): _____

| | SÍ | NO | N/A |
|---|---|---|---|
| 6. ¿Rindió la corporación los siguientes documentos?: | | | |
| (a) Declaración Informativa (Formularios 480.6A, 480.6B, 480.6C, 480.6SP) .............. (6a) | | X | |
| (b) Comprobante de Retención (Formulario 499R-2/W-2PR) ........................ (6b) | | X | |
| 7. ¿El volumen de negocio de la entidad o grupo de entidades relacionadas es igual o mayor de $3,000,000? ............................................................... (7) | | X | |
| (a) ¿Incluye estados financieros auditados o informe de procedimientos previamente acordados firmados por un CPA con licencia de Puerto Rico, según lo dispuesto en la Sección 1061.15 del Código? (Véanse instrucciones) ........................ (7a) | | X | |
| (b) ¿Incluye Anejo PCI con Informe de Posiciones Contributivas Inciertas? ... (7b) | | X | |
| 8. Número de empleados durante el año: **0** | | | |
| 9. ¿Reclamó la corporación gastos relacionados con la titularidad, uso, mantenimiento y depreciación de: | | | |
| (a) Automóviles?............................................................................................. (9a) | | X | |
| (b) Embarcaciones?........................................................................................ (9b) | | X | |
| (1) ¿Derivó más del 80% de la totalidad de sus ingresos de actividades relacionadas exclusivamente con la pesca o transportación de pasajeros o de carga o arrendamiento? ..................................... (9b1) | | | X |
| (c) Aeronaves?............................................................................................... (9c) | | X | |
| (1) ¿Derivó más del 80% de los ingresos de actividades relacionadas exclusivamente con la transportación de pasajeros o de carga o arrendamiento? ..................................... (9c1) | | | X |
| (d) Propiedad residencial fuera de Puerto Rico?...................................... (9d) | | X | |
| (1) ¿Derivó más del 80% de la totalidad de sus ingresos de actividades relacionadas exclusivamente con el alquiler de propiedades a personas no relacionadas? ..................................... (9d1) | | | X |

| | SÍ | NO | N/A |
|---|---|---|---|
| 10. ¿Reclamó la corporación gastos relacionados con: | | | |
| (a) Alojamiento? (excepto empleados del negocio) ............................ (10a) | | X | |
| (b) Empleados que asistieron a convenciones fuera de Puerto Rico o los Estados Unidos? ........................................................................... (10b) | | X | |
| 11. ¿Distribuyó la corporación, durante el año contributivo, dividendos que no fueran en acciones o en liquidación en exceso de la ganancia corriente y acumulada? Si contestó "Sí", indique la cantidad $_____ **0** (11) | | X | |
| 12. ¿Es la corporación socio de una sociedad especial o sociedad? (Si es más de una, someta detalle) ................................................................. (12) | | X | |
| Nombre de la Sociedad Especial o Sociedad _____ | | | |
| Número de identificación patronal _____ | | | |
| 13. ¿Recibió ingresos exentos? (Someta Anejo IE Corporación) ............ (13) | | X | |
| 14. Anote la cantidad correspondiente de donativos a municipios de la cantidad incluida en la Parte II, línea 57: $ **0.00** | | | |
| 15. Indique si pagó primas a aseguradores no autorizados ..................... (15) | | X | |
| 16. Número de patrono otorgado por el Departamento del Trabajo y Recursos Humanos: _____ | | | |
| 17. Número de accionistas: **1** | | | |
| (a) ¿Es alguno de los accionistas de la corporación un individuo no residente o corporación extranjera? ............................................. (17a) | | X | |
| (1) Indique el porcentaje de participación del total de accionistas no residentes o corporaciones extranjeras **100** % | | | |
| (2) Indique el país de procedencia del accionista extranjero _____ | | | |
| 18. ¿Incurrió o pagó gastos a accionistas, personas o entidades relacionadas fuera de Puerto Rico? ............................................................................... (18) | | X | |
| (a) ¿Incluye un estudio de precios de transferencia? ........................ (18a) | | X | |
| (b) ¿Obtuvo determinación administrativa para tener derecho a la totalidad de la deducción? .................................................................................. (18b) | | X | |
| 19. ¿Reclamó la corporación gastos relacionados con servicios provistos por no residentes de Puerto Rico? ........................................................... (19) | | X | |
| (a) ¿Pagó el impuesto sobre ventas y uso correspondiente? ............. (19a) | | | X |
| 20. ¿Reclamó la corporación gastos de depreciación por propiedad mueble tangible adquirida fuera de Puerto Rico? ............................................ (20) | | X | |
| (a) ¿Pagó el impuesto sobre ventas y uso correspondiente? ............. (20a) | | | X |
| 21. ¿Pagó la corporación dividendo implícito durante el año anterior? Si contestó "Sí", indique la cantidad $_____ **0** (21) | | X | |

Período de Conservación: Diez (10) años

RADICADO ELECTRÓNICAMENTE

# Anejo A Corporación

Rev. 06.19

## CONTRIBUCIÓN ALTERNATIVA MINIMA

Año contributivo comenzado el **01** de **ene.** de **2019** y terminado el **31** de **dic.** de **2019**

# 2019

| Nombre del contribuyente | Número de Identificación Patronal |
|---|---|
| **SKALAR PHARMA LLC** | **66-0902281** |

| Parte I | Ajustes en el Cómputo del Ingreso Neto Alternativo Mínimo Antes de Ajustes en los Libros y Pérdidas de Operaciones |
|---|---|

1.
   a. Ingreso neto (o pérdida) sujeto a contribución alternativa mínima (De la Parte III, línea 7 de la planilla) **(1a)** `0` `00`
   b. Menos: Ingresos sujetos a tasas preferenciales que haya optado por tributar a la tasa preferencial correspondiente (Anejo D1 Corporación, línea 3) .............. **(1b)** `0` `00`
   c. Menos: Dividendos o beneficios recibidos de corporaciones domésticas (De la Parte III, línea 8 de la planilla) .............. **(1c)** `0` `00`
   d. Menos: Participación distribuible en los ajustes para propósitos de la contribución alternativa mínima de entidades conducto (Formulario 480.6 EC. Véanse instrucciones) .............. **(1d)** `0` `00`
   e. Ingreso neto (o pérdida) sujeto a contribución alternativa mínima sin considerar: pérdida neta en operaciones de años anteriores, ingresos sujetos a tasas preferenciales y participación distribuible en los ajustes de entidades conducto (Línea 1(a) menos líneas 1(b), 1(c) y 1(d)) .............. **(1e)** `0` `00`

2. Ajustes:
   a. Depreciación flexible .............. **(2a)** `0` `00`
   b. Ventas a plazos .............. **(2b)** `0` `00`
   c. Contrato a largo plazo .............. **(2c)** `0` `00`
   d. Gastos relacionados con intereses exentos .............. **(2d)** `0` `00`
   e. Depreciación acelerada .............. **(2e)** `0` `00`
   f. Total de ajustes (Sume líneas 2(a) a 2(e)) .............. **(2)** `0` `00`

3. Ingreso neto (o pérdida) alternativo mínimo antes de ajustes de la Parte II y la pérdida de operaciones (Sume líneas 1(e) y 2(f)) **(3)** `0` `00`

| Parte II | Ajuste por el Exceso del Ingreso Neto Ajustado según Libros sobre el Ingreso Neto Alternativo Mínimo Antes de Ajustes |
|---|---|

4. Ingreso neto (o pérdida) según libros .............. **(4)** `0` `00`
5. Ajuste por amortización de plusvalía .............. **(5)** `0` `00`
6. Contribuciones sobre ingresos consideradas en los libros .............. **(6)** `0` `00`
7. Sume líneas 4 a la 6 .............. **(7)** `0` `00`
8. Ingreso de intereses exentos neto de gastos relacionados .............. **(8)** `0` `00`
9. Dividendos y distribuciones de beneficios recibidos de corporaciones o sociedades domésticas, de ingresos de fomento industrial o de desarrollo turístico .............. **(9)** `0` `00`
10. Ingreso (o pérdida) de fomento industrial, ingreso exento de desarrollo turístico, ingreso de negocio agrícola *bona fide*, ingreso de renta bajo la Ley 132-2010 o bajo la Ley 185-1996 .............. **(10)** `0` `00`
11. Ingreso (o pérdida) reconocido según el método de equidad .............. **(11)** `0` `00`
12. Reserva para pérdidas catastróficas .............. **(12)** `0` `00`
13. Ingresos sujetos a tasas preferenciales que haya optado por tributar a la tasa preferencial correspondiente (De la Parte I, línea 1(b)) (Véanse instrucciones) .............. **(13)** `0` `00`
14. Ganancia de capital bajo la Sección 1031.06 del Código .............. **(14)** `0` `00`
15. Sume líneas 8 a la 14 .............. **(15)** `0` `00`
16. Línea 7 menos línea 15 .............. **(16)** `0` `00`
17. Línea 16 menos línea 3. Si la línea 3 es mayor que la línea 16, anote cero .............. **(17)** `0` `00`
18. Ajuste por el exceso del ingreso neto ajustado según libros sobre el ingreso neto alternativo mínimo de la línea 3 (Multiplique la línea 17 por 60%) .............. **(18)** `0` `00`

| Parte III | Cómputo del Ingreso Neto Alternativo Mínimo |
|---|---|

19. Ingreso neto alternativo mínimo antes de pérdida neta en operaciones (Sume líneas 3 y 18) .............. **(19)** `0` `00`
20. Pérdida neta en operaciones de años anteriores para la determinación de la contribución alternativa mínima (No puede exceder del 70% de la línea 19) (Del Anejo G Corporación, Parte II, línea 13. Someta Anejo G Corporación) (Véanse instrucciones) ...... **(20)** `0` `00`
21. Línea 19 menos línea 20 (Anote aquí la diferencia, pero no menos del 30% de la línea 19) .............. **(21)** `0` `00`
22. Cantidad exenta (Véanse instrucciones) .............. **(22)** `0` `00`
23. Ingreso neto alternativo mínimo (Línea 21 menos línea 22) .............. **(23)** `0` `00`

| Parte IV | Cómputo del Crédito Alternativo Mínimo por Contribuciones Pagadas al Extranjero |
|---|---|

24. Contribución mínima tentativa antes del crédito por contribuciones pagadas al extranjero (Anote lo mayor entre $500 o el resultado de la línea 23 multiplicado por la tasa aplicable de 1 ☐ 18.5% 2 ☐ 23%) **(24)** `0` `00`
25. Ingreso neto alternativo mínimo antes de la deducción por pérdida neta en operaciones (Línea 19) .............. **(25)** `0` `00`
26. Cantidad exenta permisible sin considerar la pérdida neta en operaciones (Véanse instrucciones) .............. **(26)** `0` `00`
27. Línea 25 menos línea 26 .............. **(27)** `0` `00`
28. Anote lo mayor entre $500 o el resultado de la línea 27 multiplicado por la tasa aplicable de 1 ☐ 18.5% 2 ☐ 23% **(28)** `0` `00`
29. Multiplique la línea 28 por 10% .............. **(29)** `0` `00`
30. Límite del crédito (Línea 24 menos línea 29) .............. **(30)** `0` `00`
31. Crédito alternativo mínimo por contribuciones pagadas al extranjero (Esta cantidad no podrá exceder la cantidad en la línea 30. Véanse instrucciones) .............. **(31)** `0` `00`

Período de Conservación: Diez (10) años

NUMERO DE CONFIRMACION: X1909585920

Reproducido por CEGsoft (www.cegsoft.com)

| Parte V | Cómputo de la Contribución Alternativa Mínima | | | |
|---|---|---|---|---|
| 32. | Contribución mínima tentativa después del crédito alternativo mínimo por contribuciones pagadas al extranjero (línea 24 menos línea 31 de la Parte IV) .................................................................................................... | (32) | 0 | 00 |
| 33. | Contribución total neta del crédito por contribuciones pagadas a paises extranjeros, los Estados Unidos, sus estados, territorios y posesiones (Línea 3 menos línea 6 de la Parte IV, página 2 de la planilla) ........................................ | (33) | 0 | 00 |
| 34. | Contribución alternativa mínima (Línea 32 menos línea 33. Si la línea 33 excede la línea 32, anote cero, de lo contrario, anote la diferencia en el Formulario 480.2, página 3, Parte IV, línea 8) ................................................ | (34) | 0 | 00 |

| Parte VI | Cómputo del Crédito de Contribución Alternativa Mínima | | | |
|---|---|---|---|---|
| 1. | Exceso de la contribución regular sobre la contribución alternativa mínima para el año corriente (Línea 33 menos línea 32 de la Parte V. Si la línea 32 excede la línea 33, anote cero) .................................................... | (1) | 0 | 00 |
| 2. | Multiplique la línea 1 por 25% y anote el resultado aquí ........................................................................ | (2) | 0 | 00 |
| 3. | Cantidad de contribución alternativa mínima pagada en años anteriores y no reclamada como crédito (Parte VII, línea 11) ....... | (3) | 0 | 00 |
| 4. | Cantidad del crédito a reclamar (Anote lo menor entre la línea 2 o 3. Traslade a la línea 11, Parte IV de la planilla)........................... | (4) | 0 | 00 |

| Parte VII | Determinación de la Cantidad de Contribución Alternativa Mínima Pagada en Años Anteriores No Reclamada como Crédito | | |
|---|---|---|---|
| Año Contributivo (Día / Mes / Año) | (A) Contribución Alternativa Mínima Pagada en Exceso de la Contribución Regular | (B) Cantidad Utilizada como Crédito en Años Anteriores | (C) Balance |
| 1. | 00 | 00 | 00 |
| 2. | 00 | 00 | 00 |
| 3. | 00 | 00 | 00 |
| 4. | 00 | 00 | 00 |
| 5. | 00 | 00 | 00 |
| 6. | 00 | 00 | 00 |
| 7. | 00 | 00 | 00 |
| 8. | 00 | 00 | 00 |
| 9. | 00 | 00 | 00 |
| 10. | 00 | 00 | 00 |
| 11. Total (Traslade a la Parte VI, línea 3 de este Anejo) ................................................................ (11) | | 0 | 00 |

Período de Conservación: Diez (10) años

RADICADO ELECTRONICAMENTE

# Accrued Expenses

| Item | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 (Jul) | Total |
|------|-----:|-----:|-----:|-----:|-----:|-----------:|------:|
| Payroll | 38,262 | 694,112 | 1,454,897 | 3,915,694 | 360,010 | 220,120 | 6,683,095 |
| Utilities | 64,974 | 757,771 | 1,291,074 | 1,594,804 | 174,494 | 50,893 | 3,934,010 |
| Internet services | - | - | - | 11,931 | - | - | 11,931 |
| Printing services | - | - | - | 3,800 | - | - | 3,800 |
| Supplies | - | - | - | 20,586 | - | - | 20,586 |
| Security  Services | 56,360 | 229,225 | 18,005 | 222,129 | 226,474 | 142,812 | 895,004 |
| Cleaning services | - | 10,314 | 90,110 | 150,839 | - | - | 251,263 |
| Software | - | - | - | 286,402 | 176,639 | - | 463,041 |
| Legal services | 113,769 | 134,785 | 139,520 | 31,351 | 34,627 | - | 454,051 |
| Assestments / Repairs | 53,229 | 123,576 | 925,247 | 46,127 | - | - | 1,148,179 |
| Others | 111,196 | 766,211 | - | 75,000 | 63,829 | 22,107 | 1,038,343 |
| Travel Expenses | 36,570 | 47,429 | 6,055 | 36,043 | 1,339 | 755 | 128,189 |
| TOTAL | 474,358 | 2,763,422 | 3,924,909 | 6,394,705 | 1,037,411 | 436,685 | 15,031,491 |

Formulario 483.4  Rev. 8 mar 19



**2018**     GOBIERNO DE PUERTO RICO     **2018**
             DEPARTAMENTO DE HACIENDA

EXCEPCIÓN A LA RADICACIÓN ELECTRÓNICA
PLANILLA DE CONTRIBUCIÓN SOBRE INGRESOS
DE CORPORACIONES

Año contributivo comenzando el __25__ de __jun.__ de __2018__ y terminado el __31 de dic.__ de 2018

Número de Serie

Sello de Recibo

Gobierno de Puerto Rico
DEPARTAMENTO DE HACIENDA
1179-Colecturía Hato Rey
RECIBIDO
2 0 AGO. 2020
SIN PAGO

18-1346

TODO CONTRIBUYENTE RADICARÁ LA PLANILLA DE CONTRIBUCIÓN SOBRE INGRESOS DE CORPORACIONES
ELECTRÓNICAMENTE CON EXCEPCIÓN DE LOS CASOS INCLUIDOS EN ESTE FORMULARIO.

IMPORTANTE: ESTE FORMULARIO TENDRÁ QUE RADICARSE JUNTO CON LA PLANILLA EN PAPEL.

| Nombre del Contribuyente | Número de Identificación Patronal |
|---|---|
| SKALAR PHARMA LLC | 66-0902281 |

| Dirección ESTATE ROAD 53 KM 84 | Correo Electrónico | Teléfono |
|---|---|---|
| BO JOBOS Guayama PR 00784 | fernando.londono@skalarpharma.com | (787) 649 - 5826 |

**Excepciones para la Radicación Electrónica de la Planilla de Contribución sobre Ingresos de Corporaciones para el Año Contributivo 2018**

Marque la(s) razón(razones) por la(s) cual(es) la Planilla no puede ser radicada electrónicamente.

1. ⬭ Corporación extranjera no dedicada a industria o negocio en Puerto Rico que *únicamente* reporta una venta de propiedad inmueble localizada en Puerto Rico que haya sido realizada luego del **31 de diciembre de 2018**.

2. ⬭ Corporación extranjera con ingreso relacionado a la explotación de una industria o negocio en Puerto Rico según la Sección 1035.05 del Código de Rentas Internas de Puerto Rico de 2011, según enmendado ("Código") ("*Schedule U*").

3. ⬭ Corporación extranjera que no esté localizada en Puerto Rico y cuyo *único* ingreso de fuentes de Puerto Rico es por la participación distribuible de una Entidad Conducto que esté dedicada a industria o negocio en Puerto Rico.

4. ⬭ Corporación en liquidación previo a que termine su año contributivo y deba radicar una última planilla de inmediato.

5. ⬯ Corporación que radica planilla con un período contributivo menor de 12 meses que comienza y termina dentro del mismo año natural.

6. ⬭ Corporación con año contributivo de 52-53 semanas.

7. ⬭ Corporación que reclame los créditos contributivos determinados en los Anejos Q y Q1.

8. ⬭ Corporación que no pueda someter la planilla o prórroga automática electrónicamente *por error en el número de Identificación Patronal o por error en el Sistema.* Incluya código de error _____. Someta evidencia de dicho error.

9. ⬭ Corporación que no venga obligada a estar inscrita en el Registro de Comerciantes por no tener operaciones en Puerto Rico.

**JURAMENTO**

Nosotros, los suscribientes, presidente (o vicepresidente u otro oficial principal) y tesorero (o tesorero auxiliar), o agente de la corporación a nombre de la cual se hace este formulario, cada uno por sí, bajo el más solemne juramento y so pena de perjurio, declaramos que hemos examinado el mismo y que según nuestro mejor conocimiento y creencia es un formulario exacto, correcto y completo, hecho de buena fe, de acuerdo con el Código y sus Reglamentos.

| Fernando Londono | _Firma_ | 08/20/2020 |
|---|---|---|
| Nombre del presidente o vicepresidente | Firma del presidente o vicepresidente | Fecha |
| Fernando Londono | _Firma_ | 08/20/2020 |
| Nombre del tesorero o tesorero auxiliar | Firma del tesorero o tesorero auxiliar | Fecha |
| | | |
| Nombre del agente | Firma del agente | Fecha |

| Nombre del Especialista (Letra de Molde) | | Nombre de la Firma o Negocio |
|---|---|---|
| _Liza Ruiz_ | | Compliance Resources Group Inc. |
| Firma del Especialista | Fecha 9/20/2020 | Especialista por cuenta propia (ennegrezca aquí) ⬭    Número de Registro 0017974 |

*Período de Conservación: Diez (10) años

Reproducido por CEGsoft (www.cegsoft.com)

Formulario 480.2   Rev. 10.18

| Liquidador: | Revisor: | 2018 | GOBIERNO DE PUERTO RICO DEPARTAMENTO DE HACIENDA | 2018 | Número de Serie |

**Planilla de Contribución sobre Ingresos de Corporaciones**

AÑO CONTRIBUTIVO COMENZADO EL 25 de jun. de 2018 Y TERMINADO EL 31 de dic. de 2018

Investigado por:

Fecha ___/___/___
R M N

☐ PLANILLA ENMENDADA

AÑO CONTRIBUTIVO:
1 [X] NATURAL 2 ☐ ECONÓMICO 3 ☐ 52-53 SEMANAS

Sello de Pago

**Nombre del Contribuyente**
SKALAR PHARMA LLC

**Número de Identificación Patronal**
66-0902281

**Dirección Postal**
ESTATE ROAD 53 KM 84

BO JOBOS

Guayama          PR          Código Postal 00784

**Núm. de Registro del Departamento de Estado**
411680

**Clave Industrial** 3254   **Cod. Municipal** 71

**Número de Registro de Comerciante**
11298060013

**Localización de la Industria o Negocio Principal - Número, Calle, Pueblo**
ESTATE ROAD 53 KM 84

BO JOBOS Guayama PR

**Número de Teléfono - Extensión**
(787) 649 - 5826

Número de Recibo: _____
Importe: _____

**Naturaleza de la Industria o Negocio Principal (Ej. Ferretería, Cafetería, etc.)**
FABRICACION DE PRODUCTOS FARMACEUTICOS Y MEDICINALES

**Fecha de Incorporación**
Día 25 / Mes 06 / Año 2018

**Tipo de Entidad**
Compañia de Resposabilidad Limitada

Marque en el encasillado correspondiente, si aplica
1 [X] Primera planilla   2 ☐ Última planilla

CAMBIO DE DIRECCIÓN: ☐ Sí [X] No
SOLICITÓ PRÓRROGA: ☐ Sí [X] No

**Lugar de Incorporación**
1 [X] Doméstica (PR)
2 ☐ Extranjera   Puerto Rico

**Indique si es miembro de un grupo de entidades relacionadas**
☐ Sí   [X] No

Número de grupo

Contratos con Organismos Gubernamentales
☐ Sí   [X] No

**Correo Electrónico de Persona Contacto (E-mail)**
fernando.londono@skalarpharma.com

**PASE A LA PÁGINA 2 PARA DETERMINAR SU REINTEGRO O PAGO**

**Reintegro**

| | | | |
|---|---|---|---|
| 1. CONTRIBUCIÓN PAGADA EN EXCESO (Parte IV, línea 58). Indique distribución en las líneas A, B, C y D. | | (1) | 0 00 |
| A) Acreditar a la contribución estimada 2019 | | (1A) | 0 00 |
| B) Aportación al Fondo Especial para el Estuario de la Bahía de San Juan | | (1B) | 0 00 |
| C) Aportación al Fondo Especial para la Universidad de Puerto Rico | | (1C) | 0 00 |
| D) A REINTEGRAR | | (1D) | 0 00 |

**Pago**

| | | | |
|---|---|---|---|
| 2. TOTAL NO PAGADO DE LA CONTRIBUCIÓN (Parte IV, línea 58) | | (2) | 0 00 |
| 3. Menos: Cantidad pagada (a) Con Planilla | | (3a) | 0 00 |
| (b) Intereses (Véanse instrucciones) | | (3b) | 0 00 |
| (c) Recargos ___0___ y Penalidades ___0___ (Véanse instrucciones) | | (3c) | 0 00 |
| 4. BALANCE PENDIENTE DE PAGO (Línea 2 menos línea 3(a) más líneas 3(b) y 3(c)) | | (4) | 0 00 |

Gobierno de Puerto Rico DEPARTAMENTO DE HACIENDA 179-Colecturia Nat. Rev. RECIBIDO 20 AGO 2020 SIN PAGO SECRETARIA DE HACIENDA

**JURAMENTO**

Nosotros, los suscribientes, presidente (o vicepresidente u otro oficial principal) y tesorero (o tesorero auxiliar), o agente de la corporación a nombre de la cual se hace esta planilla de contribución sobre ingresos, cada uno por sí, bajo el más solemne juramento y so pena de perjurio, declaramos que hemos examinado la misma (incluyendo anejos y estados que la acompañan), y que según nuestro mejor conocimiento y creencia es una planilla exacta, correcta y completa, hecha de buena fe, de acuerdo con el Código de Rentas Internas de Puerto Rico de 2011, según enmendado, y sus Reglamentos.

| | | |
|---|---|---|
| Fernando Londono | _[firma]_ | 08/20/2020 |
| Nombre del presidente o vicepresidente | Firma del presidente o vicepresidente | Fecha |
| Fernando Londono | _[firma]_ | 08/20/2020 |
| Nombre del tesorero o tesorero auxiliar | Firma del tesorero o tesorero auxiliar | Fecha |
| | | |
| Nombre del agente | Firma del agente | Fecha |

**PARA USO DEL ESPECIALISTA SOLAMENTE**

Declaro bajo penalidad de perjurio que he examinado esta planilla (incluyendo los anejos y estados adjuntos), y a mi mejor conocimiento y creencia, los datos en la misma son ciertos, correctos y constituyen en conjunto una planilla exacta y completa. La declaración de la persona que prepara esta planilla es con relación a la información recibida y ésta puede ser verificada.

| Nombre del especialista (letra de molde) | Núm. de registro | Fecha | Marque si es especialista por cuenta propia |
|---|---|---|---|
| Liza Ruiz | 09117194 | 9/20/2020 | ☐ |

Nombre de la firma
Cepthanu Resources Group Inc.

Firma del especialista _[firma]_

Dirección PO Box 13669 San Juan PR   Código postal 00908

**NOTA AL CONTRIBUYENTE**
Indique si hizo pagos por la preparación de su planilla: [X] Sí ☐ No. Si contestó "Sí", exija la firma y el número de registro del Especialista.

Período de Conservación: Diez (10) años

Reproducido por CEGsoft (www.cegsoft.com)

| **Parte I** | **Determinación del Ingreso Neto (o Pérdida) de Operaciones** | | | | |
|---|---|---|---|---|---|

1. Ventas netas de bienes o productos (Véanse instrucciones) .......... (1) — 0 00
   Menos: Costos de ventas o costos directos de producción
2. Inventario al comienzo del año 1 ☐ "C"     2 ☐ "C" o "VM" .......... (2) 0 00
3. Compra de materiales o mercadería .......... (3) 0 00
4. Jornales directos .......... (4) 0 00
5. Otros costos directos (De la Parte V, línea 17) .......... (5) 0 00
6. Costo de bienes disponibles para la venta (Sume líneas 2 a 5) .......... (6) 0 00
7. Menos: Inventario al finalizar el año 1 ☐ "C"     2 ☐ "C" o "VM" .......... (7) 0 00
8. Total de costos de ventas o costos directos de producción (Línea 6 menos línea 7) .......... (8) 0 00
9. Ganancia (o pérdida) bruta de la venta de bienes o productos (Línea 1 menos línea 8) .......... (9) 0 00
10. Ingreso bruto generado en la venta de servicios .......... (10) 0 00
11. Ganancia neta de capital (Anejo D Corporación, Parte IV, línea 21) .......... (11) 0 00
12. Ganancia neta (o pérdida) en la venta de propiedad que no sea activo de capital (Anejo D Corporación, Parte V, línea 22) .......... (12) 0 00
13. Renta (Total $_____ 0 ) (Véanse instrucciones) .......... (13) 0 00
14. Intereses: (a) Sujetos a la tasa preferencial de 10%_____ 0 (b) Otros_____ 0 .......... (14) 0 00
15. Ingreso por comisiones .......... (15) 0 00
16. Dividendos de corporaciones: (a) Domésticas_____ 0 (b) Extranjeras_____ 0 .......... (16) 0 00
17. Participación distribuible en el ingreso neto de sociedades y sociedades especiales (Anejo R Corporación, Parte III, línea 5) .......... (17) 0 00
18. Participación distribuible en el ingreso neto sujeto a tasas preferenciales proveniente de sociedades y sociedades especiales (Véanse instrucciones) .......... (18) 0 00
19. Beneficio tributable de agricultura (Anejo S Corporación, Parte I, línea 9) .......... (19) 0 00
20. Ingreso neto derivado de las operaciones de una entidad financiera internacional que opera como una unidad de un banco .......... (20) 0 00
21. Fletes y pasajes .......... (21) 0 00
22. Regalías .......... (22) 0 00
23. Condonación de deudas (Formulario 480.6A) .......... (23) 0 00
24. Espectáculos públicos .......... (24) 0 00
25. Otros pagos reportados en un Formulario 480.6A o 480.6B .......... (25) 0 00
26. Ingresos misceláneos (Someta detalle) .......... (26) 0 00
27. Total de ingresos (Sume líneas 9 a 26) .......... (27) 0 00
28. Menos: Cantidad exenta bajo Ley 135-2014 (Véanse instrucciones) .......... (28) 0 00
29. Total de ingreso después de la exención bajo la Ley 135-2014 (Línea 27 menos línea 28) .......... (29) 0 00
30. Menos: Total de deducciones (De la Parte VI, línea 52) .......... (30) 0 00
31. Ingreso neto (o pérdida) de operaciones (Línea 29 menos línea 30) .......... (31) 0 00

| **Parte II** | **Determinación del Ingreso Neto (o Pérdida)** | | |
|---|---|---|---|

32. Menos: Deducción por pérdida neta en las operaciones del año anterior (Someta Anejo G Corporación. No exceder el 80% de la línea 31) .......... (32) 0 00
33. Ingreso neto (o pérdida) .......... (33) 0 00

| **Parte III** | **Determinación del Ingreso Neto Sujeto a Contribución Normal y Contribución Adicional** | | |
|---|---|---|---|

34. Menos: Dividendos o beneficios recibidos de corporaciones domésticas (Véanse instrucciones) .......... (34) 0 00
35. Ingreso neto sujeto a contribución normal (Línea 33 menos línea 34) .......... (35) 0 00
36. Menos: Deducción para fines de la contribución adicional (Marque aquí si viene del Modelo SC 2652 ☐) .......... (36) 0 00
37. Ingreso neto sujeto a contribución adicional (Línea 35 menos línea 36) .......... (37) 0 00

| **Parte IV** | **Cómputo de la Contribución** | | |
|---|---|---|---|

38. Contribución normal (Multiplique la línea 35 por: 1 ☒ 20% 2 ☐ 15% 3 ☐ 10% 4 ☐ 5% 5 ☐___%) (Véanse instrucciones) .......... (38) 0 00
39. Contribución adicional (Véanse instrucciones) .......... (39) 0 00
40. Contribución Total (Sume líneas 38 y 39) .......... (40) 0 00
41. Contribución Alternativa - Ganancias de Capital y Tasas Preferenciales (Anejo D1 Corporación, línea 9) .......... (41) 0 00
42. Contribución determinada antes del crédito por contribuciones pagadas a los Estados Unidos, sus posesiones y países extranjeros (Línea 40 o 41, la que sea menor, siempre que la línea 41 sea mayor de cero) .......... (42) 0 00
43. Crédito por contribuciones pagadas a los Estados Unidos, sus posesiones y países extranjeros (Anejo C Corporación, Parte III, línea 6(b)) .......... (43) 0 00
44. Contribución determinada antes de contribución alternativa mínima (Línea 42 menos línea 43) .......... (44) 0 00
45. Contribución alternativa mínima en exceso de la contribución regular (Anejo A Corporación, Parte V, línea 33) .......... (45) 0 00
46. Responsabilidad contributiva antes de créditos contributivos (Sume líneas 44 y 45) .......... (46) 0 00
47. Recobro de crédito reclamado en exceso (Anejo B Corporación, Parte I, línea 3) .......... (47) 0 00
48. Crédito por contribución alternativa mínima pagada en años anteriores (Anejo A Corporación, Parte VI, línea 4) .......... (48) 0 00
49. Créditos contributivos (Anejo B Corporación, Parte II, línea 19) .......... (49) 0 00
50. Responsabilidad contributiva antes del monto equivalente a dividendo o distribución de beneficios y de la contribución sobre dividendo implícito (Sume línea 46 y 47 menos líneas 48 y 49) .......... (50) 0 00
51. Contribución sobre monto equivalente a dividendo o distribución de beneficios (Modelo SC 2879, Contribución sobre Monto Equivalente a Dividendo, línea 11) .......... (51) 0 00
52. Contribución sobre dividendo implícito (Véanse instrucciones) (Modelo SC 2877, Contribución sobre Dividendo Implícito, línea 13) .......... (52) 0 00
53. Responsabilidad Contributiva Total (Sume líneas 50 a 52) .......... (53) 0 00
54. Menos: Otros Pagos y Retenciones (Anejo B Corporación, Parte III, línea 11) .......... (54) 0 00
55. Total no pagado de la contribución (Si la línea 54 es menor que la línea 53, anote la diferencia aquí, de lo contrario en la línea 56) .......... (55) 0 00
56. Exceso de contribución pagada o retenida (Véanse instrucciones) .......... (56) 0 00
57. Adición a la Contribución por Falta de Pago de la Contribución Estimada (Anejo T Corporación, Parte II, línea 21) .......... (57) 0 00
58. BALANCE: • Si línea 56 es mayor que la suma de líneas 55 y 57, usted tiene un sobrepago. Anote diferencia aquí y en línea 1 de página 1.
    • Si línea 56 es menor que la suma de líneas 55 y 57, usted tiene un balance pendiente de pago. Anote diferencia aquí y en línea 2 de página 1.
    • Si diferencia entre línea 56 y la suma de líneas 55 y 57 es igual a cero, anote cero aquí y pase a firmar su planilla en la PARTE A DE LA PÁGINA 1. .......... (58) 0 00

LA CANTIDAD REFLEJADA EN LA LÍNEA 58 DEBERÁ TRASLADARSE A LA LÍNEA CORRESPONDIENTE DE LA PÁGINA 1.
Período de Conservación: Diez (10) años
Reproducido por CEGsoft (www.cegsoft.com)

## Parte V    Otros Costos Directos

| Partida | Importe | Partida | Importe |
|---|---|---|---|
| 1. Jornales, sueldos y bonificaciones .......... (1) | 0 00 | 11. Renta .......... (11) | 0 00 |
| 2. Seguro social federal (FICA) .......... (2) | 0 00 | 12. Limpieza, mantenimiento y recogido de | |
| 3. Seguro de desempleo .......... (3) | 0 00 |     desperdicios .......... (12) | 0 00 |
| 4. Primas Fondo Seguro del Estado .......... (4) | 0 00 | 13. Gastos de empaque de productos .......... (13) | 0 00 |
| 5. Seguro médico o de hospitalización .......... (5) | 0 00 | 14. Gastos de comida pagados a empleados de producción | |
| 6. Otros seguros .......... (6) | 0 00 |     (Total $ _____ 0 ) .......... (14) | 0 00 |
| 7. Arbitrios / Impuesto sobre uso .......... (7) | 0 00 | 15. Depreciación (Someta Anejo E) .......... (15) | 0 00 |
| 8. Impuesto sobre ventas y uso en importaciones .......... (8) | 0 00 | 16. Otros gastos (Someta detalle) .......... (16) | 0 00 |
| 9. Reparaciones .......... (9) | 0 00 | 17. Total otros costos directos (Sume líneas 1 a la 16. | |
| 10. Luz y agua .......... (10) | 0 00 |     Traslade a la Parte I, línea 5) .......... (17) | 0 00 |

## Parte VI    Deducciones

| | Importe |
|---|---|
| 1. Compensación a directores (Véanse instrucciones Parte X) .......... (1) | 0 00 |
| 2. Compensación a oficiales (Véanse instrucciones Parte XI) .......... (2) | 0 00 |
| 3. Sueldos, comisiones y bonificaciones a empleados (Véanse instrucciones) .......... (3) | 0 00 |
| 4. Comisiones a negocios .......... (4) | 0 00 |
| 5. Seguro social federal (FICA) .......... (5) | 0 00 |
| 6. Seguro de desempleo .......... (6) | 0 00 |
| 7. Primas Fondo Seguro del Estado .......... (7) | 0 00 |
| 8. Seguro médico o de hospitalización .......... (8) | 0 00 |
| 9. Seguros .......... (9) | 0 00 |
| 10. Intereses pagados en arrendamiento financiero de automóviles .......... (10) | 0 00 |
| 11. Intereses hipotecarios .......... (11) | 0 00 |
| 12. Otros intereses (Véanse instrucciones) .......... (12) | 0 00 |
| 13. Renta de propiedad mueble tangible .......... (13) | 0 00 |
| 14. Renta de propiedad inmueble .......... (14) | 0 00 |
| 15. Contribución sobre propiedad: (a) Mueble $ _____ 0 (b) Inmueble $ _____ .......... (15) | 0 00 |
| 16. Otras contribuciones, patentes y licencias (No incluya impuesto sobre ventas y uso. Véanse instrucciones) .......... (16) | 0 00 |
| 17. Impuesto sobre ventas y uso (Véanse instrucciones) .......... (17) | 0 00 |
| 18. Pérdidas ocasionadas por fuego, huracán, otros siniestros o por robo (Véanse instrucciones) .......... (18) | 0 00 |
| 19. Gastos de automóviles (Millaje _____ 0 ) (Véanse instrucciones) .......... (19) | 0 00 |
| 20. Gastos de otros vehículos de motor (Véanse instrucciones) .......... (20) | 0 00 |
| 21. Gastos de comida y entretenimiento (Total $ _____ 0 ) (Véanse instrucciones) .......... (21) | 0 00 |
| 22. Gastos de viajes .......... (22) | 0 00 |
| 23. Servicios profesionales .......... (23) | 0 00 |
| 24. Aportaciones a planes de pensiones u otros planes calificados (Véanse instrucciones. Someta Modelo SC 6042) .......... (24) | 0 00 |
| 25. Depreciación y amortización (Véanse instrucciones. Someta Anejo E) .......... (25) | 0 00 |
| 26. Deudas incobrables (Véanse instrucciones) .......... (26) | 0 00 |
| 27. Reparaciones (Véanse instrucciones) .......... (27) | 0 00 |
| 28. Regalías .......... (28) | 0 00 |
| 29. Cargos de administración .......... (29) | 0 00 |
| 30. Deducción a patronos que emplean personas impedidas (Véanse instrucciones) .......... (30) | 0 00 |
| 31. Aportaciones a cuentas de aportación educativa para los beneficiarios de sus empleados (Véanse instrucciones) .......... (31) | 0 00 |
| 32. Gastos en propiedades arrendadas a la Compañía de Fomento Industrial de Puerto Rico o almacén de la | |
|     Compañía de Comercio y Exportación (Véanse instrucciones) .......... (32) | 0 00 |
| 33. Gastos incurridos o pagados a accionistas, personas o entidades relacionadas fuera de Puerto Rico | |
|     (Véanse instrucciones) (Total $ _____ ) .......... (33) | 0 00 |
| 34. Deducción por gastos incurridos o pagados a accionistas, personas o entidades relacionadas, totalmente deducibles (Véanse instrucciones) .......... (34) | 0 00 |
| 35. Servicios públicos (agua, luz, teléfono, internet, etc.) .......... (35) | 0 00 |
| 36. Limpieza, mantenimiento y recogido de desperdicios .......... (36) | 0 00 |
| 37. Cargos bancarios .......... (37) | 0 00 |
| 38. Gastos de publicidad y mercadeo (Anuncios) .......... (38) | 0 00 |
| 39. Materiales y efectos de oficina .......... (39) | 0 00 |
| 40. Seminarios, adiestramientos y gastos de educación continua para empleados .......... (40) | 0 00 |
| 41. Servicios de seguridad .......... (41) | 0 00 |
| 42. Servicios de cobro de cuentas .......... (42) | 0 00 |
| 43. Servicios subcontratados .......... (43) | 0 00 |
| 44. Gastos incurridos o pagados por concepto de servicios recibidos de personas no dedicadas a industria o negocio en Puerto Rico .......... (44) | 0 00 |
| 45. Gastos por concepto de cuotas, subscripciones y membresías .......... (45) | 0 00 |
| 46. Gastos relacionados con licencias y programas de computadoras no capitalizados (Véanse instrucciones) .......... (46) | 0 00 |
| 47. Aportación especial por servicios profesionales y consultivos bajo la Ley 48-2013 (Véanse instrucciones) .......... (47) | 0 00 |
| 48. Otras deducciones (Véanse instrucciones) .......... (48) | 0 00 |
| 49. Subtotal de deducciones (Sume líneas 1 a la 48) .......... (49) | 0 00 |
| 50. Donativos (Véanse instrucciones) .......... (50) | 0 00 |
| 51. Deducción bajo la Ley 185-2014 (Véanse instrucciones) .......... (51) | 0 00 |
| 52. Total de deducciones (Sume líneas 49 a la 51. Traslade a la Parte I, línea 30) .......... (52) | 0 00 |

Período de Conservación: Diez (10) años

Reproducido por CEGsoft (www.cegsoft.com)

**Parte VII**   Estado de Situación Comparado

| Activos | | Al comenzar el año | | | Al terminar el año | |
|---|---|---|---|---|---|---|
| | | | Total | | | Total |
| 1. Efectivo en caja y bancos | (1) | | 0 00 | (1) | | 107,536 00 |
| 2. Cuentas a cobrar | (2) | 0 00 | | (2) | 0 00 | |
| 3. Menos: Reserva para cuentas incobrables | (3) | 0 00 | | (3) | ( 0 00 ) | |
| 4. Inventarios | (4) | | 0 00 | (4) | | 0 00 |
| 5. Otros activos corrientes | (5) | | 0 00 | (5) | | 489,725 00 |
| 6. Obligaciones a cobrar | (6) | | 0 00 | (6) | | 0 00 |
| 7. Inversiones | (7) | | 0 00 | (7) | | 0 00 |
| 8. Activos depreciables | (8) | 0 00 | | (8) | 0 00 | |
| 9. Menos: Reserva para depreciación | (9) | 0 00 | | (9) | ( 0 00 ) | |
| 10. Préstamos por cobrar de accionistas o entidades relacionadas | (10) | | 0 00 | (10) | | 0 00 |
| 11. Terrenos | (11) | | 0 00 | (11) | | 0 00 |
| 12. Otros activos a largo plazo | (12) | | 0 00 | (12) | | 0 00 |
| 13. Total de Activos | (13) | | 0 00 | (13) | | 597,261 00 |
| **Pasivos y Capital** | | | | | | |
| **Pasivos** | | | | | | |
| 14. Cuentas a pagar | (14) | 0 00 | | (14) | 0 00 | |
| 15. Gastos incurridos y no pagados | (15) | 0 00 | | (15) | 0 00 | |
| 16. Otros pasivos corrientes | (16) | 0 00 | | (16) | 0 00 | |
| 17. Obligaciones a pagar a largo plazo | (17) | 0 00 | | (17) | 0 00 | |
| 18. Obligaciones a pagar a accionistas o entidades relacionadas | (18) | 0 00 | | (18) | 0 00 | |
| 19. Otras obligaciones a largo plazo | (19) | 0 00 | | (19) | 0 00 | |
| 20. Total de Pasivos | (20) | | 0 00 | (20) | | 0 00 |
| **Capital** | | | | | | |
| 21. Capital en acciones | | | | | | |
| (a) Acciones preferidas | (21a) | 0 00 | | (21a) | 0 00 | |
| (b) Acciones comunes | (21b) | 0 00 | | (21b) | 0 00 | |
| 22. Sobrante de capital | (22) | 0 00 | | (22) | 597,261 00 | |
| 23. Ganancias retenidas | (23) | 0 00 | | (23) | 0 00 | |
| 24. Reserva | (24) | 0 00 | | (24) | 0 00 | |
| 25. Total de Capital | (25) | | 0 00 | (25) | | 597,261 00 |
| 26. Total Pasivos y Capital | (26) | | 0 00 | (26) | | 597,261 00 |

**Parte VIII**   Reconciliación del Ingreso Neto (o Pérdida) según Libros con el Ingreso Neto Tributable (o Pérdida) según Planilla

1. Ingreso neto (o pérdida) según libros ......... (1)  | 0 00
2. Contribución sobre ingresos según libros ......... (2)  | 0 00
3. Exceso de pérdidas de capital sobre ganancias de capital ......... (3)  | 0 00
4. Ingreso tributable no registrado en los libros este año (Detalle, use anejo si es necesario)
   (a) _____ $ _____
   (b) _____ $ _____
   (c) _____ $ _____
   (d) _____ $ _____
   (e) _____ $ _____
   (f) _____ $ _____
   Total ......... (4)  | 0 00
5. Gastos registrados en los libros este año no reclamados en esta planilla (Detalle, use anejo si es necesario)
   (a) Comida y entretenimiento (porción no deducible) $ _____ 0
   (b) Depreciación $ _____ 0
   (c) Embarcaciones, aeronaves y propiedad localizada fuera de P. R. $ _____ 0
   (d) Gastos incurridos o pagados a accionistas, personas o entidades relacionadas (porción no deducible) $ _____ 0
   (e) _____ $ _____
   (f) _____ $ _____
   (g) _____ $ _____
   (h) _____ $ _____
   (i) _____ $ _____
   (j) _____ $ _____
   Total ......... (5)  | 0 00
6. Total (Sume líneas 1 a la 5) ......... (6)  | 0 00

7. Ingreso registrado en los libros este año no incluido en esta planilla (Detalle, use anejo si es necesario)
   (a) Ingresos exentos (Anejo IE Corp., Parte II, línea 22)
       $ _____ 0
   (b) Ingresos excluidos (Anejo IE Corp., Parte I, línea 5)
       $ _____ 0
   (c) _____ $ _____
   (d) _____ $ _____
   (e) _____ $ _____
   (f) _____ $ _____
   (g) _____ $ _____
   Total ......... (7)  | 0 00
8. Deducciones en esta planilla no llevadas contra el ingreso en los libros este año (Detalle, use anejo si es necesario)
   (a) Depreciación $ _____ 0
   (b) _____ $ _____
   (c) _____ $ _____
   (d) _____ $ _____
   (e) _____ $ _____
   (f) _____ $ _____
   (g) _____ $ _____
   (h) _____ $ _____
   (i) _____ $ _____
   Total ......... (8)  | 0 00
9. Total (Sume líneas 7 y 8) ......... (9)  | 0 00
10. Ingreso neto tributable (o pérdida) según planilla (Línea 6 menos línea 9) ......... (10)  | 0 00

Reproducido por CEGsoft (www.cegsoft.com)

# SKALAR PHARMA LLC
## 66-0902281
## GOBIERNO DE PUERTO RICO
## DETALLE ADJUNTO DEL FORMULARIO 480.2
## PLANILLA DE CONTRIBUCION SOBRE INGRESOS DE CORPORACIONES
## PARA EL AÑO TERMINADO EN 31/12/2018
### Página 4, Parte VII, Línea 5 - Otros Activos Corrientes (Al Terminar el Año)

| Descripción | Cantidad |
|---|---|
| PRE OPERATING COSTS | $489,725 |
| Total | $489,725 |

Reproducido por CEGsoft (www.cegsoft.com)

## Parte IX   Análisis del Sobrante según Libros

1. Balance al comenzar el año ............................ (1)  0 00
2. Ingreso neto según libros ............................... (2)  0 00
3. Otros aumentos (Detalle, use anejo si es necesario)_____
_____
_____ (3)  0 00
4. Total (Sume líneas 1, 2 y 3) ......................... (4)  0 00

5. Distribuciones:  (a) Efectivo ............................ (5a)  0 00
                    (b) Propiedad ......................... (5b)  0 00
                    (c) Acciones ......................... (5c)  0 00
6. Otras rebajas (Use anejo si es necesario)_____
_____ (6)  0 00
7. Total (Sume líneas 5 y 6) ............................. (7)  0 00
8. Balance al finalizar el año (Línea 4 menos línea 7) .... (8)  0 00

## Parte X   Compensación a Directores

| Nombre del director | Número de seguro social | Por ciento del tiempo dedicado a industria o negocio | Por ciento de las acciones poseídas | | Compensación |
|---|---|---|---|---|---|
| | | | Comunes | Preferidas | |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |

Total de compensación a directores (Traslade a la Parte VI, línea 1) .................................  0 00

## Parte XI   Compensación a Oficiales

| Nombre del oficial | Número de seguro social | Por ciento del tiempo dedicado a industria o negocio | Por ciento de las acciones poseídas | | Compensación |
|---|---|---|---|---|---|
| | | | Comunes | Preferidas | |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |

Total de compensación a oficiales (Traslade a la Parte VI, línea 2) .................................  0 00

## Parte XII   Cuestionario

|  | SÍ | NO | NA |
|---|---|---|---|
| 1. Si es una corporación extranjera, indique si la industria o negocio operó como sucursal .................... | | X | |
| 2. Si es una sucursal, indique el por ciento que representa el ingreso de fuentes de Puerto Rico del total de ingreso de la corporación: ____ 0 % | | | |
| 3. ¿Mantuvo la corporación durante este año parte de sus récords en un sistema computadorizado? ......... (3) | X | | |
| 4. Los libros de la corporación están a cargo de: | | | |

Nombre THE COMPANY - FERNANDO LONDONO
Dirección  STATE ROAD 53 KM 84
LOS JOBOS, GUAYAMA PR 009784
Correo electrónico (E-mail)  fernando.londono@skalarpharma.com
Teléfono _____

5. Indique el método de contabilidad utilizado en los libros para propósitos contributivos:
   1 ☐ Recibido y Pagado   2 ☒ Acumulación
   3 ☐ Otro (especifique):_____

|  | SÍ | NO | NA |
|---|---|---|---|
| 6. ¿Rindió la corporación los siguientes documentos?: | | | |
| (a) Declaración Informativa (Formularios 480.6A, 480.6B, 480.6C) ......... (6a) | | X | |
| (b) Comprobante de Retención (Formulario 499R-2/W-2PR) ......... (6b) | | X | |
| 7. ¿Excede de $3,000,000 el ingreso bruto de la entidad o del grupo controlado? (7) | | X | |
| (a) ¿Incluye estados financieros auditados por un CPA con licencia de Puerto Rico? (7a) | | X | |
| 8. Número de empleados durante el año: ____ 0 | | | |
| 9. ¿Reclamó la corporación gastos relacionados con la titularidad, uso, mantenimiento y depreciación de: | | | |
| (a) Automóviles? ......... (9a) | | X | |
| (b) Embarcaciones? ......... (9b) | | X | |
| (1) ¿Derivó más del 80% de la totalidad de sus ingresos de actividades relacionadas exclusivamente con la pesca o transportación de pasajeros o de carga o arrendamiento? ......... (9b1) | | X | |
| (c) Aeronaves? ......... (9c) | | X | |
| (1) ¿Derivó más del 80% de la totalidad de sus ingresos de actividades relacionadas exclusivamente con la transportación de pasajeros o de carga o arrendamiento? ......... (9c1) | | X | |
| (d) Propiedad residencial fuera de Puerto Rico? ......... (9d) | | X | |
| (1) ¿Derivó más del 80% de sus ingresos de actividades relacionadas exclusivamente con el alquiler de propiedades a personas no relacionadas? ......... (9d1) | | X | |

|  | SÍ | NO | NA |
|---|---|---|---|
| 10. ¿Reclamó la corporación gastos relacionados con: | | | |
| (a) ¿Alojamiento? (excepto empleados del negocio) ......... (10a) | | X | |
| (b) ¿Empleados que asistieron a convenciones fuera de Puerto Rico o los Estados Unidos? ......... (10b) | | X | |
| 11. ¿Distribuyó la corporación, durante el año contributivo, dividendos que no fueran en acciones o en liquidación en exceso de la ganancia corriente y acumulada? Si contestó "Sí", indique la cantidad $ _____ 0 (11) | | X | |
| 12. ¿Es la corporación socio de una sociedad especial o sociedad? (Si es más de una, someta detalle) ......... (12) | | X | |
| Nombre de la Sociedad Especial o Sociedad _____ | | | |
| Número de identificación patronal _____ | | | |
| 13. ¿Recibió ingresos exentos? (Someta Anejo IE Corporación) ......... (13) | | X | |
| 14. Anote la cantidad correspondiente de donativos a municipios de la cantidad incluida en la Parte VI, línea 50: $ ____ 0.00 | | | |
| 15. Indique si pagó primas a aseguradores no autorizados ......... (15) | | X | |
| 16. Número de patrono otorgado por el Departamento del Trabajo y Recursos Humanos: | | | |
| 17. Número de accionistas: 1 | | | |
| (a) ¿Es alguno de los accionistas de la corporación un individuo no residente o corporación extranjera? ......... (17a) | | X | |
| (1) Indique el por ciento de participación del total de accionistas no residentes o corporaciones extranjeras ____ 100 % | | | |
| (2) Indique el país de procedencia del accionista extranjero ____ | | | |
| 18. ¿Incurrió o pagó gastos a accionistas, personas o entidades relacionadas fuera de Puerto Rico? ......... (18) | | X | |
| (a) ¿Obtuvo determinación administrativa para tener derecho a la totalidad de la deducción? ......... (18a) | | X | |
| 19. ¿Reclamó la corporación gastos relacionados con servicios provistos por no residentes de Puerto Rico? ......... (19) | | X | |
| (a) ¿Pagó el impuesto sobre ventas y uso correspondiente? ......... (19a) | | X | |
| 20. ¿Reclamó la corporación gastos de depreciación por propiedad mueble tangible adquirida fuera de Puerto Rico? ......... (20) | | X | |
| (a) ¿Pagó el impuesto sobre ventas y uso correspondiente? ......... (20a) | | X | |
| 21. ¿Pagó la corporación dividendo implícito durante el año anterior? Si contestó "Sí", indique la cantidad $ _____ 0 (21) | | X | |

Reproducido por CEGsoft (www.cegsoft.com)

**Schedule 4.11(a)**

**To**

**Note Purchase Agreement**

**Budget**

[To be attached]

| Budget | Year1** | Year2 | Year3 | Year4 | Year5 | Total |
|---|---|---|---|---|---|---|
| Utilities | $ 2.485.366 | $ 4.138.290 | $ 4.468.146 | $ 4.592.890 | $ 4.721.377 | $ 20.406.069 |
| Software | $ 1.480.040 | $ 1.273.408 | $ 1.273.408 | $ 1.273.408 | $ 1.273.408 | $ 6.573.672 |
| Materials | $ 4.725.543 | $ 10.456.889 | $ 11.093.288 | $ 11.768.443 | $ 12.484.714 | $ 50.528.877 |
| **Labor** | $ 5.810.557 | $ 7.717.627 | $ 8.579.150 | $ 8.847.635 | $ 9.076.257 | $ 40.031.225 |
| External services | $ 9.202.783 | $ 4.295.595 | $ 4.540.407 | $ 4.583.323 | $ 4.632.675 | $ 27.254.783 |
| Equipment | $ 1.922.827 | $ 955.840 | $ 984.515 | $ 1.014.051 | $ 1.044.472 | $ 5.921.705 |
| Credit Payments* | $ 6.600.000 | $ 1.125.000 | $ 2.700.000 | $ 2.700.000 | $ 32.700.000 | $ 45.825.000 |
| Taxes | $ - | $ - | $ 427.655 | $ 410.663 | $ 428.395 | $ 1.266.713 |
| | $ 32.227.116 | $ 29.962.650 | $ 34.066.569 | $ 35.190.412 | $ 66.361.299 | $ 197.808.046 |
| | | | | | | |
| Estimated Revenues*** | $ 16.541.867 | $ 47.792.001 | $ 49.225.761 | $ 50.702.533 | $ 52.223.610 | |
| Estimated EBITDA | -$ 5.526.562 | $ 21.247.270 | $ 20.822.457 | $ 21.265.763 | $ 21.746.181 | |

*Includes fees, Closing costs, Structuring Fee, 18-month prepaid interest $4,102,500

**Restart plan

*** Revenues estimated for $16 dollars per Kilo

**Schedule 4.12**

**To**

**Note Purchase Agreement**

**Employee Benefit Plans**

None.

(a) <u>Main Parcel</u>:

Property number 12,497 recorded in the Registry of Property of Puerto Rico, Section of Guayama, at page 223 of volume 364 of Guayama.

Property Tax Identification Number: 419-000-008-06-901.

(b) <u>Parcel 2-A</u>:

Property number 17,247 recorded in the Registry of Property of Puerto Rico, Section of Guayama, at page 13 of volume 464 of Guayama.

Property Tax Identification Number: 419-000-009-12-000.

(c) <u>Parcel 2-B</u>:

Property number 17,244 recorded in the Registry of Property of Puerto Rico, Section of Guayama, at page 10 of volume 464 of Guayama.

Property Tax Identification Number: 419-000-009-13-000.

(d) <u>Parcel 2-C</u>:

Property number 17,245 recorded in the Registry of Property of Puerto Rico, Section of Guayama, at page 11 of volume 464 of Guayama.

Property Tax Identification Number: 419-000-009-14-000.

(e) <u>Parcel 2-D</u>:

Property number 17,246 recorded in the Registry of Property of Puerto Rico, Section of Guayama, at page 12 of volume 464 of Guayama.

Property Tax Identification Number: 419-067-610-01-000.

EAST\185762164.11

**Schedule 4.21(b)**

**To**

**Note Purchase Agreement**

**Assets**

None.

**Schedule 4.22**

**To**

**Note Purchase Agreement**

**Brokers**

London Manhattan.

William P. Barnes[1]

---

[1] Finder's fee due to Mr. Barnes will be paid by the Company after the Closing Date.

**Schedule 4.24**

**To**

**Note Purchase Agreement**

**Material Contracts**

None.

**Schedule 4.28**

**To**

**Note Purchase Agreement**

**Liabilities**

None.

EAST\185762164.11

**Schedule 5.14**

**To**

**Note Purchase Agreement**

**Post-Closing Matters**

1.      On or before the date that is five (5) days after the Closing Date, the Company shall establish the Agent Escrow Account, in which the Agent shall promptly deposit the Escrow Holdback.

2.      On or before the date that is forty-five (45) days after the Closing Date, provide to the Agent employment agreements, in form and substance satisfactory to the Agent, between the Company and each of Jose Alonso, Esteban Londoño and Julio Sarmiento.

3.      On or before the date that is forty-five (45) days after the Closing Date, provide to the Agent an employee handbook and a travel and expense policy for the Company, each in form and substance satisfactory to the Agent.

4.      On or before the date that is sixty (60) days after the Closing Date, provide to the Agent evidence, in form and substance satisfactory to the Agent, that all permits necessary for the operations of the Company have been renewed.

5.      On or before the date that is sixty (60) days after the Closing Date, provide to the Agent evidence, in form and substance satisfactory to the Agent, of insurance coverage required pursuant to Section 5.5(a) hereof.

6.      On or before the date that is ninety (90) days after the Closing Date, provide to the Agent evidence, in form and substance satisfactory to the Agent, of insurance coverage required pursuant to Section 5.5(b) hereof.

7.      On or before the date that is ninety (90) days after the Closing Date, provide to the Agent evidence, in form and substance satisfactory to the Agent, of the settlement of any and all complaints filed against the Company and payments owed by the Company or evidence satisfactory to the Agent that such complaints and payments will be settled.

8.      On or before the date that is ninety (90) days after the Closing Date, provide to the Agent evidence, in form and substance satisfactory to the Agent, that any and all taxes and/or fees payable by the Company, including but not limited to, any real property taxes currently outstanding on the Property, have been paid.

9.      On or before the date that is five (5) Business Days after the Closing Date, provide to the Agent evidence, in form and substance reasonably satisfactory to the Agent, of filing of the Notice and Request for Authorization of Transfer of Ownership in Exempted Business to the Department of Economic Development and Commerce, Office of Industrial Tax, with regard to the Tax Decree.

10.     On or before the date that is eighteen (18) months after the Closing Date, provide to the Agent evidence, in form and substance reasonably satisfactory to the Agent, of the transfer of the Tax Decree to the Company.

Schedule 5.14

11.     On or before the date that is fifteen (15) days after the Closing Date, provide to the Agent a fully executed copy of the Omnibus Amendment.

12.     The Issuers shall cooperate fully with the Agent in its efforts to obtain and secure promptly, but in any event no later than six (6) months after the Closing Date, the real property tax debt exoneration from the Municipal Revenue Collection Center ("CRIM", by its Spanish acronym) for the Real Property described in **Schedule 4.21(a)**, and in connection therewith, the Issuers shall, immediately upon request, (i) provide and deliver to the Agent (or any Person designated by the Agent) any and all information and documentation necessary or required by the Agent in connection with the application for such exoneration and the approval thereof by CRIM, or that may be otherwise required by CRIM in connection therewith, (ii) take, or cause to be taken, all appropriate action, and do or cause to be done, all things necessary, proper or advisable to obtain the real property tax debt exoneration, and (iii) execute all required documents, certificates or other instruments, and make all necessary filings, and thereafter make any other required submissions with respect to the real property tax debt exoneration.

Schedule 1A

**Schedule 1A**

**To**

**Note Purchase Agreement**

**Restart Plan**

[To be attached]



| Id | Task Name | Duración |
|----|-----------|----------|
| 1 | **Skalar Pharma Plant Start Up** | **181 días** |
| 2 | **Administration** | **145 días** |
| 3 | **Human Resources** | **70 días** |
| 4 | Platform | 70 días |
| 5 | Procedures and Systems | 70 días |
| 6 | Benefits | 70 días |
| 7 | Department Materials and Equipment | 70 días |
| 8 | Computer Software | 70 días |
| 9 | **Finance Department** | **70 días** |
| 10 | Platform | 70 días |
| 11 | Procedures and Systems | 70 días |
| 12 | Department Materials and Equipment | 70 días |
| 13 | Computer Software | 70 días |
| 14 | **Employee Center** | **125 días** |
| 15 | Repairs and trainer | 125 días |
| 16 | **Security** | **70 días** |
| 17 | Platform | 70 días |
| 18 | Procedures and Systems | 70 días |
| 19 | Department Materials and Equipment | 70 días |
| 20 | Computer Software | 70 días |
| 21 | Card Reader Implementation | 70 días |
| 22 | Recording Camera Implementation | 70 días |
| 23 | Miscelaneous security equipment | 70 días |
| 24 | **Office supply** | **20 días** |
| 25 | Consumables | 20 días |
| 26 | **Building 10 (Administration)** | **65 días** |
| 27 | Utilities and repairs | 65 días |
| 28 | **Quality Operations** | **181 días** |



| Id | Task Name | Duración |
|----|-----------|----------|
| 29 | **Quality Systems Platform Implemantation** | **145 días** |
| 30 | Master Control | 80 días |
| 31 | QMS & Audit | 130 días |
| 32 | Document Control | 145 días |
| 33 | Training | 109 días |
| 34 | Regulatory Affairs | 78 días |
| 35 | Technical Services & Validation | 129 días |
| 36 | Laboratory Operations | 102 días |
| 37 | ICQA, IPQA & Product Disposition | 118 días |
| 38 | **Quality Control Laboratory Bldg 15 GMP Certification** | **181 días** |
| 39 | LIMS Implementation | 65 días |
| 40 | Metasis BMS Implementation | 65 días |
| 41 | Synthesis Plan | 90 días |
| 42 | Utilities & Facilities Qualification | 101 días |
| 43 | Laboratories | 59 días |
| 44 | Stability Room | 20 días |
| 45 | Microbiology Laboratory | 56 días |
| 46 | **Final Product Laboratory** | **65 días** |
| 47 | LIMS Implementation | 65 días |
| 48 | Instrument assessement / Validations & Repairs | 65 días |
| 49 | New equipment | 65 días |
| 50 | Redundancy and Technology Compliance | 65 días |
| 51 | **EHS** | **155 días** |
| 52 | **Implementation Program of Permits & Certifications** | **155 días** |
| 53 | Ocupational Security | 60 días |
| 54 | General Permits | 72 días |



| Id | Task Name | Duración | M-1 | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 |
|----|-----------|----------|-----|----|----|----|----|----|----|----|----|----|-----|
| 55 | Enviromental Permits & Certifications | 155 días | | | | | | | | | | | |
| 56 | **Medical office** | **129 días** | | | | | | | | | | | |
| 57 | Equipment and operation | 129 días | | | | | | | | | | | |
| 58 | **Plant Fire System** | **70 días** | | | | | | | | | | | |
| 59 | Update and Repairs | 70 días | | | | | | | | | | | |
| 60 | **Safety Equipment** | **125 días** | | | | | | | | | | | |
| 61 | Safety equipment electrical / soldering / water / Hi work / confined space etc | 125 días | | | | | | | | | | | |
| 62 | **Business Continuity Programs** | **135 días** | | | | | | | | | | | |
| 63 | Safety / Programmed Certifications / Audits | 135 días | | | | | | | | | | | |
| 64 | **Information Technology (IT)** | **111 días** | | | | | | | | | | | |
| 65 | Data Center Platform | 111 días | | | | | | | | | | | |
| 66 | Procedures and Systems | 70 días | | | | | | | | | | | |
| 67 | Benefits | 70 días | | | | | | | | | | | |
| 68 | Department Materials and Equipment | 70 días | | | | | | | | | | | |
| 69 | Computer Software | 70 días | | | | | | | | | | | |
| 70 | Computers Purchasing | 70 días | | | | | | | | | | | |
| 71 | Data Center Infrastructure | 70 días | | | | | | | | | | | |
| 72 | **Purchasing / Material and Warehousing** | **95 días** | | | | | | | | | | | |
| 73 | Platform | 70 días | | | | | | | | | | | |
| 74 | Procedures and Systems | 70 días | | | | | | | | | | | |
| 75 | Benefits | 70 días | | | | | | | | | | | |
| 76 | Department Materials and Equipment | 70 días | | | | | | | | | | | |
| 77 | Computer Software | 70 días | | | | | | | | | | | |
| 78 | **Building 30** | **65 días** | | | | | | | | | | | |
| 79 | Upgrade | 65 días | | | | | | | | | | | |
| 80 | Equipment purchasing | 65 días | | | | | | | | | | | |
| 81 | Technology and Validation | 65 días | | | | | | | | | | | |



| Id | Task Name | Duración |
|----|-----------|----------|
| 82 | **Building 80** | **80 días** |
| 83 | Upgrade | 80 días |
| 84 | Equipment purchasing | 80 días |
| 85 | Technology and Validation | 80 días |
| 86 | **SAP business 1** | **70 días** |
| 87 | Software aquisition & implementation | 70 días |
| 88 | **General Facilities and Utilities** | **125 días** |
| 89 | Platform | 125 días |
| 90 | Procedures and Systems | 90 días |
| 91 | Repairs | 90 días |
| 92 | **Refrigeration Systems** | **120 días** |
| 93 | 78-03X01 CHILLERS YORK CHILLER PR610425 | 104 días |
| 105 | 78-03X02 CHILLERS YORK CHILLER PR610424 | 80 días |
| 117 | 78-03X03 CHILLERS YORK CHILLER S/N-JOR-014 | 80 días |
| 129 | 24-96-X01 CHILLERS CHILLER CARRIER S/N-2599F30135 | 80 días |
| 141 | 24-96X02 CHILLERS CARRIER S/N-2599F30129 | 80 días |
| 153 | 24-96X03 CHILLERS TRANE S/N-U06C06312 | 80 días |
| 165 | 24-96X04 CHILLERS TRANE S/N-U06C06313 | 80 días |
| 177 | 78-05X01 CHILLERS TRANE S/N-C06B00877 | 80 días |
| 189 | 78-02X01 CHILLERS VILTER S/N F52019-6 | 120 días |
| 190 | Utilities Resources | 80 días |
| 191 | Repairs | 80 días |
| 192 | **Solvent Recovery Tower** | **80 días** |
| 195 | **Purified Water** | **120 días** |

| Id | Task Name | Duración | M-1 | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 |
|----|-----------|----------|-----|----|----|----|----|----|----|----|----|----|-----|
| | | | | | trimestre 1 | | | trimestre 2 | | | | trimestre 3 | | |
| 196 | Assessment Protocol Generation | 120 días | | | | | | | | | | | |
| 197 | Assessment Execution | 120 días | | | | | | | | | | | |
| 198 | Repair and Actions | 120 días | | | | | | | | | | | |
| 199 | Assessment Approval | 120 días | | | | | | | | | | | |
| 200 | Commissioning Start Up | 120 días | | | | | | | | | | | |
| 201 | Commissioning Report Approval | 120 días | | | | | | | | | | | |
| 202 | Release for Qualification | 120 días | | | | | | | | | | | |
| 203 | Installation Qualification | 120 días | | | | | | | | | | | |
| 204 | Operational Qualification | 120 días | | | | | | | | | | | |
| 205 | Performance Qualification Protocol Generation | 120 días | | | | | | | | | | | |
| 206 | Final Release for Operation | 120 días | | | | | | | | | | | |
| 207 | **Glycol System** | **90 días** | | | | | | | | | | | |
| 208 | Assessment Protocol Generation | 90 días | | | | | | | | | | | |
| 209 | Assessment Execution | 90 días | | | | | | | | | | | |
| 210 | Repair and Actions | 90 días | | | | | | | | | | | |
| 211 | Assessment Approval | 90 días | | | | | | | | | | | |
| 212 | Commissioning Start Up | 90 días | | | | | | | | | | | |
| 213 | Commissioning Report Approval | 90 días | | | | | | | | | | | |
| 214 | Release for Qualification | 90 días | | | | | | | | | | | |
| 215 | Installation Qualification | 90 días | | | | | | | | | | | |
| 216 | Operational Qualification | 90 días | | | | | | | | | | | |
| 217 | Performance Qualification | 90 días | | | | | | | | | | | |
| 218 | Final Release for Operation | 90 días | | | | | | | | | | | |
| 219 | **Water Treatement Plant** | **45 días** | | | | | | | | | | | |
| 220 | Update and repairs | 45 días | | | | | | | | | | | |
| 221 | **Tank Farm** | **45 días** | | | | | | | | | | | |
| 222 | Update and repairs | 45 días | | | | | | | | | | | |
| 223 | Resources | 45 días | | | | | | | | | | | |
| 224 | **Compressed Air System** | **80 días** | | | | | | | | | | | |

| Id | Task Name | Duración | | trimestre 1 | | | trimestre 2 | | | trimestre 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | M-1 | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 |
| 225 | 77-01K01 AIR COMPRESSOR PR66091 | 80 días | | | | | | | | | | |
| 237 | 77-02K01 AIR COMPRESSOR PR6U6092 | 80 días | | | | | | | | | | |
| 249 | 77-03K01 AIR COMPRESSOR PR6U5106 | 80 días | | | | | | | | | | |
| 261 | 79-K01A AIR COMPRESSOR ATLAS COPCO PR610350 | 80 días | | | | | | | | | | |
| 273 | 79-K01B AIR COMPRESSOR ATLAS COPCO PR610351 | 80 días | | | | | | | | | | |
| 285 | 79-RFD-101A AIR DRYER PR610348 | 80 días | | | | | | | | | | |
| 297 | RFD-101B AIR DRYER ATLAS COPCO S/N-APF132421 | 80 días | | | | | | | | | | |
| 309 | Utilities Resources | 80 días | | | | | | | | | | |
| 310 | Repairs | 80 días | | | | | | | | | | |
| 311 | **Generators** | **60 días** | | | | | | | | | | |
| 312 | 70-GE01 GENERADOR CUMING DETROIT DIESELPR6U5309 | 60 días | | | | | | | | | | |
| 324 | 70-GE02 GENERADOR CARTERPILLAR PR6U5007 | 60 días | | | | | | | | | | |
| 336 | Utilities Resources | 60 días | | | | | | | | | | |
| 337 | Repairs | 60 días | | | | | | | | | | |
| 338 | **Boilers** | **40 días** | | | | | | | | | | |
| 339 | 71-01SB1 BOILER JOHNSTON BOILER PR6U4933 | 40 días | | | | | | | | | | |
| 351 | 71-02SB1 BOILER JOHNSTON BOILER PR6U4945 | 40 días | | | | | | | | | | |
| 363 | Utilities Resources | 40 días | | | | | | | | | | |
| 364 | Repairs | 40 días | | | | | | | | | | |
| 365 | **Nitrogen System** | **90 días** | | | | | | | | | | |
| 366 | Assessment Protocol Generation | 90 días | | | | | | | | | | |
| 367 | Assessment Execution | 90 días | | | | | | | | | | |
| 368 | Repair and Actions | 90 días | | | | | | | | | | |



| Id | Task Name | Duración |
|----|-----------|----------|
| 369 | Assessment Approval | 90 días |
| 370 | Commissioning Start Up | 90 días |
| 371 | Commissioning Report Approval | 90 días |
| 372 | Release for Qualification | 90 días |
| 373 | Installation Qualification | 90 días |
| 374 | Operational Qualification | 90 días |
| 375 | Performance Qualification Protocol Generation | 90 días |
| 376 | Final Release for Operation | 90 días |
| 377 | **Spare Parts Room** | **30 días** |
| 378 | Inventory | 30 días |
| 379 | Parts purchases | 90 días |
| 380 | Computers & Software | 90 días |
| 381 | Resources | 90 días |
| 382 | **Control Building 81** | **65 días** |
| 383 | Equipment purchasing | 65 días |
| 384 | Technology and Validation | 65 días |
| 385 | **Plant Enhancements** | **45 días** |
| 386 | Repairs after hurricane Maria | 45 días |
| 387 | **Manufacturing Operations** | **144 días** |
| 388 | Platform | 78 días |
| 389 | Procedures and Systems | 78 días |
| 390 | Department Materials and Equipment | 78 días |
| 391 | Computer Software | 78 días |
| 392 | **Manufacturing Building 22** | **144 días** |
| 393 | Platform | 78 días |
| 394 | Procedures and Systems | 78 días |
| 395 | Benefits | 78 días |
| 396 | Department Materials and Equipment | 78 días |
| 397 | Computer Software | 78 días |

| Id | Task Name | Duración |
|----|-----------|----------|
| 398 | 22-03R01 REACTOR DE DIETRICH PR6P3004 | 80 días |
| 410 | 22-05-RF1 REACTOR DE DIETRICH PR6P3042 | 80 días |
| 422 | 22-01-R01 REACTOR DE DIETRICH PR6P3003 | 80 días |
| 434 | 22-03-LB1 GLOVE BOX PRP 2967 | 80 días |
| 446 | 22-01-LB1 GLOVE BOX PR6P2966 | 80 días |
| 458 | 22-04-C01 CENTRIFUGA HEINKEL S/N 101016 | 80 días |
| 470 | VACUMM PUMP DRY STAR PRP2999 | 80 días |
| 482 | HOSOWAKA MIKROPUL PR6P4807 | 80 días |
| 494 | SUMMIX ZUTPHEN-HOLLAND PR6P12904 | 80 días |
| 506 | 22-07-RV2 ROTARY DERION PR64864 | 80 días |
| 518 | 22-07RV1 ROTARY DERION PR64858 | 80 días |
| 530 | 22-07M01 BAVER MEISTER (MILL) T5196 | 80 días |
| 542 | Building Facility Qualification / Repairs | 20 días |
| 554 | Electrician / Operator / Drafter / Mechanic / Instrumentation spec | 129 días |

| | | | | | |
|---|---|---|---|---|---|
| | Skalar Pharma Plant Start Up | | | $ | 3.677.276,80 |
| | **Administration** | | | $ 379.600,00 | |
| | ***Human Resources*** | | $ 41.100,00 | | |
| Software | Procedures and Systems* (MasterControl) | $ | 33.600,00 | | |
| Materials | Materials and Office supplies | $ | 2.500,00 | | |
| Software | Computer Software | $ | 5.000,00 | | |
| | ***Finance Department*** | | $ 50.300,00 | | |
| Software | Procedures and Systems* (MasterControl) | $ | 44.800,00 | | |
| Materials | Materials and Office supplies | $ | 2.500,00 | | |
| Software | Computer Software | $ | 3.000,00 | | |
| | ***Employee Center*** | | $ 5.000,00 | | |
| Materials | Repairs | $ | 5.000,00 | | |
| | ***Security*** | | $ 260.200,00 | | |
| Software | Procedures and Systems* (MasterControl) | $ | 11.200,00 | | |
| Materials | Materials and Office supplies | $ | 4.000,00 | | |
| Software | Computer Software | $ | 5.000,00 | | |
| Materials | Card Reader Implementation | $ | 100.000,00 | | |
| Materials | Recording Camera Implementation | $ | 100.000,00 | | |
| Materials | Miscelaneous security equipment | $ | 40.000,00 | | |
| | ***Office supply*** | | $ 7.000,00 | | |
| Materials | Consumables | $ | 7.000,00 | | |
| | ***Building 10 (Administration)*** | | $ 16.000,00 | | |
| | Utilities and repairs | $ | 16.000,00 | | |
| | **Quality Operations** | | | $ 734.931,00 | |
| | ***Quality Systems Platform Implemantation*** | | $ 432.535,00 | | |
| External Services | QMS & Audit | $ | 95.000,00 | | |
| External Services | Document Control | $ | 34.000,00 | | |
| External Services | Training | $ | 47.980,00 | | |
| External Services | Regulatory Affairs | $ | 81.424,00 | | |
| External Services | Technical Services & Validation | $ | 162.368,00 | | |
| External Services | ICQA, IPQA & Product Disposition | $ | 11.763,00 | | |
| | ***Quality Control Laboratory Bldg 15 GMP Certification*** | | $ 220.696,00 | | |
| Software | LIMS Implementation | $ | 61.578,00 | | |
| Software | Metasis BMS Implementation | $ | 60.300,00 | | |
| External Services | Utilities & Facilities Qualification | $ | 50.215,00 | | |
| Materials | Raw Material Laboratory | $ | 30.122,00 | | |
| Materials | Stability Room | $ | 9.183,00 | | |
| Materials | Microbiology Laboratory | $ | 9.298,00 | | |
| | ***Final Product Laboratory*** | | $ 81.700,00 | | |
| External Services | Instrument assessement / Validations & Repairs | $ | 75.000,00 | | |
| External Services | Redundancy and Technology Compliance | $ | 6.700,00 | | |
| | **EHS** | | | $ 101.205,00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Implementation Program of Permits & Certifications** | | | $ | 70.265,00 | |
| External Services | General Permits | $ | 61.096,00 | | | |
| External Services | Enviromental Permits & Certifications | $ | 9.169,00 | | | |
| | **Medical office** | | | $ | 14.190,00 | |
| Materials | Equipment and operation | $ | 14.190,00 | | | |
| | **Plant Fire System** | | | $ | 1.750,00 | |
| Materials | Update and Repairs | $ | 1.750,00 | | | |
| | **Safety Equipment** | | | $ | 15.000,00 | |
| Materials | Safety equipment electrical / soldering / water / Hi work / confined space etc | $ | 15.000,00 | | | |
| | **Information Technology (IT)** | | | $ | 455.400,00 | $ 455.400,00 |
| Software | Procedures and Systems* (MasterControl) | $ | 50.400,00 | | | |
| Materials | Materials and Office supplies | $ | 25.000,00 | | | |
| Software | Computer Software | $ | 150.000,00 | | | |
| Materials | Data Center Infrastructure | $ | 230.000,00 | | | |
| | **Purchasing / Material and Warehousing** | | | | | $ 438.796,00 |
| Software | Procedures and Systems* (MasterControl) | $ | 22.400,00 | $ | 42.400,00 | |
| Materials | Materials and Office supplies | $ | 5.000,00 | | | |
| Software | Computer Software | $ | 15.000,00 | | | |
| | **Building 30** | | | $ | 46.396,00 | |
| Materials | Upgrade | $ | 43.646,00 | | | |
| External Services | Technology and Validation | $ | 2.750,00 | | | |
| | **SAP business 1** | | | $ | 350.000,00 | |
| Software | Software aquisition & implementation | $ | 350.000,00 | | | |
| | **General Facilities and Utilities** | | | | | $ 1.003.960,00 |
| Software | Procedures and Systems* (MasterControl) | $ | 28.800,00 | $ | 68.800,00 | |
| Materials | Materials and Office supplies | $ | 40.000,00 | | | |
| | **Refrigeration Systems** | | | $ | 171.000,00 | |
| Materials | 78-03X01 CHILLERS YORK CHILLER PR610425 | $ | 19.000,00 | | | |
| Materials | 78-03X02 CHILLERS YORK CHILLER PR610424 | $ | 19.000,00 | | | |
| Materials | 78-03X03 CHILLERS YORK CHILLER S/N-JOR-014 | $ | 19.000,00 | | | |
| Materials | 24-96-X01 CHILLERS CHILLER CARRIER S/N-2599F30135 | $ | 19.000,00 | | | |
| Materials | 24-96X02 CHILLERS CARRIER S/N-2599F30129 | $ | 19.000,00 | | | |
| Materials | 24-96X03 CHILLERS TRANE S/N-U06C06312 | $ | 19.000,00 | | | |
| Materials | 24-96X04 CHILLERS TRANE S/N-U06C06313 | $ | 19.000,00 | | | |
| Materials | 78-05X01 CHILLERS TRANE S/N-C06B00877 | $ | 19.000,00 | | | |
| Materials | 78-02X01 CHILLERS VILTER S/N F52019-6 | $ | 19.000,00 | | | |
| | **Solvent Recovery Tower** | | | $ | 16.000,00 | |
| Materials | General maintenance | $ | 16.000,00 | | | |
| Materials | **Purified Water** | $ | 74.960,00 | $ | 74.960,00 | |
| Materials | **Glycol System** | $ | 13.500,00 | $ | 13.500,00 | |
| | **Water Treatement Plant** | | | $ | 45.000,00 | |
| Materials | Update and repairs | $ | 45.000,00 | | | |
| | **Tank Farm** | | | $ | 20.000,00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Materials | Update and repairs | $ | 20.000,00 | | | |
| | *Compressed Air System* | | | $ | 7.700,00 | |
| Materials | *77-01K01 AIR COMPRESSOR PR66091* | $ | 1.100,00 | | | |
| Materials | *77-02K01 AIR COMPRESSOR PR6U6092* | $ | 1.100,00 | | | |
| Materials | *77-03K01 AIR COMPRESSOR PR6U5106* | $ | 1.100,00 | | | |
| Materials | *79-K01A AIR COMPRESSOR ATLAS COPCO PR610350* | $ | 1.100,00 | | | |
| Materials | *79-K01B AIR COMPRESSOR ATLAS COPCO PR610351* | $ | 1.100,00 | | | |
| Materials | *79-RFD-101A AIR DRYER PR610348* | $ | 1.100,00 | | | |
| Materials | *RFD-101B AIR DRYER ATLAS COPCO S/N-APF132421* | $ | 1.100,00 | | | |
| | *Generators* | | | $ | 3.200,00 | |
| Materials | *70-GE01 GENERADOR CUMING DETROIT DIESELPR6U5309* | $ | 1.600,00 | | | |
| Materials | *70-GE02 GENERADOR CARTERPILLAR PR6U5007* | $ | 1.600,00 | | | |
| | *Boilers* | | | $ | 18.000,00 | |
| Materials | *71-01SB1 BOILER JOHNSTON BOILER PR6U4933* | $ | 9.000,00 | | | |
| Materials | *71-02SB1 BOILER JOHNSTON BOILER PR6U4945* | $ | 9.000,00 | | | |
| | *Nitrogen System* | $ | 214.800,00 | $ | 214.800,00 | |
| | *Control Building 81* | $ | 1.000,00 | $ | 1.000,00 | |
| | *Plant Enhancements* | | | $ | 350.000,00 | |
| Materials | Repairs after hurricane Maria | $ | 350.000,00 | | | |
| | **Manufacturing Operations** | | | | $ | 83.740,00 |
| | *Manufacturing Building 22* | | | $ | 83.740,00 | |
| Software | Procedures and Systems* (MasterControl) | $ | 24.960,00 | | | |
| Materials | Materials and Office supplies | $ | 3.000,00 | | | |
| Materials | *22-03R01 REACTOR DE DIETRICH PR6P3004* | $ | 3.900,00 | | | |
| Materials | *22-05-RF1 REACTOR DE DIETRICH PR6P3042* | $ | 3.900,00 | | | |
| Materials | *22-01-R01 REACTOR DE DIETRICH PR6P3003* | $ | 3.900,00 | | | |
| Materials | *22-03-LB1 GLOVE BOX PRP 2967* | $ | 250,00 | | | |
| Materials | *22-01-LB1 GLOVE BOX PR6P2966* | $ | 250,00 | | | |
| Materials | *22-04-C01 CENTRIFUGA HEINKEL S/N 101016* | $ | 920,00 | | | |
| Materials | *VACUMM PUMP DRY STAR PRP2999* | $ | 1.100,00 | | | |
| Materials | *HOSOWAKA MIKROPUL PR6P4807* | $ | 540,00 | | | |
| Materials | *SUMMIX ZUTPHEN-HOLLAND PR6P12904* | $ | 670,00 | | | |
| Materials | *22-07-RV2 ROTARY DERION PR64864* | $ | 590,00 | | | |
| Materials | *22-07RV1 ROTARY DERION PR64858* | $ | 590,00 | | | |
| Materials | *22-07M01 BAVER MEISTER (MILL) T5196* | $ | 570,00 | | | |
| External Services | Implementation and start up | $ | 28.000,00 | | | |
| Materials | *Building Facility Qualification / Repairs* | **$** | **10.600,00** | | | |
| | **General contingency 15%** | $ | 479.644,80 | $ | 479.644,80 | $ | 479.644,80 |

**Schedule 2A**

**To**

**Note Purchase Agreement**

**Documentation Checklist**

[To be attached]

**CLOSING CHECKLIST**

**NOTE PURCHASE AGREEMENT**
**AMONG**
**SKALAR PHARMA HOLDING LLC**
**SKALAR PHARMA LLC**
**THE OTHER ISSUERS FROM TIME TO TIME PARTY THERETO,**
**THE PURCHASERS NAMED THEREIN, and**
**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**

**CLOSING DATE: November 16, 2021**

**$30,000,000**

**Note Document Parties**

**Agent —** Corbel Distressed And Special Opportunities Fund, L.P.
**Company —** Skalar Pharma LLC
**Parent —** Skalar Pharma Holding LLC
**Note Parties —** collectively, Company, Parent and each of Parent's present and future Subsidiaries and any party that executes the Guaranty Agreement
**Purchasers —** Corbel Distressed and Special Opportunities Fund, L.P., Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P.

**Counsel to the Parties**

**DLA —** DLA Piper LLP (US), counsel to Agent
**AMG —** Adsuar, Muñiz, Goyco, Seda & Pérez-Ochoa PSC, counsel to Note Parties

EAST\185967526.3

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|-----|----------|-----------------------------------|-------------|-------------------|--------|
| **1.** | Note Purchase Agreement | Annex 2 | Agent<br>Purchasers<br>Note Parties | DLA | AGREED |
| Annexes | | | | | |
| | • Annex 1 - Definitions and Construction | | --- | DLA | Attached to Note Purchase Agreement |
| | • Annex 2 - Closing Conditions | | --- | DLA | Attached to Note Purchase Agreement |
| Exhibits | | | | | |
| | • Exhibit A - Form of Note | | --- | DLA | AGREED |
| | • Exhibit 1 - Form of Addendum | | --- | DLA | Attached to Note Purchase Agreement |
| | • Exhibit 5.3(c) - Form of Compliance Certificate | | --- | DLA | AGREED |
| Schedules | | | | | |
| | • Schedule 1.1 - Purchasers' Commitments | | --- | Agent | Attached to Note Purchase Agreement |
| | • Schedule 4.1 - Legal Status | | --- | Note Parties / AMG | Attached to Note Purchase Agreement |
| | • Schedule 4.7 - Litigation | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.9(a) - Ownership of Parent | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.9(b) - Ownership of Subsidiaries | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.11 - Financial Statements | | --- | | Attached to Note Purchase Agreement |

3

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|---|---|---|---|---|---|
| | • Schedule 4.11(a) - Budget | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.12 - Employee Benefit Plans | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.21(a) - Real Property | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.21(b) - Assets | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.22 - Brokers | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.24 - Material Contracts | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 4.28 - Liabilities | | --- | | Attached to Note Purchase Agreement |
| | • Schedule 5.14 - Post-Closing Matters | | --- | DLA | Attached to Note Purchase Agreement |
| | • Schedule 1A - Restart Plan | | --- | AMG | Attached to Note Purchase Agreement |
| | • Schedule 2A - Documentation Checklist | | --- | DLA | Attached to Note Purchase Agreement |
| 2. | Note (Corbel Distressed and Special Opportunities Fund, L.P.) | Annex 2 | Note Parties | DLA | AGREED |
| 3. | Note (Corbel Distressed and Special Opportunities Fund (SPV Skalar), L.P.) | Annex 2 | Note Parties | DLA | AGREED |
| 4. | Continuing Guaranty Agreement | Annex 2 | Note Parties Agent | DLA | AGREED |
| 5. | Intercompany Subordination Agreement | Annex 2 | Note Parties Agent | DLA | AGREED |
| 6. | Security Agreement | Annex 2 | Note Parties Agent | DLA | AGREED |
| Annexes | | | | | |

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|---|---|---|---|---|---|
| | • Annex 1 – Definitions and Construction | --- | --- | DLA | Attached to Security Agreement |
| | • Annex 2 – Form of Supplement | --- | --- | DLA | Attached to Security Agreement |
| Schedules | | | | | |
| | • Schedule 1 – Disclosure Schedules | --- | --- | Note Parties | Attached to Security Agreement |
| | • Schedule 2 – Pledged Note Parties | --- | --- | Note Parties | Attached to Security Agreement |
| Exhibits | | | | | |
| | • Exhibit A – Form of Copyrights Security Agreement | --- | --- | DLA | Attached to Security Agreement |
| | • Exhibit B – Form of Patent Security Agreement | --- | --- | DLA | Attached to Security Agreement |
| | • Exhibit C – Form of Pledged Interests Addendum | --- | --- | DLA | Attached to Security Agreement |
| | • Exhibit D – Form of Trademark Security Agreement | --- | --- | DLA | Attached to Security Agreement |
| 7. | Monitoring and Services Agreement | Annex 2 | Agent Company Parent | DLA | AGREED |
| 8. | Board Monitoring and Board Management Services Agreement | Annex 2 | Company Parent Class A Directors | DLA | AGREED |
| **Filings and Searches (Personal Property); Existing Indebtedness and Liens** | | | | | |
| 9. | UCC searches in each of the locations and against each of the Note Parties (other than Parent) (US) | Annex 2 | --- | DLA | Received |
| 10. | Confirmatory lien searches (Colombia) | | --- | AMG | Received |

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|-----|----------|-----------------------------------|-------------|-------------------|--------|
| 11. | UCC-1 financing statements naming Agent as Secured Party and each Note Party as Debtor | | --- | DLA | AGREED |
| 12. | Fixture filings naming Agent as Secured Party and each Note Party as Debtor (to the extent applicable) | | --- | DLA | AGREED |
| 13. | Post-closing UCC searches | | --- | DLA | To be conducted post-closing. |
| **Incorporation and Good Standing Documents** | | | | | |
| 14. | Certificates of Formation (other similar document) and all amendments thereto for each Note Party | Annex 2 | --- | AMG | Received |
| 15. | Certificates of Good Standing and Foreign Qualifications for each Note Party | Annex 2 | --- | AMG | Received |
| 16. | Certificates from secretary or assistant secretary of each Note Party certifying (i) the incumbency and signatures of the Authorized Officers who are executing the Note Documents on behalf of such Note Party; (ii) the operating agreement of such Note Party and all amendments thereto as being true and correct and in full force and effect; (iii) the resolutions of the Owners of such Note Party as being true and correct and in full force and effect, authorizing the execution and delivery of the Note Documents and the Purchase Documents, and authorizing the transactions contemplated thereunder, and authorizing the Authorized Officers to execute the same on behalf of such Note Party; (iv) such Note Party's certified charter; and (v) a certificate of good standing and all foreign qualifications for such Note Party. | Annex 2 | --- | AMG | --- |
| | • Company | --- | Officers | AMG | AGREED |
| | • Parent | --- | Officers | AMG | AGREED |
| **Miscellaneous Note Closing Documents/Requirements** | | | | | |
| 17. | Fee Letter | Annex 2 | Agent Company Parent | DLA | AGREED |

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|---|---|---|---|---|---|
| **18.** | Flow of Funds Agreement | Annex 2 | Agent Company Parent | Agent | AGREED |
| **19.** | Closing Date Certificate | Annex 2 | Note Parties | DLA | AGREED |
| **20.** | Perfection Certificate | | Parent | AMG / Note Parties | AGREED |
| **21.** | Deposit Account Control Agreements | Annex 2 | Agent Note Parties Depositary Bank | AMG / Note Parties | AGREED |
| **22.** | PATRIOT Act/KYC documentation | | --- | Note Parties | Complete |
| **23.** | Historical Financial Statements | | --- | Note Parties | Complete |
| **24.** | Payment of fees | Annex 2 | --- | Note Parties | |
| **Legal Opinion** | | | | | |
| **25.** | Legal Opinion of Counsel to the Note Parties | Annex 2 | AMG | AMG | AGREED |
| **Puerto Rico Documents** | | | | | |
| **26.** | Contribution Agreement | --- | Parent Bioapi | DLA | AGREED |
| **27.** | Security Agreement (Fixtures) | --- | Company Agent | DLA | AGREED |
| **28.** | Deed of Mortgage | --- | Company Notary | DLA | AGREED |
| **29.** | Mortgage Note | --- | Company Notary | DLA | AGREED |
| **30.** | Mortgage Note Pledge and Security Agreement | --- | Agent Company Notary | DLA | AGREED |

EAST\185967526.3

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|---|---|---|---|---|---|
| **31.** | Deed of Exchange | --- | Company Bioapi Notary | AMG | AGREED |
| **32.** | Exchange Agreement | --- | Company Bioapi | DLA | AGREED |
| **33.** | Bill of Sale and Assignment | --- | Company Bioapi | DLA | AGREED |
| **34.** | Proforma Title Insurance Commitment (with agreed exceptions) | --- | --- | DLA | Complete |
| **Colombia Documents** | | | | | |
| **35.** | Historical financial statements (2017-2018) (Bioapi) | --- | --- | AMG | Received |
| **36.** | Certificate by Camilo Rodriguez Saboya, legal counsel to BIOAPI S.A.S., dated November 8, 2021 | --- | Saboya | AMG | Received |
| **37.** | Certificate by Fernando Londoño Benveniste, Legal representative to BIOAPI S.A.S., dated November 8, 2021 | --- | Benveniste | AMG | Received |
| **38.** | Certificate by Ricardo Sarmiento Franco, accountant, dated November 2, 2021 | --- | Franco | AMG | Received |
| **39.** | Bank Certificate, dated November 3, 2021 | --- | Bank | AMG | Received |
| **Post-Closing Items** | | | | | |
| **40.** | Escrow Account & Escrow Agreement | Schedule 5.14(1) | Company Escrow Agent | Note Parties | 5 days post-closing |
| **41.** | Evidence of filing of transfer of the Tax Decree to the Company | Schedule 5.14(9) | --- | Note Parties | 5 Business Days post-closing |
| **42.** | Omnibus Amendment to Convertible Debentures | Schedule 5.14(11) | Company Holders | DLA | 15 days post-closing |
| **43.** | Employment Agreements – Alonso, Londoño, Sarmiento | Schedule 5.14(2) | Note Parties Employee | Note Parties | 45 days post-closing |

EAST\185967526.3

| No. | Document | Note Purchase Agreement Reference | Signatories | Responsible Party | Status |
|---|---|---|---|---|---|
| **44.** | Employee handbook and travel expense policy | Schedule 5.14(3) | --- | Note Parties | 45 days post-closing |
| **45.** | Evidence of renewal of all permits necessary for operations of Company | Schedule 5.14(4) | --- | Note Parties | 60 days post-closing |
| **46.** | Insurance Certificates and Endorsements required under Section 5.5(a) | Schedule 5.14(5) | --- | Note Parties | 60 days post-closing |
| **47.** | Insurance Certificates and Endorsements required under Section 5.5(b) | Schedule 5.14(6) | --- | Note Parties | 90 days post-closing |
| **48.** | Evidence of settlement of all complaints | Schedule 5.14(7) | --- | Note Parties | 90 days post-closing |
| **49.** | Evidence of payment of all taxes | Schedule 5.14(8) | --- | Note Parties | 90 days post-closing |
| **50.** | Real property tax exoneration | Schedule 5.14(12) | --- | Note Parties | 6 months post-closing |
| **51.** | Evidence of transfer of the Tax Decree to Company | Schedule 5.14(10) | --- | Note Parties | 18 months post-closing |

EAST\185967526.3