Exhibit 4

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "*Security Agreement*"), dated as of November 16, 2021, is entered into by and among the Persons listed on the signature pages hereof as "Grantors" and those additional entities that hereafter become parties hereto by executing the form of Joinder attached hereto as **Annex 2** (each sometimes individually referred to herein as a "*Grantor*" and collectively, as the "*Grantors*"), on the one hand, and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers (as defined below), on the other hand. Capitalized terms used in this Security Agreement have the meanings ascribed to such terms in **Annex 1**. All capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Note Purchase Agreement (as defined below).

## R E C I T A L S

A.     SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("*Parent*"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "*Company*"), the other Issuers from time to time party thereto, one or more additional direct or indirect Subsidiaries of Parent which became party thereto by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers of the Notes named therein (the "*Purchasers*") and Agent are contemporaneously herewith entering into that certain Note Purchase Agreement, dated as of even date herewith (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "*Note Purchase Agreement*");

B.     In connection with the Note Purchase Agreement, each Guarantor is executing and delivering to Agent and the Purchasers, a Facility Guaranty; and

C.     To induce Agent and the Purchasers to enter into the Note Purchase Agreement, each Grantor has agreed to enter into this Security Agreement in order to grant to Agent, for the benefit of the Purchasers, a first priority security interest in the Collateral to secure payment and performance of the Secured Obligations.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual promises, covenants, conditions, representations, and warranties hereinafter set forth, and for other good and valuable consideration, the parties hereto agree as follows:

1.     *Creation of Security Interest.* Each Grantor hereby grants to Agent, for the benefit of the Purchasers, a continuing security interest in and Lien on all presently existing and hereafter acquired or arising and wherever located Collateral in order to secure the payment and performance of all of the Secured Obligations. Each Grantor acknowledges and affirms that such security interest in the Collateral has attached to all Collateral without further act on the part of Agent or such Grantor.

2.     *Further Assurances.*

2.1     Grantors shall execute and deliver to Agent concurrently with Grantors' execution of this Security Agreement, and from time to time at the reasonable request of Agent, and Grantors hereby authorize Agent to prepare and file, all financing statements, continuation financing statements, fixture filings, security agreements, chattel mortgages, assignments, and all other documents that Agent may

reasonably require, in form reasonably satisfactory to Agent, to perfect and maintain the validity, perfection, enforceability and relative priority of Agent's security interests in and Lien on the Collateral, and in order to consummate fully all of the transactions contemplated by this Security Agreement and the Note Purchase Agreement. Without limiting the generality of the foregoing, any financing statements, along with amendments and modifications thereto, may describe the collateral covered thereby in such manner as Agent may elect, including using descriptions such as "all personal property of debtor" or "all assets of debtor" or words of similar effect. Each Grantor hereby irrevocably makes, constitutes, and appoints Agent (and Agent's officers, employees, or agents) as such Grantor's true and lawful attorney with power to sign the name of such Grantor on any of the above-described documents or on any other similar documents which need to be executed, recorded, or filed, and to do any and all things necessary in the name and on behalf of such Grantor in order to perfect, or continue the perfection of, Agent's security interests in and Lien on the Collateral. Each Grantor agrees that neither Agent, nor any of its designees or attorneys-in-fact, will be liable for any act of commission or omission, or for any error of judgment or mistake of fact or law with respect to the exercise of the power of attorney granted under this Section 2.1, other than as a result of its or their gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. THE POWER OF ATTORNEY GRANTED UNDER THIS SECTION 2.1 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL ALL OF THE SECURED OBLIGATIONS HAVE BEEN PAID IN FULL IN CASH (OTHER THAN INCHOATE INDEMNIFICATION OBLIGATIONS), THE NOTE PURCHASE AGREEMENT TERMINATED, AND ALL OF GRANTORS' DUTIES HEREUNDER AND THEREUNDER HAVE BEEN DISCHARGED IN FULL.

2.2    Without limiting the generality of the foregoing Section 2.1 or any of the provisions of the Note Purchase Agreement, promptly upon Agent's reasonable request, Grantors shall: (i) mark conspicuously Grantors' Books with a legend, in form and substance reasonably satisfactory to Agent, indicating that the Collateral is subject to the security interest granted hereby; (ii) mark all Chattel Paper with a conspicuous legend indicating Agent's security interest therein and otherwise in form and substance reasonably satisfactory to Agent; and (iii) appear in and defend any action or proceeding which may materially affect any Grantor's title to, or the security interest of Agent in, any of the Collateral.

2.3    With respect to the Negotiable Collateral (other than drafts and checks received in the ordinary course of business so long as no Event of Default is continuing), Grantors shall, promptly upon reasonable request by Agent, endorse (where appropriate) and assign the Negotiable Collateral over to Agent, and deliver to Agent actual physical possession of the Negotiable Collateral together with such undated powers, or other relevant document of transfer, endorsed in blank as shall be reasonably requested by Agent, all in form and substance reasonably satisfactory to Agent, in each case except to the extent the value thereof does not exceed $50,000, individually, or $100,000 in the aggregate.

2.4    Except in the case of locations or premises as to which the value of the tangible Collateral does not exceed $50,000, individually, or $100,000 in the aggregate, in the event that any tangible Collateral is in the possession of one or more third Person(s), or is located on any leased premises, Grantors shall use commercially reasonable efforts to promptly obtain a duly executed Collateral Access Agreement with respect to such location or premises;

2.5    Grantors shall promptly deliver to Agent (a) a duly executed control agreement in form and substance reasonably satisfactory to Agent with respect to all Deposit Accounts (other than Excluded Accounts) and (b) following its request therefor (x) electronic Chattel Paper (except to the extent the value thereof does not exceed $50,000, individually, or $100,000 in the aggregate), (y) Investment Property (only to the extent described in (i) of the definition thereof), and (z) Letter of Credit Rights (except to the extent the value thereof does not exceed $50,000, individually, or $100,000 in the aggregate).

EAST\186123408.6

2.6     Grantors shall promptly notify Agent of any Commercial Tort Claims in excess of $50,000, individually, or $100,000 in the aggregate, any of them may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of damages and such other information as Agent may reasonably request (including copies of any complaint or demand letter submitted by the applicable Grantor), and in connection therewith, at Agent's reasonable request, Grantors and Agent shall enter into an amendment to this Security Agreement granting to Agent, for the benefit of the Purchasers, a security interest and lien in and to each such Commercial Tort Claim and all proceeds thereof to secure the Secured Obligations.

3.      *Pledged Interests*.

3.1     Each Grantor shall cause 100% of the issued and outstanding Ownership Interests of each Subsidiary to be subject at all times to a first priority, perfected Lien in favor of Agent, for the benefit of the Purchasers, pursuant to the terms and conditions of this Security Agreement, subject only to Permitted Liens.  In furtherance of the foregoing, with respect to each direct or indirect Subsidiary of any Grantor formed or acquired after the Closing Date, the applicable Grantor shall execute and deliver to Agent a Pledged Interests Addendum pursuant to Section 5.10(a) hereof with respect to such Subsidiary, and any filings and deliveries reasonably necessary in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to Agent.  In addition, promptly upon Agent's reasonable request Grantors shall enter into such amendments to this Security Agreement as are reasonably requested by Agent to facilitate the pledge of Ownership Interests in Subsidiaries to the extent such Ownership Interests constitute Collateral.

3.2     Anything herein to the contrary notwithstanding, (i) each of the Grantors shall remain obligated under the contracts and agreements included in the Collateral, including, without limitation, the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (ii) the exercise by Agent of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (iii) to the extent allowed under applicable law, Agent shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Agent be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.  Until an Event of Default shall occur and be continuing, except as otherwise provided in this Security Agreement, the Note Purchase Agreement, or any other Note Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their business, subject to and upon the terms hereof and of the Note Purchase Agreement and the other Note Documents.  Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including, without limitation, all voting, consensual, and dividend or distribution rights (except as set forth in paragraph 3.3(b) below or the last sentence of Section 3.3 below), shall remain with the applicable Grantor until the occurrence of and during the continuation of an Event of Default pursuant to Section 8 hereof.

3.3     To the extent payment of the same is permitted under the Note Purchase Agreement, Grantors shall be entitled to receive and retain any and all dividends and/or distributions paid in respect of the Ownership Interests of the Pledged Companies; *provided*, *however*, that, except as expressly permitted under the Note Purchase Agreement and/or except as set forth in the last sentence of this Section 3.3, any and all:

(a)     Distributions paid or payable other than in cash in respect of, and any and all additional shares or instruments or other property received, receivable, or otherwise distributed in respect of, or in exchange for the Ownership Interests of the Pledged Companies;

(b)         Distributions paid or payable in cash in respect of any Ownership Interests of the Pledged Companies in connection with a partial or total liquidation or dissolution, merger, consolidation of any Pledged Company, or any exchange of stock, conveyance of assets, or similar corporate reorganization;

(c)         cash paid with respect to, payable, or otherwise distributed on redemption of, or in exchange for, any Ownership Interests of the Pledged Companies, and

(d)         after the occurrence and during the continuance of an Event of Default, and upon the election of Agent, all Distributions in respect of any Ownership Interests of the Pledged Companies (including cash dividends other than those described in subparagraphs (b) and (c) above),

shall be forthwith delivered to Agent to hold as Collateral and shall, if received by Grantors, be received in trust for the benefit of Agent, be segregated from the other property or funds of Grantors, and be forthwith delivered to Agent as Collateral in the same form as so received (with any necessary endorsement), and, if deemed necessary by Agent, Grantors shall take such actions, including the actions described in Section 5.10, as Agent may reasonably require.  Notwithstanding anything to the contrary contained herein or in any other Note Document, in no event shall the payment of Tax Distributions by any Grantor directly or indirectly to the applicable Owners be restricted by this Section 3.3 or any other provisions hereof or during any Default or Event of Default and in no event shall any Tax Distributions be required to be held in trust for Agent or be delivered to Agent.

4.         *Representations and Warranties*.  In order to induce Agent and the Purchasers to enter into the Note Purchase Agreement and to purchase the Notes, in addition to the representations and warranties of Grantors set forth in the other Note Documents which are incorporated herein by this reference, each Grantor represents and warrants to Agent and the Purchasers that on the Closing Date and thereafter on the date of any other extension of credit under the Note Purchase Agreement:

4.1         *Legal Name; State of Organization; Location of Chief Executive Office and Collateral; FEIN*.  Each Grantor's exact legal name, state of incorporation or formation, FEIN and charter or organizational identification number as of the Closing Date is accurately set forth in Section 4.1 of **Schedule 1**.  Each Grantor's chief executive office as of the Closing Date is located at the address set forth in Section 4.1 of **Schedule 1**, and all other locations where each Grantor maintains an office or tangible Collateral as of the Closing Date (other than (i) tangible Collateral with a value of not more than $50,000, individually, or $100,000 in the aggregate for all such locations, and (ii) Collateral in transit in the ordinary course of business or sent to a location in connection with the service and/or repair thereof) is kept are set forth in Section 4.1 of **Schedule 1**.

4.2         *Locations of Grantor's Books*.  As of the Closing Date, all locations where Grantors' Books are kept, including all equipment necessary for accessing Grantors' Books and the names and addresses of all service bureaus, computer or data processing companies and other Persons keeping Grantors' Books or collecting Rights to Payment for Grantors, are set forth in Section 4.2 of **Schedule 1**.

4.3         *Trade Names and Trade Styles*.  All trade names and trade styles under which Grantors presently conduct their business operations as of the Closing Date are set forth in Section 4.3 of **Schedule 1**, and, except as set forth in Section 4.3 of **Schedule 1**, no Grantor has, at any time during the five years preceding the date of this Security Agreement: (i) been known as or used any other corporate, trade or fictitious name; (ii) changed its name; (iii) been the surviving or resulting corporation in a merger or consolidation; or (iv) acquired through asset purchase or otherwise any business of any Person.

EAST\186123408.6

4.4     *Enforceability; Priority of Security Interest.*  (i) This Security Agreement creates a security interest which is enforceable against the Collateral in which any Grantor now has rights and will create a security interest which is enforceable against the Collateral in which any Grantor hereafter acquires rights at the time such Grantor acquires any such rights, and (ii) Agent has a perfected security interest (to the fullest extent perfection can be obtained by filing, notification to third Persons, possession or control) and a first priority security interest in the Collateral in which such Grantor now has rights (subject only to Permitted Liens), and will have a perfected and first priority security interest (to the fullest extent perfection can be obtained by filing, notification to third Persons, possession or control) in the Collateral in which such Grantor hereafter acquires rights at the time such Grantor acquires any such rights (subject only to Permitted Liens), in each case securing the payment and performance of the Secured Obligations.

4.5     *Other Financing Statements*. Other than financing statements in favor of Agent and financing statements filed in connection with Permitted Liens, to the Knowledge of Grantors, no effective financing statement naming any Grantor as debtor, assignor, grantor, mortgagor, pledgor or the like and covering all or any part of the Collateral is on file in any filing or recording office in any jurisdiction.

4.6     *Rights to Payment*.

(a)     To the knowledge of the Grantors, the Rights to Payment represent valid, binding and enforceable obligations of the Account Debtors or other Persons obligated thereon, except as enforceability may be limited by bankruptcy, insolvency, and similar laws and equitable principles affecting the enforcement of creditors' rights generally, representing undisputed, bona fide transactions completed in accordance with the terms and provisions contained in any documents related thereto, and are free from Liens (other than Permitted Liens);

(b)     to the knowledge of the Grantors, all Rights to Payment comply with all applicable laws concerning form, content and manner of preparation and execution, including where applicable any federal and state consumer credit laws;

(c)     no Grantor has assigned any of its rights under the Rights to Payment other than to Agent pursuant to this Security Agreement, pursuant to any Permitted Lien; and

(d)     to the knowledge of the Grantors, all statements made, all unpaid balances and all other information in Grantors' Books and other documentation relating to the Rights to Payment are true and correct in all material respects and what they purport to be.

4.7     *Inventory.*  Except as set forth in Section 4.1 of **Schedule 1** (other than (i) Inventory kept at locations not listed on Section 4.1 of **Schedule 1** with a value of not more than $50,000, individually, or $100,000 in the aggregate for all such locations, and (ii) Collateral in transit in the ordinary course of business or sent to a location in connection with the service and/or repair thereof), as of the Closing Date, no Inventory is stored with any bailee, warehouseman or similar Person or on any premises leased to any Grantor, nor has any Inventory been consigned to any Grantor or consigned by any Grantor to any Person or is held by such Grantor for any Person under any "bill and hold" or other arrangement.

4.8     *Intellectual Property.*  As of the Closing Date, (i) Section 4.8(a)(i) of **Schedule 1** provides a complete and correct list of all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any Grantor, and all other Copyrights owned by any Grantor and material to the conduct of the business of any Grantor; (ii) Section 4.8(a)(ii) of **Schedule 1** provides a complete and correct list of all Intellectual Property Licenses entered into by any Grantor pursuant to which (A) any Grantor has provided any license or other rights in Intellectual Property owned or controlled by

such Grantor to any other Person other than non-exclusive licenses granted in the ordinary course of business or (B) any Person has granted to any Grantor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Grantor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Grantor (other than any commercially available, click-through or shrink-wrap license); (iii) Section 4.8(a)(iii) of **Schedule 1** provides a complete and correct list of all Patents owned by any Grantor and all applications for Patents owned by any Grantor; and (iv) Section 4.8(a)(iv) of **Schedule 1** provides a complete and correct list of all registered Trademarks owned by any Grantor, all applications for registration of Trademarks owned by any Grantor, and all other Trademarks owned by any Grantor and material to the conduct of the business of any Grantor.

4.9 *Intentionally Omitted.*

4.10 *Deposit Accounts*. The names and addresses of all financial institutions at which each Grantor maintains its Deposit Accounts as of the Closing Date, and the account numbers and account names of such Deposit Accounts, are set forth in Section 4.10 of **Schedule 1**.

4.11 *Investment Property*. As of the Closing Date, all financial institutions or financial intermediaries holding or in possession of any Investment Property are set forth in Section 4.11 of **Schedule 1**. Each Grantor is and will at all times (except in the case of a Permitted Disposition) be the sole holder of record and the legal and beneficial owner, free and clear of all Liens other than Permitted Liens, of the Pledged Interests indicated on **Schedule 2** as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date. All of the Pledged Interests issued by Pledged Companies are duly authorized, validly issued, fully paid and (to the extent such concept is applicable) nonassessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Ownership Interests of the Pledged Companies of such Grantor identified on **Schedule 2** hereto as supplemented or modified by any Pledged Interests Addendum. Such Grantor has the right and requisite authority to pledge the Investment Property pledged by such Grantor to Agent as provided herein. All actions necessary under the UCC (to the extent the UCC is applicable) to perfect, establish the first priority of, or otherwise protect, Agent's Liens in the Investment Property, and the Proceeds thereof, have been or will, upon the reasonable request of Agent, be promptly and duly taken. Each Grantor has delivered to and deposited with Agent (or, with respect to any Pledged Interests created after the Closing Date, will deliver and deposit in accordance with Sections 3.1 and 5.10(a) hereof) all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers, or other relevant document of transfer, endorsed in blank with respect to such certificates.

4.12 *Commercial Tort Claims*. All of each Grantor's Commercial Tort Claims as of the Closing Date with a value in excess of $50,000, individually, or $100,000 in the aggregate, that it has brought against any Person, including the name and address of each defendant, a summary of the facts, and an estimate of such Grantor's damages, are set forth in Section 4.12 of **Schedule 1**.

5. *Covenants*. In addition to the covenants of Grantors set forth in the other Note Documents which are incorporated herein by this reference, each Grantor agrees that from the Closing Date and thereafter until the payment, performance and satisfaction in full, in cash, of the Secured Obligations (other than inchoate indemnification obligations), and all of Agent's and the Purchasers' commitments under the Note Purchase Agreement to Issuers have been terminated:

5.1 *Defense of Collateral*. Grantors shall appear in and defend any action, suit or proceeding which may affect its title to or right or interest in, or Agent's right or interest in (on behalf of the Purchasers), any Collateral, (i) if any Grantor has Knowledge of such an action, suit or proceeding,

unless such Collateral is immaterial to the operation of the Grantors, taken as a whole, or (ii) at the reasonable request of Agent.

5.2     *Compliance with Laws, Etc.*  Grantors shall comply with all laws, regulations and ordinances, and all policies of insurance, relating to the possession, operation, maintenance and control of the Collateral, to the extent that failure to comply could reasonably be expected to have a Material Adverse Effect.

5.3     *Location of Grantors' Books and Chief Executive Office.*  Grantors shall: (i) keep all Grantors' Books that are material at the locations set forth in Section 4.2 of **Schedule 1**; and (ii) maintain the location of each Grantor's chief executive office or principal place of business at the locations set forth in Section 4.1 of **Schedule 1**, without at least 10 days' prior written notice to Agent (or such shorter period as Agent may permit).

5.4     *Location of Collateral.*  Each Grantor shall keep the tangible Collateral only at the locations identified on Section 4.1 of **Schedule 1** or such other locations as to which the Grantors shall have provided at least 10 days' prior written notice (or such shorter period as Agent may permit) (other than (i) tangible Collateral with a value of not more than $50,000, individually, or $100,000 in the aggregate for all such locations, and (ii) Collateral in transit in the ordinary course of business or sent to a location in connection with the service and/or repair thereof).

5.5     *Change in Name.*  Each Grantor shall give Agent at least 10 days' prior written notice (or such shorter period as Agent may permit) of any change in such Grantor's legal name.

5.6     *State of Incorporation or Formation.*  No Grantor shall change the state of its incorporation or formation or its form of organization, without at least 10 days' prior written notice to Agent (or such shorter period as Agent may permit).

5.7     *Maintenance of Records.*  Grantors shall keep separate, accurate and complete Grantors' Books, disclosing Agent's security interest hereunder.

5.8     *Intellectual Property.*  Grantors shall, except to the extent otherwise permitted under the Note Purchase Agreement:

(a)     If any Grantor shall file an application for, register or acquire any Patents, Trademarks or Copyrights after the date hereof, it shall promptly (and in any event within 7 Business Days of such application, registration or acquisition (or such later date as Agent may permit)) execute and deliver to Agent one or more Copyright Security Agreements, Trademark Security Agreements, or Patent Security Agreements, as applicable, in order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office, which each Grantor hereby explicitly authorizes the Agent to make on its behalf;

(b)     not allow or suffer any registered Intellectual Property that is necessary in or material to the conduct of such Grantor's business to become abandoned, nor any registration thereof to be terminated, forfeited, expired or dedicated to the public;

(c)     diligently prosecute all applications for patents, copyrights and trademarks, and file and prosecute any and all continuations, continuations-in-part, applications for reissue, applications for certificate of correction and like matters as shall be reasonable and appropriate in accordance with prudent business practice, and promptly and timely pay any and all maintenance, license, registration and other fees, taxes and expenses incurred in connection with any Intellectual Property; and

7

(d)     take reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by such Grantor that are material to the business of such Grantor.

5.9     *Disposition of Collateral.* Grantors shall not surrender or lose possession of, sell, lease, rent, license, or otherwise dispose of or transfer any of the Collateral or any right or interest therein, except for Permitted Dispositions.

5.10     *Investment Related Property.*

(a)     If any Grantor shall receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly (and in any event within 7 Business Days of receipt thereof (or such later date as Agent may permit) deliver to Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests;

(b)     Except as otherwise permitted under the Note Purchase Agreement, and without in any way limiting the last sentence of Section 3.3, upon the occurrence and during the continuation of an Event of Default, all sums of money and property thereafter paid or distributed in respect of the Investment Property which are received by any Grantor shall be held by the Grantors in trust for the benefit of Agent segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Agent in the exact form received;

(c)     Each Grantor shall promptly deliver to Agent a copy of each material notice or other material written communication received by it in respect of any Pledged Interests that would reasonably be expected to be materially adverse to the interests of Agent in the Collateral on behalf of the Purchasers;

(d)     No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than as permitted by the Note Documents unless the same could not reasonably be expected to be materially adverse to the interests of Agent in the Collateral on behalf of the Purchasers;

(e)     Each Grantor agrees that it will cooperate with Agent's reasonable requests in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law in connection with Agent's Lien on the Investment Property or any sale or transfer thereof (provided, however, that in no event shall any Grantor be required to make any filings with the Securities and Exchange Commission or any other regulatory agency in connection therewith); and

(f)     As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby represents, warrants and covenants that the Pledged Interests issued pursuant to any such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not necessitate registration by such Grantor with the Investment Company Act of 1940, as amended, and (C) are not and will not be held by such Grantor in a Securities Account (unless such Securities Account subject to the "control" (as defined in the UCC) of Agent).  In addition, except as otherwise required by Agent, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provide or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction unless such Grantor advises Agent of same and delivers any certificated securities received by such Grantor.

5.11    *Deposit Accounts and Securities Accounts.*  No Grantor shall have any Deposit Account or Securities Account unless it promptly delivers to Agent a duly executed control agreement in form and substance reasonably satisfactory to Agent (other than Excluded Accounts).

6.    *Collection of Rights to Payment.*  Agent shall have the right at any time after the occurrence and during the continuance of an Event of Default (a) to notify the Account Debtors to make payments directly to Agent or a lockbox account as set forth in clause (c) of this Section 6, (b) to enforce Grantor's rights against the Account Debtors, and (c) to require that all payments made by Account Debtors be deposited directly into a lockbox account as Agent may specify, pursuant to a lockbox agreement in form and substance reasonably satisfactory to Agent, with a lockbox servicing agent acceptable to Agent.

7.    *Disposition of Pledged Interests by Agent.*  None of the Pledged Interests existing as of the date of this Security Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration.  Each Grantor understands that in connection with such disposition, Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market.  Each Grantor, therefore, agrees that:  (a) if Agent shall, pursuant to the terms of this Security Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that Agent has handled the disposition in a commercially reasonable manner.

8.    *Voting Rights.*

(a)    Upon the occurrence and during the continuation of an Event of Default, (i) Agent shall have the right to, in addition to all rights and remedies available to Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, and all other ownership or consensual rights in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Agent obligated by the terms of this Security Agreement to exercise such rights, and (ii) if Agent exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints Agent, such Grantor's true and lawful attorney-in-fact and irrevocable proxy to vote such Pledged Interests in any manner Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be.  The power-of-attorney granted hereby is coupled with an interest and shall be irrevocable until the Secured Obligations (other than inchoate indemnification obligations) have been paid in cash, in full, the obligations of Agent and the Purchasers under the Note Documents have been terminated, and this Security Agreement is terminated.

(b)    For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of Agent, vote or take any consensual action with respect to such Pledged Interests which would reasonably be expected to materially and adversely affect the rights of Agent or which could have the effect of materially impairing the value of the Pledged Interests or that would reasonably be expected to materially and adversely affect the rights and remedies of Agent under the Note Purchase Agreement, any other Note Document or any other instrument or agreement referred to therein.

9.     *Events of Default*.   The occurrence of any Event of Default under the Note Purchase Agreement shall constitute an event of default ("*Event of Default*") hereunder.

10.     *Rights and Remedies*.   During the continuance of an Event of Default, Agent may, without notice or demand, exercise any remedies of a secured creditor under the UCC or other applicable law; without in any way limiting the foregoing, Agent may do any one or more of the following during the continuance of an Event of Default, all of which are authorized by Grantors:

(a)     Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Agent considers advisable, and in such cases, Agent will credit the Secured Obligations with only the net amounts received by Agent in payment of such disputed Accounts after deducting all Expenses incurred or expended in connection therewith;

(b)     Cause Grantors to hold all returned Inventory in trust for Agent, segregate all returned Inventory from all other property of Grantors or in Grantors' possession and conspicuously label said returned Inventory as the property of Agent;

(c)     Without notice to or demand upon Grantors or any guarantor, make such payments and do such acts as Agent considers necessary or reasonable to protect its security interests in the Collateral.   Grantors agree to assemble the Collateral if Agent so requires, and to make the Collateral available to Agent as Agent may designate.   So far as Grantors can give authority therefor and only to the extent permitted by law, Grantors authorize Agent to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or Lien that in Agent's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith.   With respect to any of any Grantor's owned or leased premises, such Grantor hereby grants Agent, to the extent permitted by law and, in the case of leased premises, by the relevant landlord, a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Agent's rights or remedies provided herein, at law, in equity, or otherwise;

(d)     Without notice to Grantors (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation, set off and apply to the Secured Obligations any and all (i) balances and Deposit Accounts of any Grantor held by Agent (other than Excluded Accounts), or (ii) indebtedness at any time owing to or for the credit or the account of any Grantor held by Agent;

(e)     Hold, as cash collateral, any and all balances and Deposit Accounts (other than Excluded Accounts) of any Grantor held by Agent, to secure the full and final repayment of all of the Secured Obligations;

(f)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral.   Agent is hereby granted a non-exclusive, non-transferable, royalty-free, non-sublicensable license or other right to use, without charge, each Grantor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, URLs, domain names and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and each Grantor's rights under all licenses and all franchise agreements shall inure to Agent's benefit;

(g)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Grantor's premises) as Agent determines is commercially reasonable.   Agent shall have no obligation to

10

clean-up or otherwise prepare the Collateral for sale. It is not necessary that the Collateral be present at any such sale;

        (h)      Agent shall give notice of the disposition of the Collateral as follows:

        (i)      Agent shall give Grantors and each holder of a security interest in the Collateral who has filed with Agent a written request for notice, a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, then the time on or after which the private sale or other disposition is to be made;

        (ii)      The notice shall be personally delivered or mailed, postage prepaid, to Grantors as provided in Section 9.1 of the Note Purchase Agreement, at least 10 days before the date fixed for the sale, or at least 10 days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to Persons other than Grantors claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Agent;

        (iii)      If the sale is to be a public sale, Agent also shall give notice of the time and place by publishing a notice one time at least 10 days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

        (i)      Agent may credit bid and purchase at any public sale;

        (j)      Grantors agree that Agent shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Agent agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Agent may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Agent may apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Agent; and

        (k)      The following shall be the basis for any finder of fact's determination of the value of any Collateral which is the subject matter of a disposition giving rise to a calculation of any surplus or deficiency under Section 9615(f) of the UCC: (i) the Collateral which is the subject matter of the disposition shall be valued in an "as is" condition as of the date of the disposition, without any assumption or expectation that such Collateral will be repaired or improved in any manner; (ii) the valuation shall be based upon an assumption that the transferee of such Collateral desires a resale of the Collateral for cash promptly (but no later than 30 days) following the disposition; (iii) all reasonable closing costs customarily borne by the seller in commercial sales transactions relating to property similar to such Collateral shall be deducted including, without limitation, brokerage commissions, tax prorations, attorney's fees, whether in-house or outside counsel is used, and marketing costs; (iv) the value of the Collateral which is the subject matter of the disposition shall be further discounted to account for any estimated holding costs associated with maintaining such Collateral pending sale (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the value of such Collateral must be given by persons having at least 5 years' experience in appraising property similar to the Collateral and who have conducted and prepared a complete written appraisal of such Collateral taking into consideration the factors set forth above. The "value" of any such Collateral shall be a factor in determining the amount of proceeds which would have been realized in a disposition to a transferee other than a secured party, a person related to a secured party or a secondary obligor under Section 9615(f) of the UCC.

EAST\186123408.6

10.2    Agent shall have no obligation to attempt to satisfy the Secured Obligations by collecting them from any third Person which may be liable for them or any portion thereof, and Agent may release, modify or waive any collateral provided by any other Person as security for the Secured Obligations or any portion thereof, all without affecting Agent's rights against Grantors.  Each Grantor waives any right it may have to require Agent to pursue any third Person for any of the Secured Obligation.

10.3    Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and Agent's compliance therewith will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

10.4    Agent may sell the Collateral without giving any warranties as to the Collateral. Agent may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

10.5    If Agent sells any of the Collateral upon credit, Grantors will be credited only with payments actually made by the purchaser, received by Agent and applied to the indebtedness of the purchaser.  In the event that the purchaser fails to pay for the Collateral, Agent may resell the Collateral and Grantors will be credited with the proceeds of such sale.

10.6    Agent shall be under no obligation to marshal any assets in favor of Grantors, or against or in payment of the Secured Obligations or any other obligation owed to Agent by Grantors or any other Person.

10.7    Upon the exercise by Agent of any power, right, privilege, or remedy pursuant to this Security Agreement which requires any consent, approval, registration, qualification, or authorization of any Governmental Authority, each Grantor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Agent or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization, upon Agent's or such purchaser's reasonably request.

10.8    The rights and remedies of Agent and the Purchasers under this Security Agreement, the Note Purchase Agreement, the other Note Documents, and all other agreements contemplated hereby and thereby shall be cumulative. Agent and the Purchasers shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity.  No exercise by Agent or any Purchaser of any one right or remedy shall be deemed an election of remedies, and no waiver by Agent of any Purchaser of any default on Grantors' part shall be deemed a continuing waiver of any further defaults.  No delay by Agent or any Purchaser shall constitute a waiver, election or acquiescence with respect to any right or remedy.

10.9    All Proceeds of Collateral and any other amounts received by Agent as payment on the Secured Obligations following an Event of Default and exercise by Agent of its rights and remedies shall be applied as provided in Section 1.8(e)(ii) of the Note Purchase Agreement.

11.    *Agent Not Liable.*  So long as Agent complies with the obligations, if any, imposed by the UCC or other applicable law, Agent shall not otherwise be liable or responsible in any way or manner for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion or from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  Grantors bear the risk of loss or

damage of the Collateral. Notwithstanding the foregoing, Agent shall be liable to the extent of Agent's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.

12.    *Notices*.  All notices or demands by any party hereto to the other party and relating to this Security Agreement shall be made in the manner and to the addresses set forth in Section 9.1 of the Note Purchase Agreement, or the case of a Guarantor, in the manner and to the address for notices set forth in the applicable Guaranty.

13.    *General Provisions*.

(a)    *Successors and Assigns*.  This Security Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of Grantors and Agent; provided, however, that Grantors may not assign this Security Agreement nor delegate any of their duties hereunder without Agent's prior written consent and any prohibited assignment or delegation shall be absolutely void.  No consent by Agent to an assignment by Grantors shall release Grantors from the Secured Obligations. Agent reserves its right to sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in, the rights and benefits hereunder pursuant to and in accordance with the provisions of the Note Purchase Agreement.  In connection therewith, Agent may disclose all documents and information which Agent now or hereafter may have relating to Grantors, Grantor's business, or the Collateral to any such prospective or actual Transferee, subject to the terms of Section 9.5(e) and 9.6 of the Note Purchase Agreement.

(b)    *Exhibits and Schedules*.  All of the exhibits and schedules attached hereto shall be deemed incorporated by reference.

(c)    *No Presumption Against Any Party*.  Neither this Security Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Agent or Grantors, whether under any rule of construction or otherwise.  On the contrary, this Security Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

(d)    *Amendments and Waivers*.  Any provision of this Security Agreement or any of the Note Documents to which any Grantor is a party may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

(e)    *Counterparts; Integration; Effectiveness*.  This Security Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Security Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.  This Security Agreement shall become effective when executed by each of the parties hereto and delivered to Agent.

(f)    *Severability*.  The provisions of this Security Agreement are severable. The invalidity, in whole or in part, of any provision of this Security Agreement shall not affect the validity or enforceability of any other of its provisions.  If one or more provisions hereof shall be declared invalid or unenforceable, the remaining provisions shall remain in full force and effect and shall be construed in the broadest possible manner to effectuate the purposes hereof.

14.    *New Subsidiaries*.  Pursuant to Section 5.13 of the Note Purchase Agreement, any new direct or indirect Subsidiary (whether by acquisition or creation) of any Grantor is required to enter into this Security Agreement by executing and delivering in favor of Agent a joinder to this Security Agreement

EAST\186123408.6

in the form of **Annex 2**. Upon the execution and delivery of **Annex 2** by such new Subsidiary, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any instrument adding an additional Grantor as a party to this Security Agreement shall not require the consent of any Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor hereunder.

15.     *Patent, Trademark, Copyright Security Agreements.* The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Security Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Agent hereunder. In the event of any conflict between any provision in this Security Agreement and a provision in a Copyright Security Agreement, Trademark Security Agreement or Patent Security Agreement, such provision of this Security Agreement shall control.

16.     *Intentionally Omitted.*

17.     *Termination; Release of Security Interest.* Upon the payment, performance and satisfaction in full in cash of the Secured Obligations and the termination of all of Agent's and the Purchasers' obligations under the Note Purchase Agreement (other than inchoate indemnification obligations), the security interests created by this Security Agreement shall be terminated. Furthermore, any security interest granted hereby or pursuant to any other Note Document in any Collateral that is disposed of pursuant to a Permitted Disposition (other than to another Note Party) shall be automatically released (without affecting the security interest in Collateral that is not being disposed of) without the requirement for any action on the part of any Person. In each case Agent will, promptly (but, in any event, within two business days), (a) file appropriate UCC financing statement amendments to release of record any security interest to be released in accordance with the foregoing, (b) file appropriate documentation with the United States Patent and Trademark Office or other appropriate government agency to release of record any security interest in any Intellectual Property of any Grantor to be released in accordance with the foregoing, and (c) take such other actions as may be reasonably requested by Issuers to evidence the release of such security interests.

18.     *CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; CLASS ACTION WAIVER.*

(a)     THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS SECURITY AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS SECURITY AGREEMENT, EACH GRANTOR AND THE AGENT CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH GRANTOR AND THE AGENT IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS SECURITY AGREEMENT OR OTHER DOCUMENT RELATED HERETO. EACH GRANTOR AND THE AGENT WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

(c)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(d)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 18.

*   *   *

*[remainder of this page intentionally left blank]*

EAST\186123408.6

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first set forth above.

**Grantors:**

**SKALAR PHARMA HOLDING LLC**

By:_____
Name: Fernando Londoño Benveniste
Title: Authorized Representative

**SKALAR PHARMA LLC**

By:_____
Name: Fernando Londoño Benveniste
Title: Authorized Representative

**Agent:**

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
as the Agent

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its Managing Member


By:        _____
Name:   Michael H. Jones
Title:    Authorized Signatory

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first set forth above.

**Grantors:**                                    **SKALAR PHARMA HOLDING LLC**

By:_____
Name:_____
Title:_____

**SKALAR PHARMA LLC**

By:_____
Name:_____
Title:_____

**Agent:**                                     **CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
as the Agent

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its Managing Member

By: _____
Name:  Michael H. Jones
Title:   Authorized Signatory

Definitions and Construction

1.     Definitions.   The following terms, as used in this Security Agreement, shall have the following meanings:

"*Account Debtor*" means any Person who is or who may become obligated with respect to, or on account of, an Account, Chattel Paper or General Intangible.

"*Accounts*" means any and all of each Grantor's presently existing and hereafter arising accounts (as defined in the UCC).

"*Chattel Paper*" means all of each Grantor's presently existing and hereafter acquired or created chattel paper (as defined in the UCC).

"*Collateral*" means the following, collectively: any and all of the Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Instruments, Inventory, Investment Property, General Intangibles, Letter of Credit Rights, Negotiable Collateral, Supporting Obligations, Vehicles, Grantors' Books, in each case whether now existing or hereafter acquired or created, any money or other assets of any Grantor that now or hereafter come into the possession, custody, or control of Agent and any Proceeds or products of any of the foregoing, or any portion thereof. In no event shall the Collateral include, or Agent's Lien attach to, Excluded Assets.

"*Collateral Access Agreement*" means a landlord waiver, mortgagee waiver, bailee letter, or acknowledgement agreement of any warehouseman, processor, lessor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in the Equipment or Inventory, in each case, in form and substance reasonably satisfactory to Agent.

"*Commercial Tort Claims*" means all of each Grantor's presently existing and hereafter acquired or arising commercial tort claims (as defined in the UCC), including those listed in Section 4.12 of **Schedule 1** attached hereto.

"*Copyrights*" means any and all rights in any works of authorship, including (i) copyrights and moral rights, (ii) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Section 4.8(a)(i) of **Schedule 1**, (iii) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present, and future infringements thereof, and  (v) all of each Grantor's rights corresponding thereto throughout the world.

"*Copyright Security Agreement*" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of **Exhibit A**.

"*Deposit Account*" means all of each Grantor's presently existing and hereafter acquired or arising deposit accounts (as defined in the UCC).

"*Documents*" means all of each Grantor's presently existing and hereafter acquired or

arising documents (as defined in the UCC).

"*Equipment*" means any and all of each Grantor's presently existing and hereafter acquired equipment (as defined in the UCC), wherever located.

"*Expenses*" has the meaning of "*Expenses*" under the Note Purchase Agreement and shall also mean:  any and all reasonable and documented costs or expenses required to be paid by Grantors under this Security Agreement which are paid or advanced by Agent; all reasonable and documented costs and expenses of Agent, including its reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code), incurred or expended to correct any default or enforce any provision of this Security Agreement, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, irrespective of whether a sale is consummated; and all reasonable and documented costs and expenses of suit incurred or expended by Agent, including its reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) in enforcing or defending this Security Agreement, irrespective of whether suit is brought.

"*FEIN*" means Federal Employer Identification Number.

"*General Intangibles*" means any and all of each Grantor's presently existing and hereafter acquired or arising general intangibles (as defined in the UCC), and includes payment intangibles, contract rights, rights to payment, rights under swaps (including the right to receive payment on account of the termination (voluntarily or involuntarily) of any such swap), rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property, Intellectual Property Licenses, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, interests in a partnership or limited liability company which do not constitute a security under Article 8 of the UCC, and any other personal property other than Commercial Tort Claims, money, Accounts, Chattel Paper, Deposit Accounts, goods, Investment Related Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

"*Grantors*" and "*Grantor*" have the meanings assigned to such terms in the Preamble.

"*Grantors' Books*" means any and all presently existing and hereafter acquired or created books and records of Grantors, including all records (including maintenance and warranty records), ledgers, computer programs, disc or tape files, printouts, runs, and other computer prepared information indicating, summarizing, or evidencing the Collateral.

"*Instruments*" means any and all of each Grantor's presently existing and hereafter acquired or arising instruments (as defined in the UCC).

"*Intellectual Property*" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for

Annex 1
2

registration or registrations thereof.

"*Intellectual Property Licenses*" means, with respect to any Person (the "*Specified Party*"), (i) any licenses or other similar rights provided to the Specified Party in or with respect to Intellectual Property owned or controlled by any other Person, and (ii) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by the Specified Party, in each case, including (A) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (B) the license agreements listed on Section 4.8(a)(ii) of **Schedule 1**, and (C) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of Agent's rights under the Note Documents.

"*Inventory*" means any and all of each Grantor's presently existing and hereafter acquired inventory (as defined in the UCC).

"*Investment Property*" means any and all of each Grantor's presently existing and hereafter acquired (i) investment property (as defined in the UCC), and (ii) all of the following regardless of whether classified as investment property under the UCC:  all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

"*Letter of Credit Rights*" means any and all of each Grantor's presently existing and hereafter acquired letter of credit rights (as defined in the UCC).

"*Negotiable Collateral*" means any and all of each Grantor's presently existing and hereafter acquired or arising letters of credit, letter of credit rights, advises of credit, certificates of deposit, notes, drafts, money, Instruments, Documents and tangible Chattel Paper.

"*Note Purchase Agreement*" is defined in the Recitals.

"*Patents*" means patents and patent applications, including (i) the patents and patent applications listed on Section 4.8(a)(iii) of **Schedule 1**, (ii) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (iii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present, and future infringements thereof, and (v) all of each Grantor's rights corresponding thereto throughout the world.

"*Patent Security Agreement*" means each Patent Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of **Exhibit B**.

"*Pledged Companies*" means, each Person listed on **Schedule 2** hereto as a "Pledged Company," together with each other Person, all or a portion of whose Ownership Interests is acquired or otherwise owned by a Grantor after the Closing Date.

"*Pledged Interests*" means all of each Grantor's right, title and interest in and to all of the Ownership Interests now or hereafter owned by such Grantor, regardless of class or designation, including, without limitation, in each of the Pledged Companies, and all substitutions therefor and replacements

EAST\186123408.6

thereof, all Proceeds thereof and all rights relating thereto, including, without limitation, any certificates representing the Ownership Interests, the right to request after the occurrence and during the continuation of an Event of Default that such Ownership Interests be registered in the name of Agent or any of its nominees, the right to receive any certificates representing any of the Ownership Interests and the right to require that such certificates be delivered to Agent together with undated powers or assignments of investment securities with respect thereto, duly endorsed in blank by such Grantor, transfers, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and of all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

"*Pledged Interests Addendum*" means a Pledged Interests Addendum substantially in the form of **Exhibit C**.

"*Pledged Operating Agreements*" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of the Pledged Companies that are limited liability companies, if any.

"*Pledged Partnership Agreements*" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships, if any.

"*Proceeds*" means whatever is receivable or received from or upon the sale, lease, license, collection, use, exchange or other disposition, whether voluntary or involuntary, of any Collateral, including "proceeds" as defined in the UCC, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of any Grantor from time to time with respect to any of the Collateral, any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), any and all other amounts from time to time paid or payable under or in connection with any of the Collateral or for or on account of any damage or injury to or conversion of any Collateral by any Person, any and all other tangible or intangible property received upon the sale or disposition of Collateral, and all proceeds of proceeds.

"*Rights to Payment*" means all Accounts and any and all rights and claims to the payment or receipt of money or other forms of consideration of any kind in, to and under all electronic Chattel Paper, General Intangibles, Letter of Credit Rights, Negotiable Collateral and Proceeds thereof.

"*Secured Obligations*" means, collectively, (i) the "Obligations" as defined in the Note Purchase Agreement, (ii) the "Guaranteed Obligations" as defined in each Guaranty, and (iii) any and all debts, liabilities, obligations, or undertakings owing by Grantors (or any of them) to Agent arising under, advanced pursuant to, or evidenced by this Security Agreement, whether direct or indirect, absolute or contingent, matured or unmatured, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest not paid when due and all Expenses which Grantors are required to pay or reimburse pursuant to this Security Agreement, the Note Purchase Agreement, the other Note Documents or by law.

"*Security Agreement*" shall mean this Security Agreement, as amended or restated from time to time.

"*Supporting Obligations*" has the meaning given to such term in the UCC.

"*Trademarks*" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (i) the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Section 4.8(a)(iv) of **Schedule 1**, (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iv) the right to sue for past, present and future infringements and dilutions thereof, (v) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (vi) all of each Grantor's rights corresponding thereto throughout the world.

"*Trademark Security Agreement*" means each Trademark Security Agreement executed and delivered by Grantors, or any of them, and Agent, in substantially the form of **Exhibit D**.

"*URL*" means "uniform resource locator," an internet web address.

2.    Construction.  Unless the context of this Security Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the part includes the whole, "including" is not limiting, and "or" has the inclusive meaning represented by the phrase "and/or." References in this Security Agreement to "determination" by Agent include reasonable estimates (absent manifest error) by Agent (in the case of quantitative determinations) and reasonable beliefs (absent manifest error) by Agent (in the case of qualitative determinations). The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Security Agreement refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement. Article, section, subsection, exhibit, and schedule references are to this Security Agreement unless otherwise specified.

## ANNEX 2 TO SECURITY AGREEMENT

## FORM OF SUPPLEMENT

Supplement No. _____ (this "Supplement") dated as of _____, to the Security Agreement, dated as of November 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*") by each of the parties listed on the signature pages thereto and those additional entities that thereafter become parties thereto (collectively, "*Grantors*" and each individually "*Grantor*") and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers (as defined below).

### W I T N E S S E T H :

WHEREAS, SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("*Parent*"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "*Company*"), the other Issuers from time to time party thereto, one or more additional direct or indirect Subsidiaries of Parent which became party thereto by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers of the Notes named therein (the "*Purchasers*") and Agent entered into that certain Note Purchase Agreement, dated as of November 16, 2021 (as may be amended or restated from time to time, the "*Note Purchase Agreement*");

WHEREAS, Grantors have entered into the Security Agreement in order to induce Agent and the Purchasers to enter into the Note Purchase Agreement;

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement or, if not defined therein, the Note Purchase Agreement;

WHEREAS, pursuant to Section 5.13 of the Note Purchase Agreement, certain new Subsidiaries of Parent must execute and deliver certain Note Documents, including a joinder to the Security Agreement, and the execution of this Supplement by the undersigned new Grantor or Grantors (collectively, the "*New Grantors*") in favor of Agent satisfies such requirement with respect to the New Grantors; and

NOW, THEREFORE, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each New Grantor hereby agrees as follows:

1. In accordance with Section 14 of the Security Agreement, each New Grantor, by its signature below, becomes a "Grantor" under the Security Agreement with the same force and effect as if originally named therein as a "Grantor" and each New Grantor hereby (a) agrees to all of the terms and provisions of the Security Agreement applicable to it as a "Grantor" thereunder and (b) represents and warrants that the representations and warranties made by it as a "Grantor" thereunder are true and correct on and as of the date hereof. In furtherance of the foregoing, each New Grantor, as security for the payment and performance in full of the Secured Obligations, does hereby grant, assign, and pledge to Agent, for the benefit of the Purchasers, a security interest in and to all Collateral of such New Grantor to secure the full and prompt payment of the Secured Obligations. **Schedule 1** and **Schedule 2** hereto shall be deemed a supplement to **Schedule 1** and **Schedule 2** to the Security Agreement and shall be deemed a part thereof

for all purposes of the Security Agreement. Each reference to a "Grantor" in the Security Agreement shall be deemed to include each New Grantor. The Security Agreement is incorporated herein by reference.

2.      Each New Grantor represents and warrants to Agent that this Supplement has been duly executed and delivered by such New Grantor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws affecting creditors' rights generally and general principles of equity.

3.      This Supplement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument. Delivery of a counterpart hereof by facsimile transmission or by e-mail transmission shall be as effective as delivery of a manually executed counterpart hereof.

4.      Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

5.      This Supplement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the conflict of laws principles thereof.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, each Grantor has caused this Supplement to Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**"New Grantors"**

Address for notices:

[_____]
[_____]
[_____]
Attn:
Telephone:
Facsimile:

[_____]
a [_____]
By_____
Name:
Title:

Address for notices:

[_____]
[_____]
[_____]
Attn:
Telephone:
Facsimile:

[_____]
a [_____]
By_____
Name:
Title:

**"Agent"**
**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**, as the Agent

By: CORBEL DSOF GP LLC, its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC, its Managing Member

By: _____
Name:  Michael H. Jones
Title:  Authorized Signatory

EAST\186123408.6

**SCHEDULE 1**

Section 4.1 – Legal Name; State of Organization; Location of Chief Executive Office and Collateral; FEIN

| Grantor | State of Organization | FEIN | Organizational ID # | Locations |
|---|---|---|---|---|
| Skalar Pharma LLC | Puerto Rico | 66-0902281 | 411680 | State Road 53, Km. 82, Jobos Ward, Guayama, PR 00784 |
| Skalar Pharma Holding LLC | Puerto Rico | 66-0994298 | 476108 | State Road 53, Km. 82, Jobos Ward, Guayama, PR 00784 |

Section 4.2 – Location of Grantor's Books

| Grantor | Location of Books |
|---|---|
| Skalar Pharma LLC | State Road 53, Km. 82, Jobos Ward, Guayama, PR 00784 |
| Skalar Pharma Holding LLC | State Road 53, Km. 82, Jobos Ward, Guayama, PR 00784 |

Section 4.3 – Trade Names and Trade Styles

None.

Section 4.8(a)(i) – Copyrights Registrations and/or applications for registration of Copyrights

None.

Section 4.8(a)(ii) – Intellectual Property Licenses

None.

Section 4.8(a)(iii) – Patents and/or applications for Patents

None.

Section 4.8(a)(iv) – Trademarks

None.

EAST\186123408.6

Section 4.10 – Deposit Accounts

| Bank Account | Account Number | Contact Information | Name in which Held |
|---|---|---|---|
| Banco Popular de Puerto Rico | 030-244862 | Raquel Feliciano Beltrán | Skalar Pharma LLC |

Section 4.11 – Investment Property

| Subsidiary Name | Jurisdiction of Organization | Owner | Ownership % Held |
|---|---|---|---|
| Skalar Pharma LLC | Puerto Rico | Skalar Pharma Holding LLC | 100% |

Section 4.12 – Commercial Tort Claims

None.

EAST\186123408.6

## SCHEDULE 2

PLEDGED NOTE PARTIES

| Name of Pledgor | Name of Pledged Company | Number of Shares /Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
| Skalar Pharma Holding LLC | Skalar Pharma LLC | 60 | Class A Membership Interests | 100% | N/A |

Schedule 2

# COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (this "*Copyright Security Agreement*") is made this ___ day of _____, 20__, by and among the Grantors listed on the signature pages hereof (collectively, "*Grantors*" and each individually "*Grantor*"), and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers (as defined below).

## W I T N E S S E T H:

WHEREAS, SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("*Parent*"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "*Company*"), the other Issuers from time to time party thereto, one or more additional direct or indirect Subsidiaries of Parent which became party thereto by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers of the Notes named therein (the "*Purchasers*") and Agent entered into that certain Note Purchase Agreement, dated as of November 16, 2021 (as may be amended or restated from time to time, the "*Note Purchase Agreement*");

WHEREAS, Grantors have entered into that certain Security Agreement, dated as of November 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*") between the Grantors and Agent in order to induce Agent and the Purchasers to enter into the Note Purchase Agreement; and

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of the Purchasers, this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.      DEFINED TERMS.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Note Purchase Agreement.

2.      GRANT OF SECURITY INTEREST IN COPYRIGHT COLLATERAL.  Each Grantor hereby unconditionally grants, assigns and pledges to Agent, for the benefit of the Purchasers, to secure the Secured Obligations, a continuing security interest (referred to in this Copyright Security Agreement as the "*Security Interest*") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "*Copyright Collateral*"):

(a)      all of such Grantor's Copyrights and Copyright Intellectual Property Licenses to which it is a party including those referred to on Schedule I;

(b)      all renewals or extensions of the foregoing; and

(c)     all products and proceeds (as that term is defined in the UCC) of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Copyright or any Copyright exclusively licensed under any Intellectual Property License, including the right to receive damages, or the right to receive license fees, royalties, and other compensation under any Copyright Intellectual Property License.

Notwithstanding the foregoing, the Copyright Collateral shall not include any assets excluded from the definition of Collateral (as defined in the Note Purchase Agreement).

3.     SECURITY FOR SECURED OBLIGATIONS.  This Copyright Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Copyright Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.     SECURITY AGREEMENT.  The Security Interest granted pursuant to this Copyright Security Agreement is granted in conjunction with the security interests granted to Agent pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the Security Interest in the Copyright Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Copyright Security Agreement and the Security Agreement, the Security Agreement shall control.

5.     AUTHORIZATION TO SUPPLEMENT.  If any Grantor shall obtain rights to any new copyright application or registered copyright, the provisions of this Copyright Security Agreement shall automatically apply thereto. Grantors shall give notice in writing to Agent with respect to any such new copyright rights in accordance with the terms of the Security Agreement. Without limiting Grantors' obligations under this Section 5, Grantors hereby authorize Agent to unilaterally modify this Copyright Security Agreement by amending Schedule I to include any future United States registered copyrights or applications therefor of each Grantor, *provided, however,* that Agent shall provide notice and a copy thereof to the Grantors.  Notwithstanding the foregoing, no failure to so modify this Copyright Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.     GOVERNING LAW. This Copyright Security Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the conflict of laws principles thereof.

7.     COUNTERPARTS.  This Copyright Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Copyright Security Agreement.   Delivery of an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Copyright Security Agreement.  Any party delivering an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Copyright Security Agreement

but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Copyright Security Agreement.

[SIGNATURE PAGE FOLLOWS]

Exhibit A
Copyright Security Agreement
3

IN WITNESS WHEREOF, the parties hereto have caused this Copyright Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**

_____

By:_____
Name:_____
Title:_____


_____

By:_____
Name:_____
Title:_____


ACCEPTED AND ACKNOWLEDGED BY:

**AGENT:**

**CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**,
as the Agent

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its Managing Member

By: _____
    Name:  Michael H. Jones
    Title:   Authorized Signatory

**Copyright Registrations**

| Grantor | Country | Copyright | Registration No. | Registration Date |
|---------|---------|-----------|------------------|-------------------|
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |

**Copyright Licenses**

<u>**EXHIBIT B**</u>

**PATENT SECURITY AGREEMENT**

This PATENT SECURITY AGREEMENT (this "*Patent Security Agreement*") is made this ___ day of _____, 20__, by and among the Grantors listed on the signature pages hereof (collectively, "*Grantors*" and each individually "*Grantor*"), and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers (as defined below).

W I T N E S S E T H:

WHEREAS, SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("*Parent*"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "*Company*"), the other Issuers from time to time party thereto, one or more additional direct or indirect Subsidiaries of Parent which became party thereto by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers of the Notes named therein (the "*Purchasers*") and Agent entered into that certain Note Purchase Agreement, dated as of November 16, 2021 (as may be amended or restated from time to time, the "*Note Purchase Agreement*");

WHEREAS, Grantors have entered into that certain Security Agreement, dated as of November 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*") between the Grantors and Agent in order to induce Agent and the Purchasers to enter into the Note Purchase Agreement; and

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of the Purchasers, this Patent Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1. **DEFINED TERMS**. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Note Purchase Agreement.

2. **GRANT OF SECURITY INTEREST IN PATENT COLLATERAL**. Each Grantor hereby unconditionally grants, assigns and pledges to Agent, for the benefit of the Purchasers, to secure the Secured Obligations, a continuing security interest (referred to in this Patent Security Agreement as the "*Security Interest*") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "*Patent Collateral*"):

(a) all of its Patents and Patent Intellectual Property Licenses to which it is a party including those referred to on <u>Schedule I</u>;

(b)     all divisionals, continuations, continuations-in-part, reissues, reexaminations, or extensions of the foregoing; and

(c)     all products and proceeds (as that term is defined in the UCC) of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Patent or any Patent exclusively licensed under any Intellectual Property License, including the right to receive damages, or right to receive license fees, royalties, and other compensation under any Patent Intellectual Property License.

Notwithstanding the foregoing, the Patent Collateral shall not include any assets excluded from the definition of Collateral (as defined in the Note Purchase Agreement).

3.     **SECURITY FOR SECURED OBLIGATIONS**.  This Patent Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Patent Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.     **SECURITY AGREEMENT**.  The Security Interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interests granted to Agent pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the Security Interest in the Patent Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Patent Security Agreement and the Security Agreement, the Security Agreement shall control.

5.     **AUTHORIZATION TO SUPPLEMENT**.  If any Grantor shall obtain rights to any new patent application or issued patent or become entitled to the benefit of any patent application or patent for any divisional, continuation, continuation-in-part, reissue, or reexamination of any existing patent or patent application, the provisions of this Patent Security Agreement shall automatically apply thereto.  Grantors shall give notice in writing to Agent with respect to any such new patent rights in accordance with the terms of the Security Agreement.  Without limiting Grantors' obligations under this Section 5, Grantors hereby authorize Agent to unilaterally modify this Patent Security Agreement by amending Schedule I to include any such new patent rights of each Grantor, *provided, however,* that Agent shall provide notice and a copy thereof to the Grantors.  Notwithstanding the foregoing, no failure to so modify this Patent Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.     **GOVERNING LAW**. This Patent Security Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the conflict of laws principles thereof.

7.     **COUNTERPARTS**.  This Patent Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Patent Security Agreement.  Delivery of an executed counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Patent Security Agreement.  Any party delivering an executed

counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Patent Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Patent Security Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Patent Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:** _____

By: _____
Name: _____
Title: _____

_____

By: _____
Name: _____
Title: _____

ACCEPTED AND ACKNOWLEDGED BY:

**AGENT:**      **CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.,**
as the Agent

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL
MANAGEMENT, LLC,
its Managing Member

By: _____
        Name: Michael H. Jones
        Title: Authorized Signatory

Exhibit B
Patent Security Agreement
3

## SCHEDULE I
### to
## PATENT SECURITY AGREEMENT

### Patents

| Grantor | Country | Patent | Application/Patent No. | Filing Date |
|---------|---------|--------|------------------------|-------------|
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |
|         |         |        |                        |             |

### Patent Licenses

Schedule I to
Patent Security Agreement

# EXHIBIT C

## PLEDGED INTERESTS ADDENDUM

This Pledged Interests Addendum, dated as of _____ ___, 20___, is delivered pursuant to Section 5.10(a) of the Security Agreement referred to below. The undersigned hereby agrees that this Pledged Interests Addendum may be attached to that certain Security Agreement, dated as of November 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), made by the undersigned, together with the other Grantors named therein, to CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Security Agreement or, if not defined therein, the Note Purchase Agreement. The undersigned hereby agrees that the additional interests listed on this Pledged Interests Addendum as set forth below shall be and become part of the Pledged Interests pledged by the undersigned to Agent in the Security Agreement and any pledged company set forth on this Pledged Interests Addendum as set forth below shall be and become a "Pledged Company" under the Security Agreement, each with the same force and effect as if originally named therein.

The undersigned hereby certifies that the representations and warranties set forth in Section 4 of the Security Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof (to the extent applicable).

[_____]

By:_____
Name:
Title:

Exhibit C
Pledged Interests Addendum
1

EAST\186123408.6

| Name of Pledgor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Exhibit C
Pledged Interests Addendum
2

## TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (this "*Trademark Security Agreement*") is made this ___ day of _____, 20__, by and among the Grantors listed on the signature pages hereof (collectively, "*Grantors*" and each individually "*Grantor*"), and CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P., as administrative agent ("*Agent*") for the benefit of the Purchasers (as defined below).

W I T N E S S E T H:

WHEREAS, SKALAR PHARMA HOLDING LLC, a Puerto Rico limited liability company ("*Parent*"), SKALAR PHARMA LLC, a Puerto Rico limited liability company (the "*Company*"), the other Issuers from time to time party thereto, one or more additional direct or indirect Subsidiaries of Parent which became party thereto by executing an Addendum thereto (the Company, Parent, such other Issuers and such Subsidiaries are sometimes individually referred to herein as an "*Issuer*" and collectively referred to herein as the "*Issuers*"), the Purchasers of the Notes named therein (the "*Purchasers*") and Agent entered into that certain Note Purchase Agreement, dated as of November 16, 2021 (as may be amended or restated from time to time, the "*Note Purchase Agreement*");

WHEREAS, Grantors have entered into that certain Security Agreement, dated as of November 16, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*") between the Grantors and Agent in order to induce Agent and the Purchasers to enter into the Note Purchase Agreement; and

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of the Purchasers, this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1. **DEFINED TERMS**. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Note Purchase Agreement.

2. **GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL**. Each Grantor hereby unconditionally grants, assigns and pledges to Agent, for the benefit of the Purchasers, to secure the Secured Obligations, a continuing security interest (referred to in this Trademark Security Agreement as the "*Security Interest*") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "*Trademark Collateral*"):

(a) all of its Trademarks and Trademark Intellectual Property Licenses to which it is a party including those referred to on Schedule I;

(b)     all goodwill of the business connected with the use of, and symbolized by, each Trademark and each Trademark Intellectual Property License; and

(c)     all products and proceeds (as that term is defined in the UCC) of the foregoing, including any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademarks exclusively licensed under any Intellectual Property License, including right to receive any damages, (ii) injury to the goodwill associated with any Trademark, or (iii) right to receive license fees, royalties, and other compensation under any Trademark Intellectual Property License.

Notwithstanding the foregoing, the Trademark Collateral shall not include any assets excluded from the definition of Collateral (as defined in the Note Purchase Agreement).

3.     **SECURITY FOR SECURED OBLIGATIONS**.  This Trademark Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Trademark Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.     **SECURITY AGREEMENT**.  The Security Interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interests granted to Agent pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the Security Interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Trademark Security Agreement and the Security Agreement, the Security Agreement shall control.

5.     **AUTHORIZATION TO SUPPLEMENT**.  If any Grantor shall obtain rights to any new trademarks, the provisions of this Trademark Security Agreement shall automatically apply thereto. Grantors shall give notice in writing to Agent with respect to any such new trademarks in accordance with the terms of the Security Agreement.  Without limiting Grantors' obligations under this Section 5, Grantors hereby authorize Agent to unilaterally modify this Trademark Security Agreement by amending Schedule I to include any such new trademark rights of each Grantor, *provided, however,* that Agent shall provide notice and a copy thereof to the Grantors.  Notwithstanding the foregoing, no failure to so modify this Trademark Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.     **GOVERNING LAW**.  This Trademark Security Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the conflict of laws principles thereof.

7.     **COUNTERPARTS**.  This Trademark Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Trademark Security Agreement.  Delivery of an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Trademark Security Agreement. Any party delivering an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method

of transmission also shall deliver an original executed counterpart of this Trademark Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Trademark Security Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Trademark Security Agreement to be executed and delivered as of the day and year first above written.

GRANTORS: _____

By: _____
Name: _____
Title: _____

_____

By: _____
Name: _____
Title: _____

ACCEPTED AND ACKNOWLEDGED BY:

AGENT: **CORBEL DISTRESSED AND SPECIAL OPPORTUNITIES FUND, L.P.**, as the Agent

By: CORBEL DSOF GP LLC,
its general partner
By: CORBEL DSOF CAPITAL MANAGEMENT, LLC,
its Managing Member

By: _____
Name: Michael H. Jones
Title: Authorized Signatory

Exhibit D
Trademark Security Agreement
4

**SCHEDULE I**
to
**TRADEMARK SECURITY AGREEMENT**

**Trademark Registrations/Applications**

| Grantor | Country | Mark | Application/ Registration No. | Application/ Registration Date |
|---------|---------|------|-------------------------------|--------------------------------|
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |
|         |         |      |                               |                                |

**Trademark Licenses**

Schedule I to
Trademark Security Agreement